UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| NATIONAL WILDLIFE REFUGE ASSOCIATION, DRIFTLESS AREA LAND CONSERVANCY, WISCONSIN WILDLIFE FEDERATION, and DEFENDERS OF WILDLIFE | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No.3:21-cv-00306 |
| v. | ) ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, LIEUTENANT GENERAL SCOTT A. SPELLMON, Chief of Engineers and Commanding General, U.S. Army Corps of Engineers, COLONEL STEVEN SATTINGER, Commander and District Engineer, Rock Island District, U.S. Army Corps of Engineers, and COLONEL KARL JANSEN, Commander and District Engineer, St. Paul District, U.S. Army Corps of Engineers, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

---

## COMPLAINT

---

Plaintiffs NATIONAL WILDLIFE REFUGE ASSOCIATION, DRIFTLESS AREA LAND CONSERVANCY, WISCONSIN WILDLIFE FEDERATION, and DEFENDERS OF WILDLIFE for their Complaint allege and state as follows:

## <u>INTRODUCTION</u>

1.     This is a civil action for declaratory and injunctive relief under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, for the Defendants' violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et

seq., Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, and Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), and corresponding administrative rules. This suit also seeks declaratory and injunctive relief under the citizen suit provision of the ESA, 16 U.S.C. § 1540(g), for Defendants' violations of Section 7 of the ESA, 16 U.S.C. § 1536(a)(2).

2.      This lawsuit involves the proposed controversial 101-mile Cardinal-Hickory Creek ("CHC") high-voltage transmission line. The huge CHC transmission line is proposed to run on a wide path from Dubuque County, Iowa, directly through the protected Upper Mississippi River National Wildlife and Fish Refuge ("the Upper Mississippi Refuge"), across the Mississippi River, and then through southwest Wisconsin's scenic Driftless Area, before ending at a substation in Middleton, Wisconsin.

3.      If allowed to proceed, the CHC transmission line and its clear cut right-of-way will have significant negative impacts on protected "waters of the United States," both direct and indirect, as well as on wildlife, outdoor recreation, protected public lands, private conservation lands, family farms, and property values.

4.      The CHC transmission line cannot be constructed or operated unless and until defendant U.S. Army Corps of Engineers ("USACE"), by the defendant District Engineers for the Rock Island and St. Paul Districts of USACE, grant valid permits under Section 404 of the Clean Water Act., 33 U.S.C. § 1344, for "dredged and fill" material discharged into "waters of the United States," and a permit to cross the Mississippi River under Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403.

5.      Under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.,* no USACE permit for the CHC transmission line project can be valid unless and until preceded by an environmental impact statement ("EIS") that meets NEPA's requirements.

6.      On February 14, 2020, defendant USACE, along with the Rural Utilities Service of the U.S. Department of Agriculture ("RUS") and the U.S. Fish and Wildlife Service, published a notice in the *Federal Register* of the availability of a Record of Decision ("ROD") for the CHC transmission line project. 85 Fed. Reg. 8554 (Feb. 14, 2020). The ROD is attached and incorporated herein as Exhibit A.

7.      The ROD contained findings approving the environmental impact statement that had been prepared for the CHC transmission line.

8.      The ROD incorporated a USFWS Biological Opinion that the project would not jeopardize any endangered or threatened species or result in the destruction or adverse modification of critical habitat for any such species. *Id.,* Appendix E.

9.      The ROD also incorporated USACE Section 10 and Section 404 permits for the CHC project. USACE's Rock Island District, through its District Engineer, issued permits for the Iowa portion of the project and for the Mississippi River crossing, and USACE's St. Paul District, through its District Engineer issued permits for the Wisconsin portion. *Id.,* Appendix C, Parts 1–3.

10.      In both cases, USACE used so-called "general" permits—"Nationwide Permit 12" in Iowa, which had been reissued in 2017, and the St. Paul District's "Utility Regional General Permit" in Wisconsin, which had been reissued in 2018—that apply generally to "utility lines." ("the General Permits"). USACE did not go through its "individual" permitting process for the CHC transmission line or any part of it.

11.      Under Section 404(e) of the Clean Water Act, 33 U.S.C. § 1344(e), USACE may only use general permits, whether state, regional, or nationwide, to authorize categories of activities involving discharges of dredged and fill material if the activities in such categories "are

3

similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." *Id.,* § 1344(e)(1).

12.     USACE general permits are not valid unless preceded by environmental review that meets the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*

13.     USACE general permits are also not valid unless the agency complies with its obligation under the Endangered Species Act to consult on a project's impacts on listed species and their critical habitat. 16 U.S.C. § 1536(a). The agency must consult with either USFWS or the National Marine Fisheries Service, depending on which listed species or critical habitat may be impacted.

14.     The General Permits USACE used to approve the CHC transmission line project are not valid for three reasons:

(a) they were not preceded by an environmental impact statement ("EIS") that met the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.;

(b) they do not meet the substantive requirements of Section 404(e)(1) of the Clean Water Act, 33 U.S.C. § 1344(e)(1);

(c) they were not preceded by programmatic consultation with USFWS, as required by Section 7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2).

15.     The USACE's specific decisions to permit the CHC transmission line ("the CHC permits") are invalid as well for two additional reasons:

a. the environmental impact statement ("EIS") for the CHC transmission line, on which USACE was a "cooperating agency," does not meet the requirements of NEPA;

b. USACE did not make an independent or otherwise valid assessment of whether the CHC permits would have only minimal adverse environmental impacts, separately and cumulatively, whether there are less environmentally damaging practicable alternatives to the proposed project or projects,  and whether the CHC transmission line was in the public interest;

16.   Because of the violations described in paragraphs 15 and 16 of this Complaint, USACE's decisions relating to the CHC transmission line must be set aside under the APA as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).

17.   Because of the ESA violations described in paragraphs 6 and 7 of this Complaint, USACE's decisions to permit the CHC transmission line project should be enjoined under the citizen suit provisions in the ESA, 16 U.S.C. § 1540(g).

## JURISDICTION AND VENUE

18.   This court has federal question jurisdiction under 28 U.S.C. § 1331 because this action presents a controversy under federal laws including NEPA, the CWA, the ESA, and the APA. This court also has jurisdiction under 28 U.S.C. § 1346, because this is a civil action against the United States. This court has authority to grant the requested relief under the APA, 28 U.S.C. §§ 2201 (declaratory relief) and 2202 (injunctive relief), and under the citizen suit provisions in the ESA, 16 U.S.C. § 1540(g).

19.     Almost all of the CHC transmission line is proposed to be built in the Western District of Wisconsin, and therefore this is "a judicial district in which … a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated" within the meaning of 28 U.S.C. § 1391(e)(1).  There are also three related lawsuits involving the proposed CHC transmission line pending in the Western District of Wisconsin. *NWRA v. RUS*, No. 21-cv-00096-wmc; *Driftless Area Land Conservancy v. Huebsch*, 19-cv-01007-wmc; *Driftless Area Land Conservancy v. Huebsch*, 20-mc-0031-wmc. Plaintiffs Driftless Area Land Conservancy and Wisconsin Wildlife Federation also reside in this judicial district. Venue is therefore appropriate in this district under 28 U.S.C. § 1391.

