IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

NATIONAL WILDLIFE REFUGE ASSOCIATION, et al.,

        Plaintiffs,

    v.

RURAL UTILITIES SERVICE, et al.,

        Federal Defendants,

AMERICAN TRANSMISSION COMPANY, LLC, et al.,

        Intervenor-Defendants.

Case No. 3:21-cv-00096-wmc
(lead)

---

NATIONAL WILDLIFE REFUGE ASSOCIATION, et al.,

        Plaintiffs,

    v.

U.S. ARMY CORPS OF ENGINEERS, et al.,

        Federal Defendants,

AMERICAN TRANSMISSION COMPANY, LLC, et al.,

        Intervenor-Defendants.

Case No. 3:21-cv-00306-wmc
(consol.)

---

## FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

---

Pursuant to Federal Rule of Civil Procedure 56(a), Federal Defendants[1] move for summary judgment on all claims in the above-captioned consolidated cases. The grounds for the Motion are set forth in the accompanying Memorandum in Support.

---

[1] Federal Defendants in Case No. 3:21-cv-00096-wmc are Rural Utilities Service; Christopher McLean, in his official capacity as Acting Administrator, Rural Utilities Service; United States Fish and Wildlife Service; Charles Wooley, in his official capacity as Midwest Regional Director; and Sabrina Chandler, in her official capacity as Manager, Upper Mississippi

Dated: September 3, 2021                    Respectfully submitted,

JEAN E. WILLIAMS
Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

/s/ Leslie Coleman
LESLIE COLEMAN (NY Atty. Reg. No. 5252788)
ANDREW A. SMITH (NM Bar No. 8341)
U.S. Department of Justice
Environment & Natural Resources Division
999 18th St.
South Terrace, Suite 370
Denver, CO 80202
leslie.coleman@usdoj.gov | (303) 844-1363

*Attorneys for Federal Defendants in Case No.*
*3:21-cv-00096-wmc*

/s/ Jacob D. Ecker
BENJAMIN CARLISLE (NY Bar No. 4734612)
JACOB D. ECKER (TX Bar No. 24097643)
DEVON LEA FLANAGAN (DC Bar No. 1022195)
MIRANDA M. JENSEN (DC Bar No. 1617421)
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044
miranda.jensen@usdoj.gov | (202) 598-3071
benjamin.carlisle@usdoj.gov | (202) 514-9771
jacob.ecker@usdoj.gov | (202) 305-0466
devon.flanagan@usdoj.gov | (202) 305-0201

*Attorneys for Federal Defendants in Case No. 3:21-*
*cv-00306-wmc*

---

River National Wildlife and Fish Refuge. Federal Defendants in Case No. 3:21-cv-00306 are
United States Army Corps of Engineers; Lieutenant General Scott A. Spellmon, in his official
capacity as Chief of Engineers and Commanding General for the Corps; Colonel Steven Sattinger,
in his official capacity as Commander and District Engineer, Corps Rock Island District; and
Colonel Karl Jansen, in his official capacity as Commander and District Engineer, Corps St. Paul
District.

### MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### TABLE OF CONTENTS

I.      INTRODUCTION .......................................................................................... 1

II.     OVERVIEW OF THE CHC PROJECT AND PLAINTIFFS' LAWSUIT ...................... 6

III.    STANDARD OF REVIEW ........................................................................... 11

IV.     STATUTORY AND REGULATORY BACKGROUND ................................ 13

        A.      National Environmental Policy Act (RUS Complaint, Count I; Corps
                Complaint, Counts I and IV) ......................................................... 13

        B.      The Clean Water Act (Corps Complaint, Counts II and V) ................................. 14

                1.      Section 404(e) General Permits ................................................. 14

                2.      Nationwide Permits and Regional General Permits................................. 15

        C.      The Endangered Species Act (Corps Complaint, Count III) .............................. 20

V.      CHALLENGED AGENCY ACTIONS........................................................ 21

        A.      The EIS and Record of Decision (RUS Complaint, Count I; Corps
                Complaint, Count IV) ........................................................... 21

        B.      USFWS's Compatibility Determination and Right-of-Way Permit (RUS
                Complaint, Count II)........................................................... 25

        C.      The Corps' Issuance of Nationwide Permit 12 and St. Paul Utility Regional
                General Permit (Corps Complaint, Counts I, II, and III) ..................................... 26

                1.      NWP 12.................................................................................... 27

                2.      Utility RGP ......................................................................... 32

        D.      Verifications under NWP 12 and Utility RGP (Corps Complaint, Count V)....... 34

VI.     ARGUMENT ............................................................................................ 39

        A.      The Court lacks jurisdiction over Plaintiffs' challenges to the Record of
                Decision, USFWS's Compatibility Determination and Right-of-Way
                Permit, and the issuance and verification of NWP 12 .......................................... 39

                1.      Plaintiffs lack standing to challenge the Record of Decision because
                        they cannot show causation and redressability ......................................... 41

2.      Plaintiffs' challenges to USFWS's Compatibility Determination and Right-of-Way Permit are moot ................................................................ 45

3.      There is no case or controversy surrounding NWP 12 or the NWP 12 verification ..................................................................................... 48

B.      The EIS satisfies NEPA, and RUS's and the Corps' Record of Decision is therefore not arbitrary and capricious .................................................... 52

    1.      The EIS's purpose and need statement satisfies NEPA........................... 53

        a.      Background on the purpose and need statement and its influence on alternatives .............................................. 53

        b.      The purpose and need statement satisfies NEPA.......................... 55

    2.      The EIS's analysis of alternatives satisfies NEPA ................................. 60

        a.      The consideration and dismissal of non-transmission alternatives satisfies NEPA............................................ 61

        b.      The analysis of alternative routes satisfies NEPA ...................... 62

    3.      The EIS's discussion of direct and indirect effects, cumulative impacts, and mitigation satisfies NEPA......................................... 64

        a.      The analysis of direct and indirect effects satisfies NEPA ........... 65

        b.      The cumulative impacts analysis satisfies NEPA ........................ 66

        c.      The discussion of mitigation satisfies NEPA............................... 68

C.      NWP 12 and the Utility RGP comply with NEPA .............................................. 69

    1.      The Corps' EA and FONSI for NWP 12 are valid ................................... 69

        a.      The Corps' EA was sufficient..................................................... 70

        b.      The Corps' FONSI was not arbitrary and capricious.................... 72

    2.      The EA and FONSI for the Utility RGP satisfy NEPA ........................... 78

D.      The Corps complied with the CWA....................................................................... 80

    1.      NWP 12 and the Utility RGP satisfy CWA Section 404(e) and applicable regulations ........................................................... 80

    2.      Plaintiffs' arguments misconstrue the structure of the general permitting process .................................................................... 85

            a.       Plaintiffs' challenge to the definition of "single and complete project" as to linear projects is misplaced..................................... 85

            b.       The Corps properly considered cumulative effects of multiple crossings on a single area ................................................ 90

            c.       There is no bar under the CWA against the Corps relying on mitigation in issuing general permits............................................ 97

      3.      The CWA verifications satisfy the requirements of Section 404(e) and applicable regulations....................................................... 100

            a.       The issuance of a verification under a general permit is not equivalent to issuing a permit, and particularly is not subject to the requirements attendant to issuing a permit ...................... 101

            b.       Under the Corps' regulations, the Corps does not conduct an "alternatives" analysis in conjunction with issuing general permit verifications .................................................................... 103

            c.       The Corps adequately considered the public interest in issuing NWP 12 and the Utility RGP, and it need not repeat the analysis when issuing a verification...................................... 105

  E.      The Corps complied with the ESA .................................................... 108

      1.      The ESA does not require the Corps to conduct a programmatic consultation on NWP 12 ......................................................... 109

            a.       NWP 12's no effect determination was thoroughly considered ................................................................................ 109

            b.       NWP 12 will have no effect on listed species or designated critical habitat............................................................................ 111

      2.      The ESA does not require the Corps to consult on the Utility RGP....... 115

      3.      The Agencies appropriately completed action-specific ESA analysis ... 117

  F.      The Court should take separate briefing on remedies should it find a violation ...................................................................................... 120

VII.   CONCLUSION.......................................................................... 120

# TABLE OF AUTHORITIES

## Cases

*Advocates For Transp. Alternatives, Inc. v. U.S. Army Corps of Eng'rs*,
453 F. Supp. 2d 289 (D. Mass. 2006) ........................................ 75

*Akiachak Native Cmty. v. U.S. Dep't of Interior*,
827 F.3d 100 (D.C. Cir. 2016) ................................................ 49

*Alexandria, Va. v. Slater*,
198 F.3d 862 (D.C. Cir. 1999) ................................................ 60

*All Indian Pueblo Council v. United States*,
975 F.2d 1437 (10th Cir. 1992) .............................................. 62

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) .............................................. 120

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*,
894 F.3d 692 (5th Cir. 2018) ........................................ 28, 100

*Backcountry Against Dumps v. Jewell*,
674 F. App'x 657 (9th Cir. 2017) ............................................ 62

*Bagdonas v. Dep't of Treasury*,
93 F.3d 422 (7th Cir. 1996) .................................................. 12

*Bendixen v. Standard Ins. Co.*,
185 F.3d 939 (9th Cir. 1999) ................................................ 12

*Beyond Nuclear v. U.S. Nuclear Regul. Comm'n*,
704 F.3d 12 (1st Cir. 2013) .................................................. 57

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
833 F.3d 1274 (11th Cir. 2016) .............................................. 73

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
838 F.3d 42 (1st Cir. 2016) .................................................. 12

*Campbell-Ewald Co. v. Gomez*,
577 U.S. 153 (2016) .......................................................... 52

*Cascadia Wildlands v. Bureau of Indian Affs.*,
801 F.3d 1105 (9th Cir. 2015) ................................................ 67

*Chesapeake Climate Action Network v. Exp.-Imp. Bank of the U.S.*,
78 F. Supp. 3d 208 (D.D.C. 2015) ............................................ 45

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) .......................................................... 87

*Church of Scientology of Cal. v. United States*,
506 U.S. 9 (1992) ........................................................ 41, 48

iv

*Churchill Cnty. v. Norton*,
  276 F.3d 1060 (9th Cir. 2001) ............................................................. 66

*Citizens to Pres. Overton Park v. Volpe*,
  401 U.S. 402 (1971)............................................................................ 14

*City of Angoon v. Hodel*,
  803 F.2d 1016 (9th Cir. 1986) ............................................................. 64

*Concerned Citizens All., Inc. v. Slater*,
  176 F.3d 686 (3d Cir. 1999) ........................................................... 53, 63

*Cronin v. USDA*,
  919 F.2d 439 (7th Cir. 1990) ............................................................... 12

*Crutchfield v. Cnty. of Hanover*,
  325 F.3d 211 (4th Cir. 2003) ............................................................. 102

*Ctr. for Biological Diversity v. Exp.-Imp. Bank of the U.S.*,
  894 F.3d 1005 (9th Cir. 2018) ....................................................... 43, 44

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
  563 F.3d 466 (D.C. Cir. 2009) ........................................................... 109

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004).................................................... 53, 64, 72, 80

*DH2, Inc. v. SEC*,
  422 F.3d 591 (7th Cir. 2005) ............................................................... 44

*Dorel Juv. Grp., Inc. v. DiMartinis*,
  495 F.3d 500 (7th Cir. 2007) ............................................................... 47

*Eagle Found., Inc. v. Dole*,
  813 F.2d 798 (7th Cir. 1987) ............................................................... 64

*Env't Law & Pol'y Ctr. v. U.S. Nuclear Regul. Comm'n*,
  470 F.3d 676 (7th Cir. 2006) ................................ 56, 57, 60, 63, 65, 74, 76, 80

*Fed'n of Advert. Indus. Representatives, Inc. v. Chicago*,
  326 F.3d 924 (7th Cir. 2003) ............................................................... 46

*Fl. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985)............................................................................ 12

*Fla. Audubon Soc'y v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996)......................................................... 42, 51

*Foretich v. United States*,
  351 F.3d 1198 (D.C. Cir. 2003)........................................................... 40

*Fraternal Ord. of Police Hobart Lodge No. 121, Inc. v. Hobart*,
  864 F.2d 551 (7th Cir. 1988) ............................................................... 45

v

*Friends of Cap. Crescent Trail v. U.S Army Corps of Eng'rs,*
   855 F. App'x 121 (4th Cir. 2021) .......................................................... 64

*Friends of Santa Clara River v. U.S. Army Corps of Eng'rs,*
   887 F.3d 906 (9th Cir. 2018) ................................................................ 21

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
   528 U.S. 167 (2000)............................................................................... 40

*Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs,*
   109 F. Supp. 2d 30 (D.D.C. 2000) ....................................................... 75

*Fund for Animals v. Babbitt,*
   2 F. Supp. 2d 570 (D. Vt. 1997) .......................................................... 45

*Gunpowder Riverkeeper v. FERC,*
   807 F.3d 267 (D.C. Cir. 2015)............................................................... 40

*Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.,*
   603 F. Supp. 2d 1176 (E.D. Wis. 2009)........................................... 71, 78

*Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.,*
   673 F.3d 518 (7th Cir. 2012) ..................................................... 13, 53, 65

*Habitat Educ. Ctr., Inc. v. US Forest Service,*
   593 F. Supp. 2d (E.D. Wis. 2009)............................................. 66, 67, 68

*Heartwood, Inc. v. U.S. Forest Serv.,*
   230 F.3d 947 (7th Cir. 2000) ................................................................ 13

*Highway J Citizens Grp. v. Mineta,*
   349 F.3d 938 (7th Cir. 2003) ............................... 3, 12, 14, 65, 70, 71, 75, 78

*Highway J Citizens Grp. v. U.S. Dep't of Transportation,*
   891 F.3d 697 (7th Cir. 2018) ................................................................ 67

*HonoluluTraffic.com v. Fed. Transit Admin,*
   742 F.3d 1222 (9th Cir. 2014) .............................................................. 59

*Hoosier Env't Council v. U.S. Army Corps of Eng'rs,*
   722 F.3d 1053 (7th Cir. 2013) .............................................................. 57

*Hughes River Watershed Conservancy v. Johnson,*
   165 F.3d 283 (4th Cir. 1999) ................................................................ 70

*Hummel v. St. Joseph Cnty. Bd. of Comm'rs,*
   817 F.3d 1010 (7th Cir. 2016) .............................................................. 46

*Idaho Wool Growers Ass'n v. Vilsack,*
   816 F.3d 1095 (9th Cir. 2016) ............................................................ 120

*Ill. Com. Comm'n v. Fed. Energy Regul. Comm'n,*
   721 F.3d 764 (7th Cir. 2013) ............................................................. 6, 58

*Indiana Forest All., Inc. v. U.S. Forest Serv.*,
  325 F.3d 851 (7th Cir. 2003) ................................................................. 73, 79

*Jones v. Peters*,
  No. 2:06-CV-00084BSJ, 2007 WL 2783387 (D. Utah Sept. 21, 2007) ................... 59

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019) ........................................................................... 88

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) ...................................................................... 14, 65, 68

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*,
  42 F.3d 517 (9th Cir. 1994) ............................................................. 69, 120

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*,
  689 F.3d 1060 (9th Cir. 2012) ........................................................... 71, 75

*Little Co. of Mary Hosp. v. Sebelius*,
  587 F.3d 849 (7th Cir. 2009) ................................................................... 12

*Little Traverse Lake Prop. Owners Ass'n v. Nat'l Park Serv.*,
  883 F.3d 644 (6th Cir. 2018) ......................................................... 57, 59, 63

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................. 40, 41, 42, 44, 52

*Magnuson v. Hickory Hills*,
  933 F.2d 562 (7th Cir. 1991) ................................................................... 46

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ......................................................................... 70, 72

*Metro. Edison Co. v. People Against Nuclear Energy*,
  460 U.S. 766 (1983) ............................................................................. 13

*Milwaukee v. Block*,
  823 F.2d 1158 (7th Cir. 1987) ................................................................. 45

*Mobile Baykeeper, Inc. v. U.S. Army Corps of Eng'rs*,
  No. 14-0032-WS-M, 2014 WL 5307850 (S.D. Ala. Oct. 16, 2014) ........... 93, 102, 106

*Montana Wilderness Ass'n v. Fry*,
  310 F. Supp. 2d 1127 (D. Mont. 2004) ....................................................... 70

*Morongo Band of Mission Indians v. Fed. Aviation Admin.*,
  161 F.3d 569 (9th Cir. 1998) ................................................................... 64

*N. Plains Res. Council v. US Army Corps of Eng'rs*,
  460 F. Supp. 3d 1030 (D. Mont. 2020) ...................................................... 113

*Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*,
  222 F.3d 677 (9th Cir. 2000) ................................................................... 69

*Nat'l Parks Conservation Ass'n v. Jewell*,
  965 F. Supp. 2d 67 (D.D.C. 2013) ........................................................................ 62

*North Buckhead Civic Ass'n v. Skinner*,
  903 F.2d 1533 (11th Cir. 1990) ............................................................................ 59

*Northern Plains Resource Council v. U.S. Army Corps of Engineers*,
  454 F. Supp. 3d 985 (D. Mont. 2020) ................................................................ 113

*Nuclear Energy Institute, Inc. v. EPA*,
  373 F.3d 1251 (D.C. Cir. 2004) ..................................................................... 72, 80

*Nw. Env't Def. Ctr. v. U.S. Army Corps of Engineers*,
  817 F. Supp. 2d 1290 (D. Or. 2011) ..................................................................... 77

*Nw. Motorcycle Ass'n v. USDA*,
  18 F.3d 1468 (9th Cir. 1994) ............................................................................... 12

*Ohio Valley Env't Coal. v. Bulen*,
  429 F.3d 493 (4th Cir. 2005) ....................................................................... 17, 114

*Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*,
  492 F. Supp. 3d 701 (E.D. Tex. 2020) ..................................................... 87, 88, 89, 101

*Or. Env't Council v. Kunzman*,
  817 F.2d 484 (9th Cir. 1987) ............................................................................... 65

*Ouachita Riverkeeper, Inc. v. Bostick*,
  938 F. Supp. 2d 32 (D.D.C. 2013) ................................................................. 87, 98

*Ozinga v. Price*,
  855 F.3d 730 (7th Cir. 2017) ..................................................................... 45, 47, 49

*Parvati Corp. v. Oak Forest, Ill.*,
  630 F.3d 512 (7th Cir. 2010) ............................................................................... 40

*Plump v. Graham*,
  No. CV-16-00505-PHX-GMS, 2017 WL 1862140 (D. Ariz. May 9, 2017) ................. 102, 106

*Powell v. McCormack*,
  395 U.S. 486 (1969) ............................................................................................ 41

*Pozzie v. U.S. Dep't of Housing and Urban Dev.*,
  48 F.3d 1026 (7th Cir. 1995) ............................................................................... 11

*Princeton Univ. v. Schmid*,
  455 U.S. 100 (1982) ............................................................................................ 49

*Protect Our Comtys. Found. v. Jewell*,
  825 F.3d 571 (9th Cir. 2016) ............................................................................... 62

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*,
  898 F.2d 1410 (9th Cir. 1990) ........................................................................... 111

*Rembert v. Sheahan,*
  62 F.3d 937 (7th Cir. 1995) ................................................................ 48

*River Rd. All., Inc. v. Corps of Eng'rs of U.S. Army,*
  764 F.2d 445 (7th Cir. 1985) .............................................................. 64

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989) ................................................................... 14, 68

*Roosevelt Campobello Int'l Park Comm'n v. EPA,*
  684 F.2d 1041 (1st Cir. 1982) ............................................................ 64

*S.E. Lake View Neighbors v. Dep't of Hous. & Urb. Dev.,*
  685 F.2d 1027 (7th Cir. 1982) ............................................................ 44

*Sierra Club v. Clinton,*
  746 F. Supp. 2d 1025 (D. Minn. 2010) ............................................... 62

*Sierra Club v. Marita,*
  46 F.3d 606 (7th Cir. 1995) .............................................. 11, 13, 53

*Sierra Club v. U.S. Army Corps of Eng'rs,*
  64 F. Supp. 3d 128 (D.D.C. 2014) ............................................. 93, 102

*Sierra Club v. U.S. Army Corps of Eng'rs,*
  990 F. Supp. 2d 9 (D.D.C. 2013) ..................... 16, 29, 100, 101, 102

*Sierra Club v. U.S. Army Corps of Engineers,*
  464 F. Supp. 2d 1171 (M.D. Fla. 2006) ................................... 79, 105

*Sierra Club v. U.S. Dep't of Energy,*
  825 F. Supp. 2d 142 (D.D.C. 2011) .................................................... 45

*Sierra Club, Inc. v. Bostick,*
  787 F.3d 1043 (10th Cir. 2015) ...................... 19, 21, 83, 88, 90, 93, 114

*Simmons v. U.S. Army Corps of Eng'rs,*
  120 F.3d 664 (7th Cir. 1997) ................................... 54, 56, 61, 63

*Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. U.S. Corps of Eng'rs,*
  888 F.3d 906 (8th Cir. 2018) ............................................................. 88

*Smith v. Off. of Civilian Health & Med. Program of Uniformed Servs.,*
  97 F.3d 950 (7th Cir. 1996) ............................................................... 12

*Snoqualmie Valley v. U.S. Army Corps of Eng'rs,*
  683 F.3d 1155 (9th Cir. 2012) ................................................ 101, 102

*Speech First, Inc. v. Killeen,*
  968 F.3d 628 (7th Cir. 2020) ............................................................. 46

*Spiller v. White,*
  352 F.3d 235 (5th Cir. 2003) ............................................................. 76

*St. John's United Church of Christ v. FAA,*
  520 F.3d 460 (D.C. Cir. 2008) ................................................................... 44

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
  205 F. Supp. 3d 4 (D.D.C. 2016) ........................................................... 90, 92

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
  255 F. Supp. 3d 101 (D.D.C. 2017) ........................................................... 102

*Stotts v. Cmty. Unit Sch. Dist. No. 1,*
  230 F.3d 989 (7th Cir. 2000) .............................................................. 40, 41, 52

*Strycker's Bay Neighborhood Council v. Karlen,*
  444 U.S. 223 (1980) .......................................................................... 14, 15, 16

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ............................................................................... 40, 51

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.,*
  100 F.3d 1443 (9th Cir. 1996) ............................................................. 109, 110

*Tex. Indep. Producers & Royalty Owners Ass'n v. EPA,*
  410 F.3d 964 (7th Cir. 2005) .............................................................. 40, 41, 51

*Theodore Roosevelt Conservation P'ship v. Salazar,*
  616 F.3d 497 (D.C. Cir. 2010) ................................................................... 77

*Theodore Roosevelt Conservation P'ship v. Salazar,*
  661 F.3d 66 (D.C. Cir. 2011) ................................................................. 57, 60

*Touret v. NASA,*
  485 F. Supp. 2d 38 (D.R.I. 2007) .......................................................... 43, 45

*Town of Superior v. U.S. Fish & Wildlife Serv.,*
  913 F. Supp. 2d 1087 (D. Colo. 2012) ......................................................... 47

*U.S. Army Corps of Eng'rs v. Northern Plains Res. Council,*
  141 S. Ct. 190 (2020) ............................................................................... 113

*United States v. Diekemper,*
  604 F.3d 345 (7th Cir. 2010) ................................................................. 43, 44

*United States v. Pa. Indus. Chem. Corp.,*
  411 U.S. 655 (1973) ................................................................................. 28

*Utahns for Better Transp. v. U.S. Dep't of Transp.,*
  305 F.3d 1152 (10th Cir. 2002) ................................................................. 65

*Van Abbema v. Fornell,*
  807 F.2d 633 (7th Cir. 1986) ................................................................. 56, 57

*Vill. of Bensenville v. FAA,*
  457 F.3d 52 (D.C. Cir. 2006) ..................................................................... 45

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
  435 U.S. 519 (1978)................................................................................ 60, 61

*Waukesha Cnty. Env't Action League v. U.S. Dep't of Transp.*,
  348 F. Supp. 3d 869 (E.D. Wis. 2018)................................................................ 68

*Webster v. USDA*,
  685 F.3d 411 (4th Cir. 2012) ............................................................... 58, 59

*Young Am.'s Found. v. Gates*,
  573 F.3d 797 (D.C. Cir. 2009) ........................................................................ 44

**Statutes**

16 U.S.C. § 1536(3)(A)................................................................................... 21

16 U.S.C. § 1536(a)(1)................................................................................. 111

16 U.S.C. § 1536(a)(2)................................................................. 20, 108, 109

16 U.S.C. § 1540(a)(1)................................................................................. 113

16 U.S.C. § 1540(b)(1) ................................................................................ 113

16 U.S.C. § 668dd(b)(3) ................................................................................ 47

16 U.S.C. § 668dd(d)(1)(B) ........................................................................... 25

16 U.S.C. §§ 668dd–668ee ............................................................................ 25

33 U.S.C. § 1251(a) ....................................................................................... 14

33 U.S.C. § 1311(a) ....................................................................................... 14

33 U.S.C. § 1344 ............................................................................................ 15

33 U.S.C. § 1344(a) ................................................................................. 15, 92

33 U.S.C. § 1344(b)(1) .................................................................................. 29

33 U.S.C. § 1344(e) ................................................................................ passim

33 U.S.C. § 1344(e)(1)............................................................................ passim

33 U.S.C. § 1344(e)(2) .................................................................................. 15

33 U.S.C. § 1362(7) ....................................................................................... 14

33 U.S.C. § 403 .............................................................................................. 28

42 U.S.C. § 4332(2)(C)................................................................................ 100

42 U.S.C. § 4332(2)(E)................................................................................... 70

42 U.S.C. § 4332(C)....................................................................................... 13

42 U.S.C. §§ 4332(C)(i)-(iii) ........................................................................ 13

5 U.S.C. § 704 ................................................................................................ 47

5 U.S.C. § 706 .............................................................................................. 120

5 U.S.C. § 706(2)(A) ................................................................................ 12, 72

5 U.S.C. §§ 701–706 ....................................................................................... 11

7 U.S.C. § 902 ................................................................................................ 22

7 U.S.C. § 904 ................................................................................................ 22

7 U.S.C. §§ 901–950cc-2 ................................................................................ 22

Wis. Stat. § 196.491(3) (2019) .......................................................................... 8

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................ 12

**Regulations**

33 C.F.R. § 230.11(g)(1) ................................................................................. 92

33 C.F.R. § 320.1(a)(1) ................................................................................... 17

33 C.F.R. § 320.1(a)(2) ................................................................................... 29

33 C.F.R. § 320.1(c) ................................................................................. 17, 29

33 C.F.R. § 320.4 .......................................................................................... 106

33 C.F.R. § 320.4(a) ................................................................................. passim

33 C.F.R. § 320.4(a)(1) ............................................................................ passim

33 C.F.R. § 322.3 ............................................................................................ 28

33 C.F.R. § 323.2(e)(1) ................................................................................... 28

33 C.F.R. § 325.2(b)(5) ................................................................................. 113

33 C.F.R. § 328(c)(14) .................................................................................... 93

33 C.F.R. § 328.3(a) ....................................................................................... 14

33 C.F.R. § 328.3(b) ....................................................................................... 14

33 C.F.R. § 330.1(b) ....................................................................................... 15

33 C.F.R. § 330.1(c) ........................................................................... 17, 31, 113

33 C.F.R. § 330.1(d) ......................................................................... 16, 18, 19, 32

33 C.F.R. § 330.1(e) ....................................................................................... 99

33 C.F.R. § 330.1(e)(1) ............................................................................. 18, 31

33 C.F.R. § 330.1(e)(2) ........................................................................... 36, 107

33 C.F.R. § 330.1(e)(3) ................................................................................. 19, 36, 74

33 C.F.R. § 330.2(b) ............................................................................................ 15

33 C.F.R. § 330.2(c) ...................................................................................... 16, 18

33 C.F.R. § 330.2(i) ...................................................................................... 86, 88

33 C.F.R. § 330.4(e)(1) .................................................................................. 18, 32

33 C.F.R. § 330.4(f) ........................................................................... 28, 109, 112

33 C.F.R. § 330.4(f)(2) ....................................................................................... 29

33 C.F.R. § 330.5 ................................................................................................ 29

33 C.F.R. § 330.5(b)(2) ...................................................................................... 17

33 C.F.R. § 330.5(b)(2)(ii) ................................................................................. 18

33 C.F.R. § 330.5(b)(3) ...................................................................................... 17

33 C.F.R. § 330.5(c)(1) ................................................................................. 17, 18

33 C.F.R. § 330.5(c)(1)(i) ................................................................................... 18

33 C.F.R. § 330.6 ..................................................................................... 101, 104

33 C.F.R. § 330.6(a) ....................................................................................... 18, 20

33 C.F.R. § 330.6(a)(1) ..................................................................................... 104

33 C.F.R. § 330.6(a)(3)(i) ................................................................... 19, 36, 107

33 C.F.R. § 332.2 ................................................................................................ 77

33 C.F.R. § 332.3(a) ........................................................................................... 98

33 C.F.R. § 332.3(k)(1) ...................................................................................... 99

33 C.F.R. § 332.3(k)(3) ...................................................................................... 99

33 C.F.R. § 332.4(c)(10) ..................................................................................... 77

33 C.F.R. §§ 330.1(e)(2)-(3) ............................................................................. 19

33 C.F.R. §§ 330.6(a) ......................................................................................... 31

33 C.F.R. pt. 320 ................................................................................................ 15

33 C.F.R. pt. 323 ................................................................................................ 15

33 C.F.R. pt. 325 .......................................................................................... 15, 16

33 C.F.R. pt. 330 .......................................................................................... 16, 89

33 C.F.R. pt. 332 ......................................................................... 89, 97, 98, 99

40 C.F.R. § 150.14(a) ......................................................................................... 55

40 C.F.R. § 1500.1(b) ................................................................................................ 13

40 C.F.R. § 1501.4(b) ................................................................................................ 14

40 C.F.R. § 1501.5(a) ................................................................................................ 22

40 C.F.R. § 1501.6 ..................................................................................................... 22

40 C.F.R. § 1502.13 ................................................................................................... 53

40 C.F.R. § 1502.14(a) ........................................................................... 53, 61, 62, 63

40 C.F.R. § 1502.14(d) .............................................................................................. 55

40 C.F.R. § 1502.14(f) ............................................................................................... 68

40 C.F.R. § 1502.16 ................................................................................................... 65

40 C.F.R. § 1502.16(h) .............................................................................................. 68

40 C.F.R. § 1502.22 ................................................................................................... 71

40 C.F.R. § 1505.2 ..................................................................................................... 22

40 C.F.R. § 1505.2(c) ................................................................................................ 68

40 C.F.R. § 1507.3 ..................................................................................................... 13

40 C.F.R. § 1508.13 ................................................................................................... 76

40 C.F.R. § 1508.25(a)(2) .......................................................................................... 65

40 C.F.R. § 1508.27(b) .............................................................................................. 75

40 C.F.R. § 1508.7 ................................................................................... 65, 66, 67, 71

40 C.F.R. § 1508.9 ..................................................................................................... 14

40 C.F.R. § 1508.9(b) .......................................................................................... 70, 78

40 C.F.R. § 230.10(a) ....................................................................................... 103, 104

40 C.F.R. § 230.11(g)(1) ............................................................................................ 90

40 C.F.R. § 230.7 ....................................................................................................... 83

40 C.F.R. § 230.7(a) ................................................................................................. 103

40 C.F.R. § 230.7(a)(1) .............................................................................................. 81

40 C.F.R. § 230.7(b) ....................................................................................... 17, 90, 101

40 C.F.R. § 230.7(b)(1) ....................................................................................... 82, 103

40 C.F.R. § 230.7(b)(3) ....................................................................................... 84, 90

40 C.F.R. § 35.34(k)(7) .............................................................................................. 57

40 C.F.R. §§ 1502.16(a)-(h) ....................................................................................... 65

40 C.F.R. pt. 1500 ............................................................................................ 13

40 C.F.R. pt. 230 .................................................................... 29, 80, 89, 97

40 C.F.R. pts. 1500–1508 ............................................................................ 13

48 Fed. Reg. 34,263 (July 28, 1983) ........................................................... 61

50 C.F.R. § 26.41 ........................................................................................... 26

50 C.F.R. § 26.41(c) ...................................................................................... 26

50 C.F.R. § 402.13(a) .................................................................................... 21

50 C.F.R. § 402.13(c) .................................................................................... 21

50 C.F.R. § 402.14(a) ................................................................. 20, 21, 109

50 C.F.R. § 402.14(b)(1) ............................................................................... 21

50 C.F.R. § 402.14(g)(4) ............................................................................... 21

50 C.F.R. §§ 402.14(a)-(b) ............................................................................ 21

56 Fed. Reg. 59,110 (Nov. 22, 1991) .................................................. 86, 88

65 Fed. Reg. 62,458 (Oct. 18, 2000) ........................................................... 26

7 C.F.R. § 1970.16 ........................................................................................ 68

7 C.F.R. § 1970.6(a) ...................................................................................... 55

7 C.F.R. pt. 1970 ............................................................................................ 13

81 Fed. Reg. 1900 (Jan. 14, 2016) ............................................................... 24

81 Fed. Reg. 35,186 (June 1, 2016) ............................................................. 17

86 Fed. Reg. 2744 (Jan. 13, 2021) ..................................................... 36, 48, 51

86 Fed. Reg. 2747 (Jan. 13, 2021) ......................................................... 27, 50

**Other Authorities**

*Midwest Indep. Transmission Sys. Operator, Inc.*,
    97 FERC ¶ 61,326 (2001) ........................................................................ 6

*Midwest Indep. Transmission Sys. Operator, Inc.*,
    133 FERC ¶ 61,221 (2010) ..................................................................... 58

## TABLE OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| CEQ | Council on Environmental Quality |
| CHC Project | Cardinal-Hickory Creek Project |
| Corps | U.S. Army Corps of Engineers |
| CWA | Clean Water Act |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| ITC | ITC Midwest LLC |
| MISO | Midwest Independent System Operator |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NWP 12 | Nationwide Permit 12 |
| PCN | Pre-Construction Notice |
| Refuge | Upper Mississippi River National Wildlife and Fish Refuge |
| RUS | Rural Utilities Service |
| USFWS | U.S. Fish & Wildlife Service |
| Utility RGP | Utility Regional General Permit |

# I.      INTRODUCTION

Three utility companies ("Intervenors"[1]) plan to build the Cardinal-Hickory Creek Project (the "CHC Project"), a package of transmission infrastructure improvements and a new transmission line that will carry energy—including renewable energy generated in wind-rich Iowa—to consumers in Wisconsin and beyond. The CHC Project is part of a portfolio of projects, developed over several years through a regional transmission planning process, that will deliver wind and other renewable energy resources to faraway markets, reduce congestion on the regional energy grid, and increase the reliability and efficiency of the transmission system. The CHC Project has been approved by state utility regulators in Iowa and Wisconsin.

As a private endeavor approved primarily by state and regional authorities, the CHC Project is not subject to generalized federal oversight or approvals. Rather, the federal government's role in the CHC Project is limited in scope and discrete in authority. One federal agency in this lawsuit, the Rural Utilities Service ("RUS"), promotes rural infrastructure improvements such as electric power services. RUS plans to consider a post-construction request for financial assistance to support one of the Intervenors' 9% stake in the CHC Project.

A second agency, the U.S. Fish and Wildlife Service ("USFWS"), oversees the Upper Mississippi River National Wildlife and Fish Refuge ("Refuge"), which runs along the Mississippi River for approximately 260 river miles between Minnesota and Illinois. The CHC Project's proposed route would take it through less than 30 acres of land that is currently part of the 240,000-acre Refuge. Having revoked its previous authorization for the transmission line to cross the

---

[1] "Intervenors" are Dairyland Power Cooperative, American Transmission Company LLC, and ITC Midwest LLC, who are participating in these consolidated actions as Intervenor-Defendants. *See* Case No. 3:21-cv-00096, ECF No. 36; Case No. 3:21-cv-00306, ECF No. 22 (orders granting motions to intervene).

Refuge after discovering an underlying error, USFWS is currently considering a proposal for a land exchange to facilitate construction of the line in that area.

Finally, a third agency, the U.S. Army Corps of Engineers ("Corps"), has authority to permit dredge and fill in waters of the United States (including certain wetlands) and to regulate impacts to navigation on the Mississippi River. Intervenors notified the Corps of the CHC Project's estimated permanent fill for a handful of transmission line structures in a total of 0.077 acres of waters of the United States—about the area between the goal line and the seven-yard line on a regulation football field—and for temporary construction-related fill impacting a total of approximately 13.6 acres of waters of the United States. After reviewing the proposed impacts, the Corps verified that, because these impacts were so minor, the proposed fill activities qualified for authorization under two pre-existing "general permits": Nationwide Permit 12 ("NWP 12")[2] for Iowa portions and the St. Paul District Utility Regional General Permit ("Utility RGP") for Wisconsin.

Because some of these approvals and decisions are subject to the National Environmental Policy Act ("NEPA"), the three agencies also completed an Environmental Impact Statement ("EIS"). Additionally, because some of the federal actions may affect threatened or endangered species, the agencies engaged in consultation under the Endangered Species Act ("ESA").

Despite Federal Defendants' minimal involvement in the CHC Project, Plaintiffs attempt to lay the entire project at the federal government's feet on the theory that Federal Defendants violated various environmental statutes. But the actions Plaintiffs seek to invalidate have little or no relationship to the CHC Project's construction or the environmental impacts they allege. That

---

[2] In this brief, all references to "Nationwide Permit 12" or NWP 12 are to the version of that general permit issued in 2017, not the superseding version issued in 2021, unless expressly noted otherwise.

lack of relationship is fatal to the Court's jurisdiction over nearly all of Plaintiffs' challenges. Specifically, construction of the CHC Project is well underway even though RUS has not yet even *received* an application for financial assistance, eliminating the causation and redressability elements that Plaintiffs must show to prove standing. USFWS's "Compatibility Determination" and Right-of-Way Permit authorizing construction in the Refuge have been withdrawn, rendering Plaintiffs' challenge to those actions moot. And the portions of the CHC Project in Iowa, the only area of the CHC Project where NWP 12 is in effect, have avoided impacts to waters of the United States under NWP 12, and any future impacts will proceed under a different permit. There is thus no live controversy on these issues, and the Court lacks jurisdiction over the bulk of Plaintiffs' claims.

Plaintiffs' claims also fail on the merits.[3] Importantly, each of Plaintiffs' claims rests on the judicial review principles of the Administrative Procedure Act ("APA"), under which the Court's review is highly deferential, asking only "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 952–53 (7th Cir. 2003) (citation omitted). Plaintiffs' claims cannot meet this high standard.

Plaintiffs argue that the EIS prepared for the CHC Project violates NEPA, but, consistent with NEPA, the EIS contained an appropriately broad statement of purpose and need, analyzed reasonable alternatives, and thoroughly discussed the CHC Project's environmental impacts. As a procedural statute that does not mandate particular results, NEPA requires nothing more. While Plaintiffs contend that the EIS's statement of purpose and need was too narrow, the EIS drew on

---

[3] Federal Defendants do not address Plaintiffs' challenge to USFWS's Compatibility Determination and Right-of-Way Permit on the merits because those two agency actions have been rescinded and, therefore, the Court lacks jurisdiction over that claim.

the results of a multi-year regional transmission planning process that clearly identified the need for additional transmission capacity to transfer wind energy generated in Iowa and other wind-rich areas to energy users in Wisconsin. And although Plaintiffs suggest the EIS should have analyzed a broader range of alternatives, they ignore that the EIS satisfies NEPA by including a reasoned explanation for rejecting the alternatives Plaintiffs advance. Finally, the EIS's lengthy, wide-ranging analysis of environmental impacts was undeniably sufficient. At bottom, though Plaintiffs wish the EIS had reached different conclusions, they cannot show that their quibbles with the EIS amount to a NEPA violation. NEPA requires nothing more than what the EIS provided: a "hard look" at the environmental impacts of the proposed project and alternatives sufficient to inform the public and agency decisionmakers.

Despite the completion of a comprehensive EIS for the CHC Project (and full compliance with the consultation requirements of the ESA), Plaintiffs challenge—apparently, both on their face and as-applied to the CHC Project—NWP 12 and the Utility RGP. Congress specifically authorized general permits "for any category of activities involving discharges of dredged or fill material if the [Corps] determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). In this vein, NWP 12 and the Utility RGP, by their terms, authorized activities that do not have a greater than minimal impact individually or cumulatively. Their terms and conditions specify they do not authorize any activities that may affect any federally listed endangered or threatened species or any designated critical habitat for species, without confirmation that all required ESA consultation has occurred. Numerous other safeguards—including notice requirements and multi-level review at the Corps—are designed to ensure the terms requiring minimal impacts are carried out. The Corps prepared an

EA for each of these general permits and documented its consideration of relevant factors under the Clean Water Act ("CWA") and guidance thereunder.

The Corps concluded that given the terms and conditions of these general permits, and the numerous procedural safeguards built into them, (1) NWP 12 and the Utility RGP would not have a significant impact on the environment, and thus no EIS was required under NEPA; (2) NWP 12 and the Utility RGP involved activities "similar in nature," allowed no more than "minimal" separate and cumulative impacts, and were not contrary to the public interest, and they were thus permissible under the CWA; and (3) NWP 12 and the Utility RGP did not authorize any activities that may affect ESA-listed species or critical habitat, and therefore did not require consultation under the ESA. The Corps is entitled to substantial deference in these judgment calls that fall well within its expertise. Plaintiffs' claims that NWP 12 and the Utility RGP were arbitrary and capricious because they violated NEPA, the CWA, and the ESA thus fail.

Finally, Plaintiffs challenge the Corps' three determinations, called "verifications," that the CHC Project's regulated activities in waters of the United States fell within the terms and conditions of NWP 12 and the Utility RGP totalling just 0.077 acres of permanent wetland loss over the length of 102 *miles* of proposed transmission line. And Plaintiffs' legal theories in the Complaint challenging these verifications are fatally flawed, pointing to regulatory provisions that simply do not apply to verifications. Instead, the relevant analyses were done (as required) when the Corps issued NWP 12 and the Utility RGP; the Corps' verifications merely confirm that the proposed impacts to waters of the United States fall under an existing general permit.

Plaintiffs' "everything but the kitchen sink" approach—challenging almost every aspect of the federal government's minor involvement with this Project—reveals only a series of decisions that were reasonable, well-supported, and appropriate for the scale of federal involvement.

5

Plaintiffs' claims fail as a matter of law and the Court should grant summary judgment for Federal Defendants.

## II.        OVERVIEW OF THE CHC PROJECT AND PLAINTIFFS' LAWSUIT

The CHC Project is not a federally-sponsored endeavor. Federal Defendants have no general statutory authority to plan, site, or regulate transmission lines. Rather, that responsibility belongs to federally authorized "regional transmission organizations" (here, the Midwest Independent System Operator, or "MISO"[4]) and state utility regulators (here, the Public Service Commission of Wisconsin and the Iowa Utilities Board). *See generally* ROD004978–81, ROD004996–98;[5] *Ill. Com. Comm'n v. Fed. Energy Regul. Comm'n*, 721 F.3d 764, 770 (7th Cir. 2013) (explaining that the nation's electrical grid is controlled by regional transmission organizations, including MISO, which are "responsible for planning and directing expansions and upgrades").

The CHC Project emerged from multi-year transmission planning efforts and studies undertaken by MISO, Midwestern states, transmission operators, and other stakeholders. *See* ROD004981; ROD021256–60. More than a decade ago, these entities began collaborating on an

---

[4] MISO is an independent non-profit entity that conducts electrical system planning, manages access to the transmission grid, ensures reliability, and oversees transmission operations within its territory. *See* ROD004979–81; ROD014708; *see generally* ROD014098–99. MISO's authority derives from its status as a "regional transmission organization" by order of the Federal Energy Regulatory Commission. *See* ROD014708; *Midwest Indep. Transmission Sys. Operator, Inc.*, 97 FERC ¶ 61,326, 62,500 (2001). MISO employs transmission planning procedures prescribed by the Federal Energy Regulatory Commission. ROD014106–08.

[5] Citations using the prefix "ROD" refer to documents bates stamped as such in RUS's administrative record, those using "FWS" refer to documents bates stamped as such in USFWS's administrative record, and those using "NWP" and "USACE" refer to documents bates stamped as such in the Corps' two administrative records. The certified, hyperlinked indexes for these records have been provided to the Court and the Parties along with electronic copies of the records themselves. *See* Corrected Fed. Defs.' Notice of Lodging of the Admin. Records, Case No. 96, ECF No. 59.

approach to meet regional transmission needs driven by increases in renewable energy generation. *See* ROD004981; ROD013461, ROD013478; ROD013648. Working alongside MISO, the Upper Midwest Transmission Development Initiative (a committee formed by the governors of five Midwestern states, including Iowa and Wisconsin) concluded that projected growth in renewable energy production—especially wind power, which is often generated far from where it is needed—required a substantial expansion of the regional transmission system. *See* ROD021391–93, ROD021395. The Initiative identified several potential "transmission corridors" that could cost-effectively move energy generated in Iowa and other wind-rich areas eastward into Wisconsin. ROD021400.

Building off these recommendations and other ongoing study and planning efforts, MISO developed a portfolio of "Multi-Value Projects" to provide reliability, public policy, and economic benefits across the MISO network. *See* ROD013604–05, ROD013648. The portfolio, which included what developed into the CHC Project, was designed to facilitate the delivery of renewable energy, reduce congestion, and increase system reliability and efficiency. ROD013610, ROD013651–52. MISO characterized the Multi-Value portfolio as a suite of "no regrets" projects that would confer benefits under all future scenarios. ROD013650, ROD013656. MISO's Board of Directors ultimately approved the portfolio, and MISO reconfirmed its benefits in 2014 and 2017. ROD004981.

The CHC Project also underwent detailed review by the Iowa Utilities Board and the Public Service Commission of Wisconsin ("Commission"), both of which approved the Project. [6]

---

[6] The Iowa Utilities Board approved the Project in May 2020, after Federal Defendants signed the ROD. *See* Iowa Utilities Board, *Cardinal-Hickory Electric Transmission Line Approved for Eastern Iowa* (May 27, 2020), https://iub.iowa.gov/press-release/2020-05-27/cardinal-hickory-electric-transmission-line-approved-eastern-iowa (last visited Sept. 1, 2021).

ROD004996–98. In determining whether to grant a Certificate of Public Convenience and Necessity for a proposed transmission project, the Commission must evaluate need, costs and benefits, electrical performance, alternatives, and environmental impacts, among other factors. ROD013961–62; *see generally* Wis. Stat. § 196.491(3) (2019) (outlining requirements). The Commission approved the CHC Project in September 2019 following a series of technical hearing sessions, consultation with state agencies, preparation of an environmental impact statement, a public comment period, public comment hearings, written briefing, and open meetings. ROD021246–50. Plaintiffs Driftless Area Land Conservancy and Wisconsin Wildlife Federation participated as intervenors in those proceedings. ROD021247. In approving the CHC Project, the Commission found that it "addresses the need[s] to improve electric system reliability locally and regionally, deliver economic savings for Wisconsin utilities and electric consumers, and provide infrastructure to support the public policy of greater access to renewable-based electric generation." ROD021246, ROD021255. The Commission also imposed several conditions and mitigation measures to address potential environmental, archaeological, agricultural, and safety issues. *See generally* ROD021299–324.

In contrast to the high level of responsibility and control that MISO and the state utility regulators exercised in years of planning, siting, and approving the CHC Project, Federal Defendants' role in the Project is quite small. One of the Intervenors may at some point after the CHC Project is built apply to RUS for financial assistance to support its minority (9%) ownership interest in the Project. Decl. of Jesse Beckendorf ¶¶ 7, 9–10, Case No. 96,[7] ECF No. 90 ("Beckendorf Decl."). And USFWS had previously authorized the transmission line to cross a one

---

[7] In citations to docket entries, Case No. 3:21-cv-00096-wmc is abbreviated as "Case No. 96" and Case No. 3:21-cv-00306-wmc is abbreviated as "Case No. 306."

and one-quarter mile stretch of the Refuge, *see* ROD007573–74, but recently withdrew its authorization after discovering an underlying factual error. *See* Notice of Withdrawal of U.S. Fish & Wildlife Service's Compatibility Determination & Right-of-Way-Permit ("Notice of Withdrawal"), Case No. 96, ECF No. 69. Specifically, in connection with its review of Intervenors' March 2021 application for an amended right-of-way,[8] USFWS discovered that it had considered the wrong easements for the existing transmission lines in the Refuge when assessing whether the Project qualified as a "minor realignment" of an existing right-of-way. *See* Ex. A to Notice of Withdrawal, Case No. 96, ECF No. 69-1. USFWS is currently considering a proposed land exchange instead, which could take up to eight more months to complete. *See* Ex. C to Decl. of David R. Zoppo, Case No. 96, ECF No. 53-3. Finally, Intervenors asked the Corps to verify that certain limited activities originally proposed to take place in wetlands in Iowa and Wisconsin— mostly related to construction, rather than operation, of the CHC Project, and thus temporary in nature—would have minimal impacts on wetlands and would thus qualify for applicable general permits. USACE001191; USACE000679.

Plaintiffs challenge various actions these three agencies took in considering Intervenors' applications (or, for RUS, a potential *future* application for funding). Compl. ¶¶ 4–6, 92, Case No. 96, ECF No. 1 ("RUS Compl."); Compl. ¶¶ 6, 10, Requested Relief, Case No. 306, ECF No. 1 ("Corps Compl."). Specifically, Plaintiffs allege that (1) RUS violated NEPA by preparing an inadequate EIS for the CHC Project and concluding in its "Record of Decision" that its NEPA

---

[8] Following consultation with the Ho-Chunk Nation, Intervenors applied for an amended right-of-way to avoid impacts on a burial mound site just west of the Refuge. *See* Ex. A to Decl. of David R. Zoppo, Case No. 96, ECF No. 53-1, at 3–4. The amended right-of-way would impact a substantially smaller area within the Refuge. *Id.* That application has been shelved in favor of the proposed land exchange, which would also utilize the amended route. *See* Second Rothfork Decl. ¶¶ 10–14; Ex. B to Decl. of David R. Zoppo, Case No. 96, ECF No. 53-2.

review was complete, RUS Compl. ¶¶ 75–145 (Count I); (2) USFWS violated the National Wildlife Refuge System Improvement Act in issuing the now-withdrawn Compatibility Determination and Right-of-Way Permit, RUS Compl. ¶¶ 146–98 (Count II); (3) the Corps violated NEPA in signing onto the Record of Decision to conclude that the EIS satisfied NEPA, Corps Compl. ¶¶ 111–82 (Count IV); and (4) the Corps violated the Clean Water Act by verifying that the proposed fill in wetlands in Iowa and Wisconsin would have no more than a minimal impact and were thus eligible for two pre-existing general permits, Corps Compl. ¶¶ 183–207 (Count V).

Plaintiffs also launch facial and as-applied challenges to those pre-existing general permits. Corps Compl. ¶¶ 86–110 (Counts I–III), Requested Relief ¶¶ 2–7 (challenging NWP 12 and the Utility RGP both in the abstract and in application to the CHC Project). Because the Corps determined that Intervenors' proposed activities fell within the terms and conditions of NWP 12 for fill activities in Iowa and the Utility RGP for fill activities in Wisconsin, Plaintiffs seek to stop the CHC Project indirectly by attacking the validity of these widely used permits. NWP000002; USACE008997. Plaintiffs allege the Corps, in issuing NWP 12 and the Utility RGP, violated: (1) NEPA, Corps Compl. ¶¶ 86–92 (Count I); (2) the CWA, Corps Compl. ¶¶ 93–98 (Count II); and (3) Section 7 of the ESA, Corps Compl. ¶¶ 99–110 (Count III).

All told, Plaintiffs have sued three federal agencies, challenging five separate agency actions and alleging deficiencies under four separate federal statutes. Their claims deal both with permissions specifically related to the CHC Project and, wholly divorced from the specific facts of the CHC Project, Corps general permits issued years ago. To add to this complexity, two of the agency actions Plaintiffs challenge—USFWS's Compatibility Determination and Right-of-Way Permit—have been revoked. Notice of Withdrawal & Ex. A to Notice of Withdrawal, Case No.

96, ECF Nos. 69, 69-1. Another set of actions—RUS's and the Corps' completion of the EIS—are not tied to any particular approvals for the CHC Project that Plaintiffs challenge, since RUS has not yet received an application for funding and Plaintiffs do not challenge any Corps action that relies on the EIS. Beckendorf Decl. ¶¶ 9–10; Corps Compl. ¶¶ 111–82. Finally, despite Intervenors' initial application for use of NWP 12, it is now clear that NWP 12 has not been used for any aspect of the CHC Project and will not be used in the future. Decl. of Mark Rothfork ¶¶ 7–8, Case No. 96, ECF No. 51 ("Rothfork Decl.").

Federal Defendants organize these layers of complexity in the background sections below, as follows: first, the applicable standard for judicial review under the APA for all of Plaintiffs' claims; second, the statutory and regulatory background for the specific statutes Plaintiffs allege Federal Defendants violated, as well as the authorities from which Federal Defendants derive their limited jurisdiction and permitting or approval authorities;[9] and, finally, the details of the agency actions Plaintiffs challenge in their suit, including relevant developments since Plaintiffs filed this lawsuit.

## III.   STANDARD OF REVIEW

The agency decisions that Plaintiffs challenge are subject to judicial review, if at all, under the standards of the APA, 5 U.S.C. §§ 701–706. The agencies' actions are presumed valid, *Pozzie v. U.S. Dep't of Housing and Urban Dev.*, 48 F.3d 1026, 1029 (7th Cir. 1995), and Plaintiffs bear the burden to prove otherwise, *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995). To prevail, Plaintiffs must meet the "high standard" of showing that the agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *Marita*, 46 F.3d at

---

[9] For added clarity, Federal Defendants note in parentheses to the subheadings in Section IV which counts of the two Complaints in these consolidated actions are implicated by which statutes and regulatory schemes.

619; 5 U.S.C. § 706(2)(A). Under this narrow standard of review, courts ask only "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Highway J Citizens Grp.*, 349 F.3d at 952–53 (citation omitted). The APA standard is "highly deferential," and courts may not substitute their judgment for that of the agency. *Smith v. Off. of Civilian Health & Med. Program of Uniformed Servs.*, 97 F.3d 950, 955–57 (7th Cir. 1996).

Summary judgment is proper if the evidence "shows that there is no genuine [issue] as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under the APA, the Court's review is confined to the administrative record. *Fl. Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44 (1985); *Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 856 (7th Cir. 2009). Thus, a motion for summary judgment in an APA case "is simply a vehicle to tee up a case for judicial review." *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (explaining that "an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious."); *see also Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999). Because extra-record evidence and trials are inappropriate in APA cases, courts decide APA claims via summary judgment based on the administrative record the agency compiles. *Cronin v. USDA*, 919 F.2d 439, 445 (7th Cir. 1990) ("Because the plaintiffs are not entitled to present evidence in court to challenge the [decisionmaker's] decision . . . , there will never be an evidentiary hearing in court."); *Nw. Motorcycle Ass'n v. USDA*, 18 F.3d 1468, 1472 (9th Cir. 1994). The agency must provide a "satisfactory explanation for its action," but the court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bagdonas v. Dep't of Treasury*, 93 F.3d 422, 426 (7th Cir. 1996) (citations omitted).

## IV.     STATUTORY AND REGULATORY BACKGROUND

**A.     National Environmental Policy Act (RUS Complaint, Count I; Corps Complaint, Counts I and IV)**

NEPA's purpose is "to promote human welfare by alerting governmental actors to the effect of their proposed actions on the physical environment." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983). NEPA requires that environmental information be available and subject to comment, review, and analysis by officials and citizens prior to making decisions. 40 C.F.R. § 1500.1(b). The Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA, 40 C.F.R. pts. 1500–1508, which are given "substantial deference" by the courts.[10] *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 673 F.3d 518, 527 (7th Cir. 2012). CEQ regulations also authorize federal agencies to adopt additional procedures to "supplement" those regulations. 40 C.F.R. § 1507.3; *Heartwood, Inc. v. U.S. Forest Serv.*, 230 F.3d 947, 949 (7th Cir. 2000). RUS has promulgated its own NEPA regulations at 7 C.F.R. pt. 1970.

NEPA requires agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS is "a detailed statement by the responsible official" on, among other things, the "environmental impact of the proposed action," "alternatives to the proposed action," and "any adverse environmental effects which cannot be avoided should the proposal be implemented." *Id.* § 4332(C)(i)–(iii); *see Marita*, 46 F.3d at 615–16. To determine if an action requires an EIS, the agency may complete an Environmental Assessment ("EA"), which is a document that briefly describes the proposal,

---

[10] The CEQ published a new rule in September 2020 revising earlier NEPA regulations, but the decisions challenged here were subject to the earlier version of CEQ's regulations. Thus, all citations to CEQ regulations in this brief refer to the regulations codified at 40 C.F.R. Part 1500 (2018).

examines alternatives, and considers environmental impacts. 40 C.F.R. §§ 1501.4(b), 1508.9. Agencies are not required to follow any prescribed form in preparing an EA, and, when the agency's EA leads to the conclusion that the proposed action will result in no significant impact, the agency may issue a Finding of No Significant Impact ("FONSI") and need not prepare an EIS.

The Supreme Court has stressed that "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Courts must accord considerable deference to the agency when assessing compliance with NEPA, *see Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), and may not approach NEPA disputes "as a panel of environmental experts attempting to decide which party is correct." *Highway J Citizens Grp.*, 349 F.3d at 955. Instead, they may "only review whether the agencies charged with carrying out this project took a 'hard look' at the relevant information and consequences and made an informed judgment." *Id.* Resolution of factual and technical issues is "properly left to the informed discretion of the responsible federal agencies." *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976). In particular, courts may not require agencies "to elevate environmental concerns over other, admittedly legitimate, considerations." *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 228 n.2 (1980) (per curiam).

B.     **The Clean Water Act (Corps Complaint, Counts II and V)**

    1.     **Section 404(e) General Permits**

The CWA establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, the CWA prohibits the discharge of pollutants, including dredged or fill material, into navigable waters unless authorized by a CWA permit. *See* 33 U.S.C. § 1311(a). The Act defines "navigable waters" as "waters of the United States," which, in turn, is defined by regulation to include certain wetlands. 33 U.S.C. § 1362(7); 33 C.F.R. § 328.3(a), (b).

14

Section 404 of the CWA authorizes the Corps to regulate discharges of dredged and fill material into waters of the United States through the issuance of permits. 33 U.S.C. § 1344. Section 404 originally authorized the Corps to issue only individual permits. The individual permit process generally involves a resource-intensive, case-by-case review, including site-specific documentation and review, opportunity for public hearing, public interest review, and a formal determination. *See generally* 33 U.S.C. § 1344(a); 33 C.F.R. pts. 320, 323, 325. Unless a categorical exclusion applies, individual permits require an analysis under NEPA. *See id*. at pt. 325.

In 1977, Congress concluded that requiring individual Section 404 permits for routine activities imposes unnecessary delay and administrative burdens on the public and the Corps. *See* 33 U.S.C. § 1344(e)(1); *see also* H.R. Rep. No. 95-830, at 38, 98, 100 (1977) (Conf. Rep.), *reprinted in* 1977 U.S.C.C.A.N. 4424. Those concerns led Congress to create the general permit program. *See* 33 U.S.C. § 1344(e). Specifically, Section 404(e) authorizes the Corps to issue general permits "for any category of activities involving discharges of dredged or fill material if the [Corps] determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). General permits are valid for no more than five years. 33 U.S.C. § 1344(e)(2). They also must comply with the CWA Section 404(b)(1) Guidelines promulgated by the U.S. Environmental Protection Agency and the Corps.

### 2.    Nationwide Permits and Regional General Permits

Nationwide permits are general permits that authorize activities on a nationwide basis. 33 C.F.R. § 330.2(b). They are aimed at advancing Congress's goal "to regulate with little, if any, delay or paperwork certain activities having minimal impacts." 33 C.F.R. § 330.1(b). They uphold environmental protections while maximizing administrative efficiency.

15

That is not to say a nationwide permit is an unlimited license to impact waters of the United States. Corps regulations set out policies and procedures used to issue, condition, modify, suspend, and revoke general permits as appropriate. 33 C.F.R. pts. 325, 330; *id.* § 330.2(c). Pursuant to this authority, the Corps issues nationwide permits subject to certain terms and conditions. *See id.* Corps divisions or districts may also use this authority to revoke a nationwide permit for a specific geographic area or case-specific activity authorization, or issue a regional general permit, which is similar to a nationwide permit except that it is regional in applicability. Further, as explained below, Corps divisions and districts have discretionary authority to (among other things) condition or restrict a nationwide permit based on concerns for the aquatic environment or public interest. *See* 33 C.F.R. § 330.1(d).

The Corps addresses nationwide permit activities at three levels: (1) nationally, (2) within each Corps geographically based division, and (3) at the districts within each division. *See id.* §§ 320.1(a)(2), 330.5; *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 19–22 (D.D.C. 2013). In brief, this three level process involves the Corps first issuing and addressing regional considerations as to a nationwide permit, which happens during the national level review and division level review (levels one and two). Then a general permit may require, under certain circumstances, that a project-specific review occur to verify that the project does, in fact, fit within the scope of the general permit. When it occurs, the verification stage corresponds to the third level of this three-level review and simply serves to confirm that a proposed activity fits under a general permit.

First Level: National Review. Before issuing nationwide permits, the Corps' Chief of Engineers conducts a predictive environmental analysis at the national level to determine whether the individual and cumulative adverse environmental impacts of the category of activities

authorized by each proposed permit for the next five years are no more than "minimal." *See* 33 U.S.C. § 1344(e). At this level, analysis of potential adverse effects necessarily consists of "reasoned predictions." *Ohio Valley Env't Coal. v. Bulen*, 429 F.3d 493, 501 (4th Cir. 2005). The Corps ensures minimal impact, in part, through "General Conditions." All authorized nationwide permit activities must comply with these. *See* 33 C.F.R. § 330.1(c). Some limit the types of activities authorized. *See id.*

The Corps seeks public comment, prepares appropriate NEPA documentation, and analyzes a number of factors relevant under the CWA Section 404(b)(1) Guidelines. 33 C.F.R. § 330.5(b)(2), (3); 40 C.F.R. § 230.7(b). This analysis includes a "public interest review" of approximately twenty factors, such as how a nationwide permit's issuance might affect conservation, wetlands, and energy needs. 33 C.F.R. §§ 320.1(a)(1), (c) , 320.4(a)(1) . The Corps ultimately memorializes its Section 404(b)(1), NEPA, and other national-level environmental analyses in a decision document for each nationwide permit. 33 C.F.R. § 330.5(b)(3). Because general permits follow agency rulemaking procedures and involve intensive analysis, it can take years for them to issue.

Second Level: Division Engineer Review. The Corps recognizes that there are "regional differences in aquatic resource functions and services across the country." 81 Fed. Reg. 35,186, 35,188 (June 1, 2016). Thus, each division engineer has "discretionary authority to modify, suspend, or revoke [nationwide permit] authorizations for any specific geographic area, class of activities, or class of waters within [their] division . . . ." 33 C.F.R. § 330.5(c)(1). Division engineers may exercise this authority "whenever [they] determine[] sufficient concerns for the environment under the Section 404(b)(1) Guidelines or any other factor of the public interest so requires, or if [they] otherwise determine[] that the [nationwide permit] would result in more than

minimal adverse environmental effects either individually or cumulatively." *Id.* § 330.4(e)(1) ; *see id.* § 330.1(d). It is through this second-level review that a particular district might impose particular conditions on a nationwide general permit. *See, e.g.*, *infra* at Section V.C.1 (describing conditions imposed on NWP 12 by the Mississippi Valley Division).

Before a division engineer can modify, suspend, or revoke a nationwide permit within a specific geographical boundary, the proposed changes must undergo public notice and comment. *See* 33 C.F.R. § 330.5(b)(2)(ii), (c)(1) . This comment process is conducted concurrently with the national-level notice and comment process for the proposed nationwide permits. *See id.* § 330.5(b)(2)(ii). The division engineers' consideration and conclusions, however, are documented separately from the national-level decision documents. The division engineers may impose regional conditions for specific authorized activities within the Corps' districts. *Id.* §§ 330.5(c)(1)(i), 330.1(d) .

Third Level: Project-Specific Review by District Engineers. In some cases, permittees may proceed with nationwide (or regional) permit-authorized activities without notifying the Corps. 33 C.F.R. §§ 330.1(e)(1), 330.2(c) . In other circumstances, the nationwide permit or a general or regional condition may require a prospective permittee to submit to the Corps a pre-construction notice ("PCN") seeking verification that the activity complies with the applicable terms and conditions.[11] *Id.* §§ 330.1(e)(1), 330.6(a) . In those situations, the district engineer conducts a limited analysis of the proposed activities on a case-by-case basis. NWP000012. The district engineer "may add activity-specific conditions," such as compensatory mitigation requirements, to "ensure that the activity complies with the terms and conditions of the NWP" and that adverse

---

[11] Consistent with other nationwide permit verifications, Corps districts are not required to conduct additional NEPA analysis in issuing verifications. NWP005283.

impacts are no more than minimal individually and cumulatively and will not be contrary to the public interest. 33 C.F.R. §§ 330.1(e)(2)–(3), 330.6(a)(3)(i) ; *see* NWP000022. The public interest review at the verification stage is distinct from the approximately twenty-factor public interest review found elsewhere in the Corps' regulations, and which informs the Corps' decision whether to issue the general permit in the first place. *Compare* 33 C.F.R. §§ 330.1(e)(2)–(3), 330.6(a)(3)(i) (separate regulations reflecting public interest review at verification stage), *with* 33 C.F.R. § 320.4(a) (set of approximately twenty public-interest considerations to evaluate in issuing a permit or reviewing a permit application).[12]

If the district engineer determines that "the adverse effects are more than minimal," he or she "will notify the prospective permittee that an individual permit is required . . . ." 33 C.F.R. § 330.1(e)(3). This process, therefore, ensures that *only* those projects with—at most—minimal environmental impacts, qualify for the streamlined authorization available under general permits. No additional public comment or NEPA analysis is required for general permit verifications. *See id.* § 330.6(a); *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1053 (10th Cir. 2015).

The structure described above effectuates congressional intent. The purpose of the general permit program is to minimize the delays and administrative burdens attendant to the individual permitting process where the Corps is able to identify categories of activities that meet the criteria in Section 404(e) of the CWA. Attempting to conduct the sort of detailed regulatory or impacts analysis that is associated with the *individual* permitting process for each individual project that falls within a *general* permit would defeat the efficiency gains that Congress enacted the general permit provision, 33 U.S.C. § 1344(e), to secure. Accordingly, issuing a "verification" is not

---

[12] Following verification, the district engineer retains discretion to suspend, modify, or revoke the verification based on later arising "concerns for the aquatic environment under the . . . 404(b)(1) Guidelines or for any factor of the public interest." 33 C.F.R. § 330.1(d).

analogous the issuance of an individual permit. *See* 33 C.F.R. § 330.6(a) (explaining procedures to verify that an activity is authorized under a nationwide permit); *see also infra* at Section VI.D.3. And because the Corps is not issuing a permit when it issues a verification (because the general permit itself is the relevant permit) the Corps does not, for example, apply the Section 404(b)(1) Guidelines applicable to issuing a permit in the first place. *See infra* at Section VI.D.3. This, too, makes sense. If the Corps were required to conduct its full regulatory analysis, including its analysis under the Section 404(b)(1) Guidelines at the *verification* stage—despite already having analyzed the applicable considerations when issuing the general permit—the verification stage would, in effect, devolve into the issuance of an individual permit. This would largely write Section 404(e) out of the CWA.

The issuance of NWP 12 and the Utility RGP—as well as the verifications for the particular project challenged in this case—illustrates this process. *See infra* at Sections V.C–D.

## C.     The Endangered Species Act (Corps Complaint, Count III)

Section 7(a)(2) of the ESA requires each federal agency to "insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). The ESA's implementing regulations outline the procedure whereby federal agencies proposing to take an action (i.e., "action agencies") follow a series of steps that may culminate in consultation with the appropriate expert "consulting agency," either USFWS or the National Marine Fisheries Service ("NMFS"), depending on the species.

The first step in the Section 7 process is for the action agency to assess whether its proposed action "may affect" an endangered or threatened species or that species' critical habitat. 50 C.F.R. § 402.14(a). If the action agency determines there is no effect, consultation is not required and the

agency's ESA obligations are satisfied. *Id.*; *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 913 (9th Cir. 2018).

If the agency finds that its proposed action "may affect" a listed species or critical habitat, consultation is required. 50 C.F.R. § 402.14(a). There are two varieties of consultation: informal or formal. Informal consultation, which typically includes the preparation of a Biological Assessment, is an "optional process that includes all discussions, correspondence, etc." between the two agencies and is "designed to assist the Federal agency in determining whether formal consultation or a conference is required." *Id.* § 402.13(a); *see also id.* § 402.14(b)(1). "If during informal consultation it is determined by the [action agency], with the written concurrence of the [consulting agency], that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." *Id.* § 402.13(c). If, however, the action is "likely to adversely affect" listed species or critical habitat, the agencies must engage in formal consultation. *Id.* §§ 402.13(c), 402.14(a)–(b). Formal consultation culminates in the issuance of a written biological opinion by the consulting agency that assesses the likelihood of "jeopardy" to the species and "destruction or adverse modification" of its critical habitat. *Id.* § 402.14(g)(4); 16 U.S.C. § 1536(3)(A).

## V.    CHALLENGED AGENCY ACTIONS

### A.    The EIS and Record of Decision (RUS Complaint, Count I; Corps Complaint, Count IV)

Federal Defendants completed an EIS for the CHC Project in connection with certain federal approvals and decisions. RUS served as the "lead agency" in the NEPA process, and the Corps, USFWS, and the U.S. Environmental Protection Agency participated as "cooperating

agencies."[13] ROD007600. Pursuant to 40 C.F.R. Section 1505.2's requirement to prepare a record of decision following completion of an EIS, Federal Defendants issued their Record of Decision in January 2020. ROD007652–54.

RUS prepared the EIS to enable its future consideration of a potential application for financial assistance from one of the Intervenors, Dairyland Power Cooperative ("Dairyland"), which will own approximately 9% of the CHC Project. ROD004941. Pursuant to the Rural Electrification Act of 1936, 7 U.S.C. §§ 901–950cc-2, RUS administers programs to achieve infrastructure improvements in rural communities, including the RUS Electric Program, which provides loans or guaranteed loans to finance the construction or improvement of electric distribution, transmission, and generation facilities. ROD004974; *see* 7 U.S.C. §§ 902, 904. In the Record of Decision, RUS "determined that the NEPA review is complete." ROD007607. If Dairyland applies for financial assistance, RUS will need to undertake additional financial, technical, and engineering reviews before making a final determination on any application. ROD007607–08.

The Corps signed the Record of Decision in its capacity as a cooperating agency under NEPA. The Corps' signature on the Record of Decision itself did not create any legal rights, as that document did not issue the Nationwide or Regional General Permits or verify that the proposed activities met the terms and conditions of the Nationwide and Regional General Permits. Instead, the Record of Decision contemplated further agency action—namely, issuance of a right-of-way

_____

[13] CEQ regulations provide a process for coordinating NEPA review among multiple federal agencies that are involved in a project. "Lead" agencies "supervise the preparation" of an EIS. 40 C.F.R. § 1501.5(a). "Cooperating" agencies play a supporting role, including by developing information and analyses that fall within the cooperating agency's areas of expertise. *See generally* 40 C.F.R. § 1501.6. Plaintiffs assert a NEPA claim against RUS and the Corps, but not against USFWS. *See generally* RUS Compl.; Corps Compl.

through Corps-owned property in the Refuge. ROD007607 (subjecting right-of-way request "to further coordination with the [Corps] Real Estate Division"). Plaintiffs' Complaint does not challenge the Corps' right-of-way grant. *See generally* Corps Compl.

During the NEPA process, Federal Defendants solicited input from numerous federal and state agencies, local governments, members of the public, and federally recognized tribes. ROD004999. They considered hundreds of public comment letters and held twelve well-attended public meetings. ROD004999–5003. The final EIS, published in October 2019, spans 1,241 pages and took three years to develop. ROD004942 (noting that NEPA process began in 2016).[14]

Consistent with NEPA, the EIS sets out the underlying purpose and need for the CHC Project, analyzes six alternatives in detail, and compares those alternatives to a "no action" alternative. ROD004941–42, ROD004945–50 (summary). It explains Federal Defendants' rationale for dismissing other types of alternatives, including "non-transmission" alternatives, from further consideration. ROD004945–46 (summary). The EIS also describes the affected environment and analyzes the potential impacts of the CHC Project and its alternatives on a broad range of environmental, socioeconomic, cultural, and historical resources. *See generally* ROD004952–63 (summary). Finally, the EIS identifies Federal Defendants' preferred alternative, which features 101 miles of transmission line (approximately 97 miles of which are co-located with existing rights-of-way for transmission lines, roadways, and railways). ROD005098–99.

---

[14] Federal Defendants are currently in the process of preparing an EA to assess the significance of impacts related to eight minor modifications to the CHC Project's route that were proposed after the Record of Decision was signed in January 2020. The public comment period for that EA ended on July 24, 2021. *See* USDA, *Notice of Availability of an Environmental Assessment* (June 24, 2021), https://www.rd.usda.gov/sites/default/files/21_6_15_c-hc_ ea_noa_ final.pdf (last visited Sept. 1, 2021).

In addition to the NEPA analysis, the agencies completed informal and formal ESA consultation regarding the CHC Project. RUS served as the lead action agency for ESA consultation, with USFWS and the Corps signing on as cooperating agencies. USACE007848. In November 2018, RUS transmitted a Biological Assessment to USFWS. ROD021847. The Biological Assessment concluded that the CHC Project may affect, and is likely to adversely affect, the endangered rusty patched bumble bee and the threatened northern long-eared bat, but that all impacts to the northern long-eared bat would be covered by the 4(d) rule for that species, 81 Fed. Reg. 1900, 1908 (Jan. 14, 2016), and the formal consultation that occurred on the 4(d) rule. ROD021847; USACE007844. The Biological Assessment also concluded that the project may affect, but was not likely to adversely affect, the endangered Iowa pleistocene snail and the threatened northern wild monkshood. USACE007844. And finally, it found that the CHC Project would have "no effect" on any other ESA-listed species, including, as relevant to Plaintiffs' Complaint, the whooping crane and the Higgins-eye pearlymussel. USACE007844.

On May 31, 2019, USFWS sent a letter and Biological Opinion to RUS concurring in the "not likely to adversely affect" determinations, USACE007258–59, agreeing that all ESA obligations had been met regarding the northern long-eared bat, USACE007263, and determining that the CHC Project was not likely to jeopardize the continued existence of the rusty patched bumble bee, USACE007279. USFWS, as a matter of policy, does not respond to "no effect" determinations, but acknowledged that RUS had analyzed the Project's impacts on several other species. USACE007258. USFWS stated that the Biological Opinion "satisfie[d] the Section 7(a)(2) consultation requirement for federal agencies." USACE007262. USFWS subsequently revised the Biological Opinion due to new information regarding the Project's potential impacts on the rusty

patched bumble bee, but reached the same "no jeopardy" determination. *See* USACE000650 (Dec. 22, 2019 Revised Biological Opinion).

**B.     USFWS's Compatibility Determination and Right-of-Way Permit (RUS Complaint, Count II)**

Plaintiffs challenge two USFWS decisions that were subsequently withdrawn: the December 2019 Compatibility Determination and the September 2020 Right-of-Way Permit. *See generally* RUS Compl. ¶¶ 146–98 (Count II); Notice of Withdrawal & Ex. A to Notice of Withdrawal, Case No. 96, ECF Nos. 69, 69-1. As explained in Section VI.A.2, below, the Court lacks subject matter jurisdiction over Plaintiffs' claim against USFWS because it is moot.

Following extensive study of potential alternative routes that would not cross the Refuge, as described in Section VI.B.2.b below, Intervenors applied to USFWS for authorization to construct the CHC transmission line on a portion of the Refuge along the Mississippi River in Clayton County, Iowa. *See* ROD007569. They proposed to relocate two existing rights-of-way for 69 and 161 kilovolt transmission lines that currently cross that area of the Refuge, rebuild them as the 345 kilovolt CHC transmission line, and restore the abandoned rights-of-way in accordance with a USFWS-approved vegetation management plan. ROD007568–69, ROD007573, ROD007583.

In considering the proposal, USFWS followed the standards and procedures set forth in the National Wildlife Refuge System Administration Act, as amended ("Refuge Administration Act"), 16 U.S.C. § 668dd–668ee, and its implementing regulations. The Refuge Administration Act authorizes USFWS to "permit the use of, or grant easements in, over, across, upon, through, or under any areas within the [National Refuge] System for purposes such as . . . *powerlines*, . . . including the construction, operation, and maintenance thereof, whenever [it] determines that such uses are compatible with the purposes for which these areas are established." 16 U.S.C.

25

§§ 668dd(d)(1)(B) (emphasis added). Specifically, USFWS may authorize "uses" such as transmission lines when the "Refuge Manager has determined that the use is a compatible use." 50 C.F.R. § 26.41. USFWS makes findings of compatibility (or non-compatibility) in documents known as "compatibility determinations." *See* Final Compatibility Regulations Pursuant to the National Wildlife Refuge System Improvement Act of 1997, 65 Fed. Reg. 62,458, 62,458 (Oct. 18, 2000).

In its December 2019 Compatibility Determination, USFWS determined that construction of the CHC transmission line qualified as a compatible use of the Refuge, finding that it was a "minor realignment" "of an existing right-of-way" under 50 C.F.R. § 26.41(c). ROD007583. USFWS formally authorized the transmission line to cross the Refuge in its September 2020 Right-of-Way Permit, which also specified terms and conditions for construction within the Refuge, maintenance of the new right-of-way, and restoration of the abandoned rights-of-way. *See generally* FWS01544–54. The authorized right-of-way was approximately one and one-quarter mile long and 260 feet wide. *See* ROD007573–74.

On August 27, 2021, USFWS withdrew its December 2019 Compatibility Determination and revoked the September 2020 Right-of-Way Permit, concluding that a newly discovered factual error (*see* Section II, *supra*) required rescission. Ex. A to Notice of Withdrawal, Case No. 96, ECF No. 69-1. Thus, as detailed in Section VI.A.2 below, Plaintiffs' challenge to these USFWS actions is moot.

## C.     The Corps' Issuance of Nationwide Permit 12 and St. Paul Utility Regional General Permit (Corps Complaint, Counts I, II, and III)

The Corps verified that certain activities related to the CHC Project proposed in waters of the United States were authorized under two general permits: the activities in Iowa were authorized under NWP 12 and the activities in Wisconsin were authorized under the Utility RGP. *See*

USACE000693–758; USACE000759–809; USACE0001199–1220. Plaintiffs claim the Corps' issuance of NWP 12 and the Utility RGP violated NEPA (Count I), the CWA (Count II), and the ESA (Count III). Corps Compl. ¶¶ 86–110.

### 1.    NWP 12

The Corps issued a set of nationwide permits—including NWP 12—in January 2017, following the multi-step process in its regulations.[15] NWP000002; *see supra* Section IV.B.2. As with all the nationwide permits, the Corps' review for NWP 12 included an Environmental Assessment (to consider the permit's potential environmental effects), a public interest review, and an analysis under the Section 404(b)(1) Guidelines. *See* NWP005262–349.

Consistent with the purpose of the nationwide permit program to reduce the burdens and delays associated with individual permits, NWP 12 aims to streamline the CWA Section 404 permit process, with its specific focus on "the construction, maintenance, repair, and removal of utility lines and associated facilities in waters of the United States." NWP000010, 127–28. "Utility line" is defined to include electric, telephone, internet, radio, and television cables, lines, and wires, as well as oil or gas pipelines. NWP000127.

NWP 12 only applies, however, if "the activity does [1] not result in the loss of greater than ½-acre of waters of the United States for [2] each single and complete project." NWP000127. There also "must be no change in pre-construction contours of waters of the United States." *Id*. For linear projects like transmission lines that cross "a single or multiple waterbodies several times at separate and distant locations, each crossing is considered a single and complete project for

---

[15] The Corps issued a new set of nationwide permits in 2021. NWP 12, challenged in this action, expired on March 15, 2021 and is no longer available for use for new activities. 86 Fed. Reg. 2747. The issuance of superseding nationwide permits is one reason that Plaintiffs' challenge to NWP 12 in this case is moot. *See infra* Section VI.A.3.

purposes of [nationwide permit] authorization." NWP000149. NWP 12 requires a PCN to the Corps district engineer "prior to commencing the activity" if, among other reasons, the activity also requires a Section 10 permit under the Rivers and Harbors Act. NWP000128.[16]

Under NWP 12, "loss" of a regulated water is treated in functional terms. A regulated water, including wetlands, is "lost" when it ceases to function as a water, meaning "discharges of dredged or fill material . . . change an aquatic area to dry land, increase the bottom elevation of a waterbody, or change the use of a waterbody." NWP000148. *See* 33 C.F.R. § 323.2(e)(1) (defining "fill material"). Temporary impacts are not counted as such a "loss." NWP000012. Nor is conversion of one type of wetlands to another a "loss" of regulated waters. NWP000148; *see also Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 701 (5th Cir. 2018) ("the Corps' responsibility under the CWA is to ensure the protection of aquatic functions and services, which does not include the protection of tree species as such").

NWP 12 is also subject to thirty-two General Conditions. *See* NWP000140–46. Among them are General Conditions 15 and 18. General Condition 15 prohibits the use of the same nationwide permit "more than once for the same single and complete project" (i.e., for linear projects like transmission lines, at each individual waterbody crossing). NWP000141. General Condition 18 prohibits the use of any nationwide permit for activities that would jeopardize species listed under the ESA or adversely modify designated critical habitat for such species. NWP000140; *see also* 33 C.F.R. § 330.4(f). If any species or designated critical habitat might be affected or is

---

[16] The Rivers & Harbors Act is a separate statute, designed to preserve and protect the Nation's navigable waterways. *United States v. Pa. Indus. Chem. Corp*., 411 U.S. 655, 663 (1973). Section 10 of the Act (codified at 33 U.S.C. § 403) prohibits structures and activities that obstruct navigable waters unless they are expressly authorized by the Department of the Army through individual permits that are granted only after case-by-case evaluations, or through authorizations to proceed under general permits that authorize activities that fall within specified parameters. *See* 33 C.F.R. § 322.3.

in the vicinity of the proposed activity, General Condition 18 requires a PCN. NWP000099, NWP000141–42. If a PCN is required under General Condition 18, prospective permittees may not begin work under authority of the nationwide permit unless the district engineer notifies them that the ESA's requirements have been satisfied. NWP000141; *see* 33 C.F.R. § 330.4(f)(2).

As a general permit subject to three-level review, the Corps evaluates the applicability of NWP 12: (1) nationally, (2) within each Corps geographic-based division, and (3) at the districts within each division. *See* 33 C.F.R. §§ 320.1(a)(2), 330.5; *Sierra Club*, 990 F. Supp. at 19–22; *see also supra* Section IV.B.2.

1.    <u>National Review</u>: The Corps completed an EA for NWP 12 on December 21, 2016. NWP005262, 5341. The Corps reviewed the public comments and used the substantive comments "to improve the NWP by changing NWP terms and limits, pre-construction notification requirements, and/or NWP general conditions, as necessary." NWP005267. Based on the analysis in the EA, the Corps issued a FONSI for NWP 12. NWP005340. The Corps also analyzed the relevant factors under the Section 404(b)(1) Guidelines. 33 U.S.C. § 1344(b)(1); 40 C.F.R. pt. 230, Subparts C–F. The Corps conducted a robust "public interest review" of approximately twenty factors, such as how NWP 12 issuance might affect conservation, wetlands, and energy needs. 33 C.F.R. §§ 320.1(c), 320.4(a)(1). This public interest review in the NWP 12 decision document analyzes each of the necessary factors to inform the Corps' determination that the issuance of the permit was not contrary to the public interest. NWP005317–24, NWP005340.

With regard to impacts, the EA discussed the affected environment, which "consists of terrestrial and aquatic ecosystems in the United States, as they have been directly and indirectly affected by past and present federal, non-federal, and private activities." NWP005289. The Corps then examined the potential cumulative impacts from issuing NWP 12 across the nation on the

affected environment. NWP005303–17. The Corps also considered certain substantive public comments concerning NWP 12 to assess the expected impacts. NWP005287. The EA determined that during the five-year period NWP 12 was planned to be in effect, the activities it authorizes will result in no more than minimal cumulative effects to wetlands, streams, other aquatic ecosystems, coastal areas, and endangered and threatened species and their habitats. NWP005313–16. In addition, the Corps determined that, as part of its public interest review, the adverse effects of NWP 12 activities on conservation and the general environment will be minor. NWP005317–18.

2.  Division Engineer Review: The structure of the NWP program relies on the expectation that Corps Divisions and Districts will "add regional conditions to the NWPs to enhance protection of the aquatic environment and address local concerns." NWP005288. Division engineers issue supplemental decision documents to ensure compliance with the "no more than minimal individual and cumulative adverse environmental effects" requirements for general permits. NWP000009.

The Corps Mississippi Valley Division issued a Supplemental Decision Document for NWP 12 in Iowa following two public comment periods. USACE012950. This analysis included the potential need for additional modifications to NWP 12 based on regional conditions to ensure that individual and cumulative environmental effects in the relevant area are no more than minimal. *Id.* The Corps' Division-level analysis estimated that NWP 12 would be used approximately 53 times per year in Iowa for activities requiring PCNs, resulting in approximately 1.82 acres of wetland impacts and 5,328 linear feet of impacts to tributaries. USACE012957. The Corps projected another 25 uses impacting 0.86 acres of wetlands and 2,513 linear feet of tributary that would not require PCNs. *Id.* The Corps also estimated that three percent of NWP 12 verifications

30

would require compensatory mitigation to ensure minimal impacts. *Id.* The Mississippi Valley Division concluded that, based on its analysis, NWP 12 would "have no more than minimal individual and cumulative adverse environmental effects" in Iowa. USACE012960.

By contrast, as discussed below (*see infra* Section V.C.2), the St. Paul District, whose jurisdiction includes waters of the United States in Wisconsin, considered public comment and revoked NWP 12 within that jurisdiction based on specific "resource protection, interagency coordination and permit efficiency needs for utility projects in" the locality. USACE009003, 8999–9001; USACE13001.

3. <u>Project-Specific Review by District Engineers</u>: As explained above, permittees may sometimes proceed with nationwide permit-authorized activities without notifying the Corps. 33 C.F.R. §§ 330.1(e)(1), 330.2(c) ; NWP000003 ("For some NWPs, the project proponent may proceed with the NWP activity as long as he or she complies with all applicable terms and conditions, including applicable regional conditions."). As relevant to this case, however, the proposed CHC Transmission Line Project required a PCN under NWP 12 to the Rock Island District, the Corps district with authority in Iowa, to confirm that the proposed project complies with the NWP 12 terms and conditions, including the Iowa supplemental conditions. *See* 33 C.F.R. §§ 330.1(e)(1), 330.6(a) . "The purpose of a PCN is to give the district engineer an opportunity to review a proposed NWP activity . . . to ensure that the proposed activity qualifies for NWP authorization." NWP000003. As required by the CWA, the Rock Island District considered the specific features of the project, including the proposed activities, size of permanent and temporary impacts, and efforts undertaken to avoid and minimize adverse impacts. USACE001191–92. Upon reviewing the PCN, the Corps Rock Island District verified that, with the addition of four special conditions, the activities proposed in Iowa in connection with the CHC Transmission Line Project

"will result in no more than minimal individual and cumulative adverse effects on the aquatic environment and will not be contrary to the public interest."[17] USACE001196. Accordingly, the Corps verified that the project "complies with all terms and conditions" of NWP 12. *Id.*

### 2. Utility RGP

District and Division Engineers also retain discretionary authority to suspend or revoke any NWP "whenever [they] determine[] sufficient concerns for the environment under the section 404(b)(1) Guidelines or any other factor of the public interest so requires, or if [they] otherwise determine[] that the [nationwide permit] would result in more than minimal adverse environmental effects either individually or cumulatively." 33 C.F.R. § 330.4(e)(1); *see id.* § 330.1(d). The St. Paul District, whose jurisdiction includes waters of the United States in Wisconsin, revoked NWP 12 within that jurisdiction and implemented a regional condition to prohibit use of any NWP for linear utility and linear transportation projects. USACE009003, 8999–9001. The St. Paul District issued the Utility RGP covering utility activities, including linear projects such as transmission lines. USACE009003.

Though the Utility RGP and NWP 12 have some differences in coverage and scope not relevant here, they provide a similar procedure for notifying the Corps of regulated activities through PCNs, and they use the same methodology for calculating loss and impacts to waters of the United States. USACE009005, USACE009086, USACE009090. Further, and importantly, the Utility RGP is at least as protective as NWP 12 in terms of environmental impacts. Like NWP 12, the Utility RGP applies only to activities that cause no more than one-half acre loss of waters of the United States for each single and complete project, and like all general permits it cannot be

---

[17] As the Corps pointed out in issuing the nationwide permits, "[s]ince NEPA compliance is achieved by Corps Headquarters through the preparation of a combined decision document that includes an [EA] and [FONSI], Corps districts do not need to prepare supplemental environmental impact statements for NWP verifications." NWP000033.

used for activities that cause greater than minimal environmental impacts separately or cumulatively. USACE009001. Moreover, the Utility RGP requires 30-days' notice for any "overall project"—the aggregate of all single and complete projects related to the same purpose—affecting at least one-half acre of waters of the United States even where no single and complete project requires notice. USACE009048. Finally, like NWP 12, the Utility RGP does not authorize any activity that is likely to jeopardize any federally listed endangered or threatened species, or destroy or adversely modify any designated critical habitat for species. USACE009047. It also does not authorize any activity that "'may affect' a listed species or critical habitat, *unless* ESA Section 7 consultation addressing the effects of the proposed activity has been completed." *Id.* And it requires a PCN for any activity that "might affect any Federally-listed threatened, endangered, or proposed threatened and endangered species, designated critical habitat, or proposed critical habitat." USACE009049.

As with NWP 12, in issuing the Utility RGP, the St. Paul District completed an EA under NEPA and a review of the Section 404(b)(1) Guidelines and public interest factors under the CWA. USACE008997, USACE009018–35, USACE009005–18. The Utility RGP EA described Minnesota and Wisconsin aquatic resources and discussed reasonably foreseeable direct, indirect, and cumulative effects on these resources on a predictive basis. USACE009005–18. The Corps EA for the Utility RGP noted "[a]dverse effects will be limited by the terms and conditions of the RGP and special conditions added to RGP verifications." USACE009005. Based on its EA, the St. Paul District issued a FONSI, determining that "the issuance of this RGP will not have a significant impact on the quality of the human environment." USACE009041. The District also concluded that "issuance of this RGP is not contrary to the public interest" and complies with the Section 404(b)(1) Guidelines. *Id.*

33

As a district-issued general permit, the Utility RGP is subject to two levels of review—the district-level review upon issuance, described above, and any project-specific review when a PCN is required. Here, Intervenors submitted two PCNs for verification under the Utility RGP. USACE004822; USACE004225. The Corps considered the proposed specific activities, avoidance and minimization measures, and anticipated impacts to waters, and verified that the proposed impacts met the requirements of the Utility RGP. USACE000679–85; USACE000686–91.

## D.      Verifications under NWP 12 and Utility RGP (Corps Complaint, Count V)

As explained above, both NWP 12 and the Utility RGP require—in some circumstances— the submission of a PCN so that the Corps can "verify" the project falls within the scope of the applicable general permit. Here, Intervenors submitted PCNs for regulated activities in both Iowa and Wisconsin for the proposed CHC Transmission Line. On September 19, 2019, they submitted one PCN under NWP 12 to the Rock Island District for the portion of the regulated activities in Iowa ("NWP 12 PCN"). USACE004032. That same month, they also submitted two PCNs (from different Intervenors) under the Utility RGP to the St. Paul District for the Wisconsin portion of the regulated activities. USACE004219; USACE004819.

The Iowa portion of the CHC Project triggered NWP 12's requirement for a PCN and proceeded through the Corps' verification stage. This trigger was not the result of a loss of greater than 1/10 acre of wetlands, but instead due to the project's need for a Section 10 permit under the Rivers and Harbors Act for its proposed crossing over the Mississippi River and its potential impacts on endangered or threatened species. USACE004038; *see* NWP000128 (requiring a PCN where "a section 10 permit is required"); NWP000141 (requiring a PCN "if any listed species or designated critical habitat might be affected or is in the vicinity of the activity"). The NWP 12 PCN addressed the Iowa portion of the CHC Project, which runs from the Hickory Creek Substation in Dubuque County to the Wisconsin state boundary at the Mississippi River near

Cassville, Wisconsin. USACE004038. This portion of the CHC Project proposes to construct 15 miles of 345 kV transmission line, and decommission and remove existing transmission line infrastructure that parallels and partially overlaps with the project area. USACE004038–39. The PCN demonstrates that the project was designed to avoid and minimize impacts to regulated waters where feasible. USACE004048. For instance, clearing activities in forested and shrub wetlands will occur by hand or by equipment parked on uplands or temporary matting.[18] Most of the impacts to waters of the United States (6.65 acres) will be temporary due to the use of wetland matting during construction. USACE004045. Total permanent loss of wetlands for the Iowa portion of the project is expected to be only 0.057 acres. *Id.*

The Corps reviewed the PCN, including the projected temporary and permanent impacts and mitigation measures. *See* USACE001191–92. On November 20, 2019, the Corps verified that the proposed activities are authorized under NWP 12. USACE001199. In issuing the verification, the Corps did not impose compensatory mitigation requirements (which are rarely required for projects falling under NWP 12). USACE1192. However, it added four activity-specific conditions: (1) notice to the Corps 72 hours before construction begins; (2) compliance with the terms of the programmatic agreement for cultural resource compliance; (3) removal of temporary mats in their entirety and restoration of temporarily impacted areas to preconstruction elevations and native vegetation; and (4) reporting to the Corps consistent with RGL 08-03 that documents the extent of restoration work in the right-of-way. USACE001199. These conditions ensure the regulated activities related to the CHC Transmission Line Project "compl[y] with the terms and conditions

---

[18] Hand clearing avoids impacts to wetlands because it does not substantially disturb the root system or involve mechanized pushing, dragging, or other similar activities that redeposit excavated soil material. USACE004047. Temporary mats are also often used to minimize adverse effects to wetlands. "Uplands" here generally refers to non-wetland areas.

of the [nationwide permit]" and that its adverse impacts are no more than minimal, both individually and cumulatively. USACE001196; *see* 33 C.F.R. §§ 330.1(e)(2)–(3),USACE001196; *see* 33 C.F.R. § 330.1(e)(2), (3) ; *id.* § 330.6(a)(3)(i); *see also* NWP000022.

Under the terms of the November 20, 2019 verification, the authorization expires on March 18, 2022, "unless the nationwide permit is modified, reissued or revoked," in which case Intervenors "have twelve months from [March 18, 2022] to complete your activity under the present terms and conditions" if construction has begun or has been contracted to begin. USACE001200. In 2021, the Corps finalized a rule re-issuing twelve existing nationwide permits (including NWP 12) and issuing four new ones. 86 Fed. Reg. 2744, 2744 (Jan. 13, 2021). The 2021 version of NWP 12 is different in ways significant to this case; most notably, it no longer covers transmission lines (such as the line at issue in this case), but instead covers only oil and gas pipelines. Transmission lines are now covered by the new Nationwide Permit 57. Intervenors have attested that they have not conducted work authorized under the November 20, 2019 NWP 12 verification (which Plaintiffs challenge in Count V), and, due to changes in their construction plans, they will seek a new authorization before undertaking any work in jurisdictional waters in Iowa. Rothfork Decl. ¶¶ 8–9. Since the 2017 version of NWP 12 is no longer in effect, any new verification for CHC Project activities in Iowa would most likely fall under the newly issued Nationwide Permit 57 or an individual permit. Therefore, Intervenors will not perform any work requiring authorization under the November 20, 2019 verification or the version of NWP 12 challenged in this litigation. *Id.*

As to the portion of the CHC Project in Wisconsin, Intervenors submitted two PCNs for verification under the Utility RGP. The first was submitted by American Transmission Company, LLC on September 4, 2019. USACE004819. It addressed regulated activities related to the

construction of a new substation near Montfort, Wisconsin, and roughly 53.4 miles of transmission line between the proposed new substation and the Cardinal Substation in Middleton, Wisconsin. USACE004822. Like the NWP 12 PCN, this PCN describes, among other things, the proposed activities, avoidance and minimization measures undertaken to reduce impacts to regulated waters, and anticipated impacts to regulated waters under. USACE004822–29. For instance, it states that construction matting will be used to minimize ground impacts in regulated waters. USACE004824. This portion of the project also proposes to use existing transmission line or highway rights-of-way, which will further reduce loss of waters of the United States. USACE004823, USACE004827. The 53.4 miles of this project section will include only five transmission line structures within regulated wetlands. USACE004828. These structures will result in a just 0.011 acres of permanent loss of regulated wetlands and approximately 7.8 acres of temporary impacts where matting is needed. *Id.*

Intervenor ITC Midwest LLC ("ITC") submitted the second Wisconsin PCN under the Utility RGP on September 19, 2019. USACE004219. This PCN addresses the eastern stretch of the project, which includes approximately 34 miles of transmission line from the new proposed substation in Montfort, Wisconsin, to Cassville, Wisconsin. USACE004225. It also proposes to decommission and remove existing transmission line infrastructure that parallels and partially overlaps with the proposed new infrastructure. USACE004226. The PCN substance is similar to the two described above: it discusses the use of temporary wetlands matting, hand or reaching equipment parked in uplands, and other techniques to minimize impacts to regulated waters. USACE004235–40. Further, as with the other sections of the project, the loss of regulated waters in this portion are miniscule. In this 34-mile stretch of the project, only four permanent transmission structures are proposed in covered wetlands, resulting in permanent loss of

approximately 380 square feet, or 0.009 acres. USACE004238. The project also proposes to place temporary matting in thirty-four wetlands, which is anticipated to cause temporary impacts to 5.8 acres. *Id.*

Both of the Wisconsin PCNs sought a waiver to Utility RGP Condition 15, which regulates the duration of temporary impacts. USACE004831; USACE004240. For this reason, and due to the amount of proposed temporary impacts and forested wetland clearing, as well as potential effects on ESA-listed species, PCN submissions were required. USACE009049; USACE004225. As in Iowa, the Corps evaluated the project's design and proposed impacts before ultimately concluding that the proposed activities "will result in no more than minimal individual and cumulative adverse effects on the aquatic environment and will not be contrary to the public interest," and "complies with all terms and conditions" of the Utility RGP. USACE000679–85; USACE000686–91. The Corps verified both Wisconsin PCNs on December 20, 2019.[19] Based on the Corps' case-specific review that concluded there would be "no more than minimal adverse effects," both verifications granted waivers to Condition 15's temporary impacts duration so as to allow timber matting to remain in place longer than the general condition allows. USACE000693; USACE000759. Neither verification imposed compensatory mitigation or any other special conditions, but reiterated that the Utility RGP terms and conditions apply. USACE000693; USACE000759. Accordingly, temporary impacts are still required to be restored. USACE000731 (listing general conditions, including "Restoration of Temporary Impacts"); USACE000782 (same).

---

[19] Both verifications expire on February 20, 2023, "unless the general permit is modified, suspended or revoked." USACE000760; USACE000694. Unlike the 2017 issuance of NWP 12, the Utility RGP is still in effect as it was when the verifications issued.

To summarize, the total loss of regulated wetlands associated with the CHC Project, aggregated across all three verifications, amounts to, at most, just 0.077 acres. To put this number in context, a regulation football field (not counting the end zones) is approximately 1.1 acres, such that the total permanent loss of wetlands due to the CHC Project would be equivalent to the area between the goal line and seven-yard line. This minimal level of permanent loss of wetlands is spread across 102.4 total miles of power transmission line.

All told, Plaintiffs challenge (1) RUS's completion of an EIS to support a potential future decision on a request for financial assistance that has not even been made; (2) the Corps' reliance on that EIS purely in the abstract, disconnected from any actual permission that Plaintiffs claim affects them; (3) USFWS's now-withdrawn Compatibility Determination and Right-of-Way Permit; (4) a Corps-issued nationwide permit—and verification thereunder—that is not actually implicated by the CHC Project; and (5) a Corps-issued regional general permit and verifications that will result in only 0.02 acres of permanent impacts to wetlands and 13.6 acres of temporary impacts. These claims fail.

## VI.     ARGUMENT

**A.     The Court lacks jurisdiction over Plaintiffs' challenges to the Record of Decision, USFWS's Compatibility Determination and Right-of-Way Permit, and the issuance and verification of NWP 12.**

The Court lacks subject matter jurisdiction to review Plaintiffs' challenges to RUS's and the Corps' Record of Decision (Count I of the RUS Complaint and Count IV of the Corps Complaint), the Corps' NWP 12 (parts of Counts I, II, and III of the Corps Complaint), the Corps' verification issued under NWP 12 (Count V of the Corps Complaint), and USFWS' Compatibility Determination and Right-of-Way Permit (Count II of the RUS Complaint). Plaintiffs lack standing to challenge the Record of Decision and NWP 12, and their challenges to NWP 12 and USFWS's Compatibility Determination and Right-of-Way Permit are moot.

Federal jurisdiction is limited to "cases" or "controversies." U.S. Const. art. III, § 2, cl. 1. This requirement "gives rise to the doctrines of standing and mootness." *Foretich v. United States*, 351 F.3d 1198, 1210 (D.C. Cir. 2003). "Establishing standing is the plaintiff's burden and must be secured at each stage of the litigation." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1007 (7th Cir. 2021) (internal quotation marks and citation omitted). To demonstrate standing, a plaintiff must show (1) that it has suffered an injury in fact;[20] (2) that the injury "is fairly traceable to the challenged action of the defendant" (causation); and (3) that it "is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" (redressability). *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). A plaintiff's injury is not "fairly traceable to the challenged action" where the plaintiff cannot show that the defendant's actions—here, the various agency actions challenged in these consolidated cases—caused the injury. *Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 972–73 (7th Cir. 2005) (quoting *Lujan*, 504 U.S. at 560).

Mootness is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Parvati Corp. v. Oak Forest, Ill.*, 630 F.3d 512, 516 (7th Cir. 2010) (quoting *Friends of the Earth*, 528 U.S. at 189). "A case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Stotts v. Cmty. Unit*

---

[20] Plaintiffs' Complaint does not establish they have suffered a concrete and particularized injury in fact. And Plaintiffs have yet to establish that they have organizational standing on behalf of their members. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). Likewise, Plaintiffs are required to show in their summary judgment submission that they fall within the "zone of interests protected by" NEPA. *See, e.g.*, *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C. Cir. 2015) ("The zone of interests protected by the NEPA is, as its name implies, environmental; economic interests simply do not fall within that zone.").

*Sch. Dist. No. 1*, 230 F.3d 989, 990 (7th Cir. 2000) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). A claim becomes moot "if an event occurs while a case is pending . . . that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992). Where relief would lack "practical impact on the parties," the claim is moot. *Stotts*, 230 F.3d at 991.

**1.     Plaintiffs lack standing to challenge the Record of Decision because they cannot show causation and redressability.**

Plaintiffs do not have standing to assert a NEPA challenge to RUS's and the Corps' Record of Decision for two interconnected reasons: (1) their alleged injuries are not fairly traceable to the Record of Decision or to any challenged agency actions that depend on the Record of Decision, and (2) a favorable ruling by this Court cannot redress those injuries. To show standing, Plaintiffs must "tie the asserted injury . . . to the challenged conduct." *Tex. Indep. Producers*, 410 F.3d at 972; *see Lujan*, 504 U.S. at 560–62.

Here, Plaintiffs' "asserted injuries" are the alleged environmental, economic, aesthetic, and recreational injuries associated with the construction and operation of the CHC Project. RUS Compl. ¶¶ 11–19; Corps Compl. ¶¶ 22–29; *see generally* Decls. of Anderson, Beheler, Mittelstadt, & Morton, Case No. 96, ECF Nos. 61–64. The "challenged conduct" is the Record of Decision and the agency actions that depended on it. *See generally* RUS Compl. Count I; Corps Compl. Count IV. The Record of Decision did not itself authorize construction or operation of the transmission line; instead, it enabled certain *other* federal decisions to occur by formally concluding the NEPA process that was required for those decisions.[21] ROD007607. Plaintiffs seek

---

[21] These federal decisions do not include the Corps' issuance of the verifications, which do not depend on the Record of Decision. ROD007606–07 (describing previous Corps decisions, including verifications). Accordingly, the argument in this section does not relate to Plaintiffs' challenges to those verifications.

relief for only one[22] (as yet unrealized) agency action that would rely on the Record of Decision: RUS's potential future financial assistance to Dairyland to fund Dairyland's 9% ownership interest in the CHC Project. RUS Compl. ¶ 20, Requested Relief ¶ 6; *see also* ROD007606–08. To prove standing, Plaintiffs must therefore tie their alleged injuries to RUS's potential grant of financial assistance. *See Lujan*, 504 U.S. at 560–62; *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664–66 (D.C. Cir. 1996) (en banc).

In *Lujan v. Defenders of Wildlife*, the Supreme Court explained that when a challenge centers on the government's conduct toward a third party, causation and redressability "hinge on the response of the regulated (or regulable) third party to the government action or inaction." 504 U.S. at 562. In those circumstances, the plaintiff must "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* While proving standing is not impossible, "it is ordinarily *substantially more difficult to establish*." *Id.* (emphasis added; citations omitted). A plurality in *Lujan* went on to conclude that standing had not been established there because federal agencies typically funded only a small fraction of the projects at issue (e.g., 10%), and it was "entirely conjectural" that those projects would either terminate or cause less harm to endangered species if federal funding were precluded. *Id.* at 571.

---

[22] Plaintiffs' Complaints and declarations fail to identify any injuries related to a Corps action that relied on the Record of Decision. The only such action was the Corps' issuance of an easement for the transmission line to cross Corps-owned areas of the Refuge. ROD007606–10. But Plaintiffs' Complaint does not even mention the existence of that easement, much less request that the Court grant any relief related to it. *See generally* Corps Compl. Similarly, Plaintiffs do not assert a NEPA claim against USFWS or otherwise challenge the Record of Decision as to USFWS. *See generally* RUS Compl. In any event, USFWS has rescinded the 2020 Right-of-Way Permit, which is the only USFWS action that depended on the Record of Decision. *See* ROD007606, ROD007608–09.

Plaintiffs fare no better here because they cannot show that construction and operation of the CHC Project are dependent on future financial assistance from RUS. *See Food & Water Watch v. USDA*, 1 F.4th 1112, 1116 (D.C. Cir. 2021) (explaining, in NEPA challenge involving federal loan guarantee for a farm, that the critical question is "whether vacating the guarantee is likely to change how the farm operates"). That failure is fatal to both causation and redressability, which are "two sides of the same coin" and "are often addressed in conjunction." *Ctr. for Biological Diversity v. Exp.-Imp. Bank of the U.S.*, 894 F.3d 1005, 1012 n.2 (9th Cir. 2018) (internal quotation marks and citations omitted); *see also United States v. Diekemper*, 604 F.3d 345, 350–51 (7th Cir. 2010) (concluding that causation and redressability were "intertwined" in case involving a third party's decisions).

Although they bear the burden on standing, Plaintiffs have not even *alleged* that eliminating RUS funding would redress their claimed injuries. *See generally* RUS Compl. Nor have they requested jurisdictional discovery to attempt to show a likelihood that the CHC Project could not go forward or would change in the absence of RUS funding. *See Food & Water Watch*, 1 F.4th at 1117 (noting that because the record was "devoid of evidence" on the farmer's finances, the court "can only guess how the lender or the farmer would react to a vacatur of the loan guarantee"). In reality, the facts on the ground support the opposite conclusion: construction of the CHC Project is well underway even though Dairyland has not sought RUS financial assistance and will not do so until construction is fully complete. Beckendorf Decl. ¶¶ 9–10; Decl. of Mark Rothfork ¶¶ 5, 7, Case No. 96, ECF No. 67 ("Second Rothfork Decl."). And even if Dairyland never secures RUS financing, there is no reason to believe the CHC Project would be abandoned because the other two Intervenors are funding the lion's share (91%) of the Project. ROD007605–06; *see Touret v. NASA*, 485 F. Supp. 2d 38, 43–44 (D.R.I. 2007) (finding that plaintiffs lacked

43

standing to pursue a NEPA claim because federal funding amounted to only 11% of the project's cost and the project could have gone forward without it).

There is also no guarantee that RUS will approve a future funding request from Dairyland, further eroding causation and redressability. Completion of the EIS, which culminated in the Record of Decision, was but an initial step in RUS's process of deciding whether to approve financial assistance. ROD007607–08. The success of any future Dairyland application hinges on several more steps, including satisfactory completion of engineering and financial reviews in accordance with RUS's regulations. ROD007608. By choosing to start construction before securing financial assistance, Dairyland has plainly accepted the risk that RUS may ultimately deny its future request, undercutting the relationship between RUS funding and implementation of the CHC Project. *See Diekemper*, 604 F.3d at 350–51 (finding no standing because the plaintiff did not adduce evidence that a third party would act in a way that would redress his injury); *DH2, Inc. v. SEC*, 422 F.3d 591, 592, 597 (7th Cir. 2005) (finding no standing to challenge statements in SEC rules because mutual funds could engage in the contested practice "with or without" those statements).

Under these circumstances, Plaintiffs' claimed injuries are not fairly traceable to the challenged agency actions, and it is entirely speculative—as opposed to likely—that vacating the Record of Decision or enjoining RUS from providing future financial assistance would remedy those injuries. *See Lujan*, 504 U.S. at 560. Indeed, courts have consistently found causation and redressability lacking in cases involving federal agencies' partial financing of a private project or undertaking. *Id.* at 571 (plurality opinion); *S.E. Lake View Neighbors v. Dep't of Hous. & Urb. Dev.*, 685 F.2d 1027, 1036–39 (7th Cir. 1982); *Ctr. for Biological Diversity*, 894 F.3d at 1012–14; *Young Am.'s Found. v. Gates*, 573 F.3d 797, 800 (D.C. Cir. 2009); *St. John's United Church of*

*Christ v. FAA*, 520 F.3d 460, 462–63 (D.C. Cir. 2008); *Vill. of Bensenville v. FAA*, 457 F.3d 52, 69–70 (D.C. Cir. 2006); *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 149–52 (D.D.C. 2011); *Chesapeake Climate Action Network v. Exp.-Imp. Bank of the U.S.*, 78 F. Supp. 3d 208, 224–28 (D.D.C. 2015); *Touret*, 485 F. Supp. 2d at 43–44; *Fund for Animals v. Babbitt*, 2 F. Supp. 2d 570, 575 (D. Vt. 1997), *aff'd*, 152 F.3d 918 (2d Cir. 1998). Thus, the Court must dismiss Plaintiffs' challenges to the Record of Decision because they cannot satisfy the fundamental jurisdictional requirement of standing.

### 2. Plaintiffs' challenges to USFWS's Compatibility Determination and Right-of-Way Permit are moot.

Because USFWS has rescinded the Compatibility Determination and Right-of-Way Permit authorizing the CHC transmission line to cross the Refuge, Plaintiffs' challenges to those agency actions are moot. *See Fraternal Ord. of Police Hobart Lodge No. 121, Inc. v. Hobart*, 864 F.2d 551, 553 (7th Cir. 1988) (holding that repeal of a challenged ordinance mooted the request for equitable relief). The Seventh Circuit has long recognized that a government agency's withdrawal of a challenged action during litigation moots any claim for injunctive or declaratory relief. *See, e.g.*, *Milwaukee v. Block*, 823 F.2d 1158, 1163–64 (7th Cir. 1987). So long as withdrawal was genuine and done in good faith, the action is not likely to recur, and adjudication of the claim would not afford relief, the court must dismiss the claim as moot. *Ozinga v. Price*, 855 F.3d 730, 734–35 (7th Cir. 2017) (summarizing the applicable legal standards and explaining that when a suit "seeks only prospective relief, the case becomes moot when the government repeals, revises, or replaces" the challenged action); *see* Miller, Wright, & Cooper, 13C Fed. Prac. & Procedure § 3533.7 (3d ed.).

Because Plaintiffs request only declaratory and injunctive relief, their claim against USFWS is moot. *See* RUS Compl., Requested Relief ¶¶ 2, 4–5. First, USFWS's withdrawal of its

Compatibility Determination and Right-of-Way Permit was genuine. As a government entity, USFWS is entitled to the presumption that it rescinded those documents in good faith. *See Speech First, Inc. v. Killeen*, 968 F.3d 628, 645–46 (7th Cir. 2020), *as amended* (Sept. 4, 2020); *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1023 (7th Cir. 2016); *Fed'n of Advert. Indus. Representatives, Inc. v. Chicago*, 326 F.3d 924, 928–29 (7th Cir. 2003); *Magnuson v. Hickory Hills*, 933 F.2d 562, 565 (7th Cir. 1991). That presumption holds true here: USFWS revoked the Compatibility Determination and Right-of-Way Permit after concluding that its mistaken reliance on the wrong easement documents undermined portions of the agency's analysis and conclusions. Ex. A to Notice of Withdrawal, Case No. 96, ECF No. 69–1, at 1. Plainly, USFWS withdrew the documents to correct a mistake, not in some bad-faith attempt to skirt litigation only to reinstate them later on. *See Fed'n of Advert. Indus. Representatives*, 326 F.3d at 929.

Second, the challenged actions are not likely to recur. Intervenors have elected to pursue a land exchange, rather than a right-of-way permit, to facilitate the CHC transmission line's proposed crossing of USFWS-owned areas currently part of the Refuge. See Ex. B to Decl. of David R. Zoppo, Case No. 96, ECF No. 53-2. USFWS agrees that the land exchange is a potentially favorable alternative to a right-of-way permit and, along with Intervenors, has taken steps toward effectuating it. Ex. A to Notice of Withdrawal, Case No. 96, ECF No. 69-1; Second Rothfork Decl. ¶ 15. There is no reason to believe that USFWS will ever reissue the 2020 Right-of-Way Permit, particularly because Intervenors sought in March 2021 to replace that permit with a *different* right-of-way to avoid impacts on a Native American cultural site. *See* n.8, *supra.* Thus, the Court can "predict with confidence that the issues are not at all likely to recur" because the parties "have found another means to achieve the same end, mooting a challenge to the original means whether

or not there is a live challenge to the new means." Miller, Wright, & Cooper, 13C Fed. Prac. &
Procedure § 3533.7 (3d ed.).

Finally, adjudicating Plaintiffs' challenge to the Compatibility Determination and Right-
of-Way Permit could not provide relief to any party. Because Intervenors cannot rely on those
rescinded documents to construct the transmission line in the Refuge, "there is no longer an
ongoing controversy" requiring a judicial ruling on the parties' rights. *Ozinga*, 855 F.3d at 734. A
future land exchange would also be an entirely different agency action for purposes of judicial
review under the APA, and—because it has not been consummated—is not yet reviewable "final
agency action." *See* 5 U.S.C. § 704 (limiting judicial review to final agency actions). Nor would a
ruling on the Compatibility Determination and Right-of-Way Permit have any application to a land
exchange because the factual circumstances and legal standards are very different.[23] For example,
because the CHC transmission line would take a different route if the land exchange is approved,
it would impact a much smaller area than the route authorized in the 2020 Right-of-Way Permit.
Second Rothfork Decl. ¶¶ 10–14. Adjudicating the validity of the Compatibility Determination
and Right-of-Way Permit would have no actual impact on the parties; therefore, Plaintiffs' claim
is moot. *Dorel Juv. Grp., Inc. v. DiMartinis*, 495 F.3d 500, 503 (7th Cir. 2007) (collecting cases).

---

[23] Contrary to Plaintiffs' suggestion, land exchanges (unlike rights-of-way) do not require
USFWS to determine that a proposed use is "compatible" with the purposes of a refuge. *See* Pls.'
Mem. in Opp'n to Mot. for Stay, Case No. 96, ECF No. 60, at 14–16. Instead, the Refuge
Administration Act gives USFWS broad authority to exchange refuge-owned lands for other
property if the refuge lands are "suitable for disposition" and the value of the properties is
"approximately equal." 16 U.S.C. § 668dd(b)(3). The withdrawn 2019 Compatibility
Determination therefore has no bearing on any future legal issues implicated by the proposed land
exchange. *Town of Superior v. U.S. Fish & Wildlife Serv.*, 913 F. Supp. 2d 1087, 1111 (D. Colo.
2012), *aff'd sub nom. WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677 (10th Cir.
2015); 65 Fed. Reg. at 62,470 (noting that the compatibility regulations do not affect land
exchanges).

In sum, allowing Plaintiffs' claim against USFWS to proceed could only lead to an impermissible advisory opinion. *See Church of Scientology*, 506 U.S. at 12 ("It has long been settled that a federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.") (internal quotation marks and citation omitted). The Court must dismiss the claim as moot. *Rembert v. Sheahan*, 62 F.3d 937, 940 (7th Cir. 1995) ("[A] finding of mootness deprives a federal court of the authority to act.").

### 3. There is no case or controversy surrounding NWP 12 or the NWP 12 verification.

Plaintiffs' challenges to the 2017 version of NWP 12 under NEPA, the CWA, and the ESA are moot, and Plaintiffs lack standing to challenge those claims, because no activities related to the CHC Project have or will rely upon NWP 12. The same is true for the verification issued under NWP 12, in Count V of Plaintiffs' Complaint against the Corps.[24]

First, Plaintiffs' challenges to NWP 12 are moot because NWP 12 was reissued and replaced in 2021. *See* Corps Compl. ¶¶ 86–110, Requested Relief. On January 13, 2021, the Corps reissued twelve existing nationwide permits and issued four new ones. 86 Fed. Reg. at 2744. What was previously covered by NWP 12 is now covered by three nationwide permits: a reissued Nationwide Permit 12 for oil or natural gas pipeline activities, the new Nationwide Permit 57 for electric utility line and telecommunications activities (the type of activity at issue here), and the new Nationwide Permit 58 for utility lines for water and other substances. *Id.* The 2021 nationwide permits went into effect on March 15, 2021. *Id.* at 2744. Thus, the 2017 version of NWP 12—the one implicated in this case—will have no effect on any future Corps authorizations. As a long line

---

[24] By contrast, work affecting regulated waters under the Utility RGP effective in Wisconsin may, in fact, be performed in reliance on the Utility RGP verifications, and, unlike NWP 12, the Utility RGP issued in 2018 has not been replaced or reissued.

of cases makes clear, a challenge to a regulation or other agency action ordinarily becomes moot when that agency action is repealed or replaced. *See, e.g., Princeton Univ. v. Schmid*, 455 U.S. 100, 103 (1982) (per curiam) (challenge to a university regulation was moot because, *inter alia*, the regulation had been substantially amended); *Ozinga*, 855 F.3d at 734 (collecting cases for the proposition that "[w]hen a plaintiff's complaint is focused on a particular statute, regulation, or rule and seeks only prospective relief, the case becomes moot when the government repeals, revises, or replaces the challenged law and thereby removes the complained-of defect"); *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100, 113 (D.C. Cir. 2016) (describing as "a perfectly uncontroversial and well-settled principle of law" that "when an agency has rescinded and replaced a challenged regulation, litigation over the legality of the original regulation becomes moot").

Second, Plaintiffs' claims for relief based upon the alleged unlawfulness of the Corps' reliance on NWP 12 for its verification of CHC Project activities, *see* Corps Compl. ¶¶ 104–05, 109–10, 183–207, Requested Relief, are moot because no fill of waters of the United States associated with the CHC Project has or will occur under the 2017 version of NWP 12. Plaintiffs' challenges to NWP 12 are based upon the Corps' November 20, 2019 verification that certain proposed CHC Project activities in Iowa are authorized under the 2017 version of NWP 12. ITC is constructing and operating the portion of the CHC Project associated with this verification and has divided construction into two segments relevant to the Iowa work: (1) construction from the Hickory Creek Substation to roughly three quarters of a mile from the Refuge boundary; and (2) construction in and immediately adjacent to the Refuge. *See* Rothfork Decl. ¶¶ 3, 7–8; Second Rothfork Decl. ¶¶ 5–6. None of the work in the segment outside the Refuge has "occurred in Corps-jurisdictional areas." Rothfork Decl. ¶¶ 7–8. In other words, ITC did not end up relying

upon the NWP 12 verification for any of its work outside the Refuge because it was able to avoid any temporary or permanent impacts to waters of the United States for this segment of the Project.

Work within the Refuge is not anticipated to begin until October 2022. Rothfork Decl. ¶ 8. If and when it does, ITC has stated that it will proceed under a new verification or other approval from the Corps. *See id.* ¶ 9 ("Before conducting work in Corps-jurisdictional areas in Iowa, ITC will seek further appropriate and required [CWA] approval(s)/verification(s) from the Corps."). Any new verification or approval would not arise under the 2017 version of NWP 12 for several reasons. First, the November 2019 verification is set to expire prior to the anticipated construction date within the Refuge. The verification is valid "until March 18, 2022," subject to a one-year extension in certain circumstances if the activities covered by the verification have commenced. USACE0001200; *see also* 86 Fed. Reg. at 2747. ITC has not commenced, and does not intend to commence, the discharges covered by the November 2019 verification prior to March 18, 2022. *See* Rothfork Decl. ¶¶ 7–9. Nor is the anticipated construction date likely to change. As discussed above in Sections II and V.B, USFWS has withdrawn its Compatibility Determination and Right-of-Way Permit. This segment of the CHC Project cannot proceed unless and until USFWS approves the proposed land exchange or otherwise authorizes construction of the Project in this area. *See* Second Rothfork Decl. ¶¶ 11–15.

Further, even if the November 2019 verification were not set to expire before work in the Refuge will begin, Intervenors would need a new verification due to their plan to change the route of the CHC transmission line to avoid potential impacts to a nearby Native American cultural site. *See* Second Rothfork Decl. ¶¶ 10–11. Therefore, the route that the Project will take within areas that are currently part of the Refuge (assuming it is approved in some form in the future), and its associated impact on jurisdictional waters, is likely to change from what was covered in the

November 2019 verification. Any fill of waters of the United States that was not specifically covered by the previous verification would need separate CWA Section 404 coverage to comply with the law. And as noted above, any new verification relating to the CHC Project would only proceed under the new Nationwide Permit 57—not the 2017 NWP 12. 86 Fed. Reg. at 2744. In sum, whether due to the verification's expiration or the proposed reroute, Intervenors have no intention of relying upon the November 2019 verification and plan to apply for a new verification or other applicable approval under Nationwide Permit 57 at some point in the future. *See* Rothfork Decl. ¶ 9.

Assuming that Plaintiffs can establish a concrete injury in fact based on the CHC Project, that NWP 12 has not been used to date and will not be used in the future means any injury is not "fairly traceable to the challenged action" and cannot be redressed through a favorable decision. Indeed, there is simply no relevant causal connection whatsoever between the CHC Project and NWP 12.[25] *See Tex. Indep. Producers*, 410 F.3d at 972. Similarly, because work on the CHC Project can proceed (and has proceeded in parts of Iowa) without NWP 12 while other work will only proceed under a different permit, a finding favorable to Plaintiffs on their NWP 12 claims would have no effect on the Project, and would therefore not redress any concrete injury. *See Fla. Audubon Soc'y*, 94 F.3d at 664 (redressability requires that the relief plaintiff seeks "will likely alleviate the particularized injury alleged by the plaintiff"). Redressability and causation are part

---

[25] Though plaintiffs in environmental cases often assert a procedural injury, that procedural injury cannot provide Article III standing absent "some concrete interest that is affected by the deprivation." *Summers*, 555 U.S. at 496. Any concrete interest Plaintiffs have (which, as noted, they have not yet shown) is unaffected by NWP 12, because the CHC Project does not rely on NWP 12. *See Fla. Audubon Soc'y*, 94 F.3d at 668 ("As in all cases, standing in an EIS suit requires adequate proof of causation. The conceptual difficulty with this requirement, in this type of case, is that an adequate causal chain must contain at least two links: one connecting the omitted EIS to some substantive government decision that may have been wrongly decided because of the lack of an EIS and one connecting that substantive decision to the plaintiff's particularized injury.").

of "the irreducible constitutional minimum of standing," *Lujan*, 504 U.S. at 560–61, yet they are wholly absent from Plaintiffs' challenge to NWP 12 and the Corps' verification thereunder.

These same facts also demonstrate that, even assuming there was a live controversy at some point, there is none now, and Plaintiffs' NWP 12 claims are moot. *See Stotts*, 230 F.3d at 990. Plaintiffs' NWP 12 claims are moot because, given that it has not and will not be used, and that NWP 12 has been replaced by new nationwide permits, NWP 12 simply has no bearing on whether the CHC Project will go forward. It is thus not possible for the Court to "grant any effectual relief" concerning NWP 12. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160–61 (2016), *as revised* (Feb. 9, 2016). The Ninth Circuit recently adopted this very position, dismissing a challenge to NWP 12 and its application to the Keystone XL Pipeline as moot because "issuance of a new nationwide permit supersedes the agency action that is the subject of these appeals." Order, *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, Nos. 20-35412, 20-35414, 20-35415, and 20-35432 (9th Cir. Aug. 11, 2021). Assuming standing for the moment, then, Plaintiffs' NWP 12 claims are nonetheless moot, and the Court lacks Article III subject matter jurisdiction over those claims. For these reasons, the portions of Plaintiffs' claims challenging NWP 12 and the Rock Island District's verification under NWP 12 should be dismissed for lack of subject matter jurisdiction. *See Corps Compl.* ¶¶ 86–110, 183–207.

**B.    The EIS satisfies NEPA, and RUS's and the Corps' Record of Decision is therefore not arbitrary and capricious.**

Federal Defendants'[26] Record of Decision and corresponding analysis in the EIS satisfy the requirements of NEPA. Plaintiffs direct their complaints to three main areas: the EIS's purpose

---

[26] RUS, USFWS, and the Corps each participated in the NEPA process (RUS as lead agency and the Corps and USFWS as cooperating agencies) and signed the January 2020 Record of Decision. ROD007606, ROD007652–54. Plaintiffs' Complaints assert NEPA claims only against RUS and the Corps, not USFWS. For simplicity, however, this section of the Memorandum uses the term "Federal Defendants."

and need statement, its analysis of alternatives, and its discussion of the impacts of the Project and its alternatives. *See generally* RUS Compl. ¶¶ 75–145 (Count I); Corps Compl. ¶¶ 111–82 (Count IV). These criticisms, however, cannot meet the "high standard" of showing that the analysis and conclusions in the EIS were arbitrary or capricious. *Marita*, 46 F.3d at 619. To the contrary, the EIS satisfies NEPA's "twin goals" of ensuring that agencies (1) consider the significant environmental impacts of a proposed action and (2) provide sufficient information to the public so that it may play a role in the decisionmaking process. *See Habitat Educ. Ctr.*, 673 F.3d at 526 (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004)).

      **1.**      **The EIS's purpose and need statement satisfies NEPA.**

            **a.**      **Background on the purpose and need statement and its influence on alternatives.**

An EIS's statement of purpose and need lays the foundation for agencies to identify and explore "reasonable alternatives" to a proposed action. 40 C.F.R. § 1502.14(a); *see Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686, 705–06 (3d Cir. 1999) (citing Court of Appeals decisions holding that "reasonable alternatives" are those that meet a project's goals). An EIS "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13.

The underlying purpose of the CHC Project is to "increase the capacity of the regional transmission system" to meet six needs: (1) addressing reliability issues on the regional bulk transmission system; (2) alleviating congestion in certain parts of the system; (3) expanding access to lower-cost generation and renewable energy generation; (4) increasing transfer capability between Iowa and Wisconsin; (5) reducing losses and increasing efficiency of the transmission system; and (6) responding to public policy objectives directed at enhancing the nation's transmission system and supporting greater access to renewable energy and natural gas generation

facilities. ROD004983–84. The EIS's six-point statement of purpose and need is consistent with the goals and needs that were identified through the comprehensive regional transmission planning process described in Section II above.[27]

Federal Defendants used this purpose and need statement to develop and compare alternatives to the Project. *See* ROD004945, ROD005005; *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir. 1997) (noting that agencies must first define a project's purpose in order to develop the range of alternatives). At RUS's direction, Intervenors completed three preliminary studies to identify a range of reasonable alternatives. ROD005005; *see* 7 C.F.R. § 1970.5(b)(3)(iii) (requiring applicants for RUS financial assistance to "develop and document reasonable alternatives"). The "Alternatives Evaluation Study" proposed the purpose and need for the Project and explored several alternatives, including non-transmission options such as energy storage, distributed energy generation, and energy efficiency. ROD005005–06; ROD014743–47. The "Macro-Corridor Study," which focused on routing options for the transmission line, analyzed 187 preliminary corridors in light of environmental, land use, socioeconomic, cultural, engineering, economic, and other considerations. ROD005006–07; *see generally* ROD014813–931. The "Alternative Crossings Analysis" examined seven different location alternatives for the

---

[27] *See, e.g.*, ROD004981–91 (EIS's description of regional planning process and purpose and need); ROD014712–33 (report prepared for RUS explaining purpose and need for the CHC Project); ROD021255, ROD021275–78 (Public Service Commission of Wisconsin order concluding that the CHC Project reduces congestion costs, addresses reliability needs, and provides access to low-cost renewable energy being developed west of Wisconsin); ROD013604 (MISO report finding that the Multi-Value Projects address reliability concerns, improve market efficiency, and support renewable and natural gas generation), ROD013710 (stating that the CHC Project would provide an outlet for wind energy and offload transmission constraints near the Quad Cities); ROD031341 (MISO report explaining reliability, congestion, and renewable energy benefits of the CHC Project and noting that it will transfer power from Iowa into southern Wisconsin). Some of these documents refer to the Dubuque-Spring Green-Cardinal project, the former name of the CHC Project. *See* ROD004982.

transmission line's crossing of the Mississippi River, including four locations outside the Refuge. ROD005006; ROD014262–86. Using these studies, Federal Defendants identified a smaller group of alternatives worthy of more detailed consideration and comparison in the EIS. *See* ROD005005, ROD005008, ROD005025; ROD007352 (noting that RUS "reviewed and accepted" these studies "as part of the alternatives development process").

The EIS ultimately conducted a detailed evaluation of six "action" alternatives featuring combinations of transmission line route segments connecting the Cardinal Substation in Wisconsin to the Hickory Creek Substation in Iowa. ROD004946. As required by NEPA, the EIS also evaluated a "no action" alternative for purposes of baseline comparison. *Id.*; 40 C.F.R. § 1502.14(d); 7 C.F.R. § 1970.6(a). Finally, the EIS explained why numerous other alternatives were considered but not carried forward for detailed analysis in the EIS. ROD005005, ROD005008–39; 40 C.F.R. § 150.14(a). Those dismissed alternatives included several corridors in Wisconsin, ROD005008–24; five alternative Mississippi River crossing locations, ROD005025–27; two alternative locations for crossing the Refuge, ROD005028–30; a lower-voltage transmission line, ROD005035–36; an underground transmission line, ROD005036–39; and a host of non-transmission alternatives, including energy efficiency, regional and local renewable electricity generation (e.g., community solar generation), energy storage (e.g., use of batteries or utility-scale storage installations), and demand response (e.g., using pricing and incentives to reduce demand for electricity on the consumer end), ROD005030–35.

### b.    The purpose and need statement satisfies NEPA.

The EIS's statement of purpose and need—and its corresponding influence on the identification of "reasonable alternatives"—complies with NEPA. In developing an EIS, an agency must confront three questions: the purpose of the proposed project, reasonable alternatives to the

55

project in light of that purpose, and the extent to explore each reasonable alternative. *Simmons*, 120 F.3d at 669. The Seventh Circuit has cautioned that those questions must be left to "an agency . . . to resolve in the first instance. We owe and accord deference to the [agency] on whether the [agency] resolved those three questions in a permissible way." *Id*. Deference is particularly appropriate because the "purpose" of a project "is a slippery concept, susceptible of no hard-and-fast definition." *Id*. at 666. In exercising its discretion, the agency should consider the "general goal" of a proposed action. *Van Abbema v. Fornell*, 807 F.2d 633, 638 (7th Cir. 1986). And it may not "contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration." *Simmons*, 120 F.3d at 666. But an EIS does not run afoul of these guidelines simply because its definition of a project's purpose precludes a particular interest group's preferred alternative. *See Env't Law & Pol'y Ctr. v. U.S. Nuclear Regul. Comm'n*, 470 F.3d 676, 683–84 (7th Cir. 2006).

Here, Plaintiffs Driftless Area Land Conservancy and Wisconsin Wildlife Federation conceded in their comments on the EIS[28] that five elements of the EIS's six-point purpose and need statement "are broad enough to meet NEPA requirements" and "are general purposes that can reasonably be accomplished by a number of alternatives." ROD006339–40. Plaintiffs take issue only with the EIS's stated goal of "increasing the transfer capability of the electrical system between Iowa and Wisconsin," claiming that it unjustifiably precluded consideration of non-transmission alternatives and routes that would not cross through the Refuge or the Driftless Area (a region of rolling hills and valleys in southwestern Wisconsin and northeastern Iowa). ROD005121; ROD006340; RUS Compl. ¶¶ 98–101; Corps Compl. ¶¶ 127–30.

---

[28] Plaintiffs National Wildlife Refuge Association and Defenders of Wildlife did not submit comments on the EIS.

This contention is unfounded. First, the Project's purpose of "increasing the transfer capability of the electrical system between Iowa and Wisconsin" falls well within the range of "general" goal statements that courts have upheld. *See Env't Law & Pol'y Ctr.*, 470 F.3d at 683–84 (upholding goal of "baseload energy generation"); *Van Abbema*, 807 F.2d at 638 (identifying the "general goal" as "deliver[ing] coal from mine to utility"); *Little Traverse Lake Prop. Owners Ass'n v. Nat'l Park Serv.*, 883 F.3d 644, 655–56 (6th Cir. 2018) (holding that purpose of providing a scenic pathway between two specified locations was not impermissibly narrow); *Beyond Nuclear v. U.S. Nuclear Regul. Comm'n*, 704 F.3d 12, 19–20 (1st Cir. 2013) (upholding purpose of providing baseload power). The EIS's fulsome consideration of six different alternatives that would each meet this goal, *see* ROD005039–99, further belies Plaintiffs' claim that it was too narrow. *Env't Law & Pol'y Ctr.*, 470 F.3d at 684; *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 73 (D.C. Cir. 2011) (explaining that an objective is too narrow if it "compels the selection of a particular alternative").

Second, the purpose of increasing transfer capability between Iowa and Wisconsin emerged from a multi-year regional transmission planning process, making it particularly worthy of judicial deference and respect. *See, e.g.*, *Hoosier Env't Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1059 (7th Cir. 2013) (warning that an agency's analysis of project alternatives should not "usurp the responsibility" assigned to other federal and state authorities in the planning process). Under federal law, regional transmission organizations such as MISO, in coordination with state authorities and other stakeholders, are responsible for transmission planning and expansion within the regions they serve. *See* 40 C.F.R. § 35.34(k)(7). Here, MISO followed a federally-authorized planning process in analyzing, proposing, and approving the Multi-Value Project portfolio, which included the CHC Project. *See* ROD004981–84; ROD005562;

ROD014106–10; *Midwest Indep. Transmission Sys. Operator, Inc.*, 133 FERC ¶ 61,221, 62,097, 62,119–20 (2010) (accepting MISO's transmission planning process for the Multi-Value Projects, with required modifications, as just and reasonable under the Federal Power Act). Indeed, the Federal Energy Regulatory Commission expressly approved the methodology MISO used to develop the Multi-Value Projects, deeming it "an important step in facilitating investment in new transmission facilities to integrate large amounts of . . . renewable generation resources" and to "reduce congestion," among other objectives. 133 FERC ¶ 61,221, 62,089, 62,119–20; *order on reh'g,* 137 FERC ¶ 61,074 (2011); *see generally Ill. Com. Comm'n*, 721 F.3d at 772–73, 781 (upholding, with exceptions not relevant here, the Commission's orders approving the Multi-Value Project portfolio's rate design and pilot projects).

As part of its planning process, MISO identified the "need for a more regional and robust transmission system to deliver renewable resources from often remote renewable energy generators to load centers." ROD013648. MISO expressly concluded that the CHC Project would enable the transfer of wind power generated in Iowa to cities such as Milwaukee and Chicago. ROD031341. Similarly, the Midwestern governors' Upper Midwest Transmission Development Initiative identified several renewable energy "transmission corridors" to transfer energy generated in wind-rich Iowa eastward to Wisconsin. ROD021396, ROD021400. Federal Defendants justifiably incorporated information and conclusions from this regional transmission planning process into their delineation of the underlying purpose and need for the CHC Project. ROD007354 (noting Federal Defendants' consideration of the transmission planning process and the findings of MISO and the Public Service Commission of Wisconsin); *see Webster v. USDA*, 685 F.3d 411, 422 (4th Cir. 2012).

Courts consistently rebuff attempts to deploy NEPA as a collateral attack on local and regional planning processes that inform an EIS's statement of purpose and need for a project. For example, in *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533 (11th Cir. 1990), the court considered an EIS for federal funding of a combined highway and rail transit project proposed by a local commission responsible for transportation planning. The commission developed the project through a planning process prescribed by the Federal Highway Administration. *Id.* at 1536. The plaintiffs complained that the EIS's purpose and need statement presumptively favored the proposed project over their preferred rail-only alternative. *Id.* at 1541. The court rejected the challenge, calling it a "fundamental misapprehension of the role of federal and state agencies in the community planning process established by the Federal-Aid Highway Act." *Id.* at 1541. It emphasized that NEPA does not confer authority for long-range transportation planning on federal agencies. *Id.* at 1541–42. Instead, because the EIS's statement of purpose and need was rooted in a federally mandated regional planning process, it satisfied NEPA. *Id.* at 1542.

*North Buckhead* and numerous other cases stand for the principle that a "project's purpose and need cannot be divorced completely from the planning process that generated the proposed project in the first place." *Jones v. Peters*, No. 2:06-CV-00084BSJ, 2007 WL 2783387, at *18–19 (D. Utah Sept. 21, 2007); *see also Little Traverse*, 883 F.3d at 648, 655–56 (upholding purpose and need statement that reflected goals developed by a committee of federal, state, and local stakeholders); *HonoluluTraffic.com v. Fed. Transit Admin*, 742 F.3d 1222, 1230–31 (9th Cir. 2014) (approving purpose and need statement that incorporated objectives developed in regional transportation plan); *Webster*, 685 F.3d at 422. Simply put, NEPA does not require Federal Defendants to conduct "[transmission] planning de novo" or to define a project's purpose and need in a way that eviscerates the goals of state and regional planning authorities. *Jones*, 2007 WL

2783387, at *19; *c.f. Hoosier Env't Council*, 722 F.3d at 1059 (rejecting similar argument in challenge to the Corps' analysis of alternatives under the Clean Water Act). Here too, Federal Defendants were entirely justified in drawing on the findings of the federally-authorized regional transmission planning process in shaping the EIS's purpose and need statement.

Finally, the EIS's statement of purpose and need does not violate NEPA simply because it led to the dismissal of non-transmission alternatives from further consideration. *See* RUS Compl. ¶¶ 98–99; Corps Compl. ¶¶ 128–29. So long as "the agency's objectives are reasonable," courts "will uphold the agency's selection of alternatives that are reasonable in light of those objectives." *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 73 (citations omitted). Indeed, the Seventh Circuit rejected an identical argument when it held that an agency's dismissal of an energy efficiency alternative did not render the project's purpose of generating baseload power impermissibly narrow. *Env't Law & Pol'y Ctr.*, 470 F.3d at 682–84. Plaintiffs cannot use NEPA to force Federal Defendants to adopt *their* preferred goals instead of those the agencies selected after considering the relevant information, including Plaintiffs' own comments in favor of non-transmission alternatives. ROD005723; *see Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978) ("NEPA['s] . . . mandate to the agencies is essentially procedural."); *Alexandria, Va. v. Slater*, 198 F.3d 862, 867–68 (D.C. Cir. 1999) (explaining that NEPA "does not substantively constrain an agency's choice of objectives[,]" which is entitled to "considerable deference").

## 2.     The EIS's analysis of alternatives satisfies NEPA.

Having specified the underlying purpose and need for the CHC Project, the EIS then identified and analyzed a number of different alternatives to the Project. An EIS should "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been

eliminated." 40 C.F.R. § 1502.14(a). At the same time, because analyzing alternatives consumes significant amounts of time and money, "[i]t is axiomatic that the [agency] need not examine every conceivable alternative." *Simmons*, 120 F.3d at 669. The Supreme Court has cautioned that "[t]o make an impact statement something more than an exercise in frivolous boilerplate[,] the concept of alternatives must be bounded by some notion of feasibility." *Vt. Yankee,* 435 U.S. at 551; *see also* CEQ, Guidance Regarding NEPA Regulations, 48 Fed. Reg. 34263, 34267 (July 28, 1983) (Reasonable alternatives are "practical or feasible from the technical and economic standpoint and using common sense," instead of "remote and speculative.").

Separate from their related challenge to the EIS's purpose and need statement, Plaintiffs critique the EIS's treatment of non-transmission alternatives and alternative routes that would not cross the Refuge or the Driftless Area. RUS Compl. ¶¶ 108–09, 124–25; Corps Compl. ¶¶ 136–37, 153–53. But the EIS and the preliminary studies that preceded it—the 110-page Alternatives Evaluation Study (ROD014700–809), the 318-page Macro-Corridor Study (ROD014813–15130), and the 408-page Alternative Crossings Analysis (ROD014262–669)—sufficiently explored both non-transmission alternatives and alternative locations for the CHC transmission line.

### a.   The consideration and dismissal of non-transmission alternatives satisfies NEPA.

The EIS considered several non-transmission alternatives to the CHC Project: regional and local renewable electricity generation, energy storage, energy efficiency, and demand response. ROD005030–35. After discussing the potential benefits of these options, the EIS concluded that they were not yet technically or economically feasible at the required scale and would not fulfill the purpose and need.[29] ROD005033–35. These conclusions are entitled to deference. *See Protect*

---

[29] Plaintiffs Driftless Area Land Conservancy and Wisconsin Wildlife Federation also advocated for non-transmission alternatives in the Public Service Commission of Wisconsin

*Our Comtys. Found. v. Jewell*, 825 F.3d 571, 581 (9th Cir. 2016) (upholding dismissal of distributed generation as infeasible and inconsistent with the agency's goals); *Backcountry Against Dumps v. Jewell*, 674 F. App'x 657, 662–63 (9th Cir. 2017) (upholding dismissal of solar generation, which would not meet the project's purpose); *Nat'l Parks Conservation Ass'n v. Jewell*, 965 F. Supp. 2d 67, 81 (D.D.C. 2013) (upholding rejection of distributed generation, which would not meet need for transmission capacity); *Sierra Club v. Clinton*, 746 F. Supp. 2d 1025, 1036–38 (D. Minn. 2010) (upholding EIS's dismissal of energy conservation and renewable energy generation because they could not serve the purpose of the proposed crude oil pipeline). Thus, the EIS's consideration and subsequent dismissal of non-transmission alternatives satisfies NEPA's requirement to "briefly discuss the reasons for their having been eliminated" from detailed study. 40 C.F.R. § 1502.14(a); *see All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1444–46 (10th Cir. 1992) (holding that similar discussion in EIS complied with 40 C.F.R. § 1502.14(a)).

### b.      The analysis of alternative routes satisfies NEPA.

The EIS's analysis of alternative routes for the transmission line also satisfies NEPA. First, in compliance with 40 C.F.R. § 1502.14(a), the EIS provided a reasoned basis for dismissing from detailed consideration routes that would not cross the Refuge. Beginning in 2012, Refuge staff worked with Intervenors to analyze options for avoiding the Refuge, which extends approximately 240,000 acres and 260 river miles along the Mississippi River. ROD028194; ROD005028; ROD005301. The Alternative Crossings Analysis explored seven alternative river crossings in detail, analyzing engineering and regulatory opportunities and constraints; environmental, land

---

proceedings. ROD021278–79. The Commission reached similar conclusions as the EIS, finding that these alternatives, even in combination, were not feasible or cost-effective alternatives to the Project. ROD021251, ROD021278–82.

use, and social impacts; and feasibility. ROD005005–06, ROD005025; ROD014266, ROD014275–81, ROD014370–463, ROD014490. Drawing on that report, the EIS briefly considered four non-Refuge crossings of the Mississippi River and explained why each was infeasible from an engineering, safety, or regulatory standpoint or presented unacceptable environmental, cultural, or historical impacts. ROD005025, ROD005027–28. It also explained that the non-Refuge crossings would pose greater overall environmental and social impacts. ROD005028; *see also* ROD014276, ROD014286. NEPA requires nothing more, *see* 40 C.F.R. § 1502.14(a), and Federal Defendants' conclusions on this subject are entitled to deference. *See, e.g.*, *Env't Law & Pol'y Ctr.*, 470 F.3d at 682.

Second, the EIS was justified in only considering routes that passed through portions of the Driftless Area. A major purpose of the CHC Project is to increase transfer capability between Iowa and Wisconsin. ROD004984. The border between those two states, of course, runs along the northeastern corner of Iowa and the southwestern corner of Wisconsin—the very same location as the Driftless Area. ROD005121, ROD005329–30; ROD027925. Alternatives that cannot meet a project's purpose and need are not "reasonable" and need not be analyzed in an EIS. *See Simmons*, 120 F.3d at 666 (tying the identification of "reasonable alternatives" to the project's purpose); *Concerned Citizens All.*, 176 F.3d at 705–06 (citing cases). Given the need to transfer energy from Iowa to Wisconsin, alternative routes that would avoid the Driftless Area would be patently unreasonable. *See Little Traverse*, 883 F.3d at 655–56 (holding that the agency was not required to analyze the plaintiffs' preferred route alternative because it would not meet the goal of creating a scenic pathway between two particular locations).

Plaintiffs' criticism of the EIS's alternatives analysis further misses the mark because Plaintiffs themselves failed to identify any routes that would not pass through the Driftless Area.

Agencies have no obligation to develop vague or unspecified proposals and requests; instead, opponents of a project must proffer reasonably specific and feasible alternatives for the agency's consideration. *See Eagle Found., Inc. v. Dole*, 813 F.2d 798, 807–08 (7th Cir. 1987); *River Rd. All., Inc. v. Corps of Eng'rs of U.S. Arm*y, 764 F.2d 445, 452–53 (7th Cir. 1985); *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 576–77 (9th Cir. 1998); *City of Angoon v. Hodel,* 803 F.2d 1016, 1022 (9th Cir. 1986); *Roosevelt Campobello Int'l Park Comm'n v. EPA*, 684 F.2d 1041, 1046–47 (1st Cir. 1982); *Friends of Cap. Crescent Trail v. U.S Army Corps of Eng'rs*, 855 F. App'x 121, 127 (4th Cir. 2021). But none of Plaintiffs' seven NEPA comment letters (one of which they submitted six weeks late, ROD007523) identify a single specific or feasible route outside the Driftless Area. *See* ROD002298; ROD003666–67; ROD003668–69; ROD003690–91; ROD004617; ROD006340; ROD007523–24 (late comment). Because Plaintiffs refused to "shoulder the burden of showing that [the agency] had overlooked some plausible alternative site," their vague and generalized requests did not obligate Federal Defendants to analyze routes outside the Driftless Area. *River Rd. All.*, 764 F.2d at 453; *see Pub. Citizen*, 541 U.S. at 764–65 (concluding that respondents had forfeited their challenge to an EA's alternatives analysis by failing to identify alternatives in their comments).

In sum, the EIS's alternatives analysis was not arbitrary or capricious because it appropriately considered and dismissed non-feasible alternatives and because Federal Defendants were under no obligation to analyze alternatives that could not meet the Project's purpose and need.

### 3.    The EIS's discussion of direct and indirect effects, cumulative impacts, and mitigation satisfies NEPA.

After identifying six different alternatives for detailed consideration and comparison, the EIS undertook a comprehensive analysis of their impacts. *See generally* ROD005110-479. NEPA

requires agencies to discuss the "environmental impacts of the alternatives including the proposed action." 40 C.F.R. § 1502.16. An EIS should discuss direct effects and their significance; indirect effects and their significance; possible conflicts between the proposed action and land use plans, policies, and controls; effects on urban quality, historical, and cultural resources; and means to mitigate adverse environmental impacts. 40 C.F.R. § 1502.16(a)–(h). It should also consider cumulative impacts of other past, present, and reasonably foreseeable future actions. *See* 40 C.F.R. §§ 1508.7, 1508.25(a)(2) ; *Habitat Educ. Ctr.*, 673 F.3d at 526.

In examining the adequacy of an EIS's impacts analysis, a court's "only role is to ensure that the agency has taken a hard look at environmental consequences." *Env't Law & Pol'y Ctr.*, 470 F.3d at 682. "[A]rbitrary and capricious review prohibits a court from substituting its judgment for that of the agency as to the environmental consequences of its actions." *Mineta*, 349 F.3d at 953 (internal quotation marks and alterations omitted) (citing *Kleppe*, 427 U.S. at 410 n.21). In conducting this review, courts must "take care to distinguish between claimed deficiencies in an EIS that are 'merely flyspecks' and those that are 'significant enough to defeat the goals of informed decisionmaking and informed public comment.'" *Habitat Educ. Ctr.*, 673 F.3d at 528 (quoting *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1163 (10th Cir. 2002)); *see also Or. Env't Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987).

### a.    The analysis of direct and indirect effects satisfies NEPA.

Federal Defendants unquestionably took a hard look at the impacts of the CHC Project and its alternatives, including the no action alternative. Chapter 3 of the EIS provides detailed discussions of direct and indirect effects on a wide range of resource categories, including:

- geology and soils, ROD005121–37;
- vegetation, plant communities, wetlands, and threatened and endangered plants, ROD005137–67;

- wildlife, including mammals, birds, fish and aquatic species, reptiles and amphibians, and threatened and endangered species, ROD005167–97;
- water resources and water quality, including trout streams, protected streams, floodplains, and groundwater, ROD005197–218;
- air quality and climate change, ROD005218–27;
- noise and vibration, ROD005227–43;
- transportation, including roadways, railways, river crossings, and airports, ROD005243–60;
- cultural and historical resources, including cemeteries, villages, farming areas and farmsteads, homes, churches, schools, mounds, earthworks, burial sites, and artifacts, ROD005261–96;
- agricultural lands, recreation areas, and natural areas, as well as local land use plans and designations, ROD005296–329;
- visual quality and aesthetics, including visual characteristics and visual impacts on scenic trails and byways, parks, and recreation areas, ROD005329–82;
- socioeconomics and environmental justice, including housing, employment and income, agriculture, tourism, property values, and burdens on communities with environmental justice concerns, ROD005382–434;
- public health and safety, including electric and magnetic fields, severe weather, security breaches, worker safety, waste, and toxic materials, ROD005434–53; and
- impacts specific to the Refuge, ROD005453–79.

The breadth and depth of the EIS's discussion of effects on these resource categories—in an analysis spanning almost 400 pages (ROD005100–479)—shows that Federal Defendants took a hard look at the environmental effects of the CHC Project. *See Churchill Cnty. v. Norton*, 276 F.3d 1060, 1071–72, 1079–81 (9th Cir. 2001) (outlining legal standards and concluding that EIS, which analyzed numerous types of environmental impacts, satisfied hard look requirement); *Habitat Educ. Ctr.*, 593 F. Supp. 2d at 1025–26 & n.8 (similar).

###    b.    The cumulative impacts analysis satisfies NEPA.

Chapter 4 of the EIS conducted a cumulative impacts analysis for each resource category analyzed in Chapter 3. ROD005484–509. Although agencies must consider the "incremental impact" of a proposed action "when added to other past, present, and reasonably foreseeable future actions," 40 C.F.R. § 1508.7, NEPA does not prescribe any particular method for analyzing

66

cumulative impacts. Instead, "the agency has discretion to consider when and how they are considered." *Highway J Citizens Grp. v. U.S. Dep't of Transportation*, 891 F.3d 697, 700 (7th Cir. 2018). While Plaintiffs criticize the EIS's treatment of past actions and the geographic and temporal bounds it applied to its analysis of specific resources, RUS Compl. ¶¶ 110–17, Federal Defendants' choices on these fronts represent a reasonable exercise of discretion.

First, Federal Defendants were entitled to consider past actions by incorporating them into the EIS's environmental "baseline" instead of cataloguing them individually. ROD005484 (explaining that cumulative effects of past actions were accounted for in the EIS's description of the affected environment). This method allows agencies to determine whether the incremental effects of a project, when considered in addition to the effects of past projects reflected in the baseline, are "collectively significant." *See* 40 C.F.R. § 1508.7. Numerous courts have upheld this approach to considering past actions. *See Cascadia Wildlands v. Bureau of Indian Affs.*, 801 F.3d 1105, 1111–13 (9th Cir. 2015) (citing decisions from the Fifth, Ninth, and D.C. Circuits). The EIS's treatment of past actions is also consistent with CEQ guidance, which confirms that "agencies can conduct an adequate cumulative effects analysis by focusing on the current aggregate effects of past actions without delving into the historical details of individual past actions." CEQ, *Guidance on the Consideration of Past Actions in Cumulative Effects Analysis* (June 24, 2005), at 2;[30] *see Habitat Educ. Ctr.*, 593 F. Supp. 2d at 1032–33 & n.17 (according deference to CEQ's guidance and rejecting argument that EIS should have detailed "specific past projects").

---

[30] *Available at* https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/Guidance_on_CE.pdf (last accessed Aug. 30, 2021).

Second, the geographic and temporal scope of the EIS's cumulative impacts analysis is reasonable. Because impacts vary by resource, Federal Defendants explained the rationale for applying different geographic and temporal bounds to each individual resource category. ROD005484–86. Identification of those bounds is "assigned to the special competency of the appropriate agencies." *Kleppe*, 427 U.S. at 413–14; *see also Habitat Educ. Ctr.*, 593 F. Supp. 2d at 1030–31; *Waukesha Cnty. Env't Action League v. U.S. Dep't of Transp.*, 348 F. Supp. 3d 869, 885 (E.D. Wis. 2018). Having delineated the appropriate geographic and temporal scope, the EIS identified 30 present or reasonably foreseeable future actions for inclusion in the cumulative impacts analysis, including other transmission lines, energy generation facilities, urban development and transportation projects, pipelines, and recreation projects. ROD005486–96. The EIS's corresponding analysis of the cumulative impacts of those actions combined with the CHC Project and its alternatives, ROD005497–512, satisfies NEPA because it provides sufficient information to enable informed decisionmaking and public participation. *See Habitat Educ. Ctr.*, 593 F. Supp. 2d at 1034.

### c.      The discussion of mitigation satisfies NEPA.

Finally, the EIS and Record of Decision examined means of mitigating adverse environmental impacts and explained how mitigation measures would be monitored and enforced, in accordance with 40 C.F.R. Sections 1502.14(f), 1502.16(h) , and 1505.2(c) . *See also* 7 C.F.R. § 1970.16 (RUS regulation on mitigation). While NEPA requires mitigation measures to be "discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated," it does not demand "a detailed explanation of specific measures which *will* be employed to mitigate the adverse impacts." *Robertson*, 490 U.S. at 352–53 (emphasis in original).

The EIS's discussion of mitigation easily meets that standard. The EIS disclosed numerous types of mitigation measures and best management practices expected to be employed during

construction and operation of the CHC Project. *See, e.g.*, ROD005076–77 (erosion control); ROD005113–19 (table of environmental commitments for 14 broad resource categories), ROD005165–67 (wetland protection), ROD005479 (anticipated mitigation measures for the Refuge); ROD005610–31 (Appendix of Best Management Practices). The EIS and ROD also appended a detailed Federal Mitigation Plan, which "outlines all mitigation measures required by the RUS, USFWS, and USACE." ROD007634; *see* ROD007588–99 (complete plan). Contrary to Plaintiffs' assertions, *see* RUS Compl. ¶ 144(h), these mitigation measures are neither superficial nor unenforceable, as Federal Defendants explained how they would be incorporated into permits, contracts, and plans. ROD007356; ROD007361. In any event, "a mitigation plan need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements." *Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 681 n.4 (9th Cir. 2000). For all of these reasons, the EIS's discussion of mitigation more than satisfies NEPA. *See Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 527–28 (9th Cir. 1994) (analyzing case law and concluding that EIS's mitigation discussion was sufficient).

In sum, the comprehensive analysis in the EIS complies with NEPA's requirements to discuss the effects of a proposed action and its alternatives, to analyze cumulative impacts, and to consider mitigation. The EIS therefore satisfies Federal Defendants' obligation to take a hard look at the environmental consequences of the CHC Project.

**C.     NWP 12 and the Utility RGP comply with NEPA.**

**1.     The Corps' EA and FONSI for NWP 12 are valid.**

Even if Plaintiffs' NEPA challenge to NWP 12 were not moot, the Corps' EA properly evaluated the potential impacts from the issuance of NWP 12. And, in rationally finding the impacts associated with NWP 12 would not be "significant" for NEPA purposes, the Corps acted

within its discretion and expertise. Count I of the Corps Complaint thus fails. *See* Corps Compl. ¶¶ 86–92.

        **a.**      **The Corps' EA was sufficient.**

"An EA is a shorter, rough-cut, low-budget EIS which is mandated when, as here, proposed action is neither one normally requiring an EIS nor one categorically excluded from the EIS process." *Highway J Citizens Grp.*, 349 F.3d at 953. An EA need not contain all the same components or the same level of detail as an EIS, but it "shall include brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). Courts ask "whether an EA took a 'hard look' at the environmental consequences of the proposed action." *Montana Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1144 (D. Mont. 2004) (citations and internal quotation marks omitted). "The Supreme Court has held that an agency takes a sufficient 'hard look' [at impacts of its action] when it obtains opinions from its own experts, obtains opinions from experts outside the agency, gives careful scientific scrutiny and responds to all legitimate concerns that are raised." *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 288 (4th Cir. 1999) (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378–85 (1989)).

The Corps' EA for NWP 12 meets these standards. It detailed (on a national level) the affected environment, summarizing relevant studies. NWP005289–303. It disclosed the relevant environment's current state, with particular emphasis on water quality impairment and causes. NWP005296–303. And the EA evaluated the proposed action's potential direct, indirect, and cumulative impacts. NWP005303–28, NWP005330–39. This analysis included impacts to water quality (NWP005335–36) and fish and wildlife, including endangered species (NWP005319–20, NWP005324–28, NWP005337). The EA also considered alternatives, including a no action

70

alternative in which no Nationwide Permit would issue, NWP005286–89, and considered and responded to public comments, NWP005267–86. With respect to its cumulative impacts analysis, the EA focused primarily on cumulative effects to aquatic resources. *See* NWP005305–16; NWP005330–35. The EA references its prior discussion on the current status of waters of the United States (NWP005311); discusses the activities that have and can impact those waters (NWP005311–13); and qualitatively conveys how activities authorized under the Permit would add to those impacts (NWP005313, NWP005330–35).[31]

Consistent with NEPA, the Corps evaluated and conveyed to the public the information on impacts that were reasonably foreseeable at the time of its decision to reissue NWP 12. *See* 40 C.F.R. §§ 1502.22, 1508.7; NWP005303, NWP005311, NWP005313. Whether an impact is "reasonably foreseeable," thus requiring consideration under NEPA, is subject to the "rule of reason," and "whether (and to what extent) the future action should have been discussed turns on the amount of discussion necessary to serve the two principal purposes of NEPA: ensuring informed decisionmaking and informed public participation." *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 603 F. Supp. 2d 1176, 1192 (E.D. Wis. 2009). Given the forward-looking nature of the nationwide permit program, the Corps' EA, which was necessarily "predictive in general terms," assessed "[o]nly the *reasonably foreseeable* direct, indirect, and cumulative effects" of NWP 12. NWP005303 (emphasis added). This determination was neither arbitrary nor capricious, and is entitled to deference. *See Highway J Citizens Grp.*, 349 F.3d at 952–53 (decisions implicating agency expertise are entitled to deference).

---

[31] There is nothing improper about qualitative, rather than quantitative, effects analyses. *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1076 (9th Cir. 2012).

To succeed in a challenge under NEPA and the APA, Plaintiffs must also show they brought any alleged defects on which they seek judicial intervention to the agency's attention during its decisionmaking process, or else the newly raised issues "are waived and will not be considered by a court on review." *Nuclear Energy Institute, Inc. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004); *see also Pub. Citizen*, 541 U.S. at 764–65 (Plaintiffs' challenges were forfeited because they "did not raise [their] particular objections to the EA" during the comment period, and thus plaintiffs denied the agency "the opportunity to examine any proposed alternatives to determine if they were reasonably available."). Importantly, though Plaintiffs' counsel—the Environmental Law & Policy Center—submitted comments to the Corps on NWP 12, these comments were not made on behalf of Plaintiffs and Plaintiffs themselves did not submit comments. *See* NWP046887. Plaintiffs' failure to identify any specific deficiency in the Corps' analysis before the agency or in their Complaint deeply undermines their claim that the Corps' EA was insufficient.

In sum, the Corps' EA for issuance of NWP 12 takes a hard look at direct, indirect, and cumulative impacts, and Plaintiffs cannot show the Corps' EA was arbitrary and capricious.

### b.   The Corps' FONSI was not arbitrary and capricious.

Based on the Corps' evaluation in its EA, it issued a FONSI, concluding "that the issuance of this NWP will not have a significant impact on the quality of the human environment." NWP005340. A FONSI "is a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh*, 490 U.S. at 376. A FONSI "can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"   *Pub. Citizen*, 541 U.S. at 763 (quoting 5 U.S.C. § 706(2)(A)). Where "an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled

to deference." *Indiana Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 859 (7th Cir. 2003); *see infra* Section VI.D.1 (discussing Corps expertise in predicting impacts). The Corps' FONSI meets this standard.

As the Corps explained in issuing the nationwide permits, "[b]ecause the NWPs only authorize activities that have no more than minimal adverse environmental effects, individually and cumulatively, the issuance or reissuance of an NWP does not result in significant impacts to quality of the human environment and does not trigger the requirement to prepare an environmental impact statement." NWP000009. Indeed, the congressional scheme allowing general (including nationwide) permits is designed to apply to activity that "will cause only minimal adverse environmental effects" both separately and cumulatively, 33 U.S.C. § 1344(e)(1), and, by its own terms, NWP 12 cannot be used for activities that have greater than minimal effects. *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 833 F.3d 1274, 1286 (11th Cir. 2016) (upholding FONSI for another Nationwide permit, noting its text "goes a long way to support the Corps' determination that authorized activities . . . will have minimal individual and cumulative adverse effects").

The Corps reasonably predicted that impacts would be minimal. For example, the Corps concluded that "[m]ost of the impacts" from activities covered by NWP 12 "will be temporary," NWP005330, including (where the activity involves impacts to jurisdictional waters) access roads to construction sites, temporary structures for remediation of drilling fluids from horizontal directional drilling for installing or replacing utility lines, and temporary structures over wetlands to allow access to utility lines, NWP005263; *see also* NWP005306 (discussing temporary impacts to wetlands); NWP005335–36 (discussing potential increases in "water turbidity," which "will normally be limited to the immediate vicinity of the disturbance and should dissipate shortly after

each phase of the construction activity"). Similarly, the Corps reasonably explained why impacts to jurisdictional waters would remain minimal even if multiple one-half acre or less crossings are planned for the same utility line. Such "separate and distant crossings of waters of the United States are usually at separate waterbodies scattered along the length of the utility line, and are often in different watersheds," such that impacts will remain cumulatively minimal. NWP005272. Even where a utility line crosses the same waterbody multiple times "at separate and distant locations, the distance between those crossings will usually dissipate the direct and indirect adverse environmental effects so that the cumulative adverse environmental effects are no more than minimal." NWP005272. Plaintiffs no doubt think the Corps should have reached a different conclusion on the significance of impacts from NWP 12, but that does not make the Corps' determination arbitrary and capricious. *Cf. Env't Law & Pol'y Ctr.*, 470 F.3d at 682 (courts "cannot substitute [their] own judgment for that of the agency as to the environmental consequences of its actions").

The Corps also ensures that NWP 12 is unavailable for activities that cause greater than minimal environmental impacts separately or cumulatively through its terms and general conditions, mitigation measures, and the district-level PCN and verification process. *See* NWP005283 ("When a district engineer issues an NWP 12 verification, he or she is confirming that the proposed NWP 12 activity complies with the terms and conditions of the NWP, including any regional and activity-specific conditions, and will result in no more than minimal individual and cumulative adverse environmental effects."). If a district engineer determines that an applicant's activities *do not* meet the terms and conditions of NWP 12, the Corps would require an individual permit and conduct a site-specific NEPA evaluation. 33 C.F.R. § 330.1(e)(3); NWP005283; NWP005309. The Corps considered and disclosed NWP 12's terms, conditions, and

74

verification scheme in issuing NWP 12, and its reasoned prediction—based on its expert judgment—that NWP 12 would not lead to significant environmental impacts is not arbitrary and capricious.[32] *See League of Wilderness*, 689 F.3d at 1073 ("As a reviewing court, we are most deferential when the agency is making predictions within its area of special expertise.") (internal quotation marks and citations omitted).

Plaintiffs' Complaint contends that the Corps "did not apply the intensity factors used to determine significance in 40 C.F.R. § 1508.27(b)." Corps Compl. ¶ 91. Not so. As an initial matter, "[t]he list of intensity factors does not serve as a 'checklist.'" *Advocates For Transp. Alternatives, Inc. v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 2d 289, 301 (D. Mass. 2006) (quoting *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 42 (D.D.C. 2000)). Intensity is simply "the severity of impact" based on ten considerations, many of which focus consideration on a specific type of impact. *See* 40 C.F.R. § 1508.27(b) (including, for example, "[t]he degree to which the proposed action affects public health and safety," any unique geographic characteristics, whether impacts are cumulatively significant, any effect on historic properties, any adverse effect on endangered species, and any threatened violation of law). The Corps considered these factors as part of its broader analysis.[33] *See, e.g.*, NWP005303–16 (impacts), NWP005284–85 (methods of ensuring minimal impacts), NWP005268 (public safety), NWP005320 (health and safety concerns), NWP005339 ("designated critical resource waters and adjacent wetlands" such as

---

[32] The Corps' estimate for use of NWP 12 in Iowa reinforces its minimal impact. The Corps predicted that NWP 12 would cause an estimated total of 2.68 acres of wetland impacts and 7,841 of linear feet of impacts to tributaries in Iowa per year (including both PCN impacts and non-PCN impacts). USACE012957.

[33] Consistent with the principle that the burden rests with plaintiffs to show agency action was arbitrary and capricious, courts typically consider only those intensity factors specifically raised by plaintiffs. *See, e.g.*, *Highway J Citizens Grp.*, 349 F.3d at 957 (evaluating only the three factors that plaintiff "claims the defendants failed to consider").

parks, monuments, and wilderness areas), NWP005267–86 (nature and effect of NWP 12 and its issuance), NWP005319 (historic properties), NWP005324–28 (endangered species). No more is required. *See Spiller v. White*, 352 F.3d 235, 242–43 (5th Cir. 2003) (NEPA requires only "that all the factors were in some way addressed and evaluated; whether this was done in factor-by-factor fashion is irrelevant."); *cf.* 40 C.F.R. § 1508.13 ("If the [EA] is included, the [FONSI] need not repeat any of the discussion in the [EA] but may incorporate it by reference.").

Likewise, the Corps' acknowledgement that activities otherwise authorized by NWP 12 may be ineligible because they cause more than minimal impacts has no bearing on whether the Corps' FONSI was arbitrary and capricious. *See* Corps Compl. ¶ 91 (alleging that the Corps "acknowledged that adverse environmental effects might be significant"). For example, the Corps recognized that division and district engineers may determine for specific watersheds that cumulative impacts are more than minimal. NWP005309. In these situations, the Corps points out, "[d]ivision and district engineers have the authority to require individual permits . . . or add conditions to the NWP" and can revoke NWP 12 for those geographic areas. *Id.* The Corps also "estimate[d] that 9 percent of the NWP 12 verifications will require compensatory mitigation to . . . ensure that the authorized activities result in only minimal adverse effects on the aquatic environment." NWP005331. Where mitigation is insufficient to bring impacts to minimal levels, NWP 12 cannot be used. NWP005283. These examples support, rather than undermine, the Corps' FONSI. After all, that the Corps disclosed and analyzed these issues in its EA reflects compliance with NEPA rather than a violation. *See Env't Law & Pol'y Ctr.*, 470 F.3d at 682 (courts' "only role is to ensure that the agency has taken a hard look at environmental consequences" and courts "cannot substitute [their] own judgment for that of the agency as to the environmental consequences of its actions").

Nor were the mitigation measures impermissibly speculative. *See* Corps Compl. ¶ 91. To the contrary, general condition 23 sets out specific parameters for district engineers for implementing mitigation measures, including the overarching requirements that all activities "must be designed and constructed to avoid and minimize adverse effects" and "[m]itigation in all its forms . . . will be required to the extent necessary to ensure that the individual and cumulative adverse environmental effects are no more than minimal." NWP000143. For specific types of mitigation, general condition 23 contains detailed guidance on what mitigation measures should be used for certain impact types, and, for compensatory mitigation, specific procedures for applicants to propose mitigation plans. *Id.* As the Corps notes in its EA, compensatory mitigation requires monitoring and, where necessary, adaptive management to address any unforeseen shortcomings in the mitigation plan.[34] NWP005313; NWP005334–35; 33 C.F.R. § 332.4(c)(10). The overarching goal of these mitigation components is to ensure that NWP 12's terms allowing only minimal impacts both individually and cumulatively are followed; the Corps was not arbitrary and capricious in concluding that it met this goal, and adequately explained available mitigation to ensure compliance with NWP 12. *See, e.g.*, *Nw. Env't Def. Ctr. v. U.S. Army Corps of Engineers*, 817 F. Supp. 2d 1290, 1312 (D. Or. 2011) (rejecting challenge to general permit's discussion of

---

[34] "Adaptive management means the development of a management strategy that anticipates likely challenges associated with compensatory mitigation projects and provides for the implementation of actions to address those challenges, as well as unforeseen changes to those projects." Adaptive management "guides modifications of [compensatory mitigation] projects to optimize performance," including through monitoring results of compensatory mitigation to implement "measures to rectify . . . problems." 33 C.F.R. § 332.2. In the context of an EIS, in which NEPA's standards are generally more demanding, the D.C. Circuit has recognized that "[t]he procedural requirements of NEPA do not force agencies to make detailed, unchangeable mitigation plans," and that "[a]llowing adaptable mitigation measures is a responsible decision in light of the inherent uncertainty of environmental impacts, not a violation of NEPA" and "certainly not arbitrary and capricious." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010).

mitigation measures where "the Corps concluded a variety of mitigation measures would limit impacts to the environment" and that finding is entitled to substantial deference).

For these reasons, the Corps reasonably found that NWP 12 would not result in significant environmental impacts. Therefore, no EIS was required.

### 2.    The EA and FONSI for the Utility RGP satisfy NEPA.

Plaintiffs' challenge to the Utility RGP that governs CHC Project work in jurisdictional waters in Wisconsin fails for many of the same reasons as their challenge to NWP 12. As with NWP 12, the Corps prepared an environmental assessment ahead of issuing the Utility RGP and included all required components. The EA discussed the affected environment in Minnesota and Wisconsin, including details (drawing on relevant studies) of the nature and type of wetlands in Minnesota and Wisconsin, their quantity and quality, and trends in wetland losses, including from climate change. USACE009005–18. The EA analyzes all reasonably foreseeable impacts of the Utility RGP. *Id.* Recognizing that "RGPs authorize activities across Minnesota and Wisconsin, projects eligible for RGP authorization may be constructed in a wide variety of environmental settings," the EA nonetheless discusses impacts "likely to be associated with each activity authorized by" the Utility RGP. USACE009005. As with NWP 12, such a predictive analysis—necessitated by the forward-looking nature of general permits—was permissible. *See, e.g.*, *Habitat Educ. Ctr.*, 603 F. Supp. 2d at 1192 ("reasonably foreseeable" definition subject to "rule of reason"). The EA also included an alternatives analysis, USACE009001–05, and summarized and responded to comments. No more is required. *See Highway J Citizens Grp.*, 349 F.3d at 953 ("EA is a shorter, rough-cut, low-budget EIS"); 40 C.F.R. § 1508.9(b).

The Corps' decision not to prepare an EIS was likewise reasonable. The Corps based its FONSI for the Utility RGP on terms and conditions at least as protective as NWP 12, including the requirement that the Utility RGP not apply to activities that have a greater than minimal impact

individually or cumulatively. *See supra* Section V.C.2; USACE009008 ("The RGP activity restrictions in Section B, the exclusions listed in Section C, the PCN requirements in Section E, and the RGP general conditions in Section H have been proposed to ensure that the activities authorized by the RGP have no more than minimal individual and cumulative adverse environmental effects."); USACE009019 ("Section F further clarifies that compensatory mitigation may be required by the Corps to ensure that the net adverse environmental effects are no more than minimal."); USACE009060 (explaining that the Corps will issue verifications for projects that meet the terms and conditions of the RGP "unless the Corps determines, after considering mitigation, that the proposed activity will result in more than minimal individual and cumulative adverse effects"). In this way, the Corps "consider[ed] the proper factors and ma[de] a factual determination on whether the environmental impacts are significant or not," and "that decision implicates substantial agency expertise and is entitled to deference." *Indiana Forest All.*, 325 F.3d at 859; *see also Sierra Club v. U.S. Army Corps of Engineers*, 464 F. Supp. 2d 1171, 1223 (M.D. Fla. 2006), *aff'd*, 508 F.3d 1332 (11th Cir. 2007) (concluding EA for regional permit issuance took sufficient hard look where "the whole permit process bespeaks the Corps' consideration of the direct, indirect, and cumulative impacts of the authorized activities" in wetlands and other waterbodies in the permit region).

Plaintiffs' Complaint is even more conclusory in challenging the Utility RGP than NWP 12, alleging only that the Corps' "failure to conduct the required environmental review before issuing the St. Paul District's Utility RGP was also contrary to law, arbitrary and capricious, and an abuse of discretion under the APA." Corps Compl. ¶ 92. And, as with NWP 12, Plaintiffs failed to provide comments to the Corps despite a public notice and comment period. *See* USACE009076. Plaintiffs should not be allowed to raise before the Court what they failed to

present to the Corps during its decisionmaking process. *See Nuclear Energy Institute, Inc.*, 373 F.3d at 1297 (issues not raised with agency "are waived and will not be considered by a court on review"); *see also Pub. Citizen*, 541 U.S. at 764–65 (NEPA challenge forfeited where not raised before agency).

For these reasons, Plaintiffs cannot show that the Corps' EA for considering whether to issue the Utility RGP was insufficient under NEPA or that the Corps' decision not to prepare an EIS was arbitrary and capricious. *See Env't Law & Pol'y Ctr.*, 470 F.3d at 682 (agency is entitled to deference "regarding the significance of environmental impacts" so long as it "considered the proper factors"); *Pub. Citizen*, 541 U.S. at 763 (A FONSI "can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"). As it did for NWP 12, the Corps properly assessed the potential environmental impacts of the Utility RGP and reasonably determined that it would not have significant impacts on the environment.

## D.  The Corps complied with the CWA.

### 1.  NWP 12 and the Utility RGP satisfy CWA Section 404(e) and applicable regulations.

To reduce the delay and burdens associated with individual permits, Congress authorized in CWA Section 404(e) the issuance of general permits covering any category of activities that is "similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). In issuing general permits, the Corps must also comply with applicable regulations, including, in pertinent part, the relevant CWA Section 404(b)(1) Guidelines and a public interest review. 40 C.F.R. pt. 230; 33 C.F.R. § 320.4(a). Both NWP 12 and the Utility RGP satisfy these requirements.

First, the activities authorized under a general permit must be "similar in nature and similar in their impact upon water quality and the aquatic environment." 40 C.F.R. § 230.7(a)(1). Both of the general permits at issue in this case cover utility lines and associated activities with no more than one-half acre loss of regulated waters. NWP000010; USACE009045–46. These activities are similar because "they involve linear pipes, cables, or wires to transport physical substances or electromagnetic energy from a point of origin to a terminal point." NWP000025; *see* USACE009027; USACE009057–58. These activities also have similar impacts on the aquatic environment. Specifically, these activities may similarly "replace[] aquatic habitats, such as wetlands, with utility line facilities." USACE009027. "Most of the impacts relating to the construction, maintenance, repair, or removal of the utility lines will be temporary." *Id.* The utility line activities covered by NWP 12 and the Utility RGP play an "important role in helping the nation achieve goals regarding the increased reliance on clean energy projects to meet the energy needs of its populace, to help reduce emissions of greenhouse gasses that contribute to climate change." NWP000026. Because these projects "result in no more than minimal individual and cumulative adverse environmental effects," the Corps reasonably determined that issuing a general permit for this class of activities is consistent with Congress's intent of streamlining the CWA Section 404 permit process. *See id.*

The Corps also reasonably determined that NWP 12 and the Utility RGP each satisfied Section 404(e)'s requirement that the activities subject to these permits result in no more than minimal separate and cumulative adverse effects on the environment. In evaluating whether each anticipated project that might fall under the general permit, viewed separately, would have only minimal effects, the Corps' "evaluation shall be based upon consideration of the prohibitions listed in [40 C.F.R.] § 230.10(b) and the factors listed in § 230.10(c), and shall include documented

81

information supporting each factual determination in § 230.11 of the Guidelines." 40 C.F.R. § 230.7(b)(1).[35] The Corps thoroughly evaluated each of these regulatory considerations in issuing both NWP 12 and the Utility RGP and determined that the discharges authorized by these general permits comply with the CWA and applicable regulations. *See* NWP005340; USACE009026–35; USACE009041.

Moreover, NWP 12 and the Utility RGP are limited to ensure that impacts of the activities that they cover are minimal. Both permits apply to "single and complete projects" that result in less than one-half acre of loss of regulated waters. *See infra* Section VI.D.2.a (discussing the meaning of "single and complete project" as applied to linear projects like utility lines). This one-half acre limit was developed to ensure that impacts remained minimal under Section 404(e). In justifying this threshold, the Corps acknowledged that "defining 'minimal' is extremely challenging because of the substantial variation in the structure, functions, and dynamics" of regulated waters. NWP000012. The Corps used its scientific expertise and its technical experience to arrive at the one-half acre limit. *See id.* (explaining that projects that propose such small impacts rarely attract significant comment during the public comment period, and emphasizing that Corps districts can "modify, suspend, or revoke" NWPs and change this threshold to reflect local conditions); NWP005272 (employing expertise to conclude that one-half acre "is an appropriate limit").

Other permit elements can further help to ensure any impacts are no more than minimal. For instance, where a PCN is required—as here—district engineers have discretion to add special permit conditions to protect the public interest and environment, including compensatory

---

[35] As explained in greater detail below, the Corps' regulations expressly provide that "consideration of alternatives in § 230.10(a) are not directly applicable to General permits." 40 C.F.R. § 230.7(b)(1).

mitigation or other limits, as appropriate based on their project-specific review. NWP000147; USACE009060. *See Bostick*, 787 F.3d at 1060 (deferring to the Corps' interpretation of CWA Section 404(e) "to allow use of project-level personnel to evaluate environmental impacts"). Based on the Corps' projections in issuing NWP 12 and the Utility RGP, the vast majority of impacts, in terms of acreage, to regulated waters authorized under those general permits will occur as a result of activities requiring a PCN. *See infra* Section VI.D.2.b. Moreover, where *any* aspect of an overarching project (e.g., a utility line as a whole) requires that a PCN be submitted to the Corps, that PCN must include information as to *all* impacts on wetlands or other regulated waters within the Corps' jurisdiction. NWP005265 (Note 8); NWP000128 (same); USACE009048. This includes the quantity of anticipated losses of wetlands, other special aquatic sites, and other waters. NWP000145; USACE009050–51. The district engineer can then evaluate the specific activities to ensure that they will have no more than minimal effects under Section 404(e). NWP000145; USACE009060. If after review the district engineer believes that a project will exceed the scope of the applicable general permit, the Corps will not issue a verification and will instead require the applicant to seek an individual permit. NWP000146; USACE009060. This creates a powerful incentive to minimize the impacts of a proposed project: the alternative—if a project's proponent is unable to satisfy the Corps that its project will have only minimal impacts—is to seek a permit under the more resource-intensive individual permitting process. *See* NWP000031; USACE009051.

In assessing the anticipated cumulative effects of each general permit, in addition to the NEPA analysis, the Corps undertakes an analysis pursuant to the CWA Section 404(b)(1) Guidelines. 40 C.F.R. § 230.7. At the general permit stage, this analysis is necessarily predictive in nature and, therefore, somewhat uncertain. "To predict cumulative effects, the [permitting

authority's] evaluation shall include the number of individual discharge activities likely to be regulated under a General permit until its expiration, including repetitions of individual discharge activities at a single location." *Id.* § 230.7(b)(3). This analysis uses historical information to forecast the expected usage of the particular general permit. *See* NWP005330–31; USACE009028; USACE009615–18. *See also* NWP005290–92 (Dahl, Frayer, and USFWS wetland tracking from 1780–1980 and how the rate of loss decreased substantially in the 1970s with the introduction of wetlands regulation, and no statistical difference between 2002–2009). The Corps' analysis of cumulative impacts at the general permit stage was detailed and thorough. *See infra* at Section VI.D.2.b.

Further, the Corps reasonably concluded that NWP 12 and the Utility RGP were not contrary to the public interest. Corps regulations at 33 C.F.R. Section 320.4(a)(1) require the Corps to consider relevant factors from a list of more than 20 specific factors to determine whether a permit "would be contrary to the public interest." In addition, subsection 320.4(a)(2) contains three additional public interest criteria for the Corps to evaluate when issuing a permit. The NWP 12 and Utility RGP decision documents reflect thoughtful and thorough public interest analysis from the Corps, including consideration of foreseeable cumulative effects. Both documents contain separate discussions for each of the required public interest considerations, followed by the Corps' explanation. NWP005317–24; USACE009018–26.

Moreover, where appropriate to protect the public interest, the Corps includes general conditions in the permit. For instance, as to both NWP 12 and the Utility RGP, in evaluating "wetlands" impacts, the Corps recognized that permitting the covered activities may result in loss or alteration of wetlands and imposed conditions to minimize these losses and alterations. NWP005318–19; USACE009019–20. NWP 12 General condition 23 requires permittees to avoid

84

and minimize impacts to regulated waters, and allows district engineers to impose compensatory mitigation to offset losses of these waters where appropriate to ensure the net losses are no more than minimal. NWP000103–09. *See* USACE009051 (Mitigation). General condition 22 offers heightened protections for "high value wetlands." NWP005319. District engineers also retain discretionary authority to provide additional conditions or require individual permits based on their region or a specific project. NWP000146–47. The Utility RGP contains similar wetlands protections in Sections C, F, H, and J. USACE009020; USACE009046–47, USACE009051–56, USACE009059.

Accordingly, in issuing each general permit, the Corps robustly explained why it concluded that the covered activities would have only minimal individual and cumulative adverse impacts on the environment. The Corps also analyzed the applicable portions of the Section 404(b)(1) Guidelines and evaluated the public interest factors. Accordingly, the Corps' decisions to issue NWP 12 and the Utility RGP were well reasoned, rational, and in full compliance with CWA Section 404(e) and applicable regulations. Plaintiffs' facial challenge to the lawfulness of these permits is not well founded.

## 2.    Plaintiffs' arguments misconstrue the structure of the general permitting process.

In Count II of their Complaint against the Corps, Plaintiffs argue that NWP 12 and the Utility RGP violate CWA Section 404(e) and the APA. Corps Compl. ¶ 98; *see id.* ¶¶ 95–97. Their arguments read restrictions into the CWA and Corps regulations that do not exist, and fundamentally misconstrue the CWA general permit process.

### a.    Plaintiffs' challenge to the definition of "single and complete project" as to linear projects is misplaced.

Plaintiffs argue in Count II that the challenged general permits "unlawfully treat each individual water or wetland crossing on a linear utility project as a separate 'single and complete

project' without limit on the number of crossings or the total number of acres of waters of the U.S. affected." Corps Compl. ¶ 95. This argument misconstrues the Corps' longstanding views on the meaning of "single and complete projects."

NWP 12 and the Utility RGP apply only to authorize "single and complete projects" that cause no more than one-half acre of "loss" of regulated waters. For linear projects that cross a single waterbody more than one time (or that cross multiple waterbodies) the Corps treats each crossing as a "single and complete project" provided that the crossings are at "separate and distant locations." NWP000128 (Note 2) (noting also that utility lines must comply with 33 C.F.R. § 330.6(d)); USACE009057–58; *see* 33 C.F.R. § 330.2(i) (defining "single and complete project"). Thus, so long as each such "separate and distant" crossing involves no more than one-half acre loss of wetlands, each such crossing would meet this threshold and therefore *might* qualify for authorization under NWP 12 or the Utility RGP. However, where a PCN is required, the district engineer would still need to verify that the regulated activities have no more than a minimal cumulative environmental impact, among other things. This definition of "single and complete project" was first articulated in 1988 and first codified in the Code of Federal Regulations in 1991. *See* 56 Fed. Reg. 59,110, 59,113–14 (Nov. 22, 1991); 33 C.F.R. § 330.2(i). The Corps has never deviated from it.

At the outset, Plaintiffs' challenge to this definition is irrelevant to the Court's review of the CHC Project. The *total* permanent loss of regulated waters associated with the construction of the CHC Project, across *all three verifications*, is very small: 0.077 acres. USACE001199, USACE000759, USACE000693. Thus, even if the Corps did not apply the definition of "single and complete project" that Plaintiffs attack in their Complaint—and instead treated every single separate crossing, no matter how distant or environmentally unrelated, as one "single and complete

project"—this would make no meaningful difference. The CHC Project would still fall well below the one-half acre thresholds to qualify for NWP 12 and the Utility RGP. *See Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 722 (E.D. Tex. 2020) ("Therefore, even if the Corps treated all of the Pipeline's separate water crossings as one single and complete project, the total 'loss of waters' would still qualify under NWP-12 and not violate the CWA."); *Ouachita Riverkeeper, Inc. v. Bostick*, 938 F. Supp. 2d 32, 46 n.7 (D.D.C. 2013) (similar).

In any event, this definition is entirely permissible and reasonable under the CWA, particularly Section 404(e), 33 U.S.C. § 1344(e). Section 404(e) allows the Corps to authorize a "category of activities" only if the environmental impact is minimal, but Congress did not define "minimal," and was silent on the precise issue. 33 U.S.C. § 1344(e). Nor did Congress put any restrictions on the number of times a particular nationwide permit could be used, or require the Corps to do so. *Id.* Accordingly, under step two of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984), the question for the Court is whether the Corps' determination is "based on a permissible construction of the statute." *Id.* It is. *See Optimus Steel*, 492 F. Supp. 3d at 722–24.

The Corps' definition of "single and complete project" in the context of linear projects is consistent with the CWA: even where a utility line crosses the same waterbody, the environmental impact remains "minimal" where the crossings are spread out and not hydrologically or biologically connected. [36] *See* USACE009083; USACE009057–58; NWP000030. *See also*

---

[36] What constitutes "separate and distant" varies depending on local conditions. The Corps "cannot establish national thresholds for determining when crossings of waters of the United States are 'separate and distant' because a variety of factors should be considered by district engineers when making those decisions, such as topography, geology, hydrology, soils, and the characteristics of the wetlands, streams, and other aquatic resources." NWP000030; NWP005278. Accordingly, Corps districts may establish local guidelines to identify "separate and distant"

*Optimus Steel*, 492 F. Supp. 3d at 722–23. Particularly for projects like utility lines, "the separate and distant crossings of waters of the United States are usually at separate waterbodies scattered along the length of the utility line, and are often in different watersheds especially for utility lines that run through multiple counties, states, or Corps districts." NWP005272. Where a utility line proposes to cross the same waterbody at "separate and distant" places, "the distance between those crossings will usually dissipate the direct and indirect adverse environmental effects" resulting in minimal cumulative adverse effects. *Id. See* 56 Fed. Reg. at 59,113–14. This rationale aligns with CWA Section 404(e)'s "minimal effects" requirement, and it is eminently reasonable for the Corps to employ it in this case where the utility line runs across more than one hundred miles. *See Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. U.S. Corps of Eng'rs*, 888 F.3d 906, 920–21 (8th Cir. 2018) (deferring to the Corps' interpretation of applying the "single and complete project" definition at separate and distant locations for linear projects); *Optimus Steel*, 492 F. Supp. 3d at 722–24 (same); *Bostick*, 787 F.3d at 1055–56 (affirming Corps' use of the one-half acre threshold).

Because the crossings must be "separate and distant" in order to qualify as distinct "single and complete projects," this necessarily imposes a practical limit on how many crossings can occur in a single, overarching project. In other words, the "separate and distant" requirement serves as a *functional* (as opposed to an arbitrary numerical) limit on the number of crossings, that is focused on ensuring that the impact of the overall project is no more than minimal. And all regulated activities under NWP 12 and the Utility RGP "must be designed and constructed to avoid and minimize (mitigate) adverse effects, both temporary and permanent, to waters of the US to the

---

crossings. *Id.* This regulatory approach is consistent with the Corps' reasonable longstanding construction of the statute and interpretation of its regulations, and it is entitled to deference. 33 C.F.R. § 330.2(i); *see* 56 Fed. Reg. 59,110, 59,113–14 (Nov. 22, 1991); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417–18 (2019).

maximum extent practical at the project site (i.e., on site)." USACE009051; NWP000143. *See* 33 C.F.R. pt. 332; 40 C.F.R. pt. 230.

Moreover, NWP 12 and the Utility RGP apply solely to single and complete projects that result in less than one-half acre of loss of regulated waters. But, particularly where a PCN is required, the Corps will further confirm that the environmental impacts on regulated waters will be no more than minimal. Where an overall project requires a PCN, that PCN must include information on impacts to regulated waters that do not, in themselves, trigger the requirement of submitting a PCN, thereby allowing the district engineer to evaluate the specific activities to ensure that they will have no more than minimal effects under Section 404(e). NWP000145; USACE009048.[37] The district engineer can also impose conditions or require mitigation at this stage to ensure that the adverse impacts of the project are no more than minimal. *See supra* Section IV.B.2.

In short, the Corps' definition of "single and complete project" for linear projects is entirely reasonable, consistent with the CWA, and sufficient—especially when viewed in light of the other elements of the Corps' process—to ensure that activities authorized in connection with linear projects will meet the requirements of CWA Section 404(e). *See Optimus Steel*, 492 F. Supp. 3d at 722–24 (explaining that "[t]he Corps' interpretation does not allow for 'limitless' wetland impacts as Plaintiff contends" because crossings must be "separate and distant," and "any impact on jurisdictional waters is further mitigated by the Corps' national-level safeguards, as well as by its regional divisions and District Engineers"); *see generally* NWP000002; 33 C.F.R. pt. 330.

---

[37] The Corps anticipates that most impacted acreage under NWP 12 and the Utility RGP will result from activities requiring a PCN. *See infra* at Section VI.D.2.b.

Thus, the Corps reasonably interpreted Section 404(e)'s minimal effects requirement as met without incorporating into NWP 12 an arbitrary limit on the number of "single and complete projects" that may exist within an overall linear project. *Bostick*, 787 F.3d at 1056.

### b. The Corps properly considered cumulative effects of multiple crossings on a single area.

Next, Plaintiffs broadly claim in Count II that the Corps "does not consider the cumulative effect of multiple crossings on a single overall project or in a single area under either NWP 12 or the . . . Utility RGP."[38] Corps Compl. ¶ 96. This argument, too, is wrong.

Cumulative effects in the CWA context differ from those in the NEPA context. As stated in the Section 404(b)(1) Guidelines, cumulative effects under the CWA are "the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material." 40 C.F.R. § 230.11(g)(1). The Guidelines require the Corps, when issuing general permits, to "set forth in writing an evaluation of the potential individual and cumulative impacts of the category of activities to be regulated under the general permit." 40 C.F.R. § 230.7(b). Consideration of cumulative impacts occurs both at the general permit stage and— where applicable—at the verification stage, but this consideration looks different at each juncture. The analysis at the general permit stage is necessarily broader and predictive; project-specific analysis is not feasible. To assess cumulative impacts at the general permit stage, therefore, the Corps employs its expertise to estimate how many times a general permit will be used, perhaps nationwide, and what the anticipated impacts may be. *See* 40 C.F.R. § 230.7(b)(3). The records for both NWP 12 and the Utility RGP include this analysis and information.

---

[38] Plaintiffs do not appear to challenge any particular impacts. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 30 (D.D.C. 2016).

NWP 12 includes a detailed discussion of estimated national cumulative impacts. Based on past years' reported data, the Corps estimated that under NWP 12, there would be 11,500 annual PCN-reported uses for covered activities nationwide, which would impact roughly 1,700 acres of regulated waters nationwide.[39] NWP005330–31. To account for unreported uses (activities that do not require a PCN), the Corps further estimated 2,500 annual NWP 12 activities, with these activities likely to impact 50 acres of regulated waters nationwide. NWP005331. In terms of compensatory mitigation, the Corps predicted that, annually, 9% of NWP 12 verifications would use compensatory mitigation. *Id.* The Corps' supplement to NWP 12 in Iowa also conducted a regional cumulative impacts analysis for projected uses within Iowa. Under this analysis, the Corps estimated 53 PCN-reported annual uses of NWP 12 in the state, resulting in impacts to approximately 1.82 acres of wetlands and 5,328 linear feet of tributary. USACE012957. For activities that do not require a PCN, the Corps estimated twenty-five annual NWP 12 activities in Iowa, which would impact 0.86 acres of wetlands and 2,513 linear feet of tributary. *Id.* Finally, compensatory mitigation was estimated to apply to 3% of NWP 12 verifications in Iowa each year. *Id.*

The Utility RGP contains similarly detailed projections. Specifically, the Corps predicted that about 597 reported activities, resulting in 1,436 acres of impacts to regulated waters in Minnesota and Wisconsin, would occur annually.[40] USACE009028. The Corps projected 799 non-

---

[39] The Corps' dataset for NWP 12 was based on PCN-reported use of NWP12 during the period of March 19, 2012, to March 1, 2015. NWP005330-31. Accordingly, it does not include data from districts that do not use NWP 12.

[40] As compared to the NWP 12 dataset, the Utility GRP dataset considered an additional year of data and utility line standard permits, in addition to general permits, because 2018 was the inaugural year of the Utility RGP. The Utility RGP dataset also conservatively assumed that all recorded conversions incorporated a regulated activity and that each recorded impact was not in the same location or footprint. Both assumptions were expected to inflate the estimated acreage of impacts. USACE009028-29. *See* USACE009615-18.

PCN activities annually, causing impacts to 47 acres of covered waters in those states. USACE009029. The Corps projected that 42% of the activities authorized after evaluation of Utility RGP PCNs will require compensatory mitigation. *Id.* Importantly, for both the PCN and non-PCN activities, over 90 percent of the estimated impacts are temporary in nature. USACE009028–29. By estimating the number of uses and impacts for each general permit, the Corps has taken reasonable and practical steps to consider cumulative impacts at the general permit level.[41]

Where a PCN is required, the Corps also considers the cumulative effects of the regulated activities for an overall project (e.g., a power transmission line) during the verification process. NWP000146; USACE009060. Importantly, however, the CWA cabins the Corps' authority to regulating discharges of dredge or fill material into waters of the United States. 33 U.S.C. § 1344(a). *See Standing Rock Sioux Tribe*, 205 F. Supp. 3d at 31–32; 40 C.F.R. § 230.11(g)(1) (indicating that the Corps' analysis of cumulative impacts focuses on changes to the aquatic ecosystem); NWP000006 ("While we recognize that many NWP activities are components of larger overall projects, the Corps' authorities under the NWP program are limited to discharges of dredged or fill material into waters of the United States . . . ."). Thus, the Corps' review of cumulative impacts occurs through this narrow lens. No provision of the CWA, the Corps'

---

[41] Plaintiffs' Complaint does not state a challenge to the substance of this analysis, instead arguing only that the Corps "does not consider the cumulative effect of multiple crossings on a single overall project or in a single area under either NWP 12 or the St. Paul District's Utility RGP." Corps Compl. ¶ 96. Of course, it would be impossible for the Corps to conduct this analysis at the general permit stage because the whole point of this permit is to *prospectively* authorize certain entire categories activities. *See* 33 U.S.C. § 1344(e). The Corps, in issuing a general permit, does not have any project-specific information before it. Thus, neither the CWA nor the Corps' regulations require the Corps to undertake the impossible task of predicting with specificity—at the general permit stage—"the cumulative effect of multiple crossings on a single overall project or in a single area." *See* Corps Compl. ¶ 96.

regulations, or either of the general permits at issue in this case requires the Corps to consider other impacts, such as those that the transmission line may have on upland areas. *See* NWP000006; *see also* USACE009008 (noting activities that the Corps does not regulate, including "[c]hanges in the use of uplands in direct proximity to wetlands"); 33 C.F.R. § 328(c)(14) (definition of "upland").

Courts that have considered challenges to the Corps' cumulative impact analyses at the verification stage have consistently held that the Corps need not provide a detailed discussion of cumulative impacts in its verifications. *Bostick*, 787 F.3d at 1060–61; *Mobile Baykeeper, Inc. v. U.S. Army Corps of Eng'rs*, No. 14-0032-WS-M, 2014 WL 5307850, at *20–22 (S.D. Ala. Oct. 16, 2014); *Sierra Club v. U.S. Army Corps of Eng'rs*, 64 F. Supp. 3d 128, 155–57 (D.D.C. 2014), *aff'd*, 803 F.3d 31 (D.C. Cir. 2015). Rather, so long as the underlying record reflects that the Corps had the relevant information before it, and the record supports the Corps' decision to issue a verification, courts will generally uphold it. *Bostick*, 787 F.3d at 1060–61. As discussed in greater detail below, this approach reflects that a verification is not equivalent to an individual permit, and it should not require extensive analysis. *See infra* Section VI.D.3.

In issuing the verifications at issue in this case, the Corps reasonably determined that the CHC Project's cumulative impacts will be no more than minimal. [42] USACE000684; USACE000691; USACE001196; NWP000032 ("The information regarding the cumulative effects of all of the utility line activities authorized by NWP 12 will be considered by the district engineer in his or her decision-making process for an NWP 12 verification."); USACE009060 (similar); USACE001196 (determining proposed activities under NWP 12 would cause "no more than minimal" cumulative impacts); USACE000684 (same, for Intervenor American Transmission

---

[42] To the extent Plaintiffs raise similar issues in Count V, in addition to Count II, the arguments below would apply there as well.

Company LLC-proposed activities under the Utility RGP); USACE000691 (same, for Intervenor ITC-proposed activities under the Utility RGP). The record supports this determination. For example, Intervenors' NWP 12 PCN submittal provided a detailed delineation of regulated waters and maps that show all crossings and their proposed impacts on those regulated waters. USACE004043–44; USACE004091–105; *see also* NWP000110 (GC 32) ("For linear projects, . . . the PCN should identify all crossings of waters of the United States that require [Department of Army] authorization."). The PCN identified nineteen wetlands (approximately 43 acres) and thirteen waterways in the CHC Project area, and it proposes to place fourteen permanent transmission line structures within six wetlands, and temporary wetlands matting in thirteen wetlands. USACE004042–43, USACE004045. The tables include each wetland or waterway type, location, and proposed impacts. USACE004043–444. For instance, the PCN proposes that two structures will be placed in Wetland B/C-IA-W02, which is a 5.94-acre palustrine emergent wetland, resulting in approximately 0.009 acres of loss and 0.95 acres of temporary impacts. USACE004043. The NWP 12 PCN as a whole reflects a total proposed loss of 0.057 acres and an additional 6.65 acres of temporary impacts from wetland matting.[43] The PCNs submitted in connection with the Utility RGP contain similarly detailed information. *See, e.g.*, USACE000693, USACE000679, USACE000686, USACE000759, USACE004229–32, USACE004235, USACE004840, USACE009050–51 (describing required contents of PCN). The total impacts anticipated under both of the Utility RGP PCNs is just 0.02 acres of loss and 13.61 acres of

---

[43] The NWP 12 PCN also proposes 12.14 total acres of conversion from one type of wetland to another type of wetland. USACE004045.

temporary impacts (predominantly from construction matting placed in wetlands). [44] USACE004232; USACE004828.

The detailed information provided in each of these PCNs and elsewhere in the record reflects that the Corps had knowledge of all impacts to regulated waters; it did not consider each "separate and complete project" in isolation. *See* USACE001202–17; USACE000761–80; USACE000695–729. As these PCNs indicate, the proposed losses to regulated waters are small for the entire CHC Project. Even aggregated, the total loss under all three PCNs is only 0.077 acres of wetlands across more than 100 miles of transmission line. Accordingly, the Corps reasonably determined that the CHC Project's regulated activities posed no greater than minimal cumulative impacts. In fact, inherent in the Corps' review of linear projects like the transmission projects is the consideration of various crossings to establish which of them are "separate and distant" and therefore may qualify as a "single and complete" project. The premise of this analysis is that the Corps is considering the nature of these crossings, and determining whether—in light of local, site-specific factors—they will have compounding impacts on the environment, or whether their impacts will dissipate. *See supra* Section VI.D.2.b. In suggesting that the Corps failed to consider "the cumulative impacts of multiple crossings . . . in a single area," Plaintiffs fail to fully account for these underlying determinations.

This record reflects that where the PCNs proposed multiple impacts within a "single area," the Corps considered the cumulative effects of those impacts in that area, treating them as part of the same "single and complete project." For example, in its list of delineated wetlands and proposed impacts, the ITC PCN under the Utility RGP has a column listing the proposed "single

---

[44] Collectively, the PCNs submitted in connection with the Utility RGP propose approximately 2.64 acres of wetland conversion. USACE004828; USACE004235–36.

and complete linear projects." USACE004231–32 ("SCLiP ID" column). This column sometimes includes just one delineated wetland per SCLiP ID, while other times it includes multiple wetlands. For instance, SCLiP ID 34 includes four delineated wetlands, reflecting the Corps' consideration of location-specific hydrology, and recognition that these four wetlands may be sufficiently close that impacts affecting them should be considered together. USACE004231; *see* USACE3828 (excel file listing wetland impacts for that segment, including entries such as "single and complete linear projects" two, nine, eleven, and twenty-two reflecting multiple impacts to wetlands from temporary matting in a single area, and "single and complete linear project" twenty-eight reflecting permanent impacts from the construction of two structures); USACE003830, USACE003837, USACE003839, USACE003850, USACE003856 (maps reflecting these impacts).

Consistent with NWP 12 and the Utility RGP, the Corps also had ample site-specific information before it when evaluating the proposed activities and their cumulative impacts. *See* NWP000147 (setting out site-specific factors the district engineer should consider in evaluating a PCN); USACE009060 (similar). The administrative record reflects detailed site information for the Corps' consideration, including the location and characteristics of each regulated water; the types of surrounding vegetation, soils, and other environmental features; the size and duration of proposed impacts; and other site details. *See, e.g.*, USACE004229–36 (ITC Utility RGP PCN). The inclusion of this information demonstrates that the Corps did not issue the verifications without considering the relevant site-specific factors. *See also* USACE000680 (Section 2.2., "[s]ite specific factors"); USACE000687; USACE0001192. Further, any site-specific concerns would be reflected in special conditions that the Corps can impose as appropriate. NWP000147; USACE009060. *See, e.g.*, USACE001199–20 (including four project-specific special conditions in NWP 12 verification).

As discussed above, the Corps has multiple avenues to ensure that cumulative impacts will be no more than minimal—both on a single overall project or in a single area, as well as at the general permit stage and the verification stage. If the Corps cannot do so, it will require the proponent of the project to seek an individual permit.

> **c.     There is no bar under the CWA against the Corps relying on mitigation in issuing general permits.**

Plaintiffs argue in Count II that the Corps' "reliance on mitigation measures to make its 'minimal-effects' determinations for NWP 12 and the Utility RGP baselessly assumes that mitigation measures will actually be implemented and effective at individual sites." Corps Compl. ¶ 97. Although the precise thrust of Plaintiffs' argument is somewhat unclear, NWP 12 and the Utility RGP are fully in accord with the CWA and the Corps' regulations with respect to mitigation.

As noted above, all regulated activities under NWP 12 and the Utility RGP "must be designed and constructed to avoid and minimize (mitigate) adverse effects, both temporary and permanent, to waters of the US to the maximum extent practical at the project site (i.e., on site)." USACE009051; NWP000143; *see* 33 C.F.R. pt. 332; 40 C.F.R. pt. 230. "Mitigation includes actions which may avoid, minimize, rectify, reduce, or compensate for adverse environmental effects or activities which may otherwise be contrary to the public interest." USACE009051. Examples of mitigation techniques include using construction matting in regulated waters, seasonally restricting timing for activities within regulated waters, avoiding additional temporary workspace in regulated waters, or using other best management practices. USACE009051; NWP000003–04.

After applicants have considered all practicable steps to mitigate an activity's adverse environmental effects on regulated waters, the Corps may impose compensatory mitigation to

offset unavoidable impacts. USACE009051; NWP000147 (compensatory mitigation); *see* 33 C.F.R. pt. 332; 33 C.F.R. § 332.3(a) ("The fundamental objective of compensatory mitigation is to offset environmental losses resulting from unavoidable impacts to waters of the United States authorized by [Department of Army] permits."). While compensatory mitigation is not required in all instances, the Corps has discretion to require compensatory mitigation "to ensure that the regulated activity results in no more than minimal adverse environmental effects, or will not be contrary to the public interest." USACE009051; *see* NWP000128 (Note 8).[45] Therefore, NWP 12 and the Utility RGP provide discretion to a district engineer reviewing a PCN during the verification stage to decide whether compensatory mitigation is required for a particular project.

To the extent Plaintiffs take issue with the Corps' consideration of compensatory mitigation under NWP 12 and the Utility RGP, this concern is misplaced. First, the Corps did not impose compensatory mitigation in this case. Therefore, the Court need not adjudicate the general issue of whether the Corps may consider or require compensatory mitigation in determining whether a project authorized by a general permit involves only minimal impacts because it is irrelevant to the outcome here. *Cf. Optimus Steel*, 492 F. Supp. 3d at 722 (discussing the irrelevance of a similar argument challenging the definition of "single and complete project" where it would make no difference to the outcome); *Ouachita Riverkeeper*, 938 F. Supp. 2d at 46 n.7 (similar).

In any event, nothing in the CWA or in the Corps' regulations prohibits the Corps from considering or requiring compensatory mitigation in issuing a verification. CWA Section 404(e) requires that the Corps determine that the covered activities "will cause only minimal adverse

---

[45] Compensatory mitigation may not be used, however, to bring the total amount of loss below the one-half acre threshold. *See* NPW000148.

environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33. U.S.C. § 1344(e). Congress did not define "minimal," as a general matter, for all cases, and the Corps reasonably interpreted the term as including the permissible consideration of mitigation as a means of fulfilling its statutory duties. Part 332 of the Corps' CWA regulations explicitly authorizes the use of compensatory mitigation and requires that the Corps follow the parameters in these regulations when imposing compensatory mitigation. 33 C.F.R. pt. 332; *see* NWP000004; 33 C.F.R. §§ 332.3(k)(1), (3). Section 330.1 also contemplates mitigation for wetlands impacts, further buttressing the reasonableness of the Corps' interpretation that Section 404(e) allows for the use of mitigation in general permits. 33 C.F.R. § 330.1(e). Accordingly, NWP 12 and the Utility RGP lawfully permit district engineers to impose mitigation when issuing verifications to ensure adverse environmental impacts are minimal.

To the extent the Complaint illuminates Plaintiffs' specific concerns about mitigation, they appear to hinge on the notion that considering mitigation under general permits "baselessly assumes that mitigation measures will actually be implemented and effective at individual sites." Corps Compl. ¶ 97. Plaintiffs again appear to fundamentally misconstrue how the general permit process actually operates together with the verification process. Where activities are authorized under a general permit, any compensatory mitigation requirements are imposed at the Corps' verification stage. *See supra* Section IV.B.2; NWP005281; USACE009051–52.

Where the Corps requires compensatory mitigation it does so in the context of addressing a specific project. District engineers therefore will have detailed information from the PCN to ensure effectiveness. *See* NWP000145 (requiring that PCNs contain sufficient project detail for the district engineer to determine whether mitigation measures are necessary). Moreover, NWP 12 Condition 23 articulates a series of nine factors for the district engineer to consider "when

determining appropriate and practicable mitigation" for a project. NWP000143. Agencies are presumed to properly discharge their duties, *Atchafalaya Basinkeeper*, 894 F.3d at 704, and Plaintiffs offer no reason to presume that the Corps has not or will not do that here. If Plaintiffs have concerns that the Corps has relied on compensatory mitigation that will not be effective in issuing a particular verification, they can seek to challenge that verification and demonstrate that the Corps' decision was arbitrary and capricious.[46]

### 3.    The CWA verifications satisfy the requirements of Section 404(e) and applicable regulations.

In Count V of their Complaint against the Corps, Plaintiffs attack the three permit verifications that the Corps issued authorizing the CHC Project's impacts to waters regulated under the CWA, arguing that these verifications were inconsistent with the CWA and the Corps' regulations. Corps Compl. ¶¶ 183–95, 199–207.[47] Here, Plaintiffs conflate the regulatory requirements for the Corps to *issue a permit* (i.e., a general permit itself) versus the requirements applicable here, where the Corps is only *verifying* that activities fall within the scope of previously issued general permits.

---

[46] To the extent that Plaintiffs suggest that mitigation will not be "implemented," the failure of a project proponent to undertake the required mitigation would be a violation of the permit and subject to a potential enforcement action. Moreover, Plaintiffs' arguments about the "effectiveness" of mitigation or whether mitigation will be "implemented" would apply to *all* instances in which the Corps requires compensatory mitigation, including individual permits.

[47] Despite Plaintiffs' inclusion of the allegations in Corps Complaint paragraphs 196–98 in Count V, which addresses the CWA, the paragraphs cite and quote regulations under NEPA. But Plaintiffs do not bring a NEPA challenge to the verifications, and the Court should not allow Plaintiffs to imply some violation of NEPA in stray paragraphs in a claim for relief dealing with a different statute. *See generally* Corps Compl. Any such challenge would fail in any event, because NEPA does not apply to verifications, as they are not "major Federal action" requiring compliance with NEPA. *See* 42 U.S.C. § 4332(2)(C); *Sierra Club*, 990 F. Supp. 2d at 20–27 (describing general permit process at length and concluding "that the general permitting system operates on a different track than the individual project-by-project permitting process for construction project discharges," and verifications thus do not trigger NEPA as "major Federal actions").

a.   **The issuance of a verification under a general permit is not equivalent to issuing a permit, and particularly is not subject to the requirements attendant to issuing a permit.**

As summarized above, the Corps evaluates the applicable Section 404(b)(1) Guidelines and conducts the roughly twenty-factor public interest review specified in 33 C.F.R. § 320.4(a) only *once,* when the Corps develops and issues the general permit itself. *See supra* at Section IV B.2 (describing this process generally); *id.* at Section V.C.1 (describing this process as to the general permits at issue here); *see also* 40 C.F.R. § 230.7(b) (describing the evaluation process for general permits); 33 C.F.R. § 320.4(a)(1) ("The decision whether to *issue a permit*" is informed by evaluation of the listed public interest factors (emphasis added)). The Corps does not—and is not required to—repeat these processes on a project-specific basis when verifying that a particular project falls within the scope of an already issued general permit. *See* 33 C.F.R. § 330.6 (regulatory procedures for nationwide permit verifications, distinct from the procedures for issuing permits); NWP000108 ("The Corps complied with the 404(b)(1) Guidelines when it issued or reissued the NWPs. For a specific activity authorized by an NWP, a separate 404(b)(1) Guidelines analysis is not required."); USACE009041 ("[T]he Corps has determined that the discharges authorized by this [Utility] RGP comply with the 404(b)(1) Guidelines . . . ."); *Standard Operating Procedures for the U.S. Army Corps of Engineers Regulatory Program*, at 19 (July 1, 2009), https://bit.ly/2ZQE1By ("A project specific determination of compliance with the 404(b)(1) Guidelines is not required for general permits because this analysis is completed as part of the development and approval of the general permit."); *Optimus Steel*, 492 F. Supp. 3d at 724.

A contrary approach would defeat the efficiency gains Congress intended to realize in authorizing the Corps to issue general permits in the first place. *See, e.g.*, *Snoqualmie Valley v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155, 1163 (9th Cir. 2012) ("Requiring an elaborate analysis of the applicable regulations and the facts would defeat this purpose."); *Sierra Club*, 990 F. Supp.

2d at 26. Courts have thus recognized the substantial differences between the analysis required when the Corps issues an individual permit and when it is verifying that a particular activity is covered by a general permit. *See, e.g.*, *Sierra Club*, 64 F. Supp. 3d at 146–47 (compared to individual permits, "*verifications* under the CWA general permitting system have [an] entirely different character . . . . [under which] Corps's fully-informed decision to authorize certain activities has been made *ex ante* under the nationwide permitting system"); *Sierra Club*, 990 F. Supp. 2d at 26.

As a result, courts have consistently refused to construe Section 404(e) or the Corps' regulations in ways that would require extensive environmental or other analysis before a verification can issue, as this would collapse the distinction between individual permits and general permits. *See, e.g.*, *Snoqualmie Valley*, 683 F.3d at 1163; *Crutchfield v. Cnty. of Hanover*, 325 F.3d 211, 214–15 (4th Cir. 2003); *Plump v. Graham*, No. CV-16-00505-PHX-GMS, 2017 WL 1862140, at *5–6 (D. Ariz. May 9, 2017); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 146 (D.D.C. 2017); *Sierra Club*, 64 F. Supp. 3d at 145; *Sierra Club*, 990 F. Supp. 2d at 26. As explained in *Mobile Baykeeper, Inc. v. United States Army Corps of Engineers*,

> forcing the Corps to perform an extensive environmental review in the verification context under NWP 12 would (i) duplicate work already performed at the nationwide permit stage in pre-clearing this category of activities; (ii) contravene the purpose of the nationwide permit process; (iii) increase exponentially the documentation a permittee must submit to the Corps, including numerous items not specifically delineated as required documentation in the General Conditions; and (iv) multiply the delay and expense associated with verifications so as to render them functionally indistinguishable from individual permit decisions, thus collapsing two conceptually distinct regulatory processes into one

2014 WL 5307850, at *15. The Court here should follow suit and reject Plaintiffs' arguments, which would accomplish this collapse by importing the sort of time-consuming and burdensome

analysis attendant to the individual permit process into the streamlined general permit verification process.

> **b.    Under the Corps' regulations, the Corps does not conduct an "alternatives" analysis in conjunction with issuing general permit verifications.**

Plaintiffs argue that the Corps improperly failed to conduct an alternatives analysis under its regulations at 40 C.F.R. § 230.10(a). Corps Compl. ¶¶ 186–95. Distinct from the NEPA alternatives analysis described *supra* Section VI.B.2, Section 230.10 of the CWA Section 404(b)(1) Guidelines generally requires the Corps—when assessing *individual* permit applications—to determine whether there is a "practicable alternative to the proposed discharge." 40 C.F.R. § 230.10(a). Plaintiffs' invocation of this requirement in the context of *general* permits, like NWP 12 and the Utility RGP, is misplaced.

Consistent with the rule that the heavy lifting in the general permit process is done at the permit issuance stage, not the verification stage, to the extent that the requirements of Section 230.10 apply *at all* in the general permit context, they apply at the issuance stage and not the verification stage. Section 230.7 governs "Conditions for the issuance of General permits" and the Corps' "evaluation process" for issuing general permits, including certain provisions under Section 230.10. But this provision explicitly states that the alternatives analysis in Section 230.10(a) "[is] not directly applicable to General permits." 40 C.F.R. § 230.7(b)(1); *see also id.* §§ 230.7(a), (b)(1) (providing that a "General permit for a category of activities involving the discharge of dredged or fill material complies with the Guidelines if it meets the *applicable* restrictions on the discharge in [Section] 230.10" and expressly identifying only Sections 230.10(b) and (c) as "applicable") (emphasis added); USACE009002 ("[T]he consideration of off-site alternatives under the 404(b)(1) Guidelines does not apply to specific projects authorized by general permits . . . ."); NWP000112 ("Pre-construction notifications do not require alternatives analyses because specific

103

activities authorized by general permits do not require alternatives analyses under the 404(b)(1) guidelines . . . ."). Thus, the obligation to conduct an alternatives analysis simply does not apply to activities authorized by general permits.

This approach is consistent with the CWA. CWA Section 404(e) sets forth the statutory requirements for general permits, which do not include an alternatives analysis. As explained above, Section 404(e) specifies that an activity qualifying for a general permit must meet the "minimal adverse effects" requirement. 33 U.S.C. § 1344(e)(1). This requirement serves as the relevant statutory limit on environmental impacts for general permits. *See also* NWP000143 (General condition 23) ("The activity must be designed and constructed to avoid and minimize effects, both temporary and permanent, to waters of the United States to the maximum extent practicable at the project site . . . ."); USACE009051.

The Corps' regulations governing verifications are in accord: there is no regulatory requirement that the Corps consider alternatives at the verification stage. As explained above, a "verification" is not a "permit"; rather, it is a "confirmation that an activity complies with the terms and conditions of an NWP." 33 C.F.R. § 330.6(a)(1). Nothing in the Corps' regulations governing verifications requires the Corps to consider alternatives when verifying that an activity falls within the scope of a general permit. *See* 33 C.F.R. § 330.6.[48] Accordingly, the Corps here verified that the proposed CHC Project's regulated activities fall within the scope of NWP 12 in Iowa and the Utility RGP in Wisconsin without considering alternatives. By virtue of qualifying for a general

---

[48] 40 C.F.R. § 230.10(a) is, itself, in accord, as it provides that no discharge "shall be permitted" unless the requirements of that provision are met. As explained, the Corps' verifications here are not "permits" for a discharge; they are simply confirmation that, among other things, the activities at issue fall within the scope of an *already issued* general permit.

permit, the Corps has confirmed that the project will have no more than minimal impacts. This is all the statute and regulations require.

This is an entirely reasonable result. The Section 404(b)(1) Guideline's "alternatives analysis" makes sense when applied to *individual permits*, as the Corps' regulations provide, because those activities have not already been screened to ensure they have no more than minimal impacts. By contrast, only those activities that have no more than minimal adverse environmental impacts can qualify for authorization under a general permit in the first place. Moreover, the Corps' verification process—even without requiring an additional formal, lengthy, and burdensome alternatives analysis under Section 230.10(a)—is geared toward further ensuring that impacts will be no more than minimal. *See supra* at Section IV.B.2. The Court need look no further than the facts of this case to see how this process works, with the CHC Project causing just 0.077 acres of permanent loss of regulated wetlands across 102 miles of electric transmission line. *See supra* at Section V.D.

Requiring an alternatives analysis under the general permit program for each verification would completely undermine Congress's goal of creating a more efficient regulatory scheme for activities that have only minimal impacts. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 464 F. Supp. 2d 1171, 1189 (M.D. Fla. 2006), *aff'd*, 508 F.3d 1332 (11th Cir. 2007) ("That the analysis does not include consideration of alternatives to any *specific* individual project is a feature contemplated by the entire general permit regulatory scheme . . . .").

> **c.   The Corps adequately considered the public interest in issuing NWP 12 and the Utility RGP, and it need not repeat the analysis when issuing a verification.**

Plaintiffs next contend that the Corps failed to conduct an "'independent public interest review' of the CHC transmission line project or any part of it" pursuant to 33 C.F.R. § 320.4(a). Corps Compl. ¶¶ 200–05. Once again, Plaintiffs conflate the procedures that apply to general

permits with the Corps' far more limited regulations governing verifications. Section 320.4 discusses "[g]eneral policies for evaluating *permit* applications." 33 C.F.R. § 320.4.[49] This provision identifies the public interest criteria that the Corps should consider when issuing an individual or general permit. It lists over twenty factors for evaluation, which the Corps considered at length during the general permit issuance stage for both NWP 12 and the Utility RGP. *See* NWP005317–24; USACE009018–26.

By contrast, because a verification is not a permit but only confirms that an established general permit authorizes a particular activity, the Corps need not repeat this lengthy and detailed public interest analysis at the verification stage. To require otherwise would undermine the efficiency gains Congress intended to realize through the general permit program in CWA Section 404(e). *See Plump*, 2017 WL 1862140, at *5–6 (explaining that the Corps appropriately "did not conduct a full scale public [interest] review" in issuing a verification because "projects that qualify under a nationwide permit are not required to go through the intensive public interest analysis outlined in 33 C.F.R. § 320.4(a)"); *Mobile Baykeeper*, 2014 WL 5307850, at *17–19 (requiring the sort of detailed analysis set forth in 33 C.F.R. § 320.4(a) would require a "staggering amount" of work that is duplicative of that conducted at the general permit issuance stage, and would "collapse the carefully crafted regulatory distinction" between individual permits and verifications).

---

[49] Similarly, it provides policies "applicable to the review of all applications for DA *permits*." 33 C.F.R. § 320.4 (emphasis added); *see also id.* § 320.4(a)(1) ("The decision whether to *issue a permit* will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest.") (emphasis added). Nothing in these regulations requires the formal, extensive public interest analysis, or any other inquiries at issue in Section 320.4, to occur at the verification stage.

The extensive Section 320.4 public interest analysis that occurs when *issuing* a general permit serves as a backdrop for the Corps' more limited public interest review at the verification stage. The detailed analysis in NWP 12 and the Utility RGP indicate that qualifying projects will (1) have only minimal impacts, and (2) be in the public interest. *See supra* at VI.D.1 (explaining Corps' public interest analysis). Nevertheless, the Corps is not forced to verify a specific project that it believes is contrary to the public interest but meets the requirements of a general permit. Corps regulations incorporate a narrow public interest review at the verification stage and provide the district engineer with flexibility to create special conditions where necessary to uphold the public interest. *See* 33 C.F.R. § 330.1(e)(2) ("The [district engineer] will review the [PCN] and may add activity-specific conditions to ensure that . . . the adverse impacts on the aquatic environment and other aspects of the public interest are individually and cumulatively minimal."); 33 C.F.R. § 330.6(a)(3)(i). Both NWP 12 and the Utility RGP also direct the district engineer to consider during the verification stage whether a proposed activity authorized by the NWP "may be contrary to the public interest." NWP000146; USACE009060.

The Corps' verifications in this case confirm that the Corps considered the public interest consistent with the limited inquiry applicable to verifications when reviewing the CHC Project PCNs. For instance, the NWP 12 verification in Iowa included special conditions "to ensure minimal effects, protect the public interest and/or ensure compliance of the activity with any of the [other] laws above[.]" USACE001195. These conditions include: (1) notifying the Corps 72 hours before work begins; (2) ensuring compliance with the terms of the programmatic agreement for cultural resource compliance; (3) removing temporary mats in their entirety and restoring temporarily impacted areas with native vegetation; and (4) providing a report to document restoration work completed, in accordance with RGL 08-03. USACE001195–96. With the

inclusion of these special conditions, the Corps determined that the proposed project "will result in no more than minimal individual and cumulative adverse effects on the aquatic environment and will not be contrary to the public interest." USACE001196. Before reaching the same result in both Wisconsin verifications, the Corps concluded, based on its review of the PCNs, that no special conditions were necessary under the Utility RGP. USACE000684, USACE000691. Instead, the Corps stated that "[t]he terms and conditions of the general permit are sufficient to ensure no more than minimal adverse effects, and no conditions are needed for compliance with other laws or to protect the public interest." USACE000684, USACE000691. These verifications confirm that the Corps considered the public interest in each instance, imposing special conditions where necessary. This is all that is required of the Corps at the verification stage, and Plaintiffs' suggestion otherwise should be rejected.[50]

**E.     The Corps complied with the ESA.**

The Corps complied fully with its ESA obligations when issuing NWP 12 and the Utility RGP. *See* Corps Compl. ¶¶ 99–110. Section 7(a)(2) of the ESA directs each federal agency to ensure, in consultation with USFWS or NMFS, that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" any listed species or destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2). The Corps was not required to engage in "programmatic consultation" over NWP 12 or the Utility RGP because it reasonably determined that these permits had "no effect" on endangered or threatened species. Any adverse effect on species would occur only after project-specific actions were taken and fully analyzed under the Section 7 consultation provisions. That is exactly what occurred here: the

---

[50] Plaintiffs' Complaint string cites a number of regulatory provisions. Corps Compl. ¶¶ 203–04. These are all housed under Section 320.4's broad "general policies for evaluating permit applications," and the Corps' public interest review, which particularly occurs at the general permit issuance stage.

Corps' verifications for discharges associated with the CHC Project relied upon a project-specific ESA consultation and Biological Opinion issued by USFWS. The Biological Opinion concluded that the CHC Project would not jeopardize any threatened or endangered species or destroy or adversely modify any designated critical habitat. Plaintiffs do not challenge this Biological Opinion or the agencies' conclusions that no further ESA consultation was required for the CHC Project. Thus, the Corps has fully complied with its ESA obligations relating to the CHC Project.

1.    **The ESA does not require the Corps to conduct a programmatic consultation on NWP 12.**

Neither Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), nor its implementing regulations require an agency to engage in formal or informal consultation unless the agency determines that its proposed action "may affect listed species or critical habitat." 50 C.F.R. § 402.14(a); *see also Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 475 (D.C. Cir. 2009) ("If the agency determines that its action will not affect any listed species or critical habitat, however, then it is not required to consult with NMFS or Fish and Wildlife."); *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447–48 (9th Cir. 1996). Here, the Corps determined that NWP 12's reissuance would have "no effect" on protected species and critical habitat. NWP000015; *see also* NWP018367–68. That determination was neither arbitrary nor inconsistent with the facts before the agency.

a.    **NWP 12's no effect determination was thoroughly considered.**

The Corps carefully considered its "no effect" determination, as the history of nationwide permits demonstrates. The Corps began voluntary consultation with NMFS and USFWS (the "Services") for the 2007 reissuance of nationwide permits. NWP031044. The Corps informed the Services of numerous requirements and procedures in place to comply with the ESA, including General Condition 18 and 33 C.F.R. § 330.4(f), and coordination between Corps districts and

regional offices of the Services. *Id.* The Corps continued voluntary Section 7 consultations with both wildlife agencies for the nationwide permits issued in 2012. *Id.* USFWS did not conclude the consultation and NMFS issued a belated biological opinion that failed to consider changes made to the nationwide permits during the rulemaking process. NWP030588. The Corps reinitiated consultation, which resulted in the "no jeopardy" 2014 biological opinion included in the record. Despite the re-initiation of voluntary consultation, in an October 2012 letter to USFWS and NMFS, the Corps explained the agency's legal position that issuance of the nationwide permits had "no effect" on protected species or designated critical habitat due to the permits' conditions and terms. NWP031043–50.

This rationale was carried forward into the 2016 proposed rule for nationwide permit reissuance. Prior to the 2016 proposed rule, the Corps informed NMFS that it would not be initiating ESA Section 7 consultation on the reissuance of the nationwide permits.[51]  However, the Corps offered to voluntarily engage in ESA Section 7(a)(1) consultation and to continue implementation of most of the protective measures from the 2014 biological opinion. NWP030588–89. The White House's Office of Management and Budget led the interagency coordination effort, hosting a series of meetings in the spring of 2016. *See* NWP026565. The agencies cooperatively resolved the issues: NMFS agreed with the ESA Section 7(a)(2) "no effect" determination, while the Corps, separately and contemporaneously, consulted with the agencies on ESA Section 7(a)(1) conservation measures regarding the implementation of the nationwide

---

[51] For its part, USFWS acknowledged the Corps' 2012 "no effect" determination and continued to recognize that position through the decisionmaking process for the 2017 reissuance. NWP030589; NWP031139.

permit program,[52] including the continuation of the majority of the protective measures from NMFS' 2014 biological opinion. NWP018197–201.

As detailed below, the Corps thoroughly explained and documented its "no effect" determination in both the proposed and final rules for the 2017 nationwide permits. *See* NWP000015–16; *see also* NWP018367–68.

> **b.    NWP 12 will have no effect on listed species or designated critical habitat.**

The structure and contents of NWP 12 and Corps regulations ensure that no action which may affect listed species or critical habitat may proceed in reliance on that nationwide permit without undergoing ESA Section 7 consultation. First, General Condition 18 states that "[n]o activity is authorized" under NWP 12 "which is likely to directly or indirectly jeopardize the continued existence of a threatened or endangered species . . . or which will directly or indirectly destroy or adversely modify the critical habitat of such species." NWP000141. That means that NWP 12 does not authorize any activity which would violate the substantive requirement in ESA Section 7(a)(2) to avoid jeopardy.

General Condition 18 also ensures that the procedural requirement to engage in consultation under Section 7(a)(2) is met for every activity that may be authorized under NWP 12. General Condition 18 requires a PCN "if any listed species or designated critical habitat *might be affected* or *is in the vicinity of* the activity, or if the activity is located in designated critical habitat." NWP000141 (emphasis added); *see also* NWP000145–46 (General Condition 32 implementing and reiterating this requirement with details about what information must be included in the PCN).

---

[52] ESA Section 7(a)(1) directs that agencies shall consult with the wildlife agencies on how to utilize their authorities to carry out programs for the conservation of listed species. 16 U.S.C. § 1536(a)(1). Agencies are afforded substantial discretion in determining how best to fulfill their Section 7(a)(1) obligations. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1418 (9th Cir. 1990).

The Corps has explained that the "might affect" threshold of General Condition 18 was intended to be "more stringent than the 'may affect' threshold for [ESA] section 7 consultation" with the Services. NWP000015. Although most General Conditions authorize permittees to begin construction if the Corps does not respond to a PCN within 45 days, *see* NWP000003, General Condition 18 is structured differently: prospective permittees may not begin work under authority of NWP 12 unless and until the district engineer notifies them that the ESA's requirements have been satisfied and that the activity is authorized. *Id.* at 1999. The requirements of General Condition mirror Corps regulations at 33 C.F.R. § 330.4(f). Thus, NWP 12 simply does not authorize any activity that might implicate the ESA until the Corps either makes a "no effect" determination or completes a site-specific ESA Section 7 consultation. These requirements have been highly effective in practice: the Corps engages in, on average, more than 4,500 formal and informal ESA consultations each year for NWP activities. NWP000016.

General Condition 18 is not the only safeguard built into NWP 12. First of all, NWP 12 ensures that no activities will have more than minimal individual or cumulative environmental effects by limiting the amount of waters of the United States that may be lost due to each single and complete project and requiring a PCN for projects that cause the loss of more than one-tenth acre of waters of the United States. *See* NWP000127–28. The Corps estimated, based on historical data, that the vast majority of NWP 12 authorizations would likely require a PCN, thus providing the Corps with notice of the project and an opportunity to make a determination about whether consultations are required. Additionally, several other General Conditions address potential environmental effects and limit the authorization to activities which incorporate certain minimization or avoidance measures to protect plants or wildlife. *See, e.g.*, NWP000140–41 (General Conditions 2, 3, 8, and 12). Regional conditions also can and do provide additional

112

protections. NWP000015; *see, e.g.*, USACE012805–06 (Iowa Fact Sheet No. 8(IA), imposing Regional Conditions on nationwide permits used in Iowa, including conditions intended to minimize environmental impacts).

NWP 12 simply does not authorize any activity that might implicate the ESA until the Corps either makes a "no effect" determination or completes a site-specific ESA Section 7 consultation. NWP000141; 33 C.F.R. § 325.2(b)(5). Indeed, permittees who proceed without submitting a PCN where General Condition 18 applies are subject to Corps enforcement action, 33 C.F.R. § 330.1(c), and possibly even to civil or criminal penalties under the ESA, 16 U.S.C. §§ 1540(a)(1), (b)(1).

Plaintiffs rely upon *Northern Plains Resource Council v. U.S. Army Corps of Engineers*, 454 F. Supp. 3d 985 (D. Mont. 2020), *amended* 460 F. Supp. 3d 1030 (D. Mont. 2020), but that case is not binding precedent and its reasoning is not persuasive. *See* Corps Compl. ¶¶ 81, 103, 108.[53] There, the court assumed that because NWP 12 would authorize discharges that would impact wetlands, streams, and aquatic resources, it "may affect" listed species and should have been subject to programmatic consultation. *N. Plains Res. Council*, 454 F. Supp. 3d at 990–91. But not all waterways contain ESA-listed species or designated critical habitat and not all discharges will affect ESA-listed species. Indeed, by its very terms NWP 12 does not authorize *any* discharges that might affect a listed species without a separate agency action (a verification)

---

[53] The initial *Northern Plains* decision vacated NWP 12 in its entirety, *N. Plains Res. Council*, 454 F. Supp. 3d at 996, as Plaintiffs request to do in this case, Corps Compl., Requested Relief. After a motion for reconsideration, in May 2020, the court limited the injunction and vacatur to apply only to the "construction of new oil and gas pipelines" under NWP 12. *N. Plains Res. Council*, 460 F. Supp. 3d at 1049. In July 2020, the Supreme Court granted a stay of the Montana district court's injunction (without any noted dissent), except as it applied to the specific project at issue in that case, the Keystone XL pipeline project. *U.S. Army Corps of Eng'rs v. Northern Plains Res. Council*, 141 S. Ct. 190 (2020).

and all appropriate ESA analysis. In addition to making incorrect assumptions about the discharges authorized by NWP 12, the *Northern Plains* decision may be subject to vacatur. The decision was appealed to the Ninth Circuit, where it was rendered moot by—among other things—the replacement of NWP 12 with new nationwide permits in 2021. *See* Order, Dkt. No. 164, *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, Nos. 20-35412, 20-35414, 20-35415, and 20-35432 (9th Cir. Aug. 11, 2021). On August 11, 2021, the Ninth Circuit dismissed the appeal as moot and remanded to the district court to determine if the cases were moot in their entirety and to assess whether the underlying decisions should be vacated. *Id.*

The Corps' determination that re-issuance of NWP 12 did not require programmatic consultation is particularly appropriate in light of the structure of CWA general permits—which, given the breadth of activities that they authorize, necessarily involve prediction under conditions of imperfect information. *See Ohio Valley Env't Coal.*, 429 F.3d at 500 ("Congress anticipated that the Corps would make its initial minimal-impact determinations under conditions of uncertainty."). And as in *Ohio Valley Environmental Coalition*, the Corps' partial reliance on post-issuance procedures does not render its initial no-effect determination any less valid. *See id.* at 502. The Tenth Circuit made similar points in rejecting a challenge to the prior version of NWP 12. *See Sierra Club v. Bostick*, 787 F.3d at 1057–58. Indeed, the great utility of a general permit, like NWP 12 (or like the nationwide permit in *Ohio Valley Environmental Coalition*) as compared to a nationwide regulation on the one hand, or as compared to an individual permit on the other hand, is precisely that it permits hybridization of a rulemaking-like approach and an individual-permitting approach, fusing the virtues of each. *See Ohio Valley Env't. Coal.*, 429 F.3d at 498 (overruling district court's conclusion that a nationwide permit was invalid because it allowed

back-end, post-NWP issuance actions by the Corps tied to particular sites instead of establishing across-the-board "objective requirements or standards").

At bottom, because NWP 12 does not authorize an activity that might affect protected species or habitat, it does not change the legal landscape for ESA Section 7(a)(2) purposes. In the absence of NWP 12, applicants would apply for an individual permit from the Corps, which would engage in site-specific ESA Section 7(a)(2) consultation on the impacts to protected species and habitat. Such a consultation would be limited to that project, including the cumulative effects of that project together with other species impacts in the action area. With NWP 12, applicants notify the Corps if the activity might affect protected species or habitat and, if the Corps determines the Section 7(a)(2) threshold is triggered, it engages in site-specific consultation. The ESA Section 7(a)(2) consultation result is the same either way.

### 2.    The ESA does not require the Corps to consult on the Utility RGP.

For many of the same reasons, the Corps reasonably concluded that the 2018 Utility RGP for the St. Paul District would have "no effect" on listed species or critical habitat and therefore did not require ESA consultation pursuant to Section 7(a)(2).

Like General Condition 18 in NWP 12, Exclusion 6 of the Utility RGP states that no activities are authorized by the general permit if the activity is "likely to directly or indirectly jeopardize the continued existence of a federally threatened or endangered species or a species proposed for such designation, as identified under the [ESA], or which will directly or indirectly destroy or adversely modify the critical habitat of such species." USACE009047; USACE009053. Additionally, "[n]o regulated activity is authorized which 'may affect' a listed species or critical habitat, unless ESA Section 7 consultation addressing the effects of the proposed activity has been completed." USACE009047; USACE009053. To ensure that this requirement is followed, the Utility RGP requires a PCN for any activity which "might affect any Federally-listed threatened,

endangered, or proposed threatened and endangered species, designated critical habitat, or proposed critical habitat." USACE009049; *see also* USACE009050. Notably, the Utility RGP uses the same over-inclusive "might affect" threshold as NWP 12, which is more stringent than the "may affect" standard that triggers either informal or formal consultation under the ESA. *See* NWP000015.

Like NWP 12, the Utility RGP contains other provisions to minimize or mitigate environmental damage or require projects to obtain individual permits or other approvals to proceed. Many of these provisions take into account the specific environmental vulnerabilities of the St. Paul District region, for instance by adding protections for the Great Lakes and other aquatic resources important to the region. *See* USACE009045–47 (Exclusions 1, 4, 5, 12); USACE009049 (listing criteria that trigger the requirement to submit a PCN); USACE009054–55 (describing best practices to minimize soil loss and sediment transport and other provisions aimed at protecting wildlife and natural resources). Additionally, most impacts authorized under the Utility RGP will require a PCN because they will cause loss of greater than one-tenth acre of waters of the United States, they will have temporary impacts to one-half acre or more of waters of the United States, or they will meet one of the numerous other criteria that trigger the need for a PCN. USACE009049.[54] If a PCN is submitted, the project proponent must receive verification from the Corps before proceeding. USACE009048. The Utility RGP, as well as applicable statutory and regulatory provisions, requires each authorized project to be designed and constructed to avoid and minimize adverse effects to waters of the United States to the maximum extent practicable and the Corps may impose additional mitigation measures to ensure that the project will cause no more

---

[54] The Utility RGP also requires project proponents to report to the Corps if a project will result in the cumulative loss of greater than one-half acre of waters of the United States, even if no single and complete project triggers the other PCN criteria. USACE009048.

than minimal adverse environmental effects. USACE009051. This could include permit conditions to minimize effects on listed species. USACE009053.

Based on the provisions of the Utility RGP, the Corps concluded that it would have no effect on listed species because it did not authorize any activity that may affect listed species or designated critical habitat unless project-specific consultation occurred. USACE009032; USACE009613. The Corps coordinated informally with USFWS's Midwest Office and provided copies of the July 11, 2017 and October 13, 2017 public notices seeking agency comment and participation in the development of the Utility RGP. USACE009032. The Corps also invited USFWS to a webinar regarding the Utility RGP, which USFWS attended. *Id.* On December 12, 2017, a USFWS representative wrote to the Corps stating that he had "no immediate concern" about the RGPs presented in the webinars. USACE009613. The USFWS representative expressed that "[e]ach RGP clearly states that 'no activity is authorized under the RGP which "may affect" a listed species or critical habitat, unless Section 7 consultation addressing the effects of the proposed activity has been completed, and a Corps RGP verification letter is issued', and this addresses our most significant concern regarding general permits." USACE009613.

Thus, the Corps' conclusion that the Utility RGP would not affect listed species or critical habitat and did not require ESA consultation was reasonable and well-grounded.

### 3. The Agencies appropriately completed action-specific ESA analysis.

In this case, the CWA permitting process worked just as intended to ensure that no activities could rely on NWP 12 or the Utility RGP without fully complying with Section 7 of the ESA.

As required by the general permits, Intervenors submitted PCNs for the use of NWP 12 and the Utility RGP in connection with the CHC Project. USACE004032–173; USACE004219–567; USACE004819–78. Prior to the issuance of any CWA verifications for the project, RUS completed a Biological Assessment regarding the full CHC Project, which documented RUS's

117

determination that the Project would have "no effect" on a number of species, sought USFWS's concurrence in its determination that certain species were "not likely to be adversely affected" by the Project, and initiated formal consultation with USFWS to ensure that all of the federal agency actions associated with the Project (including anticipated Corps actions) would not jeopardize any endangered or threatened species or destroy or adversely modify any designated critical habitat. ROD021847–49; USACE007844.[55] On May 31, 2019, USFWS sent a letter and Biological Opinion to RUS concurring in the "not likely to adversely affect" determinations, USACE007258–59, agreeing that all ESA obligations had been met in regard to the northern long-eared bat, USACE007263, and determining that the CHC Project was not likely to jeopardize the continued existence of the endangered rusty patched bumble bee, USACE007279. USFWS, as a matter of policy, does not respond to "no effect" determinations, but acknowledged that RUS had analyzed the Project's impacts on several other species. USACE007258. USFWS stated that the Biological Opinion "satisfie[d] the Section 7(a)(2) consultation requirement for federal agencies." USACE007262.[56] When issuing the verifications, the Corps confirmed that ESA consultation had been completed for any ESA-listed species that may be affected by the discharges authorized in that respective verification. *See* USACE000681–82; USACE000688–89; USACE001192–93.

Plaintiffs have *not* challenged the action agencies' "no effect" or "not likely to adversely affect" determinations, USFWS's concurrence in the "not likely to adversely affect" determinations, or the Biological Opinion, despite having adequate time and the opportunity to do

---

[55] Additionally, the agencies confirmed that no designated critical habitat overlapped with the project area. ROD021911; ROD021917; ROD021923.

[56] USFWS subsequently revised the Biological Opinion due to new information regarding the Project's potential impacts on the rusty patched bumble bee, but did not change the "no jeopardy" determination. *See* USACE000650.

so.[57] In fact, Plaintiffs do not raise any challenges to the Corps' compliance with the ESA for the verifications; their claims allege only failures to consult over NWP 12 and the Utility RGP. These unchallenged final ESA determinations establish that the CHC Project has fully complied with the requirements of Section 7 of the ESA. Thus, the Court should reject Plaintiffs' call to vacate the Corps' verifications when the Corps has indisputably ensured that these verifications will not jeopardize any listed species or destroy or adversely modify critical habitat, in satisfaction of ESA Section 7. *See* Corps Compl., Requested Relief.

Further, the ESA consultation that occurred on the CHC Project demonstrates that in practice, NWP 12 and the Utility RGP worked just as intended. Because aspects of the Project might have affected listed species, Intervenors were required to complete a PCN.[58] The PCN gave the Corps the opportunity to review and confirm that all ESA Section 7 obligations had been met for the Project. The discharges into waters of the United States associated with the CHC Project could not have been authorized by the general permits without the completion of formal ESA consultation and the Corps' issuance of the verifications. Therefore, both in the case of this specific project and more broadly, NWP 12 and the Utility RGP did not authorize, fund, or carry out any action that may affect ESA-listed species without undergoing consultation with USFWS pursuant to Section 7.

---

[57] Plaintiffs' Complaint includes allegations involving the whooping crane and the Higgins-eye pearlymussel. However, the agencies determined that the CHC Project would have "no effect" on these species and reasonably documented their analysis. *See* ROD0021857–58. Plaintiffs have not challenged this "no effect" determination.

[58] The Intervenors were also required to submit a PCN due to the size of the project and other factors, demonstrating the redundancy built into the general permits to ensure that any environmentally significant project will undergo a separate verification process.

**F.      The Court should take separate briefing on remedies should it find a violation.**

Federal Defendants are entitled to summary judgment on all claims in these consolidated actions. But should the Court find some violation of the APA over which it has subject matter jurisdiction, Federal Defendants request that it order separate briefing on remedy. In deciding what remedy to issue in APA cases, courts typically consider the seriousness of the deficiencies in the administrative action and the disruptive consequences of vacating an agency decision. *See, e.g., Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 149–51 (D.C. Cir. 1993). Moreover, the APA requires courts "to take 'due account of the rule of prejudicial error.'" *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016) (alteration omitted); *see also* 5 U.S.C. § 706. For example, "even where there is a violation of NEPA's procedural requirements, relief will not be granted if the decision-maker was otherwise fully informed as to the environmental consequences and NEPA's goals were met." *Laguna Greenbelt*, 42 F.3d at 527. Because these considerations are difficult to apply in the abstract, and given the breadth of legal issues in this case, the Court should order separate briefing on remedy if it finds a violation. This procedure would allow the parties to brief the seriousness of the deficiencies, the disruptive consequences, and, as applicable, harmless error, in the context of any specific violations the Court finds.

## VII.      CONCLUSION

The Court lacks subject matter jurisdiction over the bulk of Plaintiffs' claims. The EIS and Record of Decision (and the potential RUS funding those documents may enable in the future) bear no causal relationship to any injury Plaintiffs claim to suffer from the CHC Project, and granting Plaintiffs' requested relief would not redress their alleged injuries. USFWS has also withdrawn the Compatibility Determination and Right-of-Way Permit that Plaintiffs challenge. And NWP 12 is simply not at issue in this case, because the CHC Project did not, and will not, fill

120

jurisdictional waters in reliance on that permit. Plaintiffs lack standing to challenge these agency actions, and they are moot.

Moreover, Plaintiffs' claims fail on the merits. The EIS thoroughly analyzed alternatives to and environmental impacts stemming from the CHC Project, and its statement of purpose and need was not arbitrary and capricious. Likewise, the Corps' issuance of NWP 12 and the Utility RGP was reasonable under the APA and NEPA, the CWA, and the ESA. Both on their face and as-applied, these general permits will not cause "significant" impacts triggering NEPA's requirement to prepare an EIS; they fit within Congress's authorization for "minimal" impacts for general permits in the CWA and otherwise comply with that statute; and they will have no effect on ESA-listed species or designated critical habitat.

For these reasons, the Court should grant summary judgment for Federal Defendants and deny summary judgment for Plaintiffs.

Dated: September 3, 2021        Respectfully submitted,

JEAN E. WILLIAMS
Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

/s/ Leslie Coleman
LESLIE COLEMAN (NY Atty. Reg. No. 5252788)
ANDREW A. SMITH (NM Bar No. 8341)
U.S. Department of Justice
Environment & Natural Resources Division
999 18th St.
South Terrace, Suite 370
Denver, CO 80202
leslie.coleman@usdoj.gov | (303) 844-1363

*Attorneys for Federal Defendants in Case No.*
*3:21-cv-00096-wmc*

<u>/s/ Jacob D. Ecker</u>
BENJAMIN CARLISLE (NY Bar No. 4734612)
JACOB D. ECKER (TX Bar No. 24097643)
DEVON LEA FLANAGAN (DC Bar No. 1022195)
MIRANDA M. JENSEN (DC Bar No. 1617421)
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044
miranda.jensen@usdoj.gov | (202) 598-3071
benjamin.carlisle@usdoj.gov | (202) 514-9771
jacob.ecker@usdoj.gov | (202) 305-0466
devon.flanagan@usdoj.gov | (202) 305-0201

*Attorneys for Federal Defendants in Case No. 3:21-cv-00306-wmc*