# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| NATIONAL WILDLIFE REFUGE ASSOCIATION, DRIFTLESS AREA LAND CONSERVANCY, WISCONSIN WILDLIFE FEDERATION, and DEFENDERS OF WILDLIFE | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| RURAL UTILITIES SERVICE, CHRISTOPHER MCLEAN, Acting Administrator, Rural Utilities Service, UNITED STATES FISH AND WILDLIFE SERVICE, CHARLES WOOLEY, Midwest Regional Director, and SABRINA CHANDLER, Manager, Upper Mississippi River National Wildlife and Fish Refuge, UNITED STATES ARMY CORPS OF ENGINEERS, LIEUTENANT GENERAL SCOTT A. SPELLMON, Chief of Engineers and Commanding General, U.S. Army Corps of Engineers, COLONEL STEVEN SATTINGER, Commander and District Engineer, Rock Island District, U.S. Army Corps of Engineers, and COLONEL KARL JANSEN, Commander and District Engineer, St. Paul District, U.S. Army Corps of Engineers, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Nos. 21-cv-00096-wmc & 21-cv-00306-wmc, Consolidated. |
| Defendants, | ) ) ) | |
| and | ) ) | |
| AMERICAN TRANSMISSION COMPANY, LLC, DAIRYLAND POWER COOPERATIVE, & ITC MIDWEST LLC, | ) ) ) ) | |
| Intervenor-Defendants. | ) ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO INTERVENOR-DEFENDANTS' MOTION FOR STAY PENDING APPEAL

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 4

I.    The Transmission Companies Are Not Likely to Succeed on the Merits of Any Appeal.. 5

    A.    Contrary to the Transmission Companies' Argument, this Court Did Have Jurisdiction to Decide, and this Court Correctly Decided, That Any USFWS Authorization for this Project to Cross the Upper Mississippi River National Wildlife and Fish Refuge Would Violate the Refuge Act............................................................................................................. 6

    B.    This Court's Decision that the CHC Transmission Line Cannot Lawfully Cross the Upper Mississippi River National Wildlife and Fish Refuge Remains Sound. ...................... 9

    C.    *Simmons* Remains Good Law, and Purpose and Need Statements that Effectively Exclude Consideration of a Reasonable Range of Alternatives Still Violate NEPA. .......... 11

II.    A Stay Would Irreparably Harm the Plaintiff Conservation Groups and Their Members. ................................................................................................................................. 16

    A.    Plaintiffs' Members Will Suffer Irreparable Harm from Environmental Damages and Destruction. ....................................................................................................................... 17

    B.    Plaintiffs Will Suffer Procedural Harms if the Transmission Companies Are Allowed to Build Momentum Toward a Refuge Crossing. .............................................................. 21

III.    The Transmission Companies Will Not Be Irreparably Harmed Absent a Stay. ............ 22

IV.    The Public Interest Weighs Against a Stay...................................................................... 26

V.    This Court Should Deny the Transmission Companies' Request in the Alternative for a 21-Day Administrative Stay. ................................................................................................. 31

CONCLUSION ................................................................................................................... 33

CERTIFICATE OF SERVICE ........................................................................................... 34

# **TABLE OF AUTHORITIES**

## Cases

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967).................................................................................................. 7, 8

*Adams v. Walker*,
  488 F.2d 1064 (7th Cir. 1973) ............................................................................... 1, 4

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ............................................................................... 2, 19

*Amoco Prod. Co. v. Village of Gambell, Alaska*,
  480 U.S. 531 (1987).............................................................................................. 17, 20

*Anglers of the Au Sable v. U.S. Forest Serv.*,
  402 F. Supp. 2d 826 (E.D. Mich. 2005)................................................................. 27

*Appalachian Voices v. United States Dep't of Interior*,
  No. 20-2159, 2022 WL 320320 (4th Cir. Feb. 3, 2022) ...................................... 4

*Backcountry Against Dumps v. Chu*,
  215 F. Supp. 3d 966 (S.D. Cal. 2015)................................................................... 16

*Bouas v. Harley Davidson Motor Co.*,
  No. 3:19-cv-1367, 2020 WL 2334336 (S.D. Ill. May 11, 2020), ........................ 31

*Cavel Int'l, Inc. v. Madigan*,
  500 F.3d 544 (7th Cir. 2007) ................................................................................. 4

*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991)............................................................................... 14, 15

*Citizens for Appropriate Rural Roads v. Foxx*,
  815 F.3d 1068 (7th Cir. 2016) ............................................................................... 8

*Classic Components Supply, Inc. v. Mitsubishi Elecs. Am., Inc.*,
  841 F.2d 163 (7th Cir. 1988) ................................................................................. 4, 24

*Clinton v. Jones*,
  520 U.S. 681 (1997)............................................................................................... 31

*Colorado Wild Inc. v. U.S. Forest Service*,
  523 F. Supp. 2d 1213 (D. Colo. 2007).................................................................. 21, 22

*Davis v. Mineta*,
  302 F.3d 1104 (10th Cir. 2002) ............................................................................. 2

*Dept. of Homeland Security v. Regents of the Univ. of Calif.*,
  140 S.Ct. 1891 (2020)............................................................................................ 9

*Dhakal v. Sessions*,
  895 F.3d 532 (7th Cir. 2018) ................................................................................. 9

*Env't. L. & Policy Ctr. v. U.S. Nuclear Regul. Comm'n*,
  470 F.3d 676 (7th Cir. 2006) ................................................................................. 13, 14

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt,*
463 F. Supp. 3d 1011 (D. Alaska 2020) ........................................................................ 10, 11

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.,*
549 F.3d 1079 (7th Cir. 2008) .................................................................................... 17, 20

*Habitat Educ. Ctr., Inc., v. Bosworth,*
363 F. Supp. 2d 1070 (7th Cir. 2005) ........................................................................... 19, 27

*Hubbard Business Plaza v. Lincoln Liberty Life Ins. Co.,*
649 F. Supp. 1310 (D. Nev. 1986) ................................................................................ 30

*In re A & F Enterprises, Inc. II,*
742 F.3d 763 (7th Cir. 2014) ........................................................................................ 4, 26

*Kent v. Vilsak,*
No. 3:21-cv-540, 2021 WL 6139523 (S.D. Ill., Nov. 10, 2021) ..................................... 32

*Kootenai Tribe of Idaho v. Veneman,*
313 F.3d 1094, (9th Cir. 2002) ..................................................................................... 27

*Lake Michigan Federation v. U.S. Army Corps of Engineers,*
742 F. Supp. 441 (N.D. Ill. 1990) ................................................................................ 30

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton,*
752 F.3d 755 (9th Cir. 2014) ........................................................................................ 19

*League of Women Voters of United States v. Newby,*
838 F.3d 1 (D.C. Cir. 2016) .......................................................................................... 27

*Maryland Conservation Council, Inc. v. Gilchrist,*
808 F.2d 1039 (4th Cir. 1986) ...................................................................................... 22

*Michigan v. EPA,*
576 U.S. 743 (2015).......................................................................................................... 9

*Munson v. Butler,*
776 F. App'x 339 (7th Cir. 2019) ................................................................................. 31

*Named Individual Members of the San Antonio Conservation Soc'y v. Texas Hwy. Dept.,*
400 U.S. 968 (1970).......................................................................................................... 22

*National Wildlife Fed'n v. Burford,*
835 F.2d 305 (D.C. Cir. 1987)....................................................................................... 19

*Nicholson v. Nationstar Mortg. LLC,*
No. 17-cv-1373, 2018 WL 3344408 (N.D. Ill. July 6, 2018) ...................................... 31

*Nken v. Holder,*
556 U.S. 418 (2009)................................................................................................... 23, 26

*Northern Cal. Power Agency v. Grace Geothermal,*
469 U.S. 1306 (1984)...................................................................................................... 30

*Protect Our Parks, Inc. v. Buttigieg,*
10 F.4th 758 (7th Cir. 2021) ...................................................................................... 1, 4

*Roland Machinery Co. v. Dresser Industries, Inc.,*
749 F.2d 380 (7th Cir. 1984) ........................................................................................ 24

*Sampson v. Murray*,
   415 U.S. 61 (1974) ....................................................................................... 24

*Scruggs v. Moellering*,
   870 F.2d 376 (7th Cir. 1989) ...................................................................... 30

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) .......................................................................................... 9

*Sierra Club v. Franklin Cty. Power of Illinois, LLC*,
   546 F.3d 918 (7th Cir. 2008) ...................................................................... 17

*Sierra Club v. Marsh*,
   872 F.2d 497 (1st Cir. 1989) .................................................................. 3, 22

*Sierra Club v. U.S. Army Corps of Engineers*,
   645 F.3d 978 (8th Cir. 2011) ............................................................. passim

*Sierra Club, Illinois Chapter v. U.S. Dep't of Transportation*,
   962 F. Supp. 1037 (N.D. Ill. 1997) ...................................................... 30, 31

*Simmons v. U.S. Army Corps of Eng'rs*,
   120 F.3d 664 (7th Cir. 1997) ........................................................... 5, 12, 13

*Tennessee Valley Auth. v. Hill*,
   437 U.S. 153 (1978) ....................................................................................... 4

*U.S. Army Corps of Eng'rs v. Hawkes*,
   578 U.S. 590 (2016) ....................................................................................... 7

*W. Watersheds Project v. Bernhardt*,
   392 F. Supp. 3d 1225 (D. Or. 2019) ......................................................... 27

*WildEarth Guardians v. U.S. Fish & Wildlife Serv.*,
   784 F.3d 677 (10th Cir. 2015) ................................................................ 9, 10

*Wisconsin Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ................................................................... 24


**Statutes**

16 U.S.C. § 3192 ................................................................................................ 10
16 U.S.C. § 668dd(e)(1)(E) .............................................................................. 11
16 U.S.C. §§ 668dd–668ee ........................................................................ 6, 10


**Other Authorities**

CEQ, *National Environmental Policy Act Implementing Regulations Revisions,* 86 Fed. Reg.
   55,757, 55,760 (Oct. 7, 2021) ....................................................... 12, 13, 15

Wisconsin Citizens Utility Board Letter on *Revocation of the Federal Permit for the Cardinal-Hickory Creek Transmission Project, Docket No. 5-CE-146*, PSC REF #: 430102 (Jan. 28, 2022), https://apps.psc.wi.gov/ERF/ERFview/viewdoc.aspx?docid=430102. ......................... 27

**Regulations**

18 CFR § 35.35 ..................................................................................................................... 25

## INTRODUCTION

The Intervenor-Defendant Transmission Companies—American Transmission Co., ITC Midwest, and Dairyland Power Cooperative—have taken the unusual step of filing a motion for a stay pending appeal before this Court has decided on the full scope of appropriate remedies and entered final judgment in the case.[1] Dkt. 186. Until the Court rules on remedies, an assessment of the factors involved in a stay application—irreparable injury, balance of hardships, or the public interest—is of course uncertain to some extent.

The Intervenor-Defendants do not come close to meeting the high bar for a stay pending appeal, which is an "extraordinary remedy." *Adams v. Walker*, 488 F.2d 1064, 1065 (7th Cir. 1973); *see also Protect Our Parks, Inc. v. Buttigieg,* 10 F.4th 758, 763 (7th Cir. 2021) ("An injunction pending appeal is an extraordinary remedy, just like any other injunction."). This Court should deny the Intervenor-Defendants' stay motion.

Plaintiffs National Wildlife Refuge Association, Driftless Area Land Conservancy, Wisconsin Wildlife Federation, and Defenders of Wildlife (collectively, "Conservation Groups") respond to this stay motion as best they can in light of the uncertainties because the Court has not yet issued its final decision, including full remedies. Contrary to the Transmission Companies' arguments:

1.  This Court's decision on the merits is fully consistent with applicable law, and the Transmission Companies are not likely to prevail on appeal; and

2.  The environmental harms from ongoing construction of the massive CHC high-voltage transmission line across Wisconsin's Driftless Area and the threat of construction through the

---

[1] The federal agency Defendants—the Rural Utilities Service (RUS), the U.S. Army Corps of Engineers, and the U.S. Fish & Wildlife Service (USFWS)—have, as of the date of filing of this response, taken no public position on the Intervenor-Defendants' stay motion.

1

protected Upper Mississippi River National Wildlife and Fish Refuge, *plus* the informational and procedural harms to the public from plowing ahead with this massive transmission line without the Defendants fully and fairly considering "all reasonable alternatives," *plus* the ongoing financial burden to residential and commercial consumer ratepayers of paying for millions of dollars of construction costs, far outweigh any financial risks to the Transmission Companies.

As the Eighth Circuit explained in *Sierra Club v. U.S. Army Corps of Engineers,* 645 F.3d 978, 997–98 (8th Cir. 2011):

> We agree that, just as important as the public interest in potential economic gains is "the public's confidence that its government agencies act independently, thoroughly, and transparently when reviewing permit applications." The "environmental dangers at stake in this case are serious," *see* [*Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002)], and the public interests that might be injured by a preliminary injunction, such as temporary loss of jobs or delays in increasing energy output in the region, "do not outweigh the public interests that will be served." [*Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1138 (9th Cir. 2011)].

The Transmission Companies' own positions on irreparable injury are contradictory. On the one hand, they argue that Plaintiffs will not be injured because the Transmission Companies cannot go through the protected Upper Mississippi River National Wildlife and Fish Refuge anyway. They state: "even if the Court stays whatever declaratory and injunctive relief it issues as part of its final judgment, there will be no irreparable harm to the Plaintiffs within the Refuge, because the Co-owners do not currently have federal authorization to construct the Project through a new or realigned right-of-way in the Refuge." Dkt. 191 at 52.

On the other hand, the Transmission Companies argue that they will suffer irreparable harm from any injunction because it will delay their cutting a wide swath through the Refuge. They state: "Any relief, declaratory or injunctive, that prevents the Project from crossing the Refuge while an appeal is pending would likely force the Co-owners to defer construction work

2

within the Refuge until October 2023 at the earliest… ." Dkt. 191 at 52. The Transmission Companies, once again, seek to "have it both ways" with their inconsistent arguments that fail in both respects.

The Transmission Companies have no legal right or other entitlement to benefit and profit from illegal federal or state approvals and permits for their huge transmission line. It is the Plaintiffs and the public who need injunctive relief from this Court to remedy the Defendants' misapplication of the governing law. Granting the Transmission Companies' requested stay would improperly reward their continuing "orchestrated trainwreck" strategy of bullying and bulldozing to make it increasingly difficult for the Court to provide complete relief. This Court has already called out the Transmission Companies and the Defendant federal agencies for this cynical strategy, Dkt. 175 at 12–13, 16.  Granting the Transmission Companies' requested stay pending appeal would further compound the problem.

Courts have often recognized that "the difficulty of stopping a bureaucratic steam roller, once started . . . [is] a perfectly proper factor for the district court to take into account" when considering an injunction. *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989). Courts have stepped up to stop this attempted "bureaucratic steam roll[ing]" to end-run NEPA and other environmental law violations. *See, e.g., Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d at 991, 995. Likewise, last week, the U.S. Court of Appeals for the Fourth Circuit vacated and remanded the U.S. Fish & Wildlife Service's inadequate Biological Opinion on a pipeline project for which construction had already begun. The Fourth Circuit stated: "We recognize that this decision will further delay the completion of an already mostly finished Pipeline, but the Endangered Species Act's directive to federal agencies could not be clearer: 'halt and reverse the trend toward species extinction, whatever the cost.'" *Appalachian Voices v. United States Dep't*

*of Interior*, No. 20-2159, 2022 WL 320320, at *1 (4th Cir. Feb. 3, 2022) (*quoting Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978)).

In the present case, this Court should deny the Transmission Companies' stay motion. The Court should prevent more wasteful construction costs from being charged to consumers and prevent unnecessary property damage and environmental destruction from getting worse.

## ARGUMENT

A stay pending appeal is, like a preliminary injunction, an "extraordinary remedy." *Adams*, 488 F.2d at 1065; *see also Protect Our Parks, Inc.,* 10 F.4th at 763 ("An injunction pending appeal is an extraordinary remedy, just like any other injunction.") (*citing Cavel Int'l, Inc. v. Madigan*, 500 F.3d 544, 547 (7th Cir. 2007)); *Classic Components Supply, Inc. v. Mitsubishi Elecs. Am., Inc.*, 841 F.2d 163, 165 (7th Cir. 1988) ("Litigants should not lightly seek injunctions pending appeal.").

The standard for granting a stay pending appeal requires consideration of "the moving party's likelihood of success on the merits, the irreparable harm that will result to each side if the stay is either granted or denied in error, and whether the public interest favors one side or the other." *In re A & F Enterprises, Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014). The court applies a "sliding scale" approach in weighing these factors: "the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, and vice versa." *Id.* (*citing Cavel*, 500 F.3d at 547–48).

This Court should deny the motion for stay because the Transmission Companies have not established that they have a high likelihood of success at overturning this Court's summary judgment decisions upon appeal. A stay of the final judgment would allow construction of the transmission line to continue, as though this Court had never held that any of the federal agency actions associated with it were unlawful, and that would harm the Conservation Groups. A final

4

judgment—including a combination of vacatur, injunction, and declaratory relief—would not cause undue irreparable harm to the Transmission Companies. The public interest weighs against a stay because there is a strong public interest in preventing added wasteful costs to consumers and unnecessary environmental destruction attributable to agency actions that have already been found unlawful and because the Transmission Companies have not established that the supposed benefits of this transmission line are anything other than speculative.

I.     **THE TRANSMISSION COMPANIES ARE NOT LIKELY TO SUCCEED ON THE MERITS OF ANY APPEAL.**

The Transmission Companies argue that this Court should reconsider its January 14, 2022, Opinion and Order. They claim that they are likely to succeed on appeal for essentially three reasons:

1.   They argue this Court acted beyond its jurisdiction and misread the law in determining that allowing the huge CHC transmission line to run through the Upper Mississippi River National Wildlife and Fish Refuge by means of a land exchange would violate the National Wildlife Refuge System Improvement Act, Dkt. 191 at 33–38;

2.   They argue that this Court was wrong when it declined to embrace either Defendant USFWS's attempt to "grandfather in" the huge CHC transmission line as "maintenance" of an existing transmission line, or their own claim that USFWS could have found this huge project to be a "compatible" use, Dkt. 191 at 42–50; and

3.   They argue that the Seventh Circuit's decision in *Simmons v. U.S. Army Corps of Eng'rs,* 120 F.3d 664 (7th Cir. 1997), which held that agencies conducting environmental reviews under the National Environmental Policy Act (NEPA) may not define the "purpose and need" of a project so narrowly as to exclude all reasonable alternatives, is no longer good law. Dkt. 191 at 32–42.

The Intervenor-Defendants are incorrect on each point. None of these arguments have any merit, and the Court has already rejected each of them. This Court properly exercised its jurisdiction to reject their theory that calling a transaction a land exchange can somehow eliminate the strict "compatibility" requirement in the Refuge Act. Likewise, this Court properly rejected the Transmission Companies' other Refuge Act arguments made in their summary judgment brief, which they now repeat. And finally, *Simmons* has not been overruled. It remains good law, and so do NEPA's alternatives requirements. As Plaintiffs noted in their earlier briefing, the Council on Environmental Quality (CEQ) has specifically and recently endorsed *Simmons* on the proper scope of "purpose and need" statements and the proper range of alternatives in the environmental review process.

**A. Contrary to the Transmission Companies' Argument, this Court Did Have Jurisdiction to Decide, and this Court Correctly Decided, That Any USFWS Authorization for this Project to Cross the Upper Mississippi River National Wildlife and Fish Refuge Would Violate the Refuge Act.**

From the beginning of this project, the Transmission Companies and Defendant USFWS have sought to evade the prohibition in the National Wildlife Refuge System Improvement Act ("Refuge Act"), 16 U.S.C. §§ 668dd–668ee, against private development that is not "compatible" with the purposes of the Refuge system and any particular Refuge. Defendant USFWS has never said the CHC transmission line would satisfy that requirement; indeed, USFWS and Refuge officials have made it clear that "right-of-way projects" are always disfavored, and a new high-voltage transmission line across the Upper Mississippi River National Wildlife and Fish Refuge could cause significant ecological damage and could not be reconciled with the Refuge's wildlife and wildlife recreation purposes.

The Transmission Companies initially tried the "grandfathered in" argument that the CHC transmission line was no more than "maintenance" or a "minor" realignment of existing

low-voltage lines. Then, they abandoned that approach in favor of a "land exchange," which they claim can always be used to, in effect, allow a non-compatible use of protected Refuge land.

This Court properly rejected both of those arguments and made it clear that the mechanism chosen was immaterial—the Refuge Act, as a matter of law, does not allow a project like this to cross a National Wildlife Refuge and the Upper Mississippi River Refuge in particular. This Court also declined the Defendants' and the Intervenor-Defendants' invitation to wait until some future date when the land exchange would be finalized. As this Court determined, delay would add nothing to the consideration of the purely legal questions presented, but delay would cause irreparable harm because the Transmission Companies continue to construct the CHC transmission line up to the very edges of the Refuge's borders.

Nevertheless, the Transmission Companies continue to insist that the Refuge Act issue is somehow both moot and unripe, that the decision to authorize the CHC transmission line to cross the Refuge is not "final" enough to be subject to Administrative Procedure Act (APA) review, and that this Court therefore cannot lawfully interfere with their "build first, ask questions later" strategy.

This Court thoroughly addressed the Defendants' justiciability claims in its January 14 Opinion, Dkt. 175 at 8–13 (mootness) and 13–17 (ripeness, finality). The Transmission Companies' new brief provides no reason for this Court to reconsider its prior decision.

As the U.S. Supreme Court recognized in *Abbott Labs. v. Gardner,* 387 U.S. 136, 149 (1967), and reaffirmed in *U.S. Army Corps of Eng'rs v. Hawkes,* 578 U.S. 590, 599 (2016), courts must take a "flexible" and "pragmatic" approach to finality determinations. When agencies play "keep away"—voluntarily withdrawing unlawful decisions so they can claim mootness, and then delaying decisions in the face of ongoing unlawful conduct so they can argue

ripeness or lack of finality, even though their intentions are clear—a "flexible" and "pragmatic" approach requires courts to do just what this Court did. The question of whether the Defendant USFWS can use the land exchange device to authorize a non-compatible use of a National Wildlife Refuge is purely legal, and neither the Defendant federal agencies, nor the Transmission Companies have ever articulated what could change between now and when the land exchange is finally executed and recorded that would make any difference.

At the same time, as Plaintiffs continue to document, the Transmission Companies continue with their strategy of building as much of this transmission line as they can to try to force the outcome they desire. Every day, Plaintiffs and their members suffer harm from the ecological damage that is being done; every day, members of the ratepaying public are asked to pay more to allow the Transmission Companies to gamble that, in the end, they will be able to do what they want and no one will stop them, despite the Courts' direct findings that key parts of their project are unlawful. This is precisely the kind of case in which a mechanistic application of the finality requirement would work a serious hardship and do the adjudicative process no good.

The cases the Transmission Companies rely on do not aid their argument. *Citizens for Appropriate Rural Roads v. Foxx,* 815 F.3d 1068 (7th Cir. 2016), involved the I-69 highway extension project between Evansville and Indianapolis, Indiana. Plaintiffs there challenged part of an Environmental Impact Statement (EIS) *before* the agencies had issued their Record of Decision finding that the EIS met NEPA's requirements, and the court found that challenge premature. All this case is, then, is a reiteration of the long-established rule that NEPA claims must come after the Record of Decision (ROD), not before. There is no discussion in the court's opinion about the ripeness "exceptions" outlined in *Abbott Labs.* It appears that those plaintiffs argued that bad faith during a NEPA process could be subject to judicial review when the bad

faith occurs. The court rejected that argument, but that is not the issue in this case. Likewise, *Dhakal v. Sessions,* 895 F.3d 532 (7th Cir. 2018), just reiterated the long-settled rule that immigrants seeking asylum cannot bypass the immigration courts or the executive branch process for considering asylum claims by filing APA lawsuits. Mr. Dhakal still had administrative remedies to exhaust that could give him the relief he requested. Plaintiffs in this case do not.

### B.   This Court's Decision that the CHC Transmission Line Cannot Lawfully Cross the Upper Mississippi River National Wildlife and Fish Refuge Remains Sound.

The Transmission Companies repeat many of the same arguments on the Refuge issues that they made in earlier briefs, and they offer no compelling reason why this Court should reconsider. As a matter of law, the CHC transmission line cannot be deemed to be "maintenance" or a "minor realignment" of an existing transmission line, and Defendant USFWS cannot evade the "compatibility" requirement in the Refuge Act by denominating its authorization as a "land exchange." Dkt. 175 at 23–35. Nor can any party reasonably argue that maybe USFWS could some day decide that a high-voltage transmission line with a 150-foot right-of-way and towers up to 200 feet high is perfectly "compatible" with a National Wildlife Refuge's wildlife protection purposes. Defendant USFWS has never taken that position, and this Court therefore has no obligation to consider that argument. *Dept. of Homeland Security v. Regents of the Univ. of Calif.,* 140 S.Ct. 1891, 1907 (2020) ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'") (*quoting Michigan v. EPA*, 576 U.S. 743, 758 (2015) (*citing SEC v. Chenery Corp.*, 318 U.S. 80 (1943))).

In their stay motion, the Transmission Companies rely on *WildEarth Guardians v. U.S. Fish & Wildlife Serv.,* 784 F.3d 677 (10th Cir. 2015), to argue that USFWS's land exchanges are

not subject to significant substantive standards. That case, however, did not really involve the National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. §§ 668dd–668ee. That case instead involves a land exchange that had been specifically authorized and directed by Congress by a separate statute, the "Rocky Flats Act," which had no "compatibility" requirement. The court cited the Refuge Act as additional support for the proposition that Congress can authorize USFWS to conduct land exchanges, but there was no issue before the court involving the "compatibility" requirement in the Refuge Act. *Id.* at 685–86.

The Transmission Companies' criticism of the Izembek Refuge case, *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt,* 463 F. Supp. 3d 1011 (D. Alaska 2020), *appeal filed,* Nos. 20-35721 (9th Cir. Aug. 14, 2020), 20-35727, 20-35728 (9th Cir. Aug. 17, 2020), is equally unavailing. First, unlike the "Rocky Flats Act" at issue in *WildEarth Guardians,* the Alaska National Interest Land Conservation Act (ANILCA), 16 U.S.C. § 3192, *does* contain a "compatibility" requirement that the project developers and the agency, as in this case, were trying to avoid. The court in *Friends of Alaska* therefore had to confront the same issue presented in this case: Can USFWS avoid the compatibility requirement by structuring a transaction as a land exchange?

Second, while the Transmission Companies point out that the Izembek case involved a change in the agency's position, which creates an obligation to spell out the reasoning, Dkt. 191 at 38, the court in that case found the agency's decision to be unlawful for two separate reasons. The court found "that the Secretary's decision to enter into the Exchange Agreement is arbitrary and capricious under the APA because the Secretary failed to provide adequate reasoning to support the change in policy in favor of a land exchange and a road through Izembek." *Friends of Alaska Nat'l Wildlife Refuges,* 463 F. Supp. 3d at 1022. The court then separately found that

"[g]iven the Exchange Agreement fails to advance the stated purposes of ANILCA, it is not permissible under that statute." *Id.* at 1024. There is no reason to draw the conclusion that USFWS could remedy its second problem just with some additional explanation.

Like this Court in the present case, the court in the Izembek case made a legal determination that what USFWS and the developers were trying to do was *unlawful,* not just inadequately explained. The USFWS cannot erase the compatibility requirements in these public lands statutes simply by calling the transaction a land exchange. That interpretation gives effect to all parts of the statute, and the Transmission Companies have offered no reason why this Court should not use the same canon of construction.

The Transmission Companies also criticize this Court's consideration of the Comprehensive Conservation Plan (CCP) for the Upper Mississippi River National Wildlife and Fish Refuge when evaluating whether the CHC transmission line is "compatible" with the Refuge's purposes. These CCPs are, however, the fundamental planning document for each Refuge, and the law requires that each Refuge comply with the terms of their CCP's. As 16 U.S.C. § 668dd(e)(1)(E) provides:

> Upon completion of a comprehensive conservation plan under this subsection for a refuge or planning unit, the Secretary *shall* manage the refuge or planning unit in a manner consistent with the plan and shall revise the plan at any time if the Secretary determines that conditions that affect the refuge or planning unit have changed significantly.

(emphasis added). If a CCP prohibits or discourages a particular use of Refuge land, then that use can rarely, if ever, meet the requirement of "compatibility."

### C. *Simmons* Remains Good Law, and Purpose and Need Statements that Effectively Exclude Consideration of a Reasonable Range of Alternatives Still Violate NEPA.

As all parties and the Court acknowledge, the environmental review regulations promulgated by the Council on Environmental Quality (CEQ) have long required that

11

environmental impact statements contain a purpose and need statement that, in effect, defines a full range of reasonable alternatives that will be considered. In *Simmons v. U.S. Army Corps of Eng'rs,* 120 F.3d 664 (7th Cir. 1997), the Seventh Circuit recognized that project proponents have an incentive to try to define purpose and need unduly narrowly so that they preclude full consideration of alternatives that the proponents would not prefer. Therefore, although courts can and should consider the project proponent's stated purpose and need, it is incumbent on courts to look at those proposals with a degree of skepticism, and reject purpose and need statements that, in effect, preclude consideration of a reasonably broad range of alternatives. *Id.* at 669.

Now, the Transmission Companies argue that *Simmons* is no longer good law, that courts do not have the authority to reject purpose and need statements from private developers, and that project proponents have the right to, themselves, define the scope of a NEPA alternatives analysis. Dkt. 191 at 38–40.

That is simply an incorrect reading of the law. As CEQ itself recently explained, any requirement that agencies "prioritize the applicant's goals over other relevant factors, including the public interest" is contrary to NEPA's objectives:

> CEQ does not consider this approach to reflect the best reading of the NEPA statute or lay the appropriate groundwork for environmentally sound decision making. Agencies should have discretion to base the purpose and need for their actions on a variety of factors, which include the goals of the applicant, but not to the exclusion of other factors. For example, agencies may consider regulatory requirements, desired conditions on the landscape or other environmental outcomes, and local economic needs, as well as an applicant's goals. Always tailoring the purpose and need to an applicant's goals when considering a request for an authorization could prevent an agency from considering alternatives that better meet the policies and responsibilities set forth in NEPA merely because they do not meet an applicant's stated goals.

CEQ, *National Environmental Policy Act Implementing Regulations Revisions,* 86 Fed. Reg. 55,757, 55,760 (Oct. 7, 2021). Indeed, CEQ singled out right-of-way projects as an example:

> For example, a private applicant seeking a right-of-way on Federal land may want to site the right-of-way at a specific location and may, correspondingly, frame the applicant's goals as a right-of-way with a particular location or route. However, the agency with jurisdiction over the proposed action may want to consider a range of reasonable locations for the right-of-way that would, for example, avoid environmental impacts or reduce conflicts with other programs or plans.

*Id.* Then, quoting directly from *Simmons,* CEQ emphasized that "it is contrary to NEPA for agencies to 'contrive a purpose so slender as to define competing "reasonable alternatives" out of consideration (and even out of existence).'" *Id.* (*quoting Simmons*, 120 F.3d at 666). So, less than four months ago, the federal agency with the responsibility for defining minimum NEPA requirements for all federal agencies expressly upheld *Simmons* as a good expression of what NEPA requires.

The cases cited by the Transmission Companies do not compel a contrary conclusion. In *Env't. L. & Policy Ctr. v. U.S. Nuclear Regul. Comm'n,* 470 F.3d 676 (7th Cir. 2006), the Seventh Circuit explicitly reaffirmed *Simmons,* highlighting that:

> We have held that blindly adopting the applicant's goals is "a losing proposition" because it does not allow for the full consideration of alternatives required by NEPA. NEPA requires an agency to "exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project" and to look at the general goal of the project rather than only those alternatives by which a particular applicant can reach its own specific goals.

*Id.* at 683 (*quoting Simmons,* 120 F.3d at 669) (internal citations omitted).

The *Environmental Law & Policy Center* case involved an "early site permit" (ESP) that preceded the U.S. Nuclear Regulatory Commission's two-part construction permit and operating license process for the proposed Clinton 2 nuclear plant, which has since never been built. *Env't. L. & Policy Ctr.,* 470 F.3d at 678 ("Federal Guidelines require any entity commencing construction of a nuclear power plant to obtain a construction permit and an operating license."). As the Court explained:

> However, an ESP does not authorize the holder to construct a nuclear plant. NRC regulations require applicants to obtain additional permits before commencing such construction. Under 10 C.F.R. § 52.17 and § 52.18, an ESP applicant must submit a complete environmental report and the NRC must issue an EIS that addresses all issues NEPA identifies regarding the construction and operation of a nuclear power plant on the proposed site, but a project's benefits need not be discussed at the ESP stage. If the benefits are not discussed, they must be evaluated at later permit or licensing stages before construction may begin.

*Id.* at 679.

The Court ultimately affirmed the NRC's purpose and need statement, but it did not deviate from *Simmons*'s holding and rationale. The Court recognized that all reasonable alternatives must be considered, but in that particular multi-part licensing process, the Court agreed that the agency "could defer that [alternatives] analysis until a later combined licensing proceeding." 470 F.3d at 684. The Court noted that "[c]ourts have permitted agencies to defer certain issues in an EIS for a multistage project when … the unavailable information is not essential to determination at the earlier stage." *Id.* at 684. It found that deferring the "need for power" analysis was particularly reasonable when the nuclear reactor's construction might not even begin for forty years. *Id.* There is no such elongated "multistage" process, by contrast, in the present CHC transmission line case.

The Transmission Companies also cite cases like *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190 (D.C. Cir. 1991), which say that federal agencies should consider or must give serious consideration to private parties' purpose and need statements. No court, however, has held that federal agencies are obligated by law to accept whatever purpose and need statement they receive from applicants. That would sound the death knell for serious alternatives review because it would give companies even more incentive to define their purpose and need as essentially identical to the specific project they want to build.

14

*Busey* itself rejected that argument. As the CEQ's recent analysis of the law governing

Purpose and Need statements explained:

> [*Busey*] did *not* require the agency to base the purpose and need on the applicant's goals; rather, the court held that the agency's consideration of the applicant's goals to develop the purpose and need statement was not arbitrary and capricious. However, the court did *not* require that the applicant's goals be the sole (or even primary) factor in the formulation of the purpose and need for the action.

86 Fed. Reg. at 55,760 (emphasis added) (*citing Busey,* 938 F.3d at 196–99).

      The Transmission Companies also reiterate their argument that because the Midcontinent

Independent System Operator (MISO) indicated its support for something like the CHC

transmission line— albeit on a different route—twelve or thirteen years ago when electricity

demand forecasts were much higher, that means that non-wires alternatives or alternative routes,

which avoid the Refuge, could not be considered. Therefore, the Transmission Companies argue

that this Court had no basis for rejecting a purpose and need statement that excluded those

alternatives. As this Court fully understands, however, MISO has no authority over transmission

line siting, and its "approval" of a proposed transmission line project does nothing to override

federal environmental and public lands statutes. Of course, neither can the Wisconsin Public

Service Commission.

      Finally, the Transmission Companies suggest that Plaintiffs have not identified

reasonable alternatives that were ignored. That simply ignores the record, which includes

detailed testimony about "non-wires alternatives" packages, and the obvious possibility of

transmission line routes that would go north or south of the protected National Wildlife Refuge

or otherwise avoid running through the Refuge. *See* Dkt. 71 at 41–42 (Plaintiff's Brief in Support

of Motion for Summary Judgment); Dkt. 158 at 20–24 (Plaintiff's Reply Brief in Support of

Motion for Summary Judgment).

The case cited by the Transmission Companies, *Backcountry Against Dumps v. Chu,* 215 F. Supp. 3d 966 (S.D. Cal. 2015), *supports* Plaintiffs' position. That case also involved the environmental review for a proposed transmission line project. The Department of Energy used a narrow purpose and need statement to exclude consideration of distributed generation alternatives. The court rejected the agency's approach, concluding that "the purpose and need statement [was] too narrowly drawn and focused almost exclusively on private interests." *Id.* at 978. As the court found, "the DOE summarily used the purpose and need statement to determine that distributed energy resources fall outside the scope of responding to ESJ's request for a permit. Accordingly, the Court finds that the purpose and need statement was not proper because it defined the scope of the FEIS in such a way as to limit the consideration of alternatives to the Project." *Id.* at 979. That court did its own *Simmons*-type analysis, and found that the environmental review of the transmission line violated NEPA.

The Transmission Companies have not made the requisite "strong showing" that they are likely to succeed on appeal, and, on that basis alone, their motion for a stay pending appeal should be denied. As the following sections explain, the Transmission Companies have also not met their burden on any of the other factors.

## II.   A STAY WOULD IRREPARABLY HARM THE PLAINTIFF CONSERVATION GROUPS AND THEIR MEMBERS.

The magnitude of the harm that a stay of the final judgment would cause the Conservation Groups obviously depends on the contents of that final judgment. If a stay would allow construction to continue as though this Court had not granted summary judgment for the Plaintiffs, the Conservation Groups as well as their members will continue to suffer the irreparable injuries that this Court already recognized in issuing the preliminary injunction and this Court's January 14 Opinion and Order on summary judgment. Dkt. 175.

16

First, Conservation Group members face environmental harms from construction of the transmission line that will affect their recreational and aesthetic enjoyment of lands and waters in the Driftless Area and the Refuge. Second, the procedural harm this Court has already recognized will only grow over time if the Transmission Companies are allowed to continue construction in the absence of a NEPA-compliant EIS, along a route that is dependent on a Refuge crossing that this Court has already judged to be unlawful.

## A. Plaintiffs' Members Will Suffer Irreparable Harm from Environmental Damages and Destruction.

Conservation Group members face irreparable harms from construction of the transmission line and the consequent environmental destruction that will affect their recreational and aesthetic enjoyment of lands and waters in the southwest Wisconsin Driftless Area and the Upper Mississippi River National Wildlife and Fish Refuge. Harm is considered irreparable if it "cannot be prevented or fully rectified by the final judgment after trial." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008). The U.S. Supreme Court has recognized that "[e]nvironmental injury, by its nature, … is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 545 (1987). The Seventh Circuit has recognized that "[a]n economic award would not sufficiently compensate for" the injury of "a decrease in recreational and aesthetic enjoyment" of a natural area. *Sierra Club v. Franklin Cty. Power of Illinois, LLC*, 546 F.3d 918, 936 (7th Cir. 2008); *see also Sierra Club v. U.S. Army Corps of Engineers,* 645 F.3d at 997–98.

This Court already, correctly, found that construction of the transmission line would cause irreparable harm to the Conservation Groups when it granted a preliminary injunction. Dkt. 160 at 15–17. In issuing the preliminary injunction, this Court recognized the declarations

from Conservation Group members outlining how the construction would negatively impact their use and enjoyment of the Driftless Area. Dkt. 160 at 15. The Court found that the Defendants federal agencies' EIS prepared for the transmission line established that, regardless of best management practices and mitigation measures, at least "some harm will come to the environment," from vegetation clearing and groundbreaking for construction of the transmission line. *Id.* at 16.

Those member declarations continue to establish that irreparable injury will occur to the Conservation Groups if transmission line construction is allowed to continue in full. Dena Kurt, a member of Plaintiffs Driftless Area Land Conservancy (DALC) and Wisconsin Wildlife Federation (WWF), enjoys canoeing in the National Wildlife and Fish Refuge near Cassville, and particularly enjoys the clear water, viewing wildlife, and the feeling of being in nature.  Dkt. 94 at ¶¶ 1–9. Her experience of the Refuge would be severely diminished if the transmission line is constructed. *Id.* at ¶¶ 9-10, 16-27; *see also* Dkt. 79, Decl. of Kerry Beheler (discussing use and enjoyment of the Refuge); Dkt. 77, Decl. of Jean Luecke (same); Dkt. 86, Decl. of Todd Paddock (same).

Brian Durtschi is a DALC member who owns property in Wisconsin that would be crossed by the transmission line. Dkt. 73 at ¶¶ 1–4. Transmission line construction would diminish his ability to enjoy the scenery and view wildlife on the portion of his land that includes woods, Schlapbach creek, and other wetlands. *Id.* at ¶¶ 6–9. Debora Morton is a DALC member whose use and enjoyment of natural recreation areas including the Upper Mississippi River National Wildlife and Fish Refuge, Nelson Dewey State Park, Wyalusing State Park, and Pikes Peak State Park would be diminished if the transmission line is constructed. Dkt. 75 at ¶¶ 4–8. Importantly, these harms to members' use and enjoyment would not just emerge only after the

transmission line and its large towers are completed, but have instead begun during the clearcutting and land clearing activities that the Transmission Companies are *currently* undertaking. *See* Dkt. 182, Declaration of Dena Kurt (describing CHC transmission line construction witnessed in Iowa and Wisconsin in late January).

Federal courts have routinely held that the types of activities that will happen as part of transmission line construction—filling wetlands, clearing trees, and irreversibly altering water quality and aesthetics—constitute irreparable injury. *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d at 995 (concluding that the filling of wetlands constituted irreparable harm); *National Wildlife Fed'n v. Burford*, 835 F.2d 305, 323–26 (D.C. Cir. 1987) (affirming a finding of irreparable injury based on the permanent destruction of wildlife habitat, water quality, natural beauty, and other environmental and aesthetic values and interests); *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) (finding irreparable harm from logging mature trees and holding that "[n]either the planting of new seedlings nor the paying of money damages can normally remedy" such harm, finding moving jobs and revenue into a future year because of a preliminary injunction is minimal); *Habitat Educ. Ctr., Inc., v. Bosworth,* 363 F. Supp. 2d 1070, 1089 (7th Cir. 2005) (finding loss of red-shouldered hawk and goshawk habitat to be irreparable, "sufficient to tip the balance in favor of injunctive relief"); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (rejecting argument that ability of plaintiffs to visit other natural areas means no irreparable harm).

The Transmission Companies try to argue that any environmental harms are somehow not irreparable because "[c]leared vegetation will grow back except in the immediate right-of-way; soils will stabilize; best management practices will mitigate erosion; and wildlife species will adapt to the new environment." Dkt. 191 at 18–19. The Transmission Companies argue as though harms

are only irreparable if it is impossible to undo *any portion* of them, but that's not the definition

federal courts use for irreparability. Harms are considered irreparable if they either (1) are "of

long duration," *Amoco Prod. Co.*, 480 U.S. at 545, or (2) cannot be "*fully* rectified," *Girl Scouts

*of Manitou Council, Inc.*, 549 F.3d at 1089 (emphasis added).

The administrative record establishes that adverse environmental impacts from

construction are irreparable because they are long lasting or cannot be *fully* rectified, even if they

could be *partially* remediated. Clearcutting mature trees is a harm that is at the very least long

lasting because it takes decades for reforestation to occur. The Compatibility Determination

acknowledged that reforestation of the existing right of way through the Refuge, if it were

abandoned in favor of the new CHC right of way, would take "30 to 50 years." ROD007579–80.

The Final EIS lists "anticipated potential irreversible" impacts including "destruction of wetlands

and floodplains," "destruction of terrestrial and aquatic vegetation and wildlife habitat, including

forested areas and bluffs," and "alteration to the viewshed by clearing land, cutting and filling,

and constructing transmission line structures." ROD005512. The EIS also acknowledges that

"disturbance of vegetative cover could facilitate the introduction, spread and proliferation of

invasive species, which in turn could alter plant community composition, reduce native plant

species cover and biodiversity, alter soils and hydrology, and produce monocultures."

ROD005149–50.

The Transmission Companies also argue that there can be no imminent irreparable harm

to the Plaintiffs from planned construction in the Refuge because there is no current federal

approval that would allow for such construction and because such construction is not planned to

begin until October 2022. Dkt. 191 at 16–17. However, they inconsistently argue that any

injunctive or declaratory relief preventing them from building through the Refuge in October

2022 would cause them irreparable harm. Dkt. 191 at 22. The Transmission Companies have made clear that if this Court stays remedies and relief that would bar a crossing of the Refuge, they intend to forge ahead with clear cutting, bulldozing ("land regrading"), and foundation drilling activities in the Refuge soon. As discussed above, this type of environmental destruction has routinely been held to be irreparable.

### B. Plaintiffs Will Suffer Procedural Harms if the Transmission Companies Are Allowed to Build Momentum Toward a Refuge Crossing.

The procedural[2] harms that this Court has already recognized will grow over time if the Transmission Companies are allowed to keep building, as the "bureaucratic momentum" created by continued development increases the further along a project gets. *Colorado Wild Inc. v. U.S. Forest Service,* 523 F. Supp. 2d 1213, 1221 (D. Colo. 2007). In ruling on the preliminary injunction, this Court recognized that allowing all construction to continue would "build momentum, if not create an air of inevitability to completion of the line, even through the Upper Mississippi River National Wildlife and Fish Refuge." Dkt. 160 at 18. This momentum could make it harder for any federal agency or court to deny a right of way through the Refuge, despite the fact that "plaintiffs' claims challenging construction within the Refuge remain, by far, their strongest in terms of likelihood of prevailing." Dkt. 160 at 19. This Court specifically recognized in its January 14 Opinion and Order granting summary judgment to the Conservation Groups on their Refuge Act claim: "the Utilities are pushing forward with construction on either side of the Refuge, even without an approved path through the Refuge, in order to make any subsequent challenge to a Refuge crossing extremely prejudicial to their sunk investment… ." Dkt. 175 at 13.

---

[2] The Transmission Companies cite cases saying that procedural or informational injury alone is not sufficient to establish Article III standing. Dkt. 191 at 15. The damage Plaintiffs in this case are suffering now is not limited to procedural or informational injury.

The Conservation Groups have already prevailed on the merits. This Court should once again reject the Transmission Companies' attempt to continue building during an appeal in ways that might "skew the analysis and decision-making" of an agency "toward its original, non-NEPA compliant" decisions. *Colorado Wild Inc.,* 523 F. Supp. 2d at 1221.

The Eighth Circuit held that "the 'difficulty of stopping a bureaucratic steam roller, once started' [is] a proper factor for the district court to take into account" when considering a preliminary injunction. *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d at 995 (citing *Sierra Club v. Marsh*, 872 F.2d at 504). Likewise, it is a proper factor for this Court to consider when making the equitable decision whether to stay an injunction or other relief included in a final judgment pending appeal. The very reason a court issues a permanent injunction in cases such as this is to prevent a situation in which two already-constructed segments of a project will "stand like gun barrels pointing into the heartland" of public lands. *Maryland Conservation Council, Inc. v. Gilchrist,* 808 F.2d 1039 (4th Cir. 1986) (*quoting Named Individual Members of the San Antonio Conservation Soc'y v. Texas Hwy. Dept.,* 400 U.S. 968, 971 (1970) (Black, J., dissenting from denial of cert.)). That consideration weighing in favor of granting such an injunction also weighs strongly against staying such an injunction.

## III.   THE TRANSMISSION COMPANIES WILL NOT BE IRREPARABLY HARMED ABSENT A STAY.

The Transmission Companies have not met their burden of showing that they will suffer undue irreparable harm from a judgment that includes vacatur of the Record of Decision and Environmental Impact Statement, a declaratory judgment regarding the legality of the proposed Refuge crossing, and an injunction against construction of the transmission line. While it is difficult to argue with precision about the effects of a judgment when the precise scope is not yet known, the Transmission Companies have argued only that any of these forms of relief that the

Court could order would cause them monetary harms due to delayed construction. Monetary harms are, with few exceptions not applicable here, *not* irreparable.

In order to justify a stay pending appeal, the moving party must show more than a "possibility" of irreparable injury. *Nken v. Holder*, 556 U.S. 418, 434–35 (2009). The Transmission Companies' alleged monetary harms in the absence of a stay all relate to "delay" of construction or of the line's in-service date. Dkt. 191 at 52. As part of briefing on the preliminary injunction motion, the Conservation Groups submitted a declaration from a utility accountant noting that it is probable that a delay in construction could cause a cost *savings* overall. Dkt. 145 at ¶ 5–7. In his view, "[t]he potential increase in construction costs is highly speculative, while the financing cost savings from a delay is assured." *Id.*

The Transmission Companies are making inconsistent arguments. While: (1), on the one hand, they argue that construction in the Refuge is *not* imminent enough to constitute irreparable harm to the Conservation Groups, Doc. 191 at 52, (2) on the other hand, the Transmission Companies argue that allowing an injunction against construction in the Refuge, or even the Court's already-issued declaratory relief about the Refuge crossing's illegality, pending appeal would irreparably harm them. *Id.* They want to benefit from unlawful permits and other illegal approvals in both respects.

The Transmission Companies argue that if they "are unable to begin work within the Refuge by October 2022, they would have to push back the construction start date until October 2023, making it unlikely that the Project could be placed in-service by the currently scheduled in-service date of December 2023." Dkt. 191 at 22. However, the declaration they cite on this point is far less dire and reflects more uncertainty, saying that if the commencement of Refuge construction is pushed past October 2022, then "ITC Midwest will *likely* need to wait to commence construction in the Refuge until October 2023." Dkt. 184, Declaration of Shawn

23

Mathis, at ¶ 8 (emphasis added). If that happened, "the Project's in-service date *could* be delayed" because attempting to complete construction more quickly "would involve atypical— and more expensive—construction activities and timelines, none of which would guarantee that the in-service date is achieved." *Id*. (emphasis added).

Monetary harms as a general rule are not irreparable. In denying a motion for stay pending appeal, the Seventh Circuit has said that "[a]n injury compensable in money is not 'irreparable', so an injunction is unavailable." *Classic Components Supply*, 841 F.2d at 164–65 (*citing Sampson v. Murray*, 415 U.S. 61, 88–91 (1974)). *See also Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("It is also well settled that economic loss does not, in and of itself, constitute irreparable harm."). Monetary damages are considered to be irreparable in the Seventh Circuit only if they are shown to be "seriously deficient as a remedy for the harm suffered." *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir. 1984).

The Seventh Circuit has recognized four exceptions to this general rule that monetary damages are not irreparable: (1) "[t]he damage award may come too late to save the plaintiff's business"; (2) "[t]he plaintiff may not be able to finance his lawsuit against the defendant without the revenues from his business that the defendant is threatening to destroy"; (3) "[d]amages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected"; or (4) "[t]he nature of the plaintiff's loss may make damages very difficult to calculate." *Roland Machinery Co.,* 749 F.2d at 386.

None of those exceptions apply here. The Transmission Companies have not argued that an injunction will so harm their finances that they will be forced to abandon this lawsuit or to fold their businesses. Moreover, the fact that the Transmission Companies attempt to quantify

the monetary harms that they will allegedly suffer if construction is delayed by for a specific

time period, Dkt. 191 at 22, shows that these losses are not "very difficult to calculate."

The question in this case is not whether the Transmission Companies will be able to

recover any higher construction costs from opposing parties in this case, but whether they will be

able to recover them from any source. The Transmission Companies are currently charging all

their costs (plus a lofty "rate of return") to ratepayers, and they will continue trying to do so as

long as those costs are "prudently incurred" and "just and reasonable" under Federal Energy

Regulatory Commission Order 679 and implementing regulations, 18 CFR § 35.35.  If the

Transmission Companies are able to recover additional costs from ratepayers, then there is no

harm to the Transmission Companies. *See also* Dkt. 146 at 2–4 (Plaintiffs' Reply in Support of

Motion for Preliminary Injunction); Dkt. 142 (Declaration of former FERC Chair Jon

Wellinghoff); Dkt. 145 (Declaration of utility accountant Aaron Rothschild). If the costs are *not*

prudent and reasonable, then the Transmission Companies are not and should not be allowed to

charge those costs to consumers.

The only costs the Transmission Companies have even *argued* that they would not be

able to pass on to ratepayers are $2 million if there is a six-month injunction against all

construction, and $6 million if all construction is enjoined for a year. Dkt. 191 at 22. Those

estimates of lost profits (to the extent they are accurate) would therefore represent the maximum

injury they have even alleged. The Transmission Companies should not be allowed to profit from

federal and state agency permits and approvals that were improperly made and are contrary to

law.

The Transmission Companies have not even attempted to establish that they fall into any

of the exceptions the Seventh Circuit recognizes to the general rule that monetary harms are not

irreparable. Even if they did try, a stay is not automatic just because there is *some* claimed irreparable harm. *Nken*, 556 U.S. at 433–34. The Transmission Companies' harm must be weighed against the irreparable environmental harms and property damage that will impact the Conservation Groups' members' use and enjoyment of natural areas, as well as the costs to all ratepayers. Because of the sliding scale approach used in this Circuit, *In re A & F Enterprises, Inc. II*, 742 F.3d at 766, the Transmission Companies' low likelihood of success on appeal also requires that they show the balance of harm tips further in their favor in order to warrant a stay. *See also Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d at 997–98.

## IV.    THE PUBLIC INTEREST WEIGHS AGAINST A STAY.

The public interest weighs against a stay of the judgment pending appeal. There is a strong public interest in avoiding wasteful expenditures of money that the Transmission Companies plan to charge to ratepayers and in avoiding unnecessary property damage and environmental destruction, especially when this Court has already found the underlying federal agency actions to be unlawful. This Court should also consider what Congress has announced to be the public interest in NEPA and in the National Wildlife Refuge System Improvement Act. Additionally, there is a public interest in a full and fair, publicly-transparent NEPA review that adequately considers a range of less-environmentally destructive alternatives that a broader, NEPA-compliant purpose and need statement would provide.

The public interest weighs against letting the Transmission Companies gamble with ratepayers' money. The Transmission Companies have argued that delays in construction will cost ratepayers, but they ignore the risk that ratepayers will bear unnecessary costs if construction is allowed to continue, but this Court's decisions are upheld on appeal. *See* Dkt. 146 at 5–7; Dkt. 142 at ¶ 9. It was precisely this risk that the Wisconsin Citizens Utility Board raised recently in its letter to the Wisconsin Public Service Commission urging that any further

construction of the transmission line be suspended along the path to the unlawful crossing of the

Upper Mississippi River National Wildlife and Fish Refuge. The Citizens Utility Board stated:

"Each day that the Utilities continue with construction is a day they are knowingly and

intentionally spending Wisconsin customer dollars not just imprudently, but recklessly."[3]

There is a strong public interest in avoiding irreversible environmental degradation, and

in preserving natural areas and wildlife habitats for future generations of Americans to enjoy.

*Anglers of the Au Sable v. U.S. Forest Serv.*, 402 F. Supp. 2d 826, 839 (E.D. Mich. 2005)

("[T]here is a strong public interest in preserving national forests in their natural states and

ensuring that the dictates of NEPA are complied with.") (*citing Kootenai Tribe of Idaho v.

Veneman*, 313 F.3d 1094, 1125 (9th Cir. 2002)); *Habitat Educ. Center, Inc.*, 363 F. Supp. 2d at

1089 (harm to red-shouldered hawk habitat is irreparable "especially when coupled with the

added risk to the environment that takes place when governmental decision makers make up their

minds without having before them [a NEPA compliant] analysis").

In addition, the public interest in preventing environmental destruction is even stronger

when that destruction would be happening pursuant to federal agency actions that this Court has

already ruled are unlawful. "There is generally no public interest in the perpetuation of unlawful

agency action." *League of Women Voters of United States v. Newb*y, 838 F.3d 1, 12 (D.C. Cir.

2016). *See also W. Watersheds Project v. Bernhardt*, 392 F. Supp. 3d 1225, 1260 (D. Or. 2019)

("When the alleged action by the government violates federal law, the public interest factor

generally weighs in favor of the plaintiff.").

---

[3] Wisconsin Citizens Utility Board Letter on *Revocation of the Federal Permit for the Cardinal-Hickory Creek Transmission Project, Docket No. 5-CE-146*, PSC REF #: 430102 (Jan. 28, 2022), https://apps.psc.wi.gov/ERF/ERFview/viewdoc.aspx?docid=430102.

The court should also consider the public interest in a fair and thorough evaluation of alternatives that could achieve the same or similar benefits as the transmission line, but with less environmental harm. *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d at 997. "[J]ust as important as the public interest in potential economic gains is 'the public's confidence that its government agencies act independently, thoroughly, and transparently when reviewing permit applications.'" *Id.*

Most of the Transmission Companies' arguments regarding why the public interest favors a stay are about the cost of a delay in the transmission line's in-service date and stem from a false framing of the issues. They claim that building the transmission line *now* is better for the public than either building it later, at a higher cost, or not doing anything to improve the grid in southwestern Wisconsin. But these are not now, nor have they ever been, the only options.

The Conservation Groups have urged throughout the NEPA process that an environmental review with a lawful purpose and need statement should consider less environmentally damaging alternatives that can provide the same or similar kinds of functions as a high-voltage transmission line. The Conservation Groups' EIS comments included testimony by Kerinia Cusick, an engineer and solar and energy storage expert, that was submitted to the Wisconsin Public Service Commission about alternatives to the CHC transmission line. Ms. Cusick's expert testimony explained that an alternative "comprised of energy storage and solar can provide the same transmission services as a 345 kV line, and at a lower price point." ROD006720, ROD006727; *see also* ROD006649–83. Ms. Cusick further explained that an energy storage option would have a smaller physical footprint than a transmission line (thus creating less land disturbance and environmental harms), and could be built more quickly: "in some cases as little as 100 days from approval to commercial operation." ROD006725.

28

In short, a new NEPA-compliant environmental review must fully and fairly consider "all reasonable alternatives," including solar energy projects, energy storage, and efficiency upgrades of existing transmission lines that cost less and cause less environmental destruction. In this case, the Defendant federal agencies ruled out these kinds of alternatives *a priori*, by defining the purpose and need of the project unduly narrowly. The public interest is clearly best served by pausing costly construction until it's clear whether such an alternative will be selected through a lawful and improved NEPA process.

The Transmission Companies argue that any delay in construction will cause significant harm to renewable energy projects and will delay reductions in greenhouse gas (GHG) emissions they assert the line will achieve. Dkt. 191 at 27. This argument fails in two respects. First, as discussed above, it ignores the fact that a remand for a new environmental review process with a NEPA-compliant purpose and need statement could result in the robust consideration of less environmentally destructive, non-transmission line alternatives which would still support the expanded (and indeed perhaps even accelerate) development of renewable energy. *See* Dkt. 146 at 7. Second, their argument that the line's GHG emission reductions are known and quantifiable runs counter to their earlier arguments that "it is impossible to know with certainty how quickly carbon-free generation will displace existing fossil-fuel generation, and how much of the electricity transmitted on the CHC line will be generated by renewable sources at any given time." Dkt. 112 at 25. For their estimate of GHG emissions reductions, the Transmission Companies cite to a declaration that discusses the expected GHG emissions if 1 GW of wind energy "were never to be installed as a result of the Project never being placed in-service." Dkt. 127 at 8–9. Again, this argument is premised on a false assumption that the options are this

particular transmission line, or nothing. Moreover, the CHC transmission line would carry substantial amounts of fossil-fuel generated electricity, not just wind power.

The Transmission Companies also overstate any reliability need for the transmission line. The Conservation Groups' EIS comments attached expert testimony by Rao Konidena, an independent consultant who previously worked for MISO in a variety of roles, including as Manager of Resource Forecasting and Principal Policy Advisor for MISO. ROD006557–58. Mr. Konidena testified that there is no reliability threat to Wisconsin's grid if the CHC transmission line is not completed, especially given the availability of alternative transmission solutions. ROD006559–71. MISO would then consider and implement other solutions to maintain the reliability of the electric grid. Mr. Konidena reiterated these points in an October 2021 declaration submitted to this Court. Dkt. 144.

In *Lake Michigan Federation*, the district court explained why injunctions against unlawfully approved construction projects are appropriate to protect our environment:

> We wish to stress that the Federation has clearly satisfied the traditional criteria for injunctive relief. The Federation has succeeded on the merits of its public trust claim. In addition, the balance of equities favors the Federation. The irreparable harm to the Federation and the general public which would result if we did not issue this injunction far outweighs the pecuniary loss which will be borne by Loyola. Finally, the Federation has no adequate legal remedy through which to prevent the loss of public lands. *See, e.g., Northern Cal. Power Agency v. Grace Geothermal,* 469 U.S. 1306, 105 S. Ct. 459, 83 L. Ed. 2d 388 (1984); *Scruggs v. Moellering,* 870 F.2d 376, 378 (7th Cir. 1989); *Hubbard Business Plaza v. Lincoln Liberty Life Ins. Co.,* 649 F. Supp. 1310 (D. Nev. 1986).

*Lake Michigan Federation v. U.S. Army Corps of Engineers*, 742 F. Supp. 441, 449 n.5 (N.D. Ill. 1990).

Likewise, in *Sierra Club, Illinois Chapter v. U.S. Dep't of Transportation*, 962 F. Supp. 1037, 1046 (N.D. Ill. 1997), the district court eloquently explained the importance of applying the federal environmental laws in a lawful manner: "Environmental laws are not arbitrary hoops

through which government agencies must jump. The environmental regulations at issue in this case are designed to ensure that the public and government agencies are well-informed about the environmental consequences of proposed actions. The environmental impact statements in this case fail in several significant respects to serve this critical purpose." *Id.* at 1046. That explanation applies well to this case.

## V.   THIS COURT SHOULD DENY THE TRANSMISSION COMPANIES' REQUEST IN THE ALTERNATIVE FOR A 21-DAY ADMINISTRATIVE STAY.

The Transmission Companies request, in the alternative, if this Court does not grant the broad stay they seek, that the Court order a stay of 21-day "administrative stay" to allow them to seek a stay from the Seventh Circuit. They cite cases in which courts have stayed proceedings "to control its own docket" or "to reduce the burden of litigation on the parties and the court." Dkt. 191 at 53–54. That requested relief would, of course, do nothing to help this Court control its docket or reduce the burden of litigation on anyone. All it would do is allow another three weeks of construction, with all the harms to Plaintiffs, their members, and the public outlined above, and reward the Transmission Companies for continuing to operate as if this Court's January 14 Order were meaningless.

The cases they cite do not support their position at all. In *Clinton v. Jones,* 520 U.S. 681 (1997), the U.S. Supreme Court held, to the contrary, that it was an *abuse of discretion* for the district court to stay civil litigation proceedings against President Clinton until he left office. *Id.* at 707. Likewise, in *Munson v. Butler,* 776 F. App'x 339 (7th Cir. 2019), a prisoner civil rights case, the Seventh Circuit held that a trial court, again, abused its discretion by granting a stay of discovery pending the outcome of a similar case. *Bouas v. Harley Davidson Motor Co.,* No. 3:19-cv-1367, 2020 WL 2334336 (S.D. Ill. May 11, 2020), and *Nicholson v. Nationstar Mortg. LLC,* No. 17-cv-1373, 2018 WL 3344408 (N.D. Ill. July 6, 2018), both involved routine stays of

duplicative class actions under the generally applicable "first-to-file" rule, which has no relevance here. And finally, in *Kent v. Vilsak,* No. 3:21-cv-540, 2021 WL 6139523 (S.D. Ill., Nov. 10, 2021), the Court *denied* the federal government's stay motion, finding that the "first-to-file" rule did not apply, because the cases were not identical. None of these decisions remotely support the Transmission Companies' request here that would allow them another three weeks of construction notwithstanding the NEPA, APA, and Refuge Act violations found by this Court in its January 14, 2022 Opinion and Order.

## **CONCLUSION**

For the reasons explained above, Plaintiffs respectfully request that the Court deny the

Intervenor-Defendants' motion for a stay of judgment pending appeal.


Respectfully submitted this 7th day of February, 2022.


| | |
|---|---|
| */s/ Howard A. Learner* | */s/ Lindsay Paige Dubin* |
| Howard A. Learner | Lindsay Paige Dubin |
| Scott Strand | *Admitted Pro Hac Vice* |
| Ann Jaworski | Defenders of Wildlife |
| Environmental Law & Policy Center | 1130 17th Street NW |
| 35 East Wacker Drive, Suite 1600 | Washington, D.C. 20036 |
| Chicago, IL 60601 | T: (202) 772-3234 |
| T: (312) 673-6500 | ldubin@defenders.org |
| F: (312) 795-3730 | |
| HLearner@elpc.org | *Counsel for Plaintiff Defenders of Wildlife* |
| SStrand@elpc.org | |
| AJaworski@elpc.org | */s/ Robert M. Morgan* |
| | Robert M. Morgan |
| *Counsel for Plaintiffs National Wildlife* | *Admitted Pro Hac Vice* |
| *Refuge Association, Driftless Area Land* | National Wildlife Refuge Association |
| *Conservancy, Wisconsin Wildlife* | 415 E. Cape Shores Dr. |
| *Federation, and Defenders of Wildlife* | Lewes, DE 19958-3109 |
| | T: (301) 466-8915 |
| | RMorgan@RefugeAssociation.org |
| | |
| | *Counsel for Plaintiff National Wildlife* |
| | *Refuge Association* |

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on February 7, 2022, I electronically filed the forgoing document with the Clerk of Court using the Court's ECF system, which will serve the document on all counsel of record registered for electronic filing in the above-captioned proceeding.

Dated: February 7, 2022

<u>*/s/ Howard A. Learner*</u>
Howard A. Learner

34