## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| NATIONAL WILDLIFE REFUGE ASSOCIATION, et al., | No. 3:21-cv-00096-wmc |
| Plaintiffs, | Consolidated with No. 3:21-cv-000306-wmc |
| v. | |
| RURAL UTILITIES SERVICE, et al., | |
| Federal Defendants, | |
| AMERICAN TRANSMISSION COMPANY, LLC, et al., | |
| Intervenor-Defendants. | |
| | |
| NATIONAL WILDLIFE REFUGE ASSOCIATION, et al., | |
| Plaintiffs, | |
| v. | |
| UNITED STATES ARMY CORPS OF ENGINEERS, et al., | |
| Federal Defendants, | |
| AMERICAN TRANSMISSION COMPANY, LLC, et al., | |
| Intervenor-Defendants. | |

## INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ........................................................................................1

II.     ARGUMENT ..............................................................................................6

        A.      DALC is unlikely to succeed on the merits of the single issue on
                which it has appealed—the district court's denial of a Project-wide
                injunction. ...................................................................................................6

                1.      The vast majority of the Project consists of construction by
                        private parties on non-federal lands, which the APA does not
                        reach and the Court lacks the power to enjoin. ...........................7

                2.      The authorities Plaintiffs cite in support of their request for
                        a Project-wide injunction are plainly inapposite............................9

        B.      DALC will not be irreparably harmed absent the injunction................................12

                1.      Plaintiffs' delay in seeking relief undermines their claim of
                        irreparable harm. ......................................................................13

                2.      Impacts from ongoing work do not harm Plaintiffs because
                        those impacts are being appropriately mitigated using best
                        management practices. ..................................................................14

                3.      Neither the Driftless Area nor the specific corridor on which
                        the Project will be built are undisturbed. ....................................14

                4.      Plaintiffs will not be harmed by a "bureaucratic steamroller"
                        because the law presumes that federal agencies will
                        faithfully discharge their duties. .................................................16

        C.      The requested injunction would substantially injure the Co-owners
                and their interest in the Project. ...........................................................17

        D.      An injunction pending appeal would harm the public interest. ...........................20

                1.      The Project is needed to improve the reliability of energy
                        transmission in the midwestern region. ......................................21

                2.      An injunction that delays the Project's ability to deliver
                        renewable energy is not in the public's interest..........................22

                3.      The Project is needed to reduce losses of electricity and
                        relieve congestion. .....................................................................25

4.    Preventing MISO from performing its assigned role under the Federal Power Act as the regional grid planner is not in the public interest. ....................................................................26

5.    Injunctive relief that would deny effect to duly considered orders of the Wisconsin and Iowa state utility commissions is not in the public interest. .......................................27

6.    The Project furthers the public interest in changing the mix of generation to feature more renewable energy.......................28

E.    Proposed amicus Citizens Utility Board of Wisconsin raises state law claims not properly before this court. ............................30

F.    Amicus Counties raise state law claims not properly before this Court ..............................................................................................32

1.    Section 32.06(5) of the Wisconsin statutes is the only method for challenging the validity of condemnation in Wisconsin.....................................................................................33

2.    The takings clause protects property owners—it does not provide remedies to third parties...............................................35

3.    An injunctions is not an appropriate remedy for eminent domain concerns. ...................................................................35

G.    If the Court grants an injunction pending appeal, it should require DALC to post a bond in the amount of $40,713,766 to secure the Co-owners' rights.....................................................................36

III.    CONCLUSION..............................................................................................38

# TABLE OF AUTHORITIES

CASES

*AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*,
141 S. Ct. 1341 (U.S. 2021)..................................................................9

*Atlanta Coalition on the Transp. Crisis v. Atlanta Reg'l Comm'n*,
599 F.2d 1333 (5th Cir. 1979) ...............................................................8

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
297 F.R.D. 633 (N.D. Ala. 2014).........................................................37

*Cavel Intern., Inc. v. Madigan*,
500 F.3d 544 (7th Cir. 2007) .................................................................2

*Coliseum Square Ass'n, Inc. v. Jackson*,
465 F.3d 215 (5th Cir. 2006) .................................................................7

*Colo. River Indian Tribes v. Dep't of the Interior*,
No. CV14-02504, 2015 WL 12661945 (C.D. Cal. Jun. 11, 2015) ...................19, 30

*Common Cause Ind. v. Lawson*,
978 F.3d 1036 (7th Cir. 2020) ...........................................................2, 17

*Dep't of Transp. v. Public Citizen*,
541 U.S. 752 (2004)...............................................................................9

*Diné Citizens Against Ruining Our Env't v. Jewell*,
No. CIV 15-0209, 2015 WL 6393843 (D.N.M. Sept. 16, 2015) .................2

*Driftless Area Land Conservancy v. Valcq*,
16 F.4th 508 (7th Cir. 2021) ...............................................................27

*DSG Evergreen Family Ltd. v. Town of Perry*,
939 N.W.2d 564 (Wis. 2020)...............................................................34

*Essentia Health v. Gundersen Lutheran Health Sys., Inc.*,
No. 17-cv-100, 2017 WL 1318112 (W.D. Wis. Apr. 7, 2017) ................13

*Falkner v. N. States Power Co.*,
248 N.W.2d 885 (Wis. 1977)...............................................................34

*Fisheries Survival Fund v. Haaland*,
858 F. App'x 371 (D.C. Cir. 2021).......................................................17

*Green St. Ass'n v. Daley*,
  373 F.2d 1 (7th Cir. 1967) ...................................................34

*Gwich'in Steering Comm. v. Bernhardt*,
  No. 3:20-cv-00204, 2021 WL 46703 (D. Alaska Jan. 5, 2021) ............16

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
  607 F.3d 453 (7th Cir. 2010) ...........................................20, 36, 37

*Historic Pres. Guild of Bay View v. Burnley*,
  896 F.2d 985 (6th Cir. 1989) .................................................8

*Ill. Com. Comm'n v. Fed. Energy Regul. Comm'n*,
  721 F.3d 764 (7th Cir. 2013) ......................................... passim

Iowa Utilities Board,
  Docket No. E-22386 (May 27, 2020) ......................................27

*Karst Env't Educ. & Prot.*, 475 F.3d 1291 (D.C. Cir. 2007) ...............10

*Kleppe v. New Mexico*,
  426 U.S. 529 (1976) ........................................................10

*Knick v. Township of Scott, Pa*,
  139 S. Ct. 2162 (U.S. 2019) ...............................................36

*La Cuna de Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the
  Interior*,
  No. LA CV11-04466, 2011 WL 13130485 (C.D. Cal. Aug. 11, 2011) .............30

*Milwaukee Inner-City Congregations Allied for Hope v. Gottlieb*,
  944 F. Supp. 2d 656 (W.D. Wis. 2013) ....................................37

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ........................................................12

*Nat'l Parks Conservation Ass'n v. Semonite*,
  282 F. Supp. 3d 284 (D.D.C. 2017) ........................................16

*Nken v. Holder*,
  556 U.S. 418 (2009) .........................................................2

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
  786 F.2d 794 (7th Cir. 1986) .............................................36

*Protect Our Cmtys. Found. v. U.S. Dep't of Agric.*,
    845 F. Supp. 2d 1102 (S.D. Cal. 2012), *aff'd* 473 Fed. App'x 790 (9th Cir.
    2012) ............................................................................................................28

*Protect Our Cmtys. Found. v. U.S. Dep't of Agric.*,
    No. 11-cv-00093, 2011 WL 13356151 (S.D. Cal. Sept. 15, 2011)............................18, 25, 30

*Protecting Arizona's Res. & Children v. Fed. Highway Admin.*,
    No. CV-15-00893, 2015 WL 12618411 (D. Ariz. July 28, 2015)....................................17, 28

*Reed v. Antwerp*,
    No. 4:09CV3096, 2009 WL 2824771 (D. Ne. Aug. 28, 2009)........................................17, 22

*River Rd. All., Inc. v. Corps of Eng'rs of U.S. Army*,
    764 F.2d 445 (7th Cir. 1985) ...................................................................................15

*Save Our Sonoran, Inc. v. Flowers*,
    408 F.3d 1113 (9th Cir. 2005) ..............................................................................11, 38

*Shaikh v. City of Chicago*,
    341 F.3d 627 (7th Cir. 2003) ...................................................................................34

*Sierra Club v. Clinton*,
    689 F. Supp. 2d 1123 (D. Minn. 2010)...................................................................14

*Sierra Club v. Hickel*,
    433 F.2d 24 (9th Cir. 1970) ....................................................................................15

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    64 F. Supp. 3d 128 (D.D.C. 2014) ...........................................................................7

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    645 F.3d 978 (8th Cir. 2011) ..................................................................................28

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    803 F.3d 31 (D.C. Cir. 2015).....................................................................................7

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    990 F. Supp. 2d 9 (D.D.C. 2013)............................................................................14

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    No. 2:20-CV-00396, 2020 WL 7389744 (D. Me. Dec. 16, 2020), *aff'd*, 997
    F.3d 395 (1st Cir. 2021)............................................................................17, 18, 25

*Sierra Club v. U.S. Dep't of Agric., Rural Util. Serv.*,
841 F. Supp. 2d 349 (D.D.C. 2012) ................................................................7

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
205 F. Supp. 3d 4 (D.D.C. 2016) ..................................................................9

*State of Minn. ex rel. Alexander v. Block*,
660 F.2d 1240 (8th Cir. 1981) .....................................................................10

*Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*,
243 F.3d 270 (6th Cir. 2001) ........................................................................7

*Town of Weymouth, Mass. v. Mass. Dep't of Env't Prot.*,
973 F.3d 143 (1st Cir. 2020) .......................................................................21

*Ty, Inc. v. Jones Grp., Inc.*,
237 F.3d 891 (7th Cir. 2001) ......................................................................13

*W. Expl., LLC v. U.S. Dep't of the Interior*,
250 F. Supp. 3d 718 (D. Nev. 2017) ...........................................................35

*W. Watersheds Project v. Salazar*,
692 F.3d 921 (9th Cir. 2012) ......................................................................29

*Waller v. ATC*,
30 Wis.2d 242 (2013) ..................................................................................34

*White Tanks Concerned Citizens, Inc. v. Strock*,
563 F.3d 1033 (9th Cir. 2009) .....................................................................11

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ................................................................................ passim

*Woida v. United States*,
446 F. Supp. 1377 (D. Minn. 1978) ........................................................19, 22

*Zurn v. City of Chicago*,
59 N.E.2d 18 (Ill. 1945) ..............................................................................34

**STATUTES**

5 U.S.C. § 701(b)(1) .........................................................................................7

5 U.S.C. § 702 ..................................................................................... passim

16 U.S.C. § 824 .............................................................................................................26

Wis. Stat. § 32.06(5) ......................................................................................................34

Wis. Stat. § 196.39 .........................................................................................................32

Wis. Stat. § 196.491(3)(d)3 .......................................................................................27, 31

Wis. Stat. § 227.53 .........................................................................................................27

**R**ULES

Fed. R. Civ. P. 62(d) ......................................................................................................36

Fed. R. Civ. P. 65(c) ......................................................................................................38

**R**EGULATIONS

40 C.F.R. § 1502.2(f) ......................................................................................................16

Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, §§
    101, 201, 86 Fed. Reg. 7619 (Feb. 1, 2021) ..................................................22, 28

U.S. Dep't of Energy, Notice of Intent, *Building a Better Grid Initiative To
    Upgrade and Expand the Nation's Electric Transmission Grid To Support
    Resilience, Reliability, and Decarbonization*, 87 Fed. Reg. 2769 (Jan. 19,
    2022) ................................................................................................................29

**O**THER **A**UTHORITIES

Evan Halper, *A summer of blackouts? Wheezing power grid leaves states at risk*,
    The Washington Post (June 2, 2022) .................................................................6

*Joint Application of American Transmission Company LLC, ITC Midwest LLC,
    and Dairyland Power Cooperative, for Authority to Construct and Operate a
    New 345 kV Transmission Line from the Existing Hickory Creek Substation in
    Dubuque County, Iowa, to the Existing Cardinal Substation in Dane County,
    Wisconsin, to be Known as the Cardinal-Hickory Creek Project*,
    Docket No. 5-CE-146, *Final Decision* (Sept. 26, 2019) (PSCW REF#:
    376391) ...........................................................................................................31

*Joint Application of American Transmission Company LLC, ITC Midwest LLC,*
 *and Dairyland Power Cooperative, for Authority to Construct and Operate a*
 *New 345 kV Transmission Line from the Existing Hickory Creek Substation in*
 *Dubuque County, Iowa, to the Existing Cardinal Substation in Dane County,*
 *Wisconsin, to be Known as the Cardinal-Hickory Creek Project*, Docket
 No. 5-CE-146, *CUB Letter Requesting Reopening of Docket* (Jan. 28, 2022)
 (PSCW REF#: 430102) ..................................................................................................32

*Nichols on Eminent Domain*, § 3.04[10] (rev. 3d ed.) ..................................................35

## I.    INTRODUCTION

This Court's final judgment wisely declined to enjoin construction of the Cardinal-Hickory

Creek Project (Project), the vast majority of which is being constructed on private land outside the

Upper Mississippi National Wildlife and Fish Refuge (Refuge) and requires no federal land,

permits, or approvals. ECF No. 195[1]; *see also* ECF No. 201 (affirming that decision did not grant

injunctive relief *per se*). Plaintiffs' emergency motion for injunction pending appeal, brought

nearly three months after the Court entered its judgment, offers no reason for this Court to revisit

its original conclusion.

As this Court has recognized, the Administrative Procedure Act (APA) does not permit the

Court to exercise jurisdiction over non-federal action by private parties. In its order partially

granting preliminary injunction motion, the Court explained that it could not enjoin construction

activity in Wisconsin that did not affect jurisdictional waters "due to lapsed permits, [because it]

is outside the jurisdiction of this Court, or is not the subject of challenge in this lawsuit." ECF No.

160, at 5–6. It also recognized that "this [C]ourt has no jurisdiction to enjoin construction outside

of land on or near jurisdictional waters" *Id.* at 20. Although Plaintiffs (also referred to as "DALC")

incongruously devote most of their brief to recounting those portions of the final judgment on

which they prevailed, the only issue currently before the Court is whether to enjoin construction

of the Project in its entirety—an issue on which it previously ruled against Plaintiffs (and which

the Seventh Circuit implicitly recognized as the sole basis for its jurisdiction over Plaintiffs' cross-

appeal).[2] Their motion should be denied because Plaintiffs do not meet any of the four

---

[1] Cites to "ECF No." refer to the docket in this action, No. 3:21-cv-00096 (W.D. Wis.) and cites
to "Appeal Dkt. No." refer to the appeal docket before the Seventh Circuit Court of Appeals, No.
22-1347 (7th Cir.). Cites to Plaintiffs' brief in support of its motion for injunction, ECF No. 213,
are referred to as "Pls.' Br."
[2] *See* Order, Dkt. No. 2, No. 22-1709 (7th Cir. Apr. 28, 2022).

requirements for injunctive relief: Plaintiffs fail to establish that they are likely to succeed on the merits of their claim; that they will suffer irreparable harm without an injunction pending appeal; that the injunction will not "substantially injure" the Project and the Co-owners[3]; or that an injunction is in the public interest. *Common Cause Ind. v. Lawson*, 978 F.3d 1036, 1039 (7th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 426 (2009)).[4]

First, Plaintiffs are unlikely to succeed on the sole merits issue they challenge here: the Court's refusal to issue injunctive relief against private activity—the Co-owners' construction of the Project outside of the Refuge. Plaintiffs ask the Court to revisit its decision not to enjoin Project construction outside the Refuge, but they fail to offer any legal basis for the Court to enjoin non-federal activity on non-federal land, arguing that the Court's findings with respect to the federal agencies' (now-vacated) actions (the Environmental Impact Statement (EIS), Record of Decision, and revoked Compatibility Determination and right-of-way permit) support an injunction against the Co-owners' construction of the Project outside the Refuge. DALC's appeal thus hinges on the unsupported premise that, in this case brought under the APA, the district court can reach private activity that requires no federal authorization (other than the U.S. Army Corps of Engineers (Corps) verifications authorizing *de minimis* impacts to jurisdictional waters, which the Court upheld). Because the district court categorically rejected DALC's Clean Water Act (CWA) claims

---

[3] Intervenor-Defendants, American Transmission Company LLC and ATC Management Inc., ITC Midwest LLC, and Dairyland Power Cooperative are collectively referred to as the "Co-owners" or "Utilities."

[4] In determining whether to issue an injunction pending appeal, the court applies the same "sliding-scale approach" to an application for an injunction pending appeal as it would to an application for a preliminary injunction. *See Cavel Intern., Inc. v. Madigan*, 500 F.3d 544, 547 (7th Cir. 2007). Moreover, "[b]ecause the Plaintiffs are, in essence, requesting that the Court grant . . . relief . . . that the Court recently decided they were not entitled to receive, 'the burden of meeting the standard is a heavy one.'" *Diné Citizens Against Ruining Our Env't v. Jewell*, No. CIV 15-0209, 2015 WL 6393843, at *1 (D.N.M. Sept. 16, 2015).

(in a portion of the Court's ruling, ECF No. 175, at 41–44, that DALC wisely has not appealed), there is simply no basis for the relief DALC seeks.[5]

Second, DALC will not be irreparably injured absent an injunction pending appeal. As shown below, some of DALC's declarants discuss injuries based on impacts within the Refuge, where the Co-owners are *not* doing work, and which are thus not a proper basis for injunctive relief. DALC also relies on inadmissible and unreliable evidence to demonstrate its injuries, relying, for instance, on a road-widening project within the Refuge over which the Co-owners have no control to claim that the Co-owners are doing work in the Refuge; baseless allegations that the Co-owners are not complying with the Wisconsin Department of Natural Resources' (WDNR) erosion control requirements; and unfounded claims that Project construction is disturbing illusory Native American burial mounds that have not been identified on any Project survey or study. Anderson Decl. ¶¶ 5, 26; *see also* Rothfork Decl. ¶ 15.[6]

Beyond that, DALC premises its claim of harm on its repeated assertion that the Project will mar the unique—and, they imply, otherwise pristine—landscape of the Driftless Area. These concerns are misplaced because the Project crosses areas already marked by human activity. DALC fails to acknowledge that the Project is collocated by design with existing rights-of-way (including, on the Wisconsin side, transportation and utility rights-of-way) for 97 miles of its 101-mile length, ROD007624, or that the Co-owners are implementing a litany of measures to avoid,

---

[5] As the Co-owners demonstrate in their appeal, the district court lacked jurisdiction to review either DALC's NEPA claims concerning the EIS and Record of Decision or its Refuge Act claims concerning the Compatibility Determination and right-of-way permit. Appeal Dkt. No. 18, at 28–45. Setting aside these jurisdictional issues, the Court's conclusions on the merits were also erroneous. *Id*. at 45–62.

[6] The evidentiary deficiencies in the declarations are described in greater detail in Intervenor-Defendants' Motion to Strike Plaintiffs' Declaration Filed in Support of Emergency Motion for Injunction Pending Appeal, filed contemporaneously herewith.

minimize, and mitigate the impact of construction activities on the surrounding environment and communities. The notion that one transmission line will permanently and irreparably mar the four-state, 24,000 square mile (more than 15,000,000-acre) Driftless Area—which is characterized by wide-spread agricultural and other uses—is absurd on its face.[7] In much of the area that will be crossed by the corridor, the original vegetation has been converted to cropland and pasture. ROD005168. And as the U.S. Fish and Wildlife Service (FWS) found, any listed and endangered species present in the Project area are not likely to be adversely affected by the Project.[8]

Third, although the requested injunction would not irreparably injure Plaintiffs or their members, it would substantially injure the Co-owners. An injunction would add to the incremental delay this litigation has already wreaked on the Project schedule, compounding the injury the Co-owners already have sustained from Plaintiffs' multiple lawsuits. Enjoining Project construction pending appeal would increase its ultimate projected cost by approximately $33 million and cause ATC to lose approximately $7,137,366 in profits it could never recover. Decl. of Sarah Justus ¶ 33 (filed concurrently); Decl. of Shawn Mathis (Mathis Decl.) ¶ 16 (filed concurrently); Decl. of Michael Degenhardt (Degenhardt Decl.) ¶ 13 (filed concurrently).[9]

Fourth, halting Project construction clearly is not in the public interest—a factor to which courts "should pay particular regard . . . in employing the extraordinary remedy of injunction," *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008). Any relief that delays or risks

---

[7] Indeed, one of the Plaintiffs' declarants complains of construction of the Project through her property, while acknowledging that she uses that property for timber production and corn row crop production. ECF No. 217, ¶ 6.

[8] USACE000650–78 (final Biological Opinion). Impacts within the Refuge are beyond the scope of DALC's motion, which is directed to construction outside the Refuge. However, FWS also concluded that the Project would improve habitat connectivity within the Refuge; reduce the number of transmission poles within the Refuge; and reduce avian collisions. ROD005468.

delaying the in-service date for the Project, which is needed to transition the upper Midwest to a greater mix of renewable energy, with a resilient grid able to withstand extreme weather, avoid outages, and reduce power costs for consumers, is not in the public interest. As the Midcontinent Independent System Operator, Inc. (MISO), the Public Service Commission of Wisconsin (PSCW), and the Iowa Utilities Board found, the Project serves the public interest by advancing reliability, economic, and policy goals.

An injunction would harm renewable energy developers whose output could be curtailed if the Project is not constructed, consumers who will be subject to higher power prices without the Project in-service, and utilities that wish to more reliably and cost-effectively serve the communities in which they operate. To be sure, the approximately 1.3 miles of the Project that will pass through the Refuge cannot proceed until either (1) FWS is able to act on the Co-owners' application for a land exchange; or (2) the Utilities develop new plans, based on different engineering, to proceed unilaterally through the Refuge along their existing rights-of-way. But ongoing construction outside the Refuge is consistent with this Court's rulings and maintains the Co-owners' ability to meet the in-service date under either of one of these scenarios.

In a recent pleading they filed in the Seventh Circuit, Plaintiffs insisted that the Project is not "necessary to 'keep the lights on.'" Appeal Dkt. No. 13-1, at 25. Their current brief tellingly omits any such claims, instead focusing primarily on the Project's costs to argue that it is not in the public interest. As MISO has recently concluded, decreased "thermal requirements (largely coal-fired generation)[,] and the rapid growth of renewable generation," have diminished "total accredited capacity that MISO can expect to rely upon during high reliability risk periods." *See* Decl. of Lianying Hecker ¶ 10 (filed concurrently); Decl. of Tom Dagenais Decl. ¶ 10 (filed

concurrently).[10] The risk that these shortfalls will hit MISO customers is real, is increasing, and counsels against injunctive relief that would delay a critically needed part of the solution.

An injunction would also thwart the public interest by undermining the careful study and planning processes through which the Project was conceived and approved consistent with the Federal Power Act's allocation of authority between state and federal actors. As the Co-owners have argued, the three federal agencies sued here exhaustively studied the Project in a process that included multiple rounds of notice and comment. Appeal Dkt. No. 18, at 13–21; *see also* ROD007644–45. But they did so only after MISO conducted an extensive, multi-year transparent planning process, which proved that the Project—along with sixteen other regional transmission projects—would reduce energy costs, improve system reliability, and help member states achieve their renewable energy goals. ROD007606; ECF No. 128 ¶¶ 10–14, 18–20. Similarly, in proceedings the federal agencies watched closely, the PSCW determined that the Project is in the public interest following a lengthy and exhaustive contested case proceeding.

## II.    ARGUMENT

### A.    DALC is unlikely to succeed on the merits of the single issue on which it has appealed—the district court's denial of a Project-wide injunction.

DALC argues that it is likely to succeed on the merits because the Court has already ruled in its favor. Pls.' Br. at 3. But the sole issue on which DALC is appealing is one on which it lost— namely, whether this Court has authority to enjoin construction of the Project outside the Refuge, an almost exclusively private activity occurring on non-federal land. Plaintiffs offer no authority for the Court to enjoin this construction, and their motion should be denied.

---

[10] *See also* Evan Halper, *A summer of blackouts? Wheezing power grid leaves states at risk*, The Washington Post (June 2, 2022), https://www.washingtonpost.com/business/2022/06/02/blackout-states-summer-heat/ (regional grid in Midwest "wrestling with forecasts that it lacks the power needed to get through a heat wave" and is "short the amount of energy needed to power 3.7 million homes.").

### 1. The vast majority of the Project consists of construction by private parties on non-federal lands, which the APA does not reach and the Court lacks the power to enjoin.

DALC does not identify any legal authority to support its argument that this Court can enjoin construction of the Project in its entirety. Courts have recognized that the APA, under which DALC's claims are brought, "does not provide private plaintiffs a route for reviewing the actions of nonfederal defendants." *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 249 (5th Cir. 2006). The APA authorizes judicial review of "agency action." 5 U.S.C. § 702; 5 U.S.C. § 701(b)(1) (defining an "agency" as "each authority of the Government of the United States"). It does not allow courts to reach purely private action like construction on state-owned or privately-owned land. *See, e.g., Sierra Club v. U.S. Dep't of Agric., Rural Util. Serv.*, 841 F. Supp. 2d 349, 361 (D.D.C. 2012) (declining to award injunctive relief against nonfederal parties absent showing that private activity required federal authorization); *Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 285–86 (6th Cir. 2001) (declining to issue preliminary injunction where "the relevant federal decision-makers do not have authority to exercise sufficient control or responsibility over Route 840 South so as to influence the outcome of the project").[11] The Court

---

[11] Under the Council on Environmental Quality's regulations, agencies must often analyze impacts of actions by private actors in areas outside of the federal government's jurisdiction, but this does not expand the jurisdiction of the federal government—or of a reviewing court. *Cf. Sierra Club v. U.S. Army Corps of Eng'rs*, 64 F. Supp. 3d 128, 133–34 (D.D.C. 2014) (finding that the agencies had "permitting authority over only small segments of this private pipeline project and none of the defendant agencies, alone or in combination, ha[d] authority to oversee or control the vast portions of the [ ] Pipeline that traverse private land."); *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 54 (D.C. Cir. 2015) (concurring opinion) ("no amount of artful pleading can convert these minor federal engagements into a 'connected action' that subjects the 580 miles of *private* pipeline to NEPA review"). Thus, Plaintiffs' assertion that a Project-wide injunction is appropriate because "[t]he EIS has covered and must cover the entire transmission line, including both public and private land" is irrelevant. Pls.' Br. at 9. Even when an agency is encouraged or required under NEPA to analyze impacts on private lands from private parties, that does not give a court authority to enjoin such activity under the APA.

recognized these limits on its jurisdiction explicitly when it ruled on DALC's original motion for a preliminary injunction, ECF No. 160, at 5–6, 20, and implicitly when it issued a final judgment that did not include a Project-wide injunction, which Plaintiffs sought in their remedy briefing. ECF No. 178, at 33–44.

Despite Plaintiffs' assertion that this part of the Court's holding was an "error in judgment," Appeal Dkt. No. 53-1, at 32, the Court was wise to recognize its lack of authority to enjoin conduct by private parties outside the Refuge. The vast majority of the Project is being built on privately owned land. ROD005040. No federal funding has been awarded for the Project, nor have the Co-owners even applied for it. The only challenged federal approvals are for the 1.3-mile segment that crosses the Refuge and the Mississippi River—which have either been revoked (the Compatibility Determination and right-of-way permit) or have not been issued (the land exchange)—and a *de minimis* amount of wetland fill outside the Refuge under permits the Court upheld. Nor does the mere possibility that Dairyland will receive financial assistance for its nine percent ownership stake at some future time provide a basis for the Court to enjoin the Project; "[t]he fact that a project has been designed in order to preserve the option[] of federal funding in the future is not enough, standing alone, to make it a federal project." *Historic Pres. Guild of Bay View v. Burnley*, 896 F.2d 985, 990–91 (6th Cir. 1989) (citing *Atlanta Coalition on the Transp. Crisis v. Atlanta Reg'l Comm'n*, 599 F.2d 1333, 1347 (5th Cir. 1979).

Plaintiffs' premise that a more robust NEPA process or Refuge Act analysis could have prevented work outside the Refuge that does not require any federal approval must be rejected. NEPA does not prevent or forbid environmental impacts from occurring. Rather, it "imposes only procedural requirements to ensure that [a federal] agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental

impacts," *Winter*, 555 U.S. at 23 (quotation marks and citation omitted), and an agency need not consider impacts it has no ability to prevent. *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 770 (2004). Similarly, the Refuge Act nowhere purports to give FWS jurisdiction over activity beyond the borders of federal lands. The D.C. District Court's analysis in a linear infrastructure case is instructive here:

> Such [preliminary injunctive] relief . . . cannot stop the construction of DAPL on private lands, which are not subject to any federal law. Indeed, Standing Rock does not point the Court to any law violated by the private contracts that allow for this construction or any federal regulation or oversight of these activities. . . . [N]o federal agency had the ability to prevent DAPL's construction from proceeding on these private lands. At most, the Corps could only have stopped these activities at the banks of a navigable U.S. waterway. An injunction of any unlawful permitting now can, at most, do the same.

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 34 (D.D.C. 2016).

> ## 2. The authorities Plaintiffs cite in support of their request for a Project-wide injunction are plainly inapposite.

DALC asserts that the Court has "the power and the responsibility" to enjoin Project construction while an appeal is pending based on its inherent "equitable authority." Pls.' Br. at 15–16. But the Court is not some super-siting authority endowed with the power to regulate land use or energy policy or control the actions of private parties that have no nexus to the claims before it. To the contrary, the scope of the Court's equitable authority must be evaluated in the context of the statutes at issue. *See AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341, 1350 (U.S. 2021) (analyzing remedies under Federal Trade Commission Act). And as discussed above, neither NEPA nor the APA authorize this Court to enjoin construction of the entire Project, the vast majority of which does not depend on federal approval to proceed.

DALC cites three cases for the proposition that "[f]ederal courts have authority to enjoin conduct on private land if necessary to preserve the public lands." Pls.' Br. at 22. The first two

cases, *Kleppe v. New Mexico*, 426 U.S. 529 (1976), and *State of Minn. ex rel. Alexander v. Block*, 660 F.2d 1240 (8th Cir. 1981), clearly provide no support for DALC's statement: each involved a challenge to a statute, and the cases therefore speak only to *Congress*' constitutional power to regulate private activity on private lands (usually adjacent to or surrounded by public lands), not to a *court's* ability to enjoin such activity under a statute that authorizes only review of federal agency action. In *Kleppe*, the New Mexico Livestock Board challenged the constitutionality of the Wild Free-roaming Horses and Burros Act, which authorized federal agencies to exercise jurisdiction over horses and burros on federal lands. In *Alexander v. Block*, the State of Minnesota and an association of property owners sued the United States over the constitutionality of the Boundary Waters Canoe and Wilderness Area, under which the federal government regulates the use of motorboats and snowmobiles within the borders of a wilderness area. Plaintiffs had argued that the statue was unconstitutional because the State owned ten percent of the land within the areas, as well as the lakes and rivers within it.

The third case DALC cites, *Maryland v. Gilchrist*, is a 1984, Fourth Circuit Court of Appeals ruling that has been criticized for failing to recognize that NEPA claims are reviewed under the APA and therefore subject to its limits. *See Karst Env't Educ. & Prot.*, 475 F.3d 1291, 1297–98 (D.C. Cir. 2007) (explaining that *Gilchrist* and *Macht v. Skinner* are no longer persuasive). As the D.C. Circuit recognizes in *Macht*, the court in *Gilchrist* improperly reviewed claims and enjoined activity by non-federal actors, despite the absence of "final agency action" (a pre-requisite to APA review) by the federal defendants. Finding that nothing in the APA authorized a claim against non-federal entities, the circuit court affirmed the district court's decision dismissing them. *Id*. at 1298. By extension, the APA gives this Court no authority to enjoin private activity that would not independently qualify for APA review.

Two other out-of-circuit cases DALC cites for the proposition that private action may be enjoined are distinguishable because the federal "hook" in those cases was so integral to the challenged projects that the land affecting federal, jurisdictional waters could not realistically be segregated from the remaining work. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1125 (9th Cir. 2005) (upholding preliminary injunction where "no portion of the project can go forward without the permit because the washes subject to federal jurisdiction cannot be segregated from private lands"); *White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033, 1040 (9th Cir. 2009) ("[T]he waters are dispersed throughout the site, so that any construction on the site would be impossible without affecting the waters."). For linear infrastructure projects like the Project, work may lawfully proceed on the approximately 100-miles that do not touch federal land and are therefore not contingent upon any approvals that will be required for the Refuge crossing. The court in *Save Our Sonoran* properly recognized the limits of its jurisdiction, cautioning that if the developer could "demonstrate to the district court that a portion of the contested property can be developed without affecting the jurisdictional waters, so that no Section 404 permit would be required, then the preliminary injunction must be modified accordingly." 408 F.3d at 1125. Moreover, any suggestion that Project completion hinges on federal authorization for a new right-of-way through the Refuge is plainly incorrect, since the Co-owners could route the Project through their existing easements within the Refuge (although further study and engineering would be required to pursue this alternative). ECF Nos. 91-2, 91-3. Mathis Decl. ¶ 17 n.4.

Finally, DALC erroneously states that the Federal Defendants opposed injunctive relief on the ground that it "was unnecessary." Pls.' Br. at 10. In fact, Federal Defendants specifically *declined* in their brief to address the propriety of DALC's request for relief against the entire line, noting "[i]t is unclear what legal basis such an injunction would have in an APA case challenging

federal agency actions. Irreparable harm justifying an injunction must be 'directly traceable to' the agency actions at issue in the case . . . *yet the vast majority of Intervenors' construction work does not require federal authorization*." ECF No. 189, at 8–9 (emphasis added). In their latest pleading filed with the Seventh Circuit, the Federal Defendants recognized that even some work within the Refuge on privately-held easements could proceed without authorization from FWS. Appeal Dkt. No. 16, at 16 (citing FWS000003 and 603 FW 2.10.B).

### B.     DALC will not be irreparably harmed absent the injunction.

DALC fails to establish irreparable injury here. Plaintiffs must demonstrate not just the mere possibility of irreparable harm, but rather, a likelihood of irreparable and immediate harm. *Winter*, 55 U.S. at 24. The mere potential for environmental harm or injury does not mean that an injunction is automatically warranted. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010) (NEPA does not place a "thumb on the scales" in favor of issuing an injunction). The Supreme Court has clearly rejected Plaintiffs' argument that environmental injury outweighs all other factors. *Winter*, 555 U.S. at 23 ("[E]ven if plaintiffs have shown irreparable injury from the Navy's training exercises, any such injury is outweighed by the public interest and the Navy's interest in effective, realistic training of its sailors.").[12]

DALC's assertions of injury are undercut by its nearly three-month delay in moving for relief. In addition, DALC's proffered injuries also do not establish irreparable harm. To demonstrate irreparable injury, DALC relies on the impacts the Project will have within the Driftless Area, which DALC implies is otherwise devoid of infrastructure, and a "bureaucratic steamroller" theory, under which some courts have found harm sufficient to justify an injunction

---

[12] The Court must weigh these asserted harms against other factors including economic harms and, in this case, society's interest in maintaining a reliable grid in the face of the transition from fossil-fuel based electricity to carbon-free energy while driving down electricity costs for consumers. *See Winter*, 555 U.S. at 24 (requiring courts to balance equities).

from an agency's presumed inability to change course as a result of environmental analysis. The first argument—impacts on the Driftless Area—fails as a matter of law, since the Court cannot halt construction outside the Refuge, and as a matter of fact, because the majority of the Project is being collocated with existing rights-of-way rather than sited in previously undisturbed areas. The second theory, premised on caselaw concerning a "bureaucratic steamroller" that the Seventh Circuit has not endorsed—also fails because it is inconsistent with the presumption that federal officials comply with legal mandates when performing their duties.

### 1. Plaintiffs' delay in seeking relief undermines their claim of irreparable harm.

Plaintiffs admit in their motion that construction has been ongoing "for three months" since this Court issued its decision, Pls.' Br. at 6, and many of their declarations are dated in February. Yet Plaintiffs fail to explain why it took them until May 18, 2022 to move for an injunction pending appeal—or why they failed to move first in this Court, as the Federal Rules of Appellate Procedures require. This delay undercuts their assertions of irreparable injury or the purported need for this Court to act with greater haste than the Plaintiffs did themselves. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered."); *Essentia Health v. Gundersen Lutheran Health Sys., Inc.*, No. 17-cv-100, 2017 WL 1318112, at *8 (W.D. Wis. Apr. 7, 2017) ("[T]he court . . . can consider plaintiff's delay in determining whether it has shown a sufficient risk of irreparable harm to warrant injunctive relief.").

## 2. Impacts from ongoing work do not harm Plaintiffs because those impacts are being appropriately mitigated using best management practices.

Contrary to Plaintiffs' unsupported assertions, all of the work being done is consistent with best management practices to ensure that any impacts are appropriately mitigated. Decl. of Daniel Belin, ¶¶ 18–47, ECF No. 133 (discussing mitigation measures and best management practices, including environmental monitors, erosion control plan, vegetation management plan, and avian protection plan); Decl. of Amy Lee, ¶ 16 (filed concurrently) (discussing environmental monitors); Justus Decl., ¶ 18 (filed concurrently) (describing implementation of Erosion Control Plan approved by Wisconsin Dep't of Natural Resources); Mathis Decl., ¶ 13 (filed concurrently) (describing installed erosion and sediment control measures).

Plaintiffs cite to a decision denying a different right-of-way application as evidence that transmission line rights-of-way are *per se* too environmentally destructive to be authorized. Pls.' Br. at 24. FWS' decision on another proposed right-of-way application has no bearing here because under the Refuge Act, compatibility is determined on a case by case basis. FWS000526; FWS000536.

## 3. Neither the Driftless Area nor the specific corridor on which the Project will be built are undisturbed.

Even if the Court could enjoin the Co-owners from building the Project on non-federal lands, generic impacts to the Driftless Area, which is "marked by active agricultural and other human uses, including utility infrastructure," Belin Decl. ¶ 15, ECF No. 133, do not establish irreparable harm to Plaintiffs. *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 39 (D.D.C. 2013) (no irreparable harm where proponent "purposely designed its construction plan so that 82%" of project would be co-located along existing right-of-way); *Sierra Club v. Clinton*, 689 F. Supp. 2d 1123, 1147 (D. Minn. 2010) (denying preliminary injunction where "harms to the

environment that will be caused by the construction of the pipeline are mitigated by the fact that the AC Pipeline is largely being constructed in an existing pipeline corridor"); *Sierra Club v. Hickel*, 433 F.2d 24, 36 (9th Cir. 1970) (reversing preliminary injunction where proposed road "follows the alignment of the old road to some extent and substantially parallels it in others"). The EIS notes that "land use in the project area is primarily dominated by agricultural uses, such as croplands and farmsteads." ROD005297. The transmission infrastructure needed to expand access to energy from renewable projects to the west of the Mississippi River is not unlike the existing infrastructure that enables crop development, forestry, or other uses of the land. Belin Decl. ¶ 15. In fact, for fifty years (until 2015), an active 220 MW coal plant sat in Cassville, Wisconsin directly across the River from the Refuge. *Id.* ¶ 16. The long, active life of this facility undermines any contention that energy infrastructure development simply does not occur in the Driftless Area. *Id.* Moreover, the fact that the Project will be collocated for 97 miles with existing transmission or transportation rights-of-way also belies Plaintiffs' implication that the line is being routed through undisturbed areas. ROD007624; Belin Decl. ¶ 13 (Project's alignment parallel to existing rights-of-way for most of its length "helped to significantly avoid or reduce impacts to interior forest, undisturbed grasslands, endangered species, and other valuable resources, and limit habitat fragmentation."). The additional presence of the Project will not irreparably harm Plaintiffs.

DALC admits that no work may occur within the Refuge until new approvals are granted and thus, the Refuge therefore is not the subject of its appeal. Pls.' Br. at 11; *see also* Mathis Decl. ¶ 17. Nonetheless, it is worth noting that the Refuge is already heavily used. In addition to currently hosting two transmission lines owned by the Co-owners, the Refuge is a nationally significant commercial navigation corridor managed by the Corps. As the Seventh Circuit has aptly observed, "[t]he Mississippi is not a wilderness area." *River Rd. All., Inc. v. Corps of Eng'rs of U.S. Army*,

764 F.2d 445, 451 (7th Cir. 1985) (noting heavy barge traffic of up to 300 barges a day in area near Illinois). As the Co-owners discussed in their previous brief, there is significant commercial navigation and management for those purposes, visitation, and timber harvest within the Refuge, and more than two dozen secondary uses such as grazing and farming are authorized as well. *See generally* ECF No. 89, at 23–27.

4. **Plaintiffs will not be harmed by a "bureaucratic steamroller" because the law presumes that federal agencies will faithfully discharge their duties.**

In addition to impacts to the character of the Driftless Area from the line, DALC argues that the Co-owners' construction outside the Refuge creates a risk of harm from a "bureaucratic steamroller" because, they posit, the construction will prevent federal decision-makers from making objective decisions in the future. That theory is unavailing because, as many courts have recognized, federal officials can be presumed to act in accordance with their statutory mandates when making decisions that concern federal lands.

The Co-owners are proceeding at their own risk with construction in areas outside the Refuge, begun in January 2021 before DALC even filed these lawsuits. The companies have obtained all necessary approvals under state law for this work. Their continued work to build the Project will not, as DALC implies, prevent either FWS or the Rural Utilities Service from making objective decisions involving the Project. The Co-owners' activities on non-federal land do not involve any irretrievable commitment of the *agencies'* resources which are the NEPA regulations' sole concern. 40 C.F.R. § 1502.2(f)); *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 286–87, 290 (D.D.C. 2017) ("The Court finds it hard to believe that the Corps, which has no financial stake in this Project and is merely the permitting organization, would be unable to objectively weigh reasonable alternatives in a future EIS just because Dominion has started construction."); *Gwich'in Steering Comm. v. Bernhardt*, No. 3:20-cv-00204, 2021 WL 46703, at

*8 (D. Alaska Jan. 5, 2021) (denying motion for injunctive relief based on bureaucratic momentum); *see also Fisheries Survival Fund v. Haaland*, 858 F. App'x 371, 373 (D.C. Cir. 2021) (developer's payment of $42 million for offshore lease did not represent *de facto* commitment by BLM to approve development because "the lease's cost was not the Bureau's doing."); *Protecting Arizona's Res. & Children v. Fed. Highway Admin.,* No. CV-15-00893, 2015 WL 12618411, at *5 (D. Ariz. July 28, 2015) (declining to award relief based on "bureaucratic momentum" theory). Environmental harms do not always overcome other equities.

## C. The requested injunction would substantially injure the Co-owners and their interest in the Project.[13]

As of March 31, 2022, the Co-owners have spent more than $276 million on permitting, designing, planning, and beginning to build the Project. Mathis Decl. ¶ 3. The extent of this investment weighs against an injunction. *See Sierra Club v. U.S. Army Corps of Eng'rs*, No. 2:20-CV-00396, 2020 WL 7389744, at *23 (D. Me. Dec. 16, 2020), *aff'd*, 997 F.3d 395 (1st Cir. 2021) (utility's commitment of "considerable human and economic resources" to construct high-voltage transmission line connecting hydropower generation resource to the New England electric grid undermined plaintiffs' motion for preliminary injunction); *Reed v. Antwerp*, No. 4:09CV3096, 2009 WL 2824771, at *8 (D. Ne. Aug. 28, 2009) (denying motion for preliminary injunctive relief to halt construction on segment of new transmission line, in part due to the "considerable investment" public power district had already committed to the project).

Moreover, any delay associated with an injunction will increase construction costs by at least $33 million. ITC estimates that a delay of six months would increase its construction costs

---

[13] Under the Seventh Circuit standard for injunctive relief, the third prong is that the requested injunction would not "substantially injure" third parties. *Lawson*, 978 F.3d at1039. The *Winter* test frames this component as a balancing of harms. *Winter*, 555 U.S. at 24. This semantic difference is immaterial to the outcome here.

by "at least $10 million to account for, among other things, increased mobilization costs, labor costs, and the rising price of steel." Mathis Decl. ¶ 16. The demobilization and remobilization costs associated with an injunction alone would add $2 million. *Id.* ¶ 10.[14] Delay could add costs attributable to inflation and payment for storing the transmission structures that have already been delivered to Wisconsin. *Id*. at ¶ 14. In addition, trying to later mitigate schedule delays would increase overall construction costs for the Project. *Id*. at ¶ 13. ATC likewise estimates that a six-month delay in Project construction would increase construction costs by approximately $23 million due to (among other things) idling and then remobilizing crews, lengthening laydown yard leases, and additional construction, environmental staff, and vegetation matting costs that will accrue once construction resumes. Justus Decl. ¶ 33.

Plaintiffs assert that the Co-owners will not incur these costs because the costs will be passed along to ratepayers while, at the same time, asking FERC (unsuccessfully) to investigate whether the current construction costs are prudent and should be charged to ratepayers or fall fully and without recourse on the Co-owners. But regardless of whether these increased costs are viewed as injuries to the Co-owners under the third *Winter* prong or injuries to the ratepayers (and thus, the public interest, under the fourth *Winter* prong), they weigh against injunctive relief. *See Sierra Club*, 2020 WL 7389744, at *23 ("[The utility company] has committed to the Project considerable human and economic resources and is in the position of expending considerably more—to little or no effect—based on contractor commitments that do not disappear if it loses most of the winter months while defending this litigation."); *Protect Our Cmtys. Found. v. U.S. Dep't of Agric.*, No. 11-cv-00093, 2011 WL 13356151, at *11–12 (S.D. Cal. Sept. 15, 2011) (denying preliminary

---

[14] Demobilization and remobilization would also injure the public interest by delaying the Co-owners' ability to conduct full restoration activities that can only be finished once construction is complete. Mathis Decl. ¶ 13.

injunction against proposed 117-mile transmission line designed to facilitate access to renewable energy, in part because additional delay would increase construction costs by $16 million to $22 million per month); *Woida v. United States*, 446 F. Supp. 1377, 1390 (D. Minn. 1978) (denying motion for preliminary injunction to halt construction of high-voltage transmission line, in part because cooperative associations developing the line would incur approximately $6 million per month in additional costs, which would be passed on to ratepayers); *Colo. River Indian Tribes v. Dep't of the Interior*, No. CV14-02504, 2015 WL 12661945, at *32 (C.D. Cal. Jun. 11, 2015) (denying preliminary injunction against construction of utility scale solar project, in part because developer would incur approximately $1.5 million in labor demobilization costs under existing EPC agreement).

Delay would also cause irreparable economic damage to ATC that will not be passed on to the ratepayers. Because of the rate treatment that FERC has approved for ATC's capital projects, ATC would suffer significant lost profits from an injunction. *See generally* Degenhardt Decl. (filed concurrently). Utilities typically add a new capital investment to rate base—and thus, earn a profit on that investment—on the day the investment becomes used and useful in providing utility service. *Id.* ¶¶ 5–9. But FERC has approved alternative rate treatment for ATC, whereby ATC adds ongoing capital investments to rate base in real time. *Id.* ¶ 9.[15] ATC has been applying this accounting treatment to its investment in the Project. *Id.* ¶ 10. If an injunction issues, ATC will need to remove the capital it has already spent on the Project from rate base and will not be permitted to track or recover the lost interest on that capital while the injunction is in effect. *Id.* ¶ 11. As long as the injunction is in place, ATC will fail to earn on the money it has spent to date

---

[15] Plaintiffs also erroneously assumed that an accounting method known as "CWIP" applies to ITC Midwest. The Project's costs will not be included in ITC Midwest's rate base until the Project's in-service date. Decl. of Zachary Paquette ¶ 4 (filed concurrently).

and will have to bear the financing costs of its prior investment in the Project. *Id.* In addition, ATC will not be able to add to its rate base, and thus earn a return, on costs it incurs while the injunction remains in effect. *Id.* ¶ 12.[16] These losses would amount to approximately $7,137,366 if an injunction lasted six months. *Id.* ¶ 13. ATC would never recover these financing costs, from ratepayers or otherwise. *See Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 457 (7th Cir. 2010) ("Every day that a sum of money is wrongfully withheld, its rightful owner loses the time value of the money," and there is "no procedural vehicle to enable [non-moving party] to recover the loss of the time value of its money" in such circumstances.). These damages weigh against an injunction and also support the imposition of a bond if the Court does grant one.

### D. An injunction pending appeal would harm the public interest.

If Plaintiffs cannot demonstrate that an injunction is in the public interest, that alone is a sufficient basis to deny a plaintiff's motion. *Winter*, 555 U.S. at 26. Here, it is plainly not in the public interest to further delay a project that the grid operator and state officials have found is needed to improve reliability, relieve transmission congestion, lower energy costs, bring renewable energy from west of the Mississippi River to load centers east of the Mississippi, and help states meet their policies supporting increased reliance on renewable energy sources. Like the other 16 transmission projects that MISO approved as part of the MVP portfolio, the Project will "enabl[e] power to be transmitted efficiently across pricing zones," help utilities "satisfy renewable energy requirements, improve reliability (which benefits the entire regional grid by reducing the likelihood of brownouts or outages, which could occur anywhere on it, facilitate power flow to currently underserved areas in the MISO region, or attain several of these goals at once." *Ill. Com. Comm'n v. Fed. Energy Regul. Comm'n*, 721 F.3d 764, 774 (7th Cir. 2013); *see also* Decl. of

---

[16] These cost would include demobilization costs and the costs of storing steel that has already been received. Mathis Decl. ¶¶ 10–11, 15.

Christopher McLean Decl. ¶ 6, ECF No. 139 (describing benefits of MISO MVP portfolio based on administrative record before the Rural Utilities Service). An injunction would undermine the statutory roles and expertise of MISO and the states, and flout the comprehensive planning processes they undertook before approving the Project.

> 1.     **The Project is needed to improve the reliability of energy transmission in the midwestern region.**

The Project is needed to maintain the reliability and resilience of the regional transmission system, which will help prevent outages like during extreme weather events like those that beset Texas in mid-February, 2021. Shah Decl. ¶ 23, ECF No. 128. *See generally Ill. Com. Comm'n*, 721 F.3d at 772 ("The new transmission lines will also increase the reliability of the electricity supply in the MISO region and thus reduce brownouts and outages, and also increase the efficiency with which electricity is distributed throughout the region."). It is part of a transmission plan to provide a robust transmission system that is able to withstand disturbances such as weather fluctuations. Shah Decl. ¶ 23.

As Lianying Hecker, MISO's Senior Manager in System Planning, explains in her declaration, the region served by the Project is at a "high risk of energy emergencies during peak summer conditions" because of a capacity shortfall, and over the past few years emergency conditions are occurring with increasing frequency in other seasons as well. Hecker Decl. ¶¶ 12–13; *see also* Dagenais Decl. ¶¶ 18–19 (both filed concurrently). The shortfall stems in part from the retirement of coal-fired generation facilities. These expected shortfalls and increased threats to reliability this summer show that the urgent need for the Project continues. *Town of Weymouth, Mass. v. Mass. Dep't of Env't Prot.*, 973 F.3d 143, 146 (1st Cir. 2020) (finding that requested vacatur of approvals for natural gas project would be against public interest where "the project will be out of operation for most of the New England and Canadian winter heating season, when

demand for natural gas in the region is at its peak and shortages most likely") (citation omitted). Because of the adverse impacts that injunctive relief could have on the reliability of the transmission system, such relief would be contrary to the public interest. *Antwerp*, 2009 WL 2824771, at *8 (denying motion for preliminary injunction of 80-mile transmission project designed to reliably move power to load centers because "the public's interest lies in completion of the project and the provision of reliable electric service"); *Woida*, 446 F. Supp. at 1390 (preliminary injunction against construction of high-voltage transmission line was not in the public interest since "delay might cause a decline in the reliability of electric service for the approximately one million rural consumers"); *see also* Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, §§ 101, 201, 86 Fed. Reg. 7619 (Feb. 1, 2021) (United States must "move quickly to build resilience . . . against the impacts of climate change" by implementing "a Government-wide approach" to combat climate crisis through "deployment of clean energy technologies and infrastructure.").

### 2. An injunction that delays the Project's ability to deliver renewable energy is not in the public's interest.

To the generators waiting to bring their full capacity online to meet the Project's economic, reliability, and policy goals, the harms from delay are real and severe. "Developers of new large wind and solar plants in the upper-Midwest specifically are having difficulty interconnecting with the regional grid, because the pace of transmission expansion has not kept pace with the changing market." Decl. of Minnesota Center for Environmental Advocacy (Vohs) at ¶ 7, ECF No. 126. At this time, approximately 7,100 MW of renewable generation—enough to power millions of homes per year—have signed generator interconnection agreements that make their ability to feed their full potential into the grid contingent on the Project being built. Decl. of Tom Dagenais ¶¶ 54–60, 72, ECF No. 137 (explaining MISO's generator interconnection process and that these generators

enjoy only "conditional" status). Since October 2021, the total amount of renewable generation conditioned on the Project has increased by more than 2,000 MW, highlighting the ever growing need for the Project. Dagenais Decl. ¶ 10 (filed concurrently). Approximately 740 MW of that total consists of renewable generators located in Wisconsin that are or will be owned by Wisconsin utilities providing electric service to over two million Wisconsin residents. Dagenais Decl. ¶ 61, ECF No. 137.[17] Until the Project is placed in-service, existing and new renewable generators "could be unable to deliver their full output to the transmission system if the CHC Project is not constructed as planned." Decl. of Neil Shah ¶ 20, ECF No. 128.[18]

Generators in and outside of Wisconsin have provided evidence to this Court of how an injunction would harm them. For example:

- **ALLETE Clean Energy, Inc.** (ACE) is developing the 92 MW Red Barn wind project in Grant County, Wisconsin. McGiffert Decl. ¶ 6, ECF No. 125. That wind project will generate enough low-cost, sustainable energy to power approximately 40,000 homes, but is conditional upon the construction of the Cardinal-Hickory Creek Project. *Id.* ¶¶ 7–8. A delay in the Project's in-service date would impose significant additional risks upon this wind project. *Id.* .

- **EDF Renewables** owns and operates several wind facilities in the Midwest, including the Glaciers Edge Wind Project. Decl. of EDF Renewables, Inc. ¶¶ 4–5, ECF No. 123. EDF placed Glacier Hills into service in December 2019 with the expectation that the Project

---

[17] *See also* Decl. of Scott Smith and Daniel Krueger ¶¶ 1, 3–9, ECF No. 130; ALLETE Clean Energy Decl. (McGiffert) ¶¶ 7–8, ECF No. 125.

[18] *See also* Grace Decl. ¶¶ 11–12, ECF No. 134; Dagenais Decl. ¶¶ 58–61, 72, ECF No. 137; Allen Decl. ¶¶ 10–11, ECF No. 122; Decl. of Sean Brady ¶¶ 15–17, ECF No. 131; Vohs Decl. ¶ 8, ECF No. 126; Smith/Krueger Decl. ¶¶ 20–43, ECF No. 130; ROD016838–840, 016919–920, 016891–93.

would be built by the end of 2023. *Id.* ¶¶ 5–7. The Glacier Hills Project will remain subject to quarterly operating studies until the Cardinal-Hickory Creek transmission line is operating, and any delays in that in-service date could cause EDF to lose out on potential revenue from Glacier Hills. *Id.* ¶ 5.

- **Pattern Energy** plans to build a large wind generating facility in southwest Wisconsin. *See* Decl. of Pattern Energy ¶ 2, ECF No. 136. Uplands Wind I and II will be two 300 MW wind energy projects with enough output to power approximately 235,000 homes. *Id.* ¶ 4. The projects are expected to provide 450–600 construction jobs and 12–16 full-time jobs during operation. *Id.* ¶ 5. Wisconsin is attractive to developers like Pattern because of available transmission capacity, a skilled local workforce, and regional competitiveness. *Id.* ¶ 7. But if the Project is delayed, transmission constraints could impair Pattern's ability to develop the Project at its current scale and its ability to maintain lease option agreements related to the projects. *Id.* ¶¶ 9–10.

In addition to independent developers like ACE, EDF, and Pattern, a delay in the Project's in-service date could also harm electric utilities that provide retail service to Wisconsin ratepayers. Three of Wisconsin's largest electric utilities own the Badger Hollow solar project, a 300 MW solar project located in Grant County, Wisconsin that is conditioned on the Project. Smith/Krueger Decl. ¶¶ 7–8, 26, ECF No. 130. Those utilities, which provide retail electric service to approximately 1.75 million customers in Wisconsin invested approximately $390 million in the Badger Hollow project under the assumption that the Cardinal-Hickory Creek Project would go into service by December 2023. *Id.* ¶¶ 6, 9, 19. A delay of even *two months* to the Project's in-service date would cause these utilities to lose $15 to $20 million in capacity value in the 2024 planning year alone; they also stand to lose as much as $10,000 per day in energy market revenues

for every day the line is delayed. Smith/Krueger Decl. ¶¶ 21–43 (explaining Badger Hollow's lost capacity value and energy revenues in the event of Project delay).

### 3. The Project is needed to reduce losses of electricity and relieve congestion.

Altogether, the MVP portfolio's "high-voltage lines would reduce losses of electricity in transmission by $68 to $104 million, and save another $217 to $271 million" because "[f]ewer plants will have to be kept running in reserve to meet unexpected spikes in demand if by virtue of longer transmission lines electricity can be sent from elsewhere to meet those unexpected spikes." *Ill. Com. Comm'n*, 721 F.3d at 774. Given the need for the Project, as documented in the administrative record, federal agency decisionmakers have explained that "unnecessary delays" in its construction schedule may cause "increases or shifts in transmission congestion and related cost allocations which would adversely affect rural consumers and grid reliability." McLean Decl. ¶ 7, ECF No. 139. Any injunction that halts construction of the Project—whether temporarily or permanently—is likely to delay or prevent its congestion-related economic benefits, undermining the public interest. *See, e.g., Sierra Club*, 2020 WL 7389744, at *23 (denying motion for preliminary injunction of large-scale, electric transmission project that would connect Canadian hydropower to the New England grid, in part because "the Project will benefit Maine in a variety of ways, including by reducing rates, improving reliability, and reducing regional greenhouse gas emissions"); *Protect Our Cmtys. Found.*, 2011 WL 13356151, at *11–12 (denying motion for preliminary injunction of 117-mile transmission line between two counties as against public interest where the line would effectively mitigate transmission congestion and generate over $115 million per year in net benefits to consumers from reduced energy costs).

### 4. Preventing MISO from performing its assigned role under the Federal Power Act as the regional grid planner is not in the public interest.

An injunction also is not in the public interest because it would disregard critical findings about the Project made by the entities that—unlike this Court—are responsible for deciding which transmission projects are needed. Congress recognized in the Federal Power Act that "the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest." 16 U.S.C. § 824. Under the statute, regional transmission organizations (RTO) like MISO play an important role: "[e]ach RTO is responsible for planning and directing expansions and upgrades of its grid." *Ill. Com. Comm'n*, 721 F.3d at 770. Under the Act's regime, it is MISO and utility regulators in Iowa and Wisconsin—not federal agencies (let alone federal courts)—that decide in the first instance whether the Project is necessary and appropriate to protect the reliability of the electric grid, provide safe and affordable power to consumers, and support society's transition to carbon-free generation. *Id.* at 773 (in federal scheme for regulation of electricity, "the states retain authority over the location and construction of electrical transmission lines.").

MISO and two state utility commissions conducted the engineering, economic, and environmental analyses—and associated public proceedings—over the course of a decade. MISO studied the MVP portfolio for three years, holding more than 200 meetings and expending 35,000 hours of staff time. ROD014740. The Project addresses a need MISO identified with a high degree of specificity, including its endpoints, after three years of study. ROD005005–06 (describing MISO's rationale for endpoints, including need to connect the Hickory Creek and Cardinal substations in order to take advantage of "dominant" west-to-east flows of renewable energy; reach load centers in Madison and Milwaukee; and route power around the Quad Cities). It would be contrary to the public interest for the Court to simply disregard the extensive study and conclusions

-26-

that MISO made regarding the need for and benefits of the Project in its federally delegated role as regional grid operator.

> **5.      Injunctive relief that would deny effect to duly considered orders of the Wisconsin and Iowa state utility commissions is not in the public interest.**

The states of Wisconsin and Iowa also reviewed and approved the construction of this Project under their own standards. The States confirmed that the Project is needed to "provide[] usage, service or increased regional reliability benefits to the wholesale and retail customers or members in this state, and [that] the benefits of the facilities are reasonable in relation to their cost." ROD021252 (Wisconsin Certificate of Public Convenience and Necessity); *see also* Iowa Utilities Board, Docket No. E-22386 (May 27, 2020) (affirming that the Project in Iowa represents a "reasonable relationship to an overall plan of transmitting electricity in the public interest"). The PSCW held proceedings in which more than 50 parties, including Plaintiffs, intervened, generating "extensive proceedings and submissions." *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 516–17 (7th Cir. 2021). The Seventh Circuit recently recognized the comprehensive nature of the PSCW's process:

> The [Wisconsin] permitting process is complex. The Commission may grant a permit only if the transmission line is "in the public interest." [WIS. STAT.] § 196.491(3)(d)3. An application commences a highly technical inquiry. The Commission must consider a multitude of factors such as the reliability of the power supply, alternative sources of supply, economic factors, engineering obstacles, safety, and environmental impact.

*Id*. at 516; *see also id.* at 528 ("Wisconsin has created an elaborate permitting regime for important public-utility projects like this one . . . See generally WIS. STAT. § 227.53."). The results of this thorough process should not be lightly disturbed. The PSCW approved the Project in a unanimous, bipartisan decision that remains in effect to this day. ROD021246–1357. This Court should decline DALC's invitation to overrule its findings about need, costs, or benefits in an APA case

challenging federal agency decision-making.[19] *See, e.g., Protect Our Cmtys. Found. v. U.S. Dep't of Agric.*, 845 F. Supp. 2d 1102, 1117 (S.D. Cal. 2012) (finding that challenge to agency's analysis of alternatives to a transmission line was "a policy fight that specialized agencies charged to protect the public interest are best suited to resolve."), *aff'd* 473 Fed. App'x 790 (9th Cir. 2012); *compare with Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 997 (8th Cir. 2011) (enjoining a subset of company's activities where "outside of [company's] bare assertions . . . there was 'no other evidence of need . . . anywhere in the record'").

> ### 6. The Project furthers the public interest in changing the mix of generation to feature more renewable energy.

Enjoining the Project also would not serve society's interest in transitioning to renewable energy. "The promotion of wind power by the MVP program deserves emphasis." *Ill. Com. Comm'n*, 721 F.3d at 774. This Administration has emphasized renewable energy, noting that "[t]he United States and the world face a profound climate crisis" and directing federal officials to "identify steps that can be taken, consistent with applicable law, to accelerate the deployment of clean energy and transmission projects in an environmentally stable manner." Executive Order 14008, 86 Fed. Reg. 7619; *see also* White House Fact Sheet (Apr. 22, 2021) ("Meeting the 2030 emissions target will create millions of good-paying, middle class, union jobs – line workers who will lay thousands of miles of transmission lines for a clean, modern, resilient grid.")[20]; White

---

[19] The PSCW considered arguments that either stopping or delaying the Project would save electricity customers money and rejected those arguments. Plaintiffs should not be permitted to use this litigation as an end run around the PSCW's determination. *See Protecting Arizona's Res & Children v. Fed. Highway Admin.*, No. CV-15-00893, 2015 WL 12618411, at *5 (denying injunctive relief where plaintiffs "focused on harm to Defendants and taxpayers, not to Plaintiffs' immediate interests" and that "despite what his arguments suggested, Plaintiffs' counsel does not represent 'the taxpayers.'"); *compare with* Pls.' Br. at 6, 22 (asserting harms to ratepayers).

[20] Available at https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/22/fact-sheet-president-biden-sets-2030-greenhouse-gas-pollution-reduction-target-aimed-at-creating-good-paying-union-jobs-and-securing-u-s-leadership-on-clean-energy-technologies/.

House Fact Sheet (Jan. 12, 2022) ("This transmission buildout will make our grid more reliable and resilient in the face of intensifying extreme weather and is critical to achieving the President's goal of 100% carbon pollution-free electricity by 2035.")[21]; U.S. Dep't of Energy, Notice of Intent, *Building a Better Grid Initiative To Upgrade and Expand the Nation's Electric Transmission Grid To Support Resilience, Reliability, and Decarbonization*, 87 Fed. Reg. 2769, 2770 (Jan. 19, 2022) (DOE plans to "identify critical national transmission needs and support the buildout of long-distance, high-voltage transmission facilities," because transition to a clean energy economy "will be impossible . . .without doubling or tripling the size and scale of the Nation's transmission system."); *id.* (climate goals "require deploying interstate high-voltage lines connecting areas with significant renewable energy resources to demand centers . . . The most cost-effective renewable resources are often located in remote geographic areas far from the areas with the biggest demand.").

The Project will serve these important federal goals as well as help the States meet their renewable energy policy goals. Dagenais Decl. ¶ 67, ECF No. 137 (the Project is "part of a solution that enables new generation capacity in wind-rich areas to replace the older fossil fuel plants that are being retired throughout the region"); Vohs Decl. ¶ 11, ECF No. 126 (the Project meets "the urgent need to reduce regional greenhouse gas emissions to address climate change"); Decl. of Anne Smith, ¶¶ 11–14, ECF No. 127 (describing modeling showing Project will reduce regional carbon dioxide emissions by 100,000 to 1.2 million tons per year). Other courts have denied injunctive relief that would thwart the public's interest in transitioning to renewable energy. *W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (district court correctly declined

---

[21] Available at https://www.whitehouse.gov/briefing-room/statements-releases/2022/01/12/fact-sheet-biden-harris-administration-races-to-deploy-clean-energy-that-creates-jobs-and-lowers-costs/.

to enjoin solar project where court "properly took into account the federal government's stated goal of increasing the supply of renewable energy and addressing the threat posed by climate change, as well as California's argument the [] project is critical to the state's goal of reducing fossil fuel use, thereby reducing pollution and improving health and energy security in the state"); *Colo. River Indian Tribes*, 2015 WL 12661945, at *34–35 (denying motion for preliminary injunctive relief against solar project, and recognizing public interest in developing renewable energy on public lands); *Protect Our Cmtys. Found.*, 2011 WL 13356151, at *11–12 (denying motion for preliminary injunctive relief against 117-mile transmission line that "unlock the potential of one of the richest renewable energy regions in California" and advance state and federal policies to reduce GHG emissions); *La Cuna de Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior*, No. LA CV11-04466, 2011 WL 13130485, at *11 (C.D. Cal. Aug. 11, 2011) (denying motion for preliminary injunctive relief against solar project because "[t]he public also has a significant interest in obtaining new sources of renewable energy").

### E. Proposed amicus Citizens Utility Board of Wisconsin raises state law claims not properly before this court.

The Citizens Utility Board of Wisconsin, Inc. ("CUB") requests leave of the Court to appear in this proceeding as amicus curiae because, they explain*:* "CUB is concerned that Wisconsin customers are paying for wasteful, imprudent spending on a line that cannot carry power from Iowa to Wisconsin and therefore whose usefulness is entirely speculative and does not align with its approved purpose." ECF No. 227, at 2.

Every part of CUB's description of its interest in this case reveals that CUB belongs not here, but in front of the PSCW or the Federal Energy Regulatory Commission (FERC). The interests of Wisconsin electricity customers in the Project's prudence, cost, and purpose are matters exclusively reserved to the PSCW and FERC under the system of cooperative federalism set by

the Federal Power Act. The PSCW and FERC have established, accessible processes by which CUB can and does actively advocate on behalf of Wisconsin's electric ratepayers.

This proceeding, on the other hand, involves only the question of whether this Court was correct when, having found errors in the Rural Utilities Service's compliance with NEPA and FWS's administration of the Refuge Act, it declined to enjoin Project construction activity on non-federal lands where that construction is not regulated by either federal agency. Yet CUB's request of this Court inescapably would require this Court to assert jurisdiction to decide whether Project construction costs remain reasonable in relation to the state-determined benefits of the Project under Wis. Stat. § 196.491(3)(d)3t. CUB cites no authority, federal or otherwise, for this Court to take up those issues, and the Co-owners are aware of no precedent where a federal district court has stepped into the shoes of a state utility commission and FERC to pre-emptively rule on such matters for the purpose of enjoining state-regulated private activity on non-federal land.

CUB is forum shopping and, in doing so, demonstrating less than due regard for this Court's jurisdiction. CUB has already unsuccessfully pressed its claims before the PSCW. CUB initially expressed its opposition to the Project when it intervened in the PSCW proceeding in 2019, questioning how much of the power transmitted along the Project would be generated by fossil fuel stations.[22] The PSCW rejected CUB's arguments, finding that "there is substantial evidence that supports the applicants' finding that the [P]roject will support the interconnection of an additional 8.4 gigawatts (GW) of new renewable generation located both in Wisconsin and to

---

[22] *See Joint Application of American Transmission Company LLC, ITC Midwest LLC, and Dairyland Power Cooperative, for Authority to Construct and Operate a New 345 kV Transmission Line from the Existing Hickory Creek Substation in Dubuque County, Iowa, to the Existing Cardinal Substation in Dane County, Wisconsin, to be Known as the Cardinal-Hickory Creek Project*, Docket No. 5-CE-146, *Final Decision*, at 31 (Sept. 26, 2019) (PSCW REF#: 376391) (https://apps.psc.wi.gov/ERF/ERFview/viewdoc.aspx?docid=376391).

the west of the state."[23] Now, despite the PSCW's recognition that the Project is in the public interest, CUB is attempting to reopen the docket with claims that the Co-owners are "recklessly" overspending on the Project.[24] However, the PSCW has yet to issue a determination on CUB's request to reopen the docket, and it is unclear whether or when the PSCW will act on this request, as it is not required to do so within a designated time frame—or even at all. *See* Wis. Stat. § 196.39. If CUB feels aggrieved by a state commission's administration of state law, state court would be the right place to press any such grievance. Were CUB to be entirely candid with this Court, it would disclose their failed and ongoing efforts and explain that, unburdened by any authority or precedent or other adequate reason, they want this Court to substitute its judgment for that of the PSCW and, in effect, usurp the PSCW on a matter of state law.

CUB's participation as amicus would not aid the Court in resolution of the narrow question presented in this proceeding and would, in fact, serve only to insert irrelevant matters of state utility law into a case about federal law and federal decisions. The Court should deny CUB's motion and disregard their brief.

### F. Amicus Counties raise state law claims not properly before this Court

Dane and Iowa counties (the "Counties") have moved to participate as amicus curiae in this proceeding. ECF No. 225. They support an injunction "in the public interest." ECF No. 225-1, at 4. This Court should deny the Counties' participation as amicus and disregard their brief because it is no more than an attempted collateral challenge to the use of eminent domain under

---

[23] *Id.*

[24] *Id.*; *Joint Application of American Transmission Company LLC, ITC Midwest LLC, and Dairyland Power Cooperative, for Authority to Construct and Operate a New 345 kV Transmission Line from the Existing Hickory Creek Substation in Dubuque County, Iowa, to the Existing Cardinal Substation in Dane County, Wisconsin, to be Known as the Cardinal-Hickory Creek Project*, Docket No. 5-CE-146, *CUB Letter Requesting Reopening of Docket* (Jan. 28, 2022) (PSCW REF#: 430102) (https://apps.psc.wi.gov/ERF/ERFview/viewdoc.aspx?docid=430102).

Wisconsin state law for the Project. Wisconsin eminent domain law is not before the Court in this case. Nor is Wisconsin utility law. Nor is any agency of Wisconsin government a party. This is a federal APA case involving federal decisions under NEPA and the Refuge Act. Plaintiffs raised no claims involving eminent domain. This Court's March 1, 2022 Order, ECF No. 195—the only subject of this proceeding—is entirely unrelated to any aspect of federal Constitutional or Wisconsin state law. Neither the Counties or any other party has suggested that this Court somehow failed in some cognizable duty to apply Wisconsin state eminent domain law when it declined Plaintiffs' repeated urging to enjoin the Project as a matter of federal law. The absurdity of the Counties' premise is fully revealed by simple articulation of their logic in writing. The Counties' attempt to participate as amicus is manifestly irrelevant to the case and unhelpful to this Court.

Were the Court inclined to overlook the failure of the Counties to offer any form of assistance to the proper resolution of this proceeding and grant the Counties' motion to participate as amicus, the Counties' arguments suffer from at least three fatal flaws.

First, Wisconsin law provides the process—the only process—for attacking the validity of a use of condemnation under Wisconsin law. Second, the Constitution's Takings Clause protects property owners; it does not provide standing for third-party collateral attacks. Third, an injunction is not the appropriate remedy for concerns regarding eminent domain.

### 1. Section 32.06(5) of the Wisconsin statutes is the only method for challenging the validity of condemnation in Wisconsin.

Wisconsin law provides the procedure to be followed when a landowner wants to challenge condemnation. Section 32.06, subdivision 5, of the Wisconsin Statutes provides the method for a landowner who "desires to contest the right of the condemnor to condemn the property described in the jurisdictional offer for any reason other than that the amount of compensation offered is

inadequate[.]" Under that process, the landowner may challenge the condemnation by commencing an action in the "circuit court of the county wherein the property is located, naming the condemnor as defendant" within 40 days of the service of the jurisdictional offer, a key statutory step prior to the commencement of a condemnation action. Wis. Stat. § 32.06(5).

This "Right-to-Take" Challenge, pursuant to Section 32.06(5), "shall be the only manner in which any issue other than the amount of just compensation . . . may be raised pertaining to the condemnation of the property described in the jurisdictional offer." *See Falkner v. N. States Power Co.*, 248 N.W.2d 885, 889 (Wis. 1977) "(the owner's action [under Wis. Stat. § 32.06(5)] is now the *only manner* in which issues pertaining to the condemnation may be raised, except for those of title and just compensation . . .") (emphasis added); *DSG Evergreen Family Ltd. v. Town of Perry,* 939 N.W.2d 564, ¶ 22 (Wis. 2020) (explaining that a Section 32.06(5) action "is the only opportunity to raise an objection to the authority's right to acquire the property"); *Waller v.* ATC, 30 Wis.2d 242, ¶ 66 (2013) (citing the statute and explaining that a Section 32.06(5) action "shall be the only manner" in which to challenge the validity of a taking).

Even aside from Wisconsin's straightforward statutory prohibition on attacks on condemnation outside of the Section 32.06 process, collateral attacks on the propriety of a condemnation in federal court in non-condemnation actions are inappropriate. "[I]n nearly all cases the question of whether the land to be acquired will be devoted to a public purpose is more appropriate for the state court to make in the condemnation proceedings." *Green St. Ass'n v. Daley*, 373 F.2d 1, 6 (7th Cir. 1967) (citing *Zurn v. City of Chicago*, 59 N.E.2d 18 (Ill. 1945)). *See Shaikh v. City of Chicago*, 341 F.3d 627, 633 (7th Cir. 2003) (explaining that a landowner's proper method of challenging the City's condemnation action was to wait until the City "undertook action in a

state court to initiate condemnation proceedings" and then "raise his challenges to the City's actual exercise of their eminent-domain power").

Concerns about the use of eminent domain for the Project can and must be raised in the corresponding state court condemnation actions.[25]

### 2. The takings clause protects property owners—it does not provide remedies to third parties.

A landowner can challenge the necessity and public purpose relied upon for condemnation of their property. But third parties—parties other than the property owner whose property is condemned—cannot bring collateral attacks on those condemnations in other court actions. "[O]nly those who have suffered a legally recognized injury as a result of the exercise of eminent domain authority may challenge its constitutionality." *Nichols on Eminent Domain*, § 3.04[10] (rev. 3d ed.). No one other than the owner has the right to complain about the constitutionality of a taking. Here, the Counties attempt to rely on injuries that are derivative of purported injuries to private landowners. Such vicarious injuries would be insufficient to support standing in a case brought by the counties and should be rejected. *W. Expl., LLC v. U.S. Dep't of the Interior*, 250 F. Supp. 3d 718, 732 (D. Nev. 2017) ("[P]olitical subdivisions, such as cities and counties, whose power is derivative and not sovereign, cannot sue as *parens patriae*.").

### 3. An injunctions is not an appropriate remedy for eminent domain concerns.

If a use of condemnation does not meet the statutory and constitutional requirements, there is a process for it to be challenged, as discussed above. The general remedy for a taking is "just compensation," as provided by the Constitution. An injunction is not typically appropriate. *See*

---

[25] This venue has already dismissed a takings claim brought by third-parties in cases that are not the actual state condemnation actions. *See* Opinion and Order, Doc. 176-2, Court File No.19-cv-1007, at 28 (filed Dec. 4, 2020).

*Knick v. Township of Scott, Pa*, 139 S. Ct. 2162, 2177 (U.S. 2019) ("Given the availability of post-taking compensation, barring the government from acting will ordinarily not be appropriate."). Essentially, the taking can either be stopped in the first place within the condemnation action, or compensation will be owed. Landowners are guaranteed just compensation by the condemnation process. Enjoining the Project because of the Counties' concerns about the use of eminent domain would not be supported by law.

### G. If the Court grants an injunction pending appeal, it should require DALC to post a bond in the amount of $40,713,766 to secure the Co-owners' rights.

Plaintiffs argue that because the Court did not impose a bond when it granted preliminary relief, it should not do so here either. That decision, however, was explicitly premised on the fact that the Court's narrow injunction applied to less than 20 acres of work, as to which the Co-owners had not quantified their damages, and the Court's expectation that the injunction would last no longer than 30–60 days. ECF No. 160, at 20 n.8. If the Court grants an injunction pending appeal, it should require Plaintiffs to post a bond in the amount of at least $40,713,766 to cover the increased costs of construction and ATC's lost profits. At a minimum, Plaintiffs should be required to post a bond of $7,137,366 to secure ATC's rights to the six months' worth of profits it will have no ability to recover. Federal Rule of Civil Procedure 62(d) provides that, while an appeal is pending from a final judgment that refuses an injunction, the district court may grant an injunction "on terms for bond or other terms that secure the opposing party's rights." The Seventh Circuit has expressly *rejected* a rule that "nonprofit entities should be exempt from having to post injunction bonds, or a slightly narrower rule that would pick and choose among them on the basis of likely contribution to the overall public welfare." *Habitat Educ. Ctr.*, 607 F.3d at 459; *see also Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 786 F.2d 794, 796 (7th Cir. 1986) (under Rule 62(d), as relevant here, "an inflexible requirement of a bond would be inappropriate" only "where the

defendant's ability to pay the judgment is so plain that the cost of the bond would be a waste of money").

Plaintiffs fail to meet any of the exemptions courts recognize when issuing an injunction bond. First, courts have refrained from ordering an injunction bond when the court was "satisfied that there's no danger that the opposing party will incur any damages from the injunction." *Habitat Educ. Ctr.*, 607 F.3d at 458. Here, however, there is no question that the Co-owners will suffer significant harm should this Court order an injunction pending appeal. *See* section III.C., *supra*.

Second, in cases where a bond "that would give the opposing party absolute security against incurring any loss from the injunction would exceed the applicant's ability to pay," courts may balance the "relative cost to the opponent of a smaller bond against the cost to the applicant of having to do without a preliminary injunction[.]" *See* 607 F.3d at 458; s*ee also Milwaukee Inner-City Congregations Allied for Hope v. Gottlieb*, 944 F. Supp. 2d 656, 677–78 (W.D. Wis. 2013). Here, Plaintiffs make conclusory statements that they are "small nonprofit organization[s] with a limited budget," and that their funds are "restricted" and "can only be used for limited purposes." ECF No. 222 at ¶¶ 54–55, 57–58, 63, and 65. However, Plaintiffs fail to demonstrate that their financial resources "are so scarce that they could not afford to post a bond," that would provide at least some protection to the Co-owners, if not fully "secur[ing] their rights" as the Rule exhorts. *See Habitat No. Educ. Center*, 607 F.3d at 460 ("The innocent may be a private firm or a government agency or a hapless individual (or even another nonprofit), but that doesn't make it or him or her unworthy of the law's protection."); *see also Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 297 F.R.D. 633, 636 (N.D. Ala. 2014) (declining to waive bond under Rule 65(c) "where the damages that may be sustained would be enormous, and/or where the plaintiffs

are financially incapable of posting a fair and realistic bond"); *see also Save Our Sonoran*, 408 F.3d at 1125 (affirming imposition of $50,000 security under Fed. R. Civ. P. 65(c) in NEPA case).

Plaintiffs fail to cite any case in which a court declined to impose a bond because monies that could be used to satisfy it were allegedly donated subject to restrictions on their use. Those restrictions do not alter this Court's equitable authority and, if Plaintiffs wish to honor them, they can simply elect not to post one rather than bear the risk that Defendants' appeals will prevail in the Seventh Circuit.

## III.    CONCLUSION

For the reasons stated above, the Co-owners respectfully request that this Court deny Plaintiffs' emergency motion for injunction pending appeal.

DATED: June 10, 2022                          Respectfully submitted,

_s/ Thomas C. Jensen_
Thomas C. Jensen
Edward A. Boling
Stacey Bosshardt
**PERKINS COIE LLP**
700 Thirteenth St. NW Suite 800
Washington, D.C. 20005-3960
Tel: (202) 654-6200
Fax: (202) 654-6210
TJensen@perkinscoie.com
TedBoling@perkinscoie.com
SBosshardt@perkinscoie.com

David Zoppo
**PERKINS COIE LLP**
33 E. Main Street, Suite 201
Madison, WI 53703
Tel: (608) 663-7460
Fax: (608) 663-7499
DZoppo@perkinscoie.com

_Attorneys for Intervenor-Defendants_
_American Transmission Company LLC by_
_its corporate manager, ATC Management_
_Inc.,_
_ITC Midwest LLC, and Dairyland Power_
_Cooperative_

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2022, I electronically filed the forgoing document with the

Clerk of Court using the Court's ECF system, which will serve the document on all counsel of

record registered for electronic filing in the above-captioned proceeding.


Dated: June 10, 2022                     /s/ Thomas C. Jensen
                                         Thomas C. Jensen