20.     This action is timely under Title 41 of the FAST Act, 42 U.S.C. § 4370m-6(a)(1)(A) and under 28 U.S.C. § 2401.

## PARTIES

21.     Plaintiff National Wildlife Refuge Association ("NWRA") is a not-for-profit organization focused exclusively on protecting and promoting the 850 million-acre National Wildlife Refuge System, the world's largest network of lands and waters set aside for wildlife conservation. Founded in 1975, NWRA's mission is to conserve America's wildlife heritage for future generations through strategic programs that enhance the National Wildlife Refuge System and the landscapes beyond its boundaries. Friends of Pool 9 and Friends of the Refuge - Mississippi River Pools 7 & 8, two of the volunteer organizations which support the Upper Mississippi Refuge, are affiliates and supporters of the National Wildlife Refuge Association.

22.     NWRA has members who use and enjoy the Upper Mississippi Refuge, including both the Mississippi River and nearby wetland areas, and the extensive natural resources in

Wisconsin's Driftless Area. Those members will be injured in fact if the defendants allow the CHC transmission line project to be constructed and put into operation.

23.     Plaintiff Driftless Area Land Conservancy ("DALC") is a not-for-profit land trust and conservation organization, headquartered in Dodgeville, Wisconsin, which is dedicated to protecting sensitive lands, vital conservation areas, scenic landscapes, historic properties, and natural resources in Wisconsin's Driftless Area. DALC and its members maintain and enhance the health, diversity, and beauty of Wisconsin's natural and agricultural landscape through permanent land protection and restoration, and other conservation, natural resources protection, and preservation actions. DALC is a nationally certified land trust that was recognized as the Wisconsin Land Conservancy of the Year in 2017 by Gathering Waters, Wisconsin's Alliance for Land Trusts.

24.     Plaintiff DALC has many local members who live, work, play, and own real property near and in the proposed right-of-way for the proposed CHC transmission line, and who will be injured in fact if defendants allow the CHC transmission line to be constructed.  Plaintiff DALC has members who canoe or otherwise enjoy the Mississippi River and adjacent wetlands, and who are concerned about the adverse impact of erosion and sedimentation on those waters.

25.     Plaintiff DALC's members use and enjoy the Upper Mississippi Refuge and the extensive natural resources in Wisconsin's Driftless Area.

26.     Plaintiff DALC also owns conservation easements throughout the Driftless Area, including an easement on the historic Thomas Stone Barn property west of Barneveld, Wisconsin. The proposed CHC right-of-way would cross DALC's easement, which covers property on both the north and south sides of the road, interfere with that easement, and impair its ecological, aesthetic, and cultural value.

27.     Construction of the CHC transmission line would frustrate DALC's mission of conserving natural and historical lands in the Driftless Area and, in particular, its mission to conserve the lands on which it holds conservation easements.

28.     Plaintiff Wisconsin Wildlife Federation ("WWF") is a not-for-profit conservation organization dedicated to protecting wildlife habitat, conservation lands and waters, and natural resources throughout the State of Wisconsin on behalf of the hunters, anglers, trappers, and other individuals who are WWF members. WWF's members use and enjoy the Upper Mississippi Refuge and the extensive natural resources in Wisconsin's Driftless Area. The CHC transmission line and its direct and indirect impacts on protected waters and wetlands threaten to compromise the long-term sustainability of fish and wildlife populations, clean air, clean water, and healthy forests and grasslands, and thereby injure the WWF members who live, work, and play near the proposed route of the CHC transmission line.

29.     Plaintiff Defenders of Wildlife ("Defenders") is a not-for-profit membership organization that is one of the nation's leading advocates for threatened and endangered species and wildlife conservation. Founded in 1947, Defenders is headquartered in Washington D.C. and maintains six regional field offices throughout the country. Defenders is dedicated to the protection of all native wild animals and plants in their natural communities and the preservation of the habitats upon which they depend, including National Wildlife Refuges and protected wetlands. Defenders advocates for new approaches to wildlife conservation that will help keep species from becoming threatened and endangered, and Defenders employs education, litigation, research, and advocacy to defend wildlife and their habitat.

30.     Defenders has members who use and enjoy the Upper Mississippi Refuge, the Mississippi River, its adjacent wetlands, and the extensive natural resources in Wisconsin's

Driftless Area and who will be injured in fact if the CHC transmission line is constructed because of likely runoff, erosion, sedimentation, habitat destruction, and clearcutting. These environmental harms will negatively impact ecosystems that the members enjoy recreating in, and will negatively impact the wildlife and fish that members enjoy viewing and photographing.

31.     Defendant USACE is a unit of the U.S. Army in the Department of Defense, responsible for permitting under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403.

32.     Defendant Lieutenant General Scott A. Spellmon is the Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers and is sued in his official capacity.

33.     Defendant Colonel Steven Sattinger is USACE's Rock Island District commander and district engineer and is sued in his official capacity.

34.     Defendant Colonel Karl Jansen is the commander and district engineer for USACE's St. Paul District and is sued in his official capacity.

## THE CARDINAL HICKORY CREEK TRANSMISSION LINE

35.     Three companies—American Transmission Company LLC ("ATC"), ITC Midwest LLC ("ITC"), and Dairyland Power Cooperative ("Dairyland") (collectively, "the Developers")—plan to construct, co-own, and operate the proposed CHC transmission line.

36.     The CHC transmission line was first proposed more than a decade ago as part of a "multi-value project portfolio" of about 20 new high-voltage transmission lines proposed by the Midcontinent Independent System Operator ("MISO") in the Upper Midwest region. The CHC transmission line is the last of those lines to seek federal and state agency approvals.

37.     The proposed CHC transmission line would begin at the "Hickory Creek" substation in Dubuque County, Iowa, then run across and through the Upper Mississippi Refuge,

cross the Mississippi River, and then cut a wide swath through the scenic southwest Wisconsin Driftless Area's vital natural resources and communities, until reaching the "Cardinal" substation in Middleton, Wisconsin. The following map shows the proposed route:

[*remainder of page intentionally left blank*]



38.     The proposed route for the CHC transmission line will cross the Mississippi River, several rivers and streams, and dozens of protected wetlands. The CHC transmission line will also require clearance of hundreds of acres of uplands where stormwater runoff, erosion, and invasive species propagation will pose significant direct and indirect threats to protected waters.

39.     The proposed route for the CHC transmission line would cut directly through the Upper Mississippi Refuge and cross the Mississippi River, where its towers will be almost 20 stories high, as shown in the following map:



40.     The Upper Mississippi Refuge is comprised of wooded islands, marshes, and backwaters in Wisconsin, Iowa, Minnesota and Illinois, and provides a haven for a plethora of unique fish, wildlife, and plants.

41.     The Upper Mississippi Refuge is designated as a Wetland of International Importance pursuant to the treaty established at the Ramsar Convention on Wetlands of International Importance. https://www.fws.gov/midwest/UpperMissRamsar.htm. The designation of an area as a Ramsar site "embodies the government's commitment to take the steps necessary to ensure that its ecological character is maintained." https://www.ramsar.org/about/wetlands-of-international-importance-ramsar-sites. Ramsar sites "are recognized as being of significant value not only for the country or the countries in which they are located, but for humanity as a whole." *Id*.

42.     The Upper Mississippi Refuge is also designated as a Globally Important Bird Area.

43.     The Upper Mississippi Refuge protects important habitat and stop-over grounds for migratory birds.

44.     The Upper Mississippi Refuge is located within the Mississippi Flyway, a major bird migration route used by more than 325 migratory bird species to travel from their breeding grounds in Canada and the northern United States to their wintering grounds along the Gulf of Mexico and in Central and South America.

45.     Tracking data and in-person observations have shown that the federally endangered whooping crane, the tallest of North America's birds and one of the rarest, visited the Upper Mississippi Refuge in 2014 and again in 2017, in the precise area through which the transmission line would be built.

46.     The whooping cranes that used the Upper Mississippi Refuge are part of the Eastern Migratory population, which is the result of a major reintroduction effort by the Whooping Crane Eastern Partnership, made up of state and federal agencies, nonprofits, universities, and others. In January 2021, the Whooping Crane Eastern Partnership estimated the Eastern Migratory Population at only 80 cranes. Power lines are a major contributing factor to whooping crane mortalities. For example, one study determined that 17% of deaths in the migratory Wisconsin population of whooping cranes were caused by collisions with power lines. http://www.aplic.org/uploads/files/15518/Reducing_Avian_Collisions_2012watermarkLR.pdf at p. 33–34. The Eastern Migratory Population of whooping cranes migrates hundreds of miles each year.

47.     The CHC transmission line would pass over an Essential Habitat Area for the federally endangered Higgins eye pearlymussel where it crosses the Mississippi River at Cassville, Wisconsin.

48.     Erosion from clearing and filling the wetlands in the Upper Mississippi Refuge is very likely to lead to sedimentation in the Mississippi River both at the river crossing and downriver.

49.     Mussels, including the Higgins eye pearlymussel, are very sensitive to sedimentation, which can reduce the efficiency of their filter-feeding and even smother mussel beds. "Freshwater mussels are some of the most threatened animals in existence."[1] The Higgins eye pearlymussel can be found in discrete locations up and down the Mississippi River and in some tributaries.

---

[1] https://www.iowadnr.gov/About-DNR/DNR-News-Releases/ArticleID/807/4-Cool-Facts-You-Should-Know-About-Mussels.

50.     The Essential Habitat Area at Cassville has by far the greatest native mussel density of all the essential habitat areas for the Higgins eye pearlymussel.

51.     "Native freshwater mussels are a keystone species and are considered both ecosystem engineers, improving habitat for other species, and indicator species important in assessing the health of the ecosystem."[2] As filter-feeders, mussels filter out pollutants, silt, bacteria, and other impurities and improve water quality. Their shells provide a surface for algae and insect larvae to attach to, creating a place for fish to feed. Because mussels anchor themselves in place, they also help stabilize river bottoms. Mussels are also a food source for fish, aquatic birds, and even mammals like muskrats and otters.

52.     Once it crosses the Mississippi River, the CHC transmission line would then cut a wide swath through southwest Wisconsin's scenic Driftless Area, damaging vital natural resources and communities. Clearcutting of the right-of-way and construction and maintenance activities will negatively impact wetlands and waterways throughout the Driftless Area, including outside of the Refuge, due to removal of the tree canopy (which affects water temperatures and aquatic ecosystems), erosion, runoff, and sedimentation.

53.     Unlike much of the Midwest's landscape, the Driftless Area was not flattened by glaciers. The Driftless Area's scenic landscape includes hundreds of rolling hills with deep river valleys, and it contains many rare and unique woodland, prairie, and riparian habitats. The Driftless Area has more than 1,200 streams, including world-class trout fishing streams, more than 4,000 river miles, and a network of 600 spring-fed creeks that flow through porous limestone bedrock.

54.     According to George Meyer, the Executive Director of Plaintiff WWF and the former Secretary of the Wisconsin Department of Natural Resources: "Over the last eighty years,

---

[2] https://www.usgs.gov/centers/nwhc/science/native-freshwater-mussel-health?qt-science_center_objects=0#qt-science_center_objects.

conservatively, hundreds of thousands of dollars have been spent to restore and improve the streams of the Driftless Area such as Black Earth Creek. These restorations efforts were funded by federal, state and local governments, national, and state and local conservation groups, and these efforts included thousands upon thousands of donated volunteer hours."[3]

55.    The CHC transmission line would have multiple direct, indirect, and cumulative impacts on the natural ecosystems, species, ecological relationships, and environmental quality of fish and wildlife habitats, including protected waters, within and adjacent to the right-of-way, both through the Upper Mississippi Refuge and throughout the Driftless Area.

56.    The CHC transmission line would significantly interfere with existing land use and development plans in the Driftless Area where communities and the local economies depend on the health and vitality of the landscape, and outdoor recreational and tourism activities.

57.    The CHC transmission line would cut directly across the Mississippi Flyway, both within the Upper Mississippi Refuge and elsewhere in the Driftless Area.

58.    The CHC transmission line would increase the risk of bird strikes involving many bird species, including but not limited to bald eagles, whooping cranes, and migratory birds protected by the Migratory Bird Treaty Act of 1918, 16 U.S.C. §§ 703–712, which implemented the 1916 Migratory Bird Treaty or Convention between Canada and the United States.  Since 1918, the Migratory Bird Treaty Act has been expanded to implement treaties with Mexico (1936), Japan (1972), and Russia (1976).

59.    The protected Upper Mississippi Refuge is supposed to provide safe haven for migratory birds.

---

[3] https://apps.psc.wi.gov/ERF/ERFview/viewdoc.aspx?docid=370578 at 11.

60.     The CHC transmission line and its right-of-way would increase the risk of invasive species establishment and propagation, including the introduction of invasive species into the Upper Mississippi Refuge.

61.     The CHC transmission line and its right-of-way would result in habitat fragmentation to the detriment of many wildlife species, especially declining grassland bird species and forest interior species. These negative impacts on habitat and wildlife would occur along the length of the route, including within the protected Upper Mississippi Refuge.

62.     The CHC transmission line would have significant adverse effects on wetlands, both directly through construction in or near the wetlands, and indirectly through runoff and the propagation of invasive species along the right-of-way. This would include harmful effects on wetlands within the Upper Mississippi Refuge, which has been designated as a Wetland of International Importance.

63.     The CHC transmission line is not needed to meet anticipated electricity demand or to ensure the reliable supply of electricity in Wisconsin or any other nearby state.

64.     Upgrading existing electricity transmission and distribution lines, enhanced power line monitoring and power electronics, solar energy generation and energy storage systems on the "grid edge," demand management, and energy efficiency programs would be able to meet any transmission "need" alleged for the proposed CHC transmission, and do so at lower cost and with less environmental damage.

65.     The Developers would receive a 10.82% to 11.07% annual rate of return on their construction and financing costs for the proposed CHC transmission line.

66.     The Developers intend to charge utility ratepayers more than $2.2 billion over the 40-year expected life of the proposed CHC transmission line.

67.     Some of the negative environmental effects of the proposed CHC transmission line could also be avoided through alternative routes that do not cross the protected Upper Mississippi Refuge or the most vital conservation lands and other parts of southwest Wisconsin's scenic Driftless Area's natural resources.

## U.S. ARMY CORPS OF ENGINEERS PERMITS

68.     USACE granted dredge-and-fill permits for the CHC transmission line project under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and a permit to cross the Mississippi River under Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403.

69.     On the Iowa side, the Rock Island District of USACE verified that the project was eligible for "Nationwide Permit 12" ("NWP 12"),[4] a general permit for utility lines. Exhibit A, Record of Decision ("ROD"), Appendix C, part 1. Nationwide Permit 12, reissued in 2017, is attached and incorporated as Exhibit B.

70.     Nationwide Permit 12 authorizes "[a]ctivities required for the construction, maintenance, repair, and removal of utility lines and associated facilities in waters of the United States, provided the activity does not result in the loss of greater than ½-acre of waters of the United States for each single and complete project."  82 Fed. Reg. 1860, 1985 (Jan. 6, 2017). A "utility line" includes "any cable, line, or wire for the transmission for any purpose of electrical energy." *Id.*

71.     Nationwide Permit 12 defines a "single and complete project" not as a total project, but rather as "all crossings of a single water of the United States (*i.e.* a single waterbody) at a specific location."  *Id.* at 2007. In other words, "[f]or linear projects crossing a single or multiple

---

[4] USACE has since promulgated revised general permits that separate former NWP 12 into three separate general permits. *Reissuance and Modification of Nationwide Permits*, 86 Fed. Reg. 2,744 (Jan. 13, 2021). The effective date for these new permits was March 15, 2021.

waterbodies several times at separate and distant locations, each crossing is considered a single and complete project." *Id.*

72.     There are no limits in NWP 12 on the number of individual crossings, or on the total number of acres that can be affected by a single transmission line project. A single transmission line project could, for example, be divided into thousands of separate "single and complete projects" at each individual waterbody or wetland crossing.

73.     When USACE proposed to reissue NWP 12 in 2016, 81 Fed. Reg. 35,186, 35,188 (June 1, 2016), it invited comments. The U.S. Environmental Protection Agency (EPA) commented that it had "become increasingly concerned with the impacts resulting from multiple [general permit] verifications for individual linear utility line or transportation projects. This practice raises the likelihood that projects will result in greater than minimal cumulative effects, and should be reviewed through the individual permit process." EPA Comments to OMB on Draft Proposed 2017 NWPs, attached as Exhibit D, at 3.

74.     Defendant USACE did not take EPA's advice.

75.     On January 6, 2017, defendant USACE reissued NWP 12 without changes. USACE's "Decision Document" predicted that NWP 12 would be used to authorize up to 69,700 activities over five years and adversely impact 8,900 acres of jurisdictional waters. Exhibit C, Decision Document at 70. USACE acknowledged that NWP 12 would be applied to a "wide variety of environmental settings," *id.* at 42, and it was "difficult to predict" likely impacts. *Id.* Further, USACE admitted that "it is not possible to quantify the relative contributions of all the various activities that affect the quantity of wetlands, streams, and other aquatic resources and the functions and services they provide, because such data is not available on a national scale," *id.* at 52, but nevertheless concluded that cumulative effects would be "no more than minimal." *Id.*

76.     USACE also acknowledged that the activities authorized under NWP 12 would affect endangered and threatened species. *Id.* at 65.

77.     Nevertheless, USACE found that reissuance of NWP 12 would not significantly impact the environment. Its "finding of no significant impact" ("FONSI") was based on NWP 12's general conditions and mitigation measures, although it had no way of knowing what measures might be adopted in any particular case or whether they would be effective. 82 Fed. Reg. at 1891.

78.     On the Wisconsin side, the St. Paul District of USACE verified that the project was eligible for the St. Paul District's "Utility Regional General Permit" ("Utility RGP"), also a general permit for utility lines.  Exhibit A, ROD, Appendix C, parts 2 and 3. The Utility RGP that USACE used for the CHC transmission line project took effect on February 21, 2018, and is attached and incorporated as Exhibit E.

79.     According to its terms, the Utility RGP "may be used to authorize losses and temporary impacts in waters of the US necessary . . . for single and complete linear projects to construct, maintain, or repair utility lines, including foundations for overhead utility line towers, poles, and anchors," including "utility lines strung above, and routed in and under, Section 10 waters." Exhibit E, Utility RGP, § B.2.a. The Utility RGP may also be used for utility survey activities, substations, access roads, and remediation of inadvertent returns of drilling fluid related to installing utility lines.  *Id.* § B.2.b-e.

80.     As with NWP 12, a "single and complete linear project" under the Utility RGP is not the "overall project," but rather only "that portion of the overall linear project . . . that includes all crossings of a single water of the US (i.e., a single waterbody) at a specific location." Utility RGP at 13–14. Again, "[f]or linear projects crossing a single or multiple waterbodies several times

at separate and distant locations, each crossing is considered a single and complete project for purposes of this general permit authorization." *Id.*

81.     Defendant USACE renewed and readopted both NWP 12 and the Utility RGP in 2017 and 2018, respectively, without the environmental impact statement required by NEPA, and without consulting with USFWS as required by Section 7 of the Endangered Species Act ("ESA"). In *Northern Plains Resource Council v U.S. Army Corps of Engineers,* 454 F.Supp.3d 985, 996 (D. Mont. 2020), *amended* 460 F.Supp.3d 1030 (D. Mont. 2020), the district court vacated NWP 12 due to the USACE's failure to comply with the Endangered Species Act. The vacatur does not extend beyond the KeystoneXL crude oil pipeline that is the subject of that suit. That court has not yet ruled on whether the failure to prepare an EIS makes NWP 12 invalid under NEPA, or whether NWP 12 meets the requirements of the Clean Water Act.

82.     NWP 12 and the Utility RGP are both based on findings that "utility line" projects like the CHC transmission line will "cause only minimal adverse environmental effects." CWA § 404(e)(1), 33 U.S.C.  §1344(e)(1).

83.     Defendant USACE did not make an independent project-specific assessment of whether the CHC transmission line project or any part of it would cause more than minimal adverse environmental effects, either separately or cumulatively, whether there are less environmentally damaging practicable alternatives to the proposed project, or whether the proposed project is in the public interest.

84.     Defendant USACE did engage in a project-specific consultation with USFWS under Section 7 of the ESA, 16 U.S.C. § 1536, for the CHC transmission line project, and USFWS did issue a Biological Opinion finding no likely ESA violations. Exhibit A, ROD, Appendix E.

85.     Plaintiffs sent a 60-day notice of intent to sue USACE for violations of the ESA, which was served by registered mail on Defendant Spellmon and on Scott de la Vega, the Acting Secretary of the Department of the Interior, on or before February 22, 2021. The notice of intent to sue letter is attached and incorporated herein as Exhibit F.  Because the violations were not remedied within 60 days of the letter, Plaintiffs now file this Complaint against USACE seeking declaratory and injunctive relief for violations of NEPA, the ESA, and the CWA.

## COUNT ONE

**DEFENDANT USACE'S GENERAL PERMITS FOR UTILITY LINES—NATIONWIDE PERMIT 12 AND THE ST. PAUL DISTRICT'S UTILITY REGIONAL GENERAL PERMIT—ARE INVALID BECAUSE THEY WERE NOT PRECEDED BY AN ENVIRONMENTAL IMPACT STATEMENT THAT MET THE REQUIREMENTS OF NEPA.**

86.     Plaintiffs reallege each of the allegations in paragraphs 1 to 85 above.

87.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).[5] NEPA seeks to protect the environment by ensuring that federal agencies "make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c).

88.     NEPA requires agencies to take a "hard look" at the environmental consequences of their actions. For major federal actions with the potential for significant environmental impact, NEPA requires that the agencies first prepare an Environmental Impact Statement ("EIS").

89.     NEPA requires that an EIS must include a detailed discussion of: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between the local short-term uses of man's environment and the maintenance and

---

[5] This complaint cites the 2019 version of CEQ's NEPA regulations, which were in place at the time the environmental review for the CHC line was completed.

enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C).

90.     Defendant USACE's reissuance of NWP 12 and the St. Paul District's Utility RGP were "major federal actions" requiring compliance with NEPA. 42 U.S.C. § 4332.

91.     Defendant USACE's FONSI for NWP 12 was arbitrary and capricious, contrary to law, and an abuse of discretion under the APA. Defendant USACE did not apply the intensity factors used to determine significance in 40 C.F.R. § 1508.27(b), it acknowledged that adverse environmental effects might be significant, and it relied on mitigation that was speculative and might not be effective.  It did not take the required "hard look" at the significant direct, indirect, and cumulative adverse environmental effects of reissuance of NWP 12.

92.     Defendant's failure to conduct the required environmental review before issuing the St. Paul District's Utility RGP was also contrary to law, arbitrary and capricious, and an abuse of discretion under the APA.

## COUNT TWO

### DEFENDANT USACE'S GENERAL PERMITS FOR UTILITY LINES VIOLATE SECTION 404(E) OF THE CLEAN WATER ACT

93.      Plaintiffs reallege the allegations contained in paragraphs 1 to 92 above.

94.     Section 404(e)(1) of the Clean Water Act, 33 U.S.C. § 1344(e)(1), prohibits USACE from issuing general permits for categories of activities unless they "are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." *Id.*; 40 C.F.R. § 230.7.

95.     Both NWP 12 and the St. Paul District's Utility RGP unlawfully treat each individual water or wetland crossing on a linear utility project as a separate "single and complete

23

project," without limit on the number of crossings or the total number of acres of waters of the U.S. affected.

96.     USACE does not consider the cumulative effect of multiple crossings on a single overall project or in a single area under either NWP 12 or the St. Paul District's Utility RGP.

97.      USACE's reliance on mitigation measures to make its "minimal-effects" determinations for NWP 12 and the Utility RGP baselessly assumes that mitigation measures will actually be implemented and effective at individual sites.

98.     Consequently, Defendant USACE's minimal effects determinations for NWP 12 and the Utility RGP are arbitrary and capricious, in violation of Section 404(e) of the Clean Water Act, and an abuse of discretion under the APA.

## COUNT THREE

### DEFENDANT USACE'S GENERAL PERMITS FOR UTILITY LINES VIOLATE SECTION 7 OF THE ENDANGERED SPECIES ACT

99.      Plaintiffs reallege the allegations contained in paragraphs 1 through 98 above.

100.    Section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), requires each federal agency to ensure "that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by [USFWS] … to be critical."

101.    USACE and other federal agencies are required to initiate consultation with the USFWS if their actions "may affect" listed species or critical habitat.  *Id.,* 50 C.F.R. § 402.14.

102.    USACE did not initiate formal consultation with the USFWS before renewing NWP 12 in 2017, even though it acknowledged likely impacts on threatened and endangered species.

103.    On April 15, 2020, the United States District Court for the District of Montana concluded that USACE's failure to initiate formal consultation with USFWS under Section 7(a)(2) of the Endangered Species Act before renewing NWP 12 in 2017 was arbitrary and capricious. *Northern Plains Resource Council v. U.S. Army Corps of Engineers,* 454 F.Supp. 3d 985 (D. Mont. 2020).

104.    USACE's Rock Island District authorized dredge or fill activities under NWP 12 for the Iowa portion of the CHC transmission line project in a letter dated November 20, 2019. Exhibit A, Appendix C, Part 1.

105.    That decision by USACE was unlawful and was arbitrary and capricious because NWP 12 is itself unlawful.

106.    USACE's St. Paul District does not use NWP 12, but instead uses a "Utility Regional General Permit" for "utility line" activities. The current Utility Regional General Permit for the St. Paul District became effective on February 21, 2018.

107.    On information and belief, USACE's St. Paul District did not initiate formal consultation under Section 7(a)(2) of the Endangered Species Act before issuing the current version of the Utility Regional General Permit.

108.    That decision by USACE was unlawful and was arbitrary and capricious for the same reasons that the court in *Northern Plains Resource Council v. U.S. Army Corps of Engineers,* 454 F.Supp. 3d 985 (D. Mont. 2020), found NWP 12 to be unlawful and arbitrary and capricious.

109.    In two letters dated December 20, 2019, USACE's St. Paul District authorized dredge and fill activities under its Utility Regional General Permit for the Wisconsin side of the CHC transmission line project. Exhibit A, Appendix C, Parts 2–3.

110.    That Corps decision was unlawful, and was arbitrary and capricious, because the Utility Regional General Permit is itself unlawful and arbitrary and capricious.

## COUNT FOUR

**THE ENVIRONMENTAL IMPACT STATEMENT PREPARED FOR THE CHC TRANSMISSION LINE PROJECT DOES NOT MEET THE REQUIREMENTS OF NEPA**

111.    Plaintiffs reallege each of the allegations in paragraphs 1 to 110 above.

112.    NEPA requires that any environmental impact statement include a detailed assessment of reasonable possible alternatives to a proposed project. The Council on Environmental Quality ("CEQ") rules governing environmental review under NEPA emphasize that the alternatives analysis is the "heart of the environmental impact statement," 40 C.F.R. § 1502.14, and require agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives," including a "no action" alternative. *Id.* paras. (a), (d).

113.    An EIS must contain a statement of "purpose and need," which is required to "specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13.

114.    As explained in *Van Abbema v. Fornell*, 807 F.2d 633 (7th Cir. 1986), "the evaluation of 'alternatives' mandated by NEPA is to be an evaluation of alternative means to accomplish the general goal of an action; it is not an evaluation of the alternative means by which a particular applicant can reach his goals." *Id.* at 638.

115.    "No decision is more important than delimiting what these 'reasonable alternatives' are. That choice, and the ensuing analysis, forms 'the heart of the environmental impact statement.'" *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997) (quoting 40 C.F.R. § 1502.14).

26

116.    In *Simmons*, the court concluded "that the U.S. Army Corps of Engineers defined an impermissibly narrow purpose for the contemplated project. The Corps therefore failed to examine the full range of reasonable alternatives and vitiated the EIS." 120 F.3d at 667.

117.    As explained in *Simmons,* "[a]n agency cannot restrict its analysis to those 'alternative means by which a particular applicant can reach *his* goals.' *Van Abbema*, 807 F.2d at 638 (emphasis added); *contra*, [*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 198–99 (D.C. Cir. 1991)]. This is precisely what the Corps did in this case. The Corps has 'the duty under NEPA to exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project.' *Busey*, 938 F.2d at 209 (Buckley, J., dissenting)." 120 F.3d at 669.

118.    The court in *Simmons* further explained, "What other alternatives exist we do not know, because the Corps has not looked. . . . The public interest in the environment cannot be limited by private agreements." 120 F.3d at 670.

119.    An EIS must evaluate "[p]ossible conflicts between the proposed action and the objectives of Federal, regional, State, and local . . . land use plans, policies and controls for the area concerned." 40 C.F.R. § 1502.16(c). "Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law." 40 C.F.R. § 1506.2(d).

120.    An EIS must analyze cumulative impacts, 40 C.F.R. § 1508.25, defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7.

27

121.    NEPA requires that "[t]he information [in NEPA documents] must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b).

122.    Once an EIS is completed, federal agencies must make a formal finding that it meets all of the requirements of NEPA in a document called a Record of Decision ("ROD").

123.    The CEQ rules specifically require that agency RODs approving final EISs "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not.  A monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation." 40 C.F.R. § 1505.2.

124.    One of the developers of the CHC transmission line project—Dairyland Power Cooperative—has stated its plan to secure a loan from the Rural Utilities Service (RUS), part of the U.S. Department of Agriculture (USDA), to finance part of the CHC transmission line.

125.    Under the environmental review rules applicable to RUS, financial assistance for a project like the CHC transmission line project requires the preparation of an environmental impact statement. 7 C.F.R. pt. 1970.

126.    RUS was designated as the lead agency to prepare the environmental impact statement, and USFWS, Defendant USACE, and the U.S. Environmental Protection Agency ("USEPA") were cooperating agencies.

127.    For the proposed CHC transmission line, the transmission companies stated that a key element of the "purpose and need" of the project was to increase transfer capability between Iowa and Wisconsin.

128.    That constricted definition of the purpose and need limited the range of alternatives that were considered in the environmental review to be only high-voltage transmission lines running from Iowa to Wisconsin.

129.    The Defendants adopted the Developers' statement of the purpose and need for its EIS and ROD, and defined the purpose and need to require that any alternative "[i]ncrease the transfer capability of the electrical system between Iowa and Wisconsin."

130.    In doing so, Defendants precluded reasonable alternatives to the transmission line from being fully considered.

131.    The EIS did not evaluate whether or to what extent any of the needs identified by the transmission companies actually existed.

132.    For example, the EIS did not conduct its own need analysis in light of flat electricity demand in central and southwest Wisconsin.

133.    The EIS rejected a "no action" alternative on the grounds that it would not meet the stated purpose and need.

134.    The Developers and RUS, USFWS, and Defendant USACE did not make an assessment about what would likely actually happen if the proposed CHC transmission line project were not built, which is what a "no action" alternative is.

135.    The staff of the Public Service Commission of Wisconsin determined that if the proposed CHC transmission line was not built, targeted upgrades to the existing transmission system could achieve similar benefits.

136.    The EIS rejected "non-wires" alternatives, primarily on the grounds that they would not "increase the transfer capability of the electrical system between Iowa and Wisconsin," and that no single non-wires alternative would be sufficient.

29

137.     The EIS did not rigorously explore and objectively evaluate whether a package of non-wires alternatives would meet the general objectives of the CHC transmission line. Instead the EIS briefly considered and dismissed individual non-wires alternatives in isolation, ignoring the efficiency and synergy of combining individual technologies, like solar panels with battery storage.

138.     The EIS did not adequately assess the cumulative impacts of the proposed CHC transmission line in combination with all past, present and reasonably foreseeable transmission lines and other development projects that would create harmful environmental impacts in the Driftless Area and nearby areas.

139.     Much of the analysis in the EIS's cumulative impacts section is vague and provides only generalities rather than acknowledgment of specific cumulative impacts.

140.     The geographic and temporal scopes of the cumulative impacts analysis are improperly narrow.

141.     For example, the cumulative aesthetics impacts analysis is limited to a 2-mile area around the proposed huge transmission line, the public health and safety cumulative impacts analysis is limited to a 300-foot area, and the cumulative impacts analysis for the Refuge is limited to Pool 11 of the Refuge.

142.     Pool 11 is the area of the Mississippi River between Lock and Dam 10 and Lock and Dam 11, which encompasses only about 32 miles of the Mississippi River, while the Upper Mississippi Refuge covers about 261 miles of the Mississippi River.

143.     The temporal scope of the future impacts analysis is 60 years, which is the estimated life of the transmission line. The EIS does not address the fact that even if the line is

decommissioned in 60 years, habitat destruction and many other impacts will not disappear at that time.

144.   The EIS asserts that because past actions are now part of the "affected environment" described in other places in the EIS, it is appropriate to exclude all past actions from its cumulative impacts analysis.

145.   The EIS necessarily does not consider the cumulative impacts from past actions when it considers those past actions part of the baseline status quo.

146.   The Developers did not consider alternative routes that would not cross the Upper Mississippi Refuge or Wisconsin's Driftless Area.

147.   In early informal discussions involving the Developers, the Upper Mississippi Refuge manager advised the Developers that no new transmission line crossing of the protected National Wildlife and Fish Refuge would be considered unless the Developers could demonstrate that non-Refuge-crossing options were infeasible.

148.   The Developers completed an Alternative Crossings Analysis ("ACA"), which was released in April 2016.

149.   The Developers' ACA considered three crossings within the National Wildlife and Fish Refuge and four "non-refuge" crossings.

150.   These "non-refuge" crossings that the Developers identified were not actually located north or south of, or otherwise away from, the National Wildlife and Fish Refuge, but at existing "breaks" in the Upper Mississippi Refuge boundaries where locks and dams, bridges, or municipalities are located.

151.   The Developers' ACA rejected all of the non-refuge crossing routes as infeasible.

152.    RUS, USFWS, and Defendant USACE did not consider alternative routes that would have run north or south of the protected Upper Mississippi Refuge.

153.    The EIS did not consider alternative routes that would not cut a wide swath through the scenic Southwest Wisconsin Driftless Area's vital natural resources.

154.    The federal agencies began the NEPA process by publishing a notice of intent on October 18, 2016, to prepare an EIS, and to solicit public input on the appropriate scope of the EIS. The notice announced public scoping meetings, 81 Fed. Reg. 71,696 (Oct. 18, 2016), and the federal agencies later provided an opportunity for the public to submit written comments.

155.    Plaintiff DALC submitted scoping comments on January 6, 2017.

156.    Plaintiff DALC submitted supplemental scoping comments: on May 10, 2017, suggesting that the federal agencies defer their environmental review until after the Public Service Commission of Wisconsin determined the need for the CHC transmission line; on May 11, 2017, requesting evaluation of the CHC transmission line's impact on the Ice Age National Scenic Trail; and on August 11, 2017, expressing concern that the scoping report issued on May 17, 2017, did not commit the federal agencies to evaluating "non-wires" alternatives to the CHC project.

157.    The USEPA submitted scoping comments on January 6, 2017, in which it stated that: "[T]he development of the study area and alternative crossing locations, focusing solely on existing crossing locations, is too narrow. The scoping materials exclude evaluation of new Mississippi River crossings that would occur outside the [Upper Mississippi River National Wildlife and Fish] Refuge…. [T]he use of an existing corridor in this project will likely adversely impact the Refuge."

158.    The USEPA then stated: "EPA recommends the Draft EIS present and evaluate one or more alternative(s) outside Refuge lands. The selection of only two Refuge alternatives carried

32

forward for further evaluation leaves USDA and the Applicant vulnerable to permit denial by USFWS and an ultimate decision of no action by USDA. EPA believes one or more non-Refuge alternatives is needed in order to compare and contrast impacts that would occur within and outside of the Refuge."

159.    The federal agencies published notice of the draft EIS on December 7, 2018. 83 Fed. Reg. 63,149.

160.    The federal agencies allowed written comments on the draft EIS until April 1, 2019, and held public meetings.

161.    Plaintiffs DALC and WWF submitted written comments on April 1, 2019. The Plaintiffs' comments challenged the Defendants' draft EIS for having an impermissibly narrow Purpose and Need statement, for limiting the range of alternatives to only include consideration of high-voltage transmission lines running between eastern Iowa and southwestern Wisconsin, and for precluding consideration of non-wires alternatives or routes that would have avoided running through the protected Upper Mississippi Refuge and the Driftless Area's scenic natural landscape.

162.    Plaintiffs DALC's and WWF's comments also challenged the Defendants' draft EIS for failing to evaluate reasonable alternatives in detail.

163.    Plaintiffs DALC's and WWF's comments also challenged the Defendants' failures to independently consider the purpose and need and alternatives instead of relying entirely on reports prepared by the Developers, which predetermined the outcome.

164.    Plaintiffs DALC's and WWF's comments also challenged and pointed to specific places and ways in which the Defendants' environmental impact analysis was inadequate, where the draft EIS inappropriately relied on undescribed or poorly described and unenforceable

mitigation measures to reduce the environmental impacts, and the lack of meaningful analysis of greenhouse gas emissions and potential climate impacts in the draft EIS.

165.    The federal agencies made minor changes in the final EIS, but did not adequately address issues the Plaintiffs DALC and WWF raised in their scoping comments and in their comments on the draft EIS.

166.    The federal agencies published the final EIS on October 23, 2019. 84 Fed. Reg. 56,756.

167.    Plaintiffs DALC and WWF again submitted written comments on the final EIS on November 25, 2019.

168.    On January 16, 2020, RUS issued a ROD, with RUS, USACE, and USFWS as signatories, concluding that the final EIS met NEPA's requirements, and identifying the transmission companies' preferred alternative route as the federal agencies' preferred route, even though the federal agencies acknowledged that this was not the environmentally preferable alternative.

169.    The ROD is attached and incorporated herein as Exhibit A.

170.    Defendants' conclusion in the ROD that the final EIS was "adequate" under NEPA was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA, 5 U.S.C. § 706, and violates NEPA, 42 U.S.C. § 4321, et seq., for several reasons:

(a)  The final EIS erroneously adopts the Developers' impermissibly narrow statement of the Purpose and Need for the proposed CHC transmission line project, which improperly presumed that there was a "need" for the project and precluded the full consideration of reasonable alternatives;

(b)  The final EIS did not fully or fairly consider alternatives to the proposed high-voltage transmission line such as "non-wires" alternatives or upgrading existing transmission and distribution lines;

(c)  The final EIS did not consider alternative routes that would avoid the Upper Mississippi Refuge or the Southwest Wisconsin Driftless Area;

(d)  The final EIS did not adequately describe or analyze impacts of the proposed CHC transmission line, including impacts on birds and other wildlife, streams and wetlands, and other resources;

(e)  The final EIS did not evaluate conflicts between the CHC transmission line and local land use plans and policies;

(f)  The final EIS did not adequately describe or reasonably analyze cumulative impacts of the proposed CHC transmission line combined with all other transmission projects and other development projects in the past, present and reasonably foreseeable future;

(g)  The final EIS did not adequately analyze the additional greenhouse gas emissions and potential climate impacts attributable to the CHC transmission line's construction and fossil-fuel generated electricity it would carry; and

(h)  The final EIS relied on superficial and unenforceable descriptions of potential mitigation or remediation measures, assumed they would all be successful, and thereby understated the adverse environmental impacts of the proposed CHC transmission line.

182. Defendant USACE's decision to approve the EIS prepared for the CHC transmission line project was therefore contrary to law, arbitrary and capricious, and an abuse of discretion under the APA.

## COUNT FIVE

### DEFENDANT USACE'S GENERAL UTILITY LINE PERMIT VERIFICATIONS FOR THE CHC TRANSMISSION LINE PROJECT VIOLATED SECTION 404 OF THE CLEAN WATER ACT AND APPLICABLE REGULATIONS

183. Plaintiffs reallege the allegations contained in paragraphs 1 through 182 above.

184. Section 404 of the Clean Water Act, 33 U.S.C. § 1344, requires that projects, including the proposed CHC transmission line, receive permits from USACE to discharge dredged and fill materials into waters of the United States, including wetlands.

185. All Section 404 permits are governed by what USACE refers to as the "404(b)(1) Guidelines," promulgated by the EPA. *See* 33 U.S.C. 1344(b)(1); 40 C.F.R. pt. 230.

186. Section 230.10(a) of the 404(b)(1) Guidelines, 40 C.F.R. § 230.10(a), provides that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."

187. Section 230.10(a) further provides that "[w]here the activity associated with a discharge which is proposed for a special aquatic site… does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e. is not 'water dependent'), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3).

188. For purposes of Section 230.10(a), "special aquatic sites" include "[s]anctuaries and refuges," which are "areas designated under State and Federal laws or local ordinances to be

36

managed principally for the preservation and use of fish and wildlife resources." 40 C.F.R. § 230.40(a).

189.    The Upper Mississippi River National Wildlife and Fish Refuge is therefore a "special aquatic site" for purposes of Section 230.10(a).

190.    The CHC transmission line "does not require access or proximity to or siting within" the Upper Mississippi River National Wildlife and Fish Refuge "to fulfill its basic purpose."  40 C.F.R. § 230.10(a)(3).

191.    Therefore, "practicable alternatives" to routing the proposed CHC transmission line through the Upper Mississippi River National Wildlife and Fish Refuge are "presumed to be available."  USACE has not "clearly demonstrated otherwise."  40 C.F.R. § 230.10(a)(3).

192.    USACE has not demonstrated that the proposed CHC transmission line, its route through the Upper Mississippi River National Wildlife and Fish Refuge and Wisconsin's Driftless Area, or any of the waterbody crossings along its route, are the least environmentally damaging practicable alternative to fulfill the project's basic purpose.  40 C.F.R. § 230.10.

193.    USACE's position that off-site alternatives need not be considered for activities authorized by general permits is contrary to law.

194.    In addition, defendant USACE's rules and its general permits prohibit the use of general permits for an activity if it "will result in more than minimal individual or cumulative adverse environmental effects." Utility RGP, § K.

195.    When making those required project-specific minimal adverse environmental effects determinations, USACE must consider "site specific factors," including "the environmental setting," the functions provided by the affected aquatic resources, the degree or magnitude to which the aquatic resources perform those functions, the extent that aquatic resource functions will be

lost, the duration of the adverse effects (temporary or permanent), the importance of the aquatic resource functions to the region (e.g. watershed or ecoregion), and mitigation required by the Corps. *Id.*

196.    In addition, 33 C.F.R. § 325 Appendix B provides that USACE assessment of adverse environmental impacts of regulated activities for purposes of NEPA review must extend beyond USACE's regulatory jurisdiction when the regulated activities are "merely one component of a larger project." In those circumstances, USACE must determine whether overall federal "control and responsibility" is "sufficient to turn an essentially private action into a Federal action." *Id.,* b.(2).

197.    Typical factors to be considered in determining whether there is sufficient federal control and responsibility include:

(i)      Whether or not the regulated activity comprises "merely a link" in a corridor type project (e.g. a transportation or utility transmission project).

(ii)     Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity.

(iii)    The extent to which the entire project will be within Corps jurisdiction.

(iv)     The extent of cumulative Federal control and responsibility.

*Id.*

198.    Cumulative federal control and responsibility expands the scope of the federal action USACE must consider when other federal agencies are involved in the overall project, under statutes like the Endangered Species Act, 16 U.S.C. § 1531 *et seq.,* the National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. §§ 668dd-668ee, or environmental review laws.

38

199.     Defendant USACE did not conduct any independent analysis of whether the CHC transmission line project, or any part of it, would have more than minimal adverse environmental impacts.

200.     The rules also require USACE to conduct a "public interest review" before issuing any permit. 33 C.F.R. § 320.4(a). Permits may not be granted if they "would be contrary to the public interest." *Id.*

201.     Section 320.4(a)(1) requires that:

The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest.  Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case.  The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments.  The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process.  That decision should reflect the national concern for both protection and utilization of important resources.  All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, consideration of property ownership and, in general, the needs and welfare of the people.

33 C.F.R. § 320.4(a)(1).

202.     Section 320.4(a)(2) further provides that, for every USACE permit application, the following general criteria must be considered:

(i)     The relative extent of the public and private need for the proposed structure or work;

(ii)     Where there are unresolved conflicts as to resource use, the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work; and

(iii)    The extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work is likely to have on the public and private uses to which the area is suited.

33 C.F.R. § 320.4(a)(2).

203.    Section 320.4(b) emphasizes that "the unnecessary alteration or destruction" of wetlands "should be discouraged as contrary to the public interest," especially wetlands set aside as "sanctuaries or refuges." 33 C.F.R. § 320.4(b).

204.    Section 320.4 further requires USACE, when considering whether to grant a permit, to try to prevent the "direct and indirect loss and damage" of fish and wildlife resources, § 320.4(c), to avoid adverse effects on water quality, § 320.4(d), to preserve historic, cultural, scenic, and recreational values, § 320.4(e), to consider private property rights, § 320.4(g), to avoid degradation of floodplains, § 320.4(l), and to evaluate whether there is a genuine "need for the project from the perspective of the overall public interest." § 320.4(q).

205.    Defendant USACE conducted no independent "public interest review" of the CHC transmission line project or any part of it, nor did the federal EIS include a public interest review.

206.    Since defendant USACE did not consider whether the applicants had overcome the presumption that less environmentally damaging practicable alternatives were available for the CHC transmission line project or any part of it, did not make an independent analysis of whether the project would have more than minimal adverse environmental impacts, and did not conduct an independent public interest review, defendants' decisions to grant permits for the CHC

transmission line project and its waterbody crossings violated the requirements of the Clean Water Act and applicable regulations.

207.    Consequently, defendant USACE's permit decisions were contrary to law, arbitrary and capricious, and an abuse of discretion under the APA.

## **REQUESTED RELIEF**

WHEREFORE Plaintiffs respectfully request that this Court issue an Order granting the following relief:

1.    Declare that Defendant USACE's Record of Decision approving and making a finding of adequacy of the final EIS for the proposed CHC transmission line violated NEPA in multiple respects and, therefore, was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA;

2.    Declare that Defendant USACE's decision to renew Nationwide Permit 12 in 2017 was "arbitrary and capricious, an abuse of discretion, and contrary to the law" under the APA and violated the ESA;

3.    Declare that Defendant USACE's St. Paul District's decision to renew the Utility Regional General Permit in 2018 was "arbitrary and capricious, an abuse of discretion, and contrary to the law" under the APA and violated the ESA;

4.    Declare that Defendant USACE's Rock Island District's decision to use NWP 12 to authorize the dredge or fill activities of the Iowa portion of the CHC transmission line project, and USACE's St. Paul District's decision to use the Utility Regional General Permit to authorize the dredge or fill activities of the Wisconsin portion of the CHC transmission line project were "arbitrary and capricious, an abuse of discretion, and contrary to the law" under the APA;

5.      Vacate USACE's NWP 12 and USACE's St. Paul District's Utility Regional General Permit;

6.      Vacate USACE's Rock Island District's decision to apply NWP 12 to the Iowa portion of the proposed CHC transmission line project;

7.      Vacate USACE's St. Paul District's decision to apply its Utility Regional General Permit to the Wisconsin portion of the proposed CHC transmission line project;

8.      Enjoin Defendant USACE from providing any approvals for the proposed CHC transmission line unless and until a final EIS is prepared and approved that fully complies with all NEPA requirements;

9.      Award Plaintiffs' attorney fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and other applicable laws; and

10.     Grant such further relief as may be just, equitable and appropriate.

Dated: May 05, 2021

Respectfully submitted,

*/s/  Electronically signed by Howard A. Learner*
Howard A. Learner
Scott Strand
Rachel L. Granneman
Ann Jaworski
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
HLearner@elpc.org
SStrand@elpc.org
RGranneman@elpc.org
AJaworski@elpc.org

*Counsel for Plaintiffs National Wildlife Refuge
Association, Driftless Area Land Conservancy,
Wisconsin Wildlife Federation, and Defenders
of Wildlife